UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA | ) ) ) | |
| v. | ) ) | No. 16-cr-10137-LTS |
| KENNETH BRISSETTE and TIMOTHY SULLIVAN, | ) ) ) ) | |
| Defendants. | ) ) ) | |

ORDER ON DEFENDANTS' RENEWED MOTION TO
DISMISS (DOC. NO. 159) AND OTHER PENDING MOTIONS

February 28, 2018

SOROKIN, J.

The government has charged Kenneth Brissette and Timothy Sullivan in a Third Superseding Indictment ("the TSI") with conspiracy and extortion in violation of the Hobbs Act, 18 U.S.C. § 1951. Nine months ago, the Court denied motions filed by the defendants seeking dismissal of the charges against them. Doc. No. 106.[1] Thereafter, United States v. Burhoe, 871 F.3d 1 (1st Cir. 2017), construed certain elements of Hobbs Act extortion that are relevant to this case. The government responded to Burhoe by seeking a Second Superseding Indictment ("the SSI"), Doc. No. 143, then the TSI, Doc. No. 177.

The defendants have renewed their motions to dismiss in light of Burhoe's discussion of the elements of extortion. See generally Doc. No. 159. They also seek access to the legal

---

[1] Citations to "Doc. No. ___" are to documents appearing on the Court's electronic docket. They reference the docket number assigned by CM/ECF, and include pincites to the page numbers appearing in the top right corner of each page within the header appended by CM/ECF.

instructions provided to the grand jury, Doc. Nos. 119, 161; exclusion of evidence related to Brissette's alleged involvement in a union dispute with another company, Doc. No. 125; and severance of the charges against Sullivan, Doc. No. 117.

For the reasons that follow, the defendants' motions are DENIED.

I. BACKGROUND[2]

The Court laid out the facts alleged by the government in its ruling on the defendants' previous motions to dismiss. Doc. No. 106 at 2-5. The TSI includes the same charges and contains substantially the same factual allegations as the previous iterations of the indictment did, with one change relevant for present purposes: the government now defines the property the defendants allegedly extorted from Crash Line as "money to be paid as wages and employee benefits and as wages and employee benefits pursuant to a contract with IATSE Local 11." Doc. No. 177 ¶¶ 20, 22; compare Doc. No. 17 ¶¶ 20,[3] 21 (alleging in FSI that property extorted was "money to be paid as wages for imposed, unwanted, and unnecessary and superfluous services and wages and benefits to be paid pursuant to a labor contract with Local 11").

Until the SSI, the government's theory of the case was that the defendants, acting as agents of Local 11, had impliedly threatened Crash Line's permits and explicitly threatened a picket in order to compel an unwilling employer to hire union workers to perform actual (albeit unwanted) work, and had "obtained" the resulting wages on behalf of the union. Doc. No. 83-1 at 2-3; Doc. No. 86 at 12-13; Doc. No. 115 at 7. It seems all parties here believe that Burhoe substantially undermined that theory. See 871 F.3d at 20 (reversing extortion convictions based

---

[2] The Court presumes an indictment's allegations are true for purposes of assessing their sufficiency. United States v. Perry, 37 F. Supp. 3d 546, 548 (D. Mass. 2014).
[3] The FSI contained two paragraphs numbered 20. This citation is to the first of those paragraphs, which appeared on page 6 of the FSI.

2

on jury instructions which "impermissibly relieved the government from having to prove that the work [sought by union member defendants] was 'fictitious'" and erroneously "could have allowed the jury to find a violation merely because the union sought to turn around nonunion jobs to maintain the prevailing wage through . . . a threatened picket" where "the employer did not want to use the union workers to perform the work").[4]

After Burhoe, the government obtained the SSI, signaling a change in the government's theory of the case.  In particular, the government abandoned its view that the defendants acted as agents of Local 11, changed its description of the "property" extorted, and adopted a theory that the defendants—acting solely as agents of the City—impliedly threatened to withhold permits in order to "obtain" the relevant wages and benefits by directing Crash Line to pay them to members of Local 11.  Doc. No. 164 at 5-6, 12-13; Doc. No. 179 at 8, 45-47; accord Doc. No. 142 at 14.

The defendants moved to dismiss the SSI, incorporating their previous memoranda regarding dismissal, and supplemented their request for disclosure of the Grand Jury instructions. Doc. Nos. 159, 161.[5]  The Court heard oral argument on January 31, 2018.  That morning, the government obtained the TSI, which it said corrected minor drafting errors and eliminated confusion in the language of the charging paragraphs.  The parties agree that the issues raised by the pending motions apply with equal force to the TSI.

---

[4] Burhoe does not address conduct outside the scope of "protected union activity"—such as threats to withhold permits—or whether defendants who are not union members or agents may pursue legitimate labor objectives.

[5] The Court has considered all of the briefs submitted by each party in connection with the defendants' requests for dismissal in the wake of Burhoe.  The Court treats the most recent motion as the operative dismissal request, and directs the Clerk to TERMINATE previous iterations of that request.

II.  MOTION TO DISMISS

   A.  Legal Standard for Dismissal

The standards controlling a motion to dismiss a lawfully returned criminal indictment are set forth in the Court's decision denying the defendants' original dismissal requests, Doc. No. 106 at 6-7, and the "heavy burden" placed on a defendant seeking dismissal has not eased in the intervening time, United States v. Perry, 37 F. Supp. 3d 546, 550 (D. Mass. 2014).  In fact, the First Circuit reiterated the same principles just last month, explaining that "[a]n indictment need not say much to satisfy" the Constitution's requirement that a defendant "be informed of the nature and cause of the accusation."  United States v. Stepanets, 879 F.3d 367, 372 (1st Cir. 2018).  The Stepanets decision further emphasized that if a defendant's theory supporting dismissal depends "on disputed facts that [he] want[s] found in [his] favor," such as "contested facts surrounding the commission of the alleged offense," the "situation . . . calls for a trial" because "no court may consider [such facts] before trial."  Id. at 375 (quotation marks omitted).

As the defendants acknowledge, the criminal rules do not provide a mechanism akin to summary judgment.  Doc. No. 160 at 18.  The limited circumstances in which courts in other jurisdictions have construed Rule 12(b) to permit consideration of information beyond the challenged indictment when assessing a pretrial dismissal request do not encompass the circumstances presented here.  See United States v. Del Valle-Fuentes, 143 F. Supp. 3d 24, 26-27 (D.P.R. 2015) (collecting cases permitting resolution of challenge to legal sufficiency of government's evidence via Rule 12 motion "when the facts are undisputed, the government does not object to the procedure, and the only question is a legal one").  In this case, the government has explicitly requested that the Court limit its review to the four corners of the charging document, and has declined to stipulate to a set of facts sufficient to reduce the question

presented to a purely legal one. Doc. No. 179 at 35. Under these circumstances, the Court may not engage in a broad assessment of the legal sufficiency of the government's evidence.

B.     Discussion

The defendants argue that Burhoe renders the government unable to prove two elements of Hobbs Act extortion: "wrongful" use of economic fear, and the "obtaining" of property by the defendants. See generally Doc. No. 160. According to the defendants, the indictment does not describe a crime because it fails to allege the wages at issue were paid for "fictitious" services, and it further fails to allege that the wages were paid to the defendants themselves. Id. at 6-18.

Regarding each challenged element, the TSI does all that the law requires: it tracks the language of the Hobbs Act. See Doc. No. 177 at ¶ 22 (alleging "the defendants . . . attempted to obtain and did obtain" the identified property from Crash Line, and that they did so "by the wrongful use of fear of economic harm" (emphasis added)). The defendants' attacks as to both elements turn on facts beyond the TSI which the Court cannot consider at this time. Stepanets, 879 F.3d at 375; see Doc. No. 106 at 8-9 (rejecting defendants' previous challenge to allegations regarding "obtain" for similar reasons); compare, e.g., Doc. No. 160 at 8 (urging that "the sum and substance" of the economic harm threatened was a picket by union members), with Doc. No. 164 at 6 (characterizing the economic harm threatened as "withholding or delaying permits"); compare also Doc. No. 160 at 15-18 (arguing that neither defendant "receive[d]," "acquire[d]," or "obtain[ed] – in the plainest meaning of that word imaginable" "any of the property at issue"), with Doc. No. 164 at 12-13 (implying that the defendants directed the property "to an identifiable person associated with" them, and urging that "whether the defendants received [a personal] benefit is a question of fact for the jury").

5

Nonetheless, the defendants urge that this is a once-in-a-blue-moon criminal case in which dismissal is warranted. They describe the limits of the evidence disclosed to them in discovery and point to factual concessions the government has made that bear on its ability to prove the defendants "obtained" the property at issue. See, e.g., Doc. No. 179 at 36-37 (stating there will be no evidence that the defendants themselves received any portion of the wages at issue or any other personal financial benefit from Crash Line or Local 11, nor will there be evidence that Local 11 promised any specific future action in exchange for success in securing the relevant work). The Court declines to reach the legal questions argued by the defendants on the motion to dismiss—notwithstanding their persuasive argument that such questions should be answered now—given both the government's objection and its assertion that not all of the possibly relevant facts are presently before the Court. Cf. United States v. Wolff, 840 F. Supp. 322, 322-25 (M.D. Pa. 1993) (dismissing under Rule 12(b), over government's objection, in "unusual" case where both sides presented "consistent" set of straightforward facts forming the basis for contempt charge, and such facts showed a lack of probable cause supporting the indictment rather than a "factual defense").

Thus, based solely on the language of the TSI, the motion to dismiss is DENIED.

C. The Meaning of "Obtain"

One further point bears mention. Litigation of the motions to dismiss has served an important secondary purpose: it has illuminated the parties' divergent views of how they believe the Court should instruct the jury regarding certain legal elements of extortion. The proposed jury instructions submitted recently reflect the same divergent views. From the government's perspective, a defendant "obtains" property for Hobbs Act purposes if he directs one third party to transfer the property to another third party, without ever receiving any portion of the property

6

or deriving any personal benefit from it whatsoever. Doc. No. 179 at 36; Doc. No. 183 at 26. The defendants propose a different instruction. Doc. No. 185 at 13. After careful consideration of the law and the parties' substantial submissions on this issue, and in light of the anticipated evidence at trial as described in the government's trial brief, Doc. No. 184 at 1-6, the Court presently intends to instruct the jury on the meaning of "obtain" as follows:

> To prove this element, the government must prove beyond a reasonable doubt that Crash Line was deprived of its property, and that <u>the defendants</u> acquired <u>that property</u>. A defendant "obtains" property for these purposes when he either: 1) takes physical possession of some or all of the property; 2) <u>personally</u> acquires the power to exercise, transfer, or sell the property; or 3) directs the victim to transfer the property to an identified third party <u>and</u> personally benefits from the transfer of the property. It is not enough for the government to prove that the defendants controlled the property by directing its transfer to a third party, nor is merely depriving another of property sufficient to show that <u>the defendants</u> "obtained" that property.
>
> Under the third theory of "obtaining," you must determine, based on all of the evidence before you, whether the defendants personally benefitted from the transfer of the property. Instances in which a defendant personally benefits from the transfer of property could include: when the defendant or an organization of which he is a member receives a thing of value other than the property as a result of the transfer; when the defendant directs the property to a family member or to an organization of which the defendant is a member; and/or when the defendant directs the property to a person or entity to whom the defendant owes a debt, intending that the transfer of property will satisfy that debt. A defendant does not personally benefit from the transfer of property when he merely hopes to receive some future benefit, or when he receives a speculative, unidentifiable, or purely psychological benefit from it.

See <u>Sekhar v. United States</u>, 570 U.S. 729, 733-35 & n.4 (2013); <u>Scheidler v. Nat'l Org. for Women, Inc.</u>, 537 U.S. 393, 402-09 & n.8 (2003); <u>United States v. Burhoe</u>, 871 F.3d 1, 9-10, 26-27 (1st Cir. 2017); <u>see also</u> <u>Honeycutt v. United States</u>, 137 S. Ct. 1626, 1632 (2017). This also is the legal standard against which the Court will evaluate the evidence

on any motion for judgment of acquittal filed by the defendants at the close of the government's case-in-chief or after a verdict.[6]

III. OTHER MOTIONS

    A. Grand Jury Instructions

The defendants have requested an order requiring the government to produce any legal instructions provided to the Grand Jury that returned the SSI. Doc. Nos. 119, 120, 161. When the government superseded for a third time, the defendants orally expanded their motion to include any legal instructions provided in connection with the TSI. Doc. No. 179 at 90. These requests arise from the defendants' speculation that any instructions given may not have described the elements of Hobbs Act extortion accurately in light of Burhoe.

The government opposed the defendants' motion, but offered to provide the instructions given in connection with the SSI for the Court's in camera review. Doc. No. 164 at 17. The Court accepted the government's offer, Doc. No. 172, the government provided to the Court an audio recording and a transcript of the legal instructions provided to the Grand Jury returning the SSI, Doc. No. 176, and the Court has reviewed those instructions.

Based on that review, coupled with the government's representation in sealed proceedings regarding the status of its instructions in connection with the TSI, and given the Court's conclusion above that the TSI is facially valid, the Court perceives no irregularity or error warranting further examination or disclosure of Grand Jury materials. Accordingly, the grand jury motion (Doc. No. 119) is DENIED.

---

[6] Of course, the foregoing is subject to revision or supplementation in the event that the evidence at trial meaningfully differs from the description provided in the government's trial brief, or in light of any further legal argument.

B.    Other Acts Evidence

The TSI contains allegations pertaining to Brissette's involvement in a dispute between another local union and companies filming the "Top Chef" reality television show in Boston during the summer of 2014. That dispute culminated in a conflict between representatives of a local union and members of the "Top Chef" cast and crew at a restaurant in Milton. Four members of the union were prosecuted, tried, and acquitted of extortion charges in connection with those events. Verdict, United States v. Fidler, No. 15-cr-10300, ECF No. 325 (D. Mass. Aug. 15, 2017); Superseding Indictment, United States v. Fidler, No. 15-cr-10300, ECF No. 34 (D. Mass. Oct. 6, 2015). The events in Milton that were the focus of the separate "Top Chef" trial are not relevant in this case. The only "Top Chef" evidence that the government intends to present here supports allegations in the TSI that Brissette withheld permits due to the failure of the company filming "Top Chef" to resolve the concerns of the relevant union (which was not Local 11), that he said a union contract was necessary for permitting success when promotions for the show were to be shot thereafter, and that he was told in or around the summer of 2014 that such demands were not permissible. Doc. No. 177 at ¶¶ 8-15. For purposes of this case, the universe of "Top Chef" evidence is limited to those discrete areas, which is all the government seeks to offer here.

Brissette requests a ruling precluding the government from presenting the "Top Chef" evidence at trial. Doc. No. 125. He also asks the Court to strike the portions of the TSI containing allegations related to "Top Chef." Doc. No. 126 at 1. In Brissette's view, the "Top Chef" allegations are irrelevant to proving the charges in this case and, even if relevant, are likely to confuse the issues, mislead the jury, waste time, and unfairly prejudice him. See generally id. at 5-14. Because the government has articulated theories pursuant to which at least

9

some "Top Chef" evidence would be both relevant and admissible in this case, Brissette's motion is DENIED.

The evidence (as the government has described it) plainly is relevant to an element the government must prove as to each of the crimes charged: Brissette's willfulness, knowledge, and/or intent. It also is relevant to establishing and explaining the government's allegation that the defendants' interactions with Crash Line conveyed implicit, rather than explicit, threats to withhold permits.[7] Moreover, the government has identified uses, beyond showing mere propensity, for which Rule 404(b) allows such "other acts" evidence to be admitted: specifically, Brissette's knowledge, the absence of mistake or accident, and the alleged existence of a common plan during the relevant time period to coerce companies producing events in Boston to hire union workers. Doc. No. 140 at 5-7; see United States v. DeCicco, 370 F.3d 206, 210-11 (1st Cir. 2004) (explaining "evidence may be admissible . . . even if it may be construed as propensity evidence, if it is used to show any of the other elements set out in" Rule 404(b), including a "common plan or scheme").

Furthermore, on the present record, the Court is not persuaded that the "Top Chef" evidence fails the balancing test required by Rule 403 as a general matter. The government represents that its evidence in this regard (not including the defendants' cross-examination and response thereto) will take approximately one trial day. Doc. No. 179 at 15. Even allowing that the defense might spend an equal or greater amount of time challenging the government's presentation of this evidence, there is no basis for concluding the "Top Chef" evidence will be so

---

[7] To the extent Brissette asserts that prior conduct and warnings related to permits are irrelevant here because this case involves only a threatened picket, he ignores the government's stated theory of the case and the TSI's explicit allegation that Crash Line "was awaiting the issuance of certain permits and approvals" during the relevant time period. Doc. No. 177 at ¶¶ 16, 18. Whether permit-related threats were conveyed or perceived here will be resolved at trial.

10

time-consuming as to unreasonably prolong the trial. Brissette's concerns regarding jury confusion and improper or prejudicial consideration of the evidence by jurors can be ameliorated by clear and timely limiting instructions. And finally, the Court perceives nothing in the Burhoe decision that impacts the admissibility of the "Top Chef" evidence at this trial.

Accordingly, the Court finds no basis to categorically exclude the "Top Chef" evidence. If the defendants wish to pursue specific challenges to particular testimony or documents within this category of evidence, they may do so via motions in limine at the appropriate time.

C.   Severance

Sullivan asks the Court to sever the defendants' trials, arguing that he will suffer an "undue risk of guilt by association with Brissette and the Top Chef allegations," and that limiting instructions will not adequately mitigate that risk. See generally Doc. No. 118. Sullivan's challenges stemming from the "Top Chef" allegations fare no better than Brissette's.

As Sullivan acknowledges, id. at 7, the general rule that defendants who are indicted together are tried together means that severance is warranted only upon a strong showing of prejudice to the defendant seeking it, United States v. Soto-Beniquez, 356 F.3d 1, 29 (1st Cir. 2003). Where conspiracy is charged, "severance is particularly difficult to obtain," and for good reason. Id. Sullivan has not shown a serious risk that his right to a fair trial will be compromised if he is tried with Brissette; none of the reasons he cites as grounds for his motion persuade the Court that it should exercise its discretion to require separate (and, largely, duplicative) trials.

Sullivan's concerns about the "sensationalized" nature of the government's recent prosecution of union members on extortion charges for conduct generally related to the "Top Chef" allegations ignores the fact that an impartial jury was successfully empaneled in that case, and that a majority of the most publicized events at issue in that prosecution will not be part of

11

this case.  There is no reason to believe that Sullivan's worry about juror exposure to news reports related to the previous "Top Chef" trial cannot be addressed by careful voir dire of prospective jurors, or that his fear of prejudicial spillover of evidence admissible solely against Brissette cannot be addressed by firm and timely limiting instructions.  See Weeks v. Angelone, 528 U.S. 225, 234 (2000) ("A jury is presumed to follow its instructions.").

To the extent Sullivan believes the "Top Chef" evidence has "zero relevance" to him, Doc. No. 118 at 9, that he and Brissette "have markedly different degrees of culpability," id. at 11, and that "there could be a substantial amount of evidence against Brissette that has nothing to do with Sullivan," id. at 12, the Court cannot grant the uncommon remedy of severing co-conspirators for separate trials based on such characterizations, as they are not supported by the current record.  The government may—and, indeed, has stated it intends to—offer evidence from which jurors could infer that Sullivan was at least aware of the "Top Chef" events (and, thus, that evidence of those events bears on his knowledge and intent during the interactions giving rise to the charges in this case).  Doc. No. 140 at 11; Doc. No. 179 at 27.  Moreover, any difference in the relative culpability of the two defendants is not sufficient to warrant severance.

The remainder of Sullivan's motion repeats arguments already discussed and rejected above in explaining the denial of Brissette's "Top Chef" motion.  See Doc. No. 118 at 13-18 (seeking exclusion of the evidence based on relevancy and prejudice).  For all of these reasons, Sullivan's motion is DENIED.

IV. CONCLUSION

In light of the foregoing discussion, the Court hereby makes the following rulings:

1) The defendants' motion to dismiss (Doc. No. 159) is DENIED;

2) The defendants' prior iterations of that motion (Doc. Nos. 121, 123) are TERMINATED;

3) The defendants' motion to produce Grand Jury instructions (Doc. No. 119) is DENIED;

4) Brissette's motion to exclude "Top Chef" evidence (Doc. No. 125) is DENIED without prejudice to the defendants asserting future challenges to specific items of evidence within this larger category; and

5) Sullivan's motion to sever (Doc. No. 117) is DENIED.

              SO ORDERED.

               /s/ Leo T. Sorokin
              United States District Judge