UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | Crim. No. 16-10137-LTS |
| | ) | |
| (1) KENNETH BRISSETTE, and | ) | |
| (2) TIMOTHY SULLIVAN | ) | |
| Defendants | ) | |

**GOVERNMENT'S OPPOSITION TO DEFENDANTS' MOTION FOR RECONSIDERATION OF THEIR RENEWED MOTIONS TO DISMISS**

The United States of America, by Andrew E. Lelling, United States Attorney, Laura J. Kaplan and Kristina E. Barclay, Assistant United States Attorneys for the District of Massachusetts, submits this opposition to defendants' motion to reconsider their renewed motion to dismiss (Docket No. 243)("the Motion") the Third Superseding Indictment ("TSI"). Defendants' Motion repeats the evidentiary sufficiency arguments made in their original motions to dismiss (Docket Nos. 82-84) and renewed motions for dismissal of the indictment (Docket No. 124), and claims that the last three pages of the First Circuit's decision in *United States v. Brissette,* 919 F.3d 670, 685 (1st Cir. 2019), requires dismissal on the issue of wrongfulness. Because the First Circuit in *Brissette* was not asked to consider any issue relating to wrongfulness, and did not have before it a full record as to that issue, its opinion does not hold the precedential value defendants claim. The TSI more than sufficiently apprises defendants of the charged Hobbs Act offenses, and because nothing has changed since the last time the Court refused to dismiss the indictment in this case, the Court should deny the Motion.

1

**ARGUMENT**

The TSI sufficiently apprises defendants of the charged Hobbs Act Offenses and should not be dismissed. In its Order denying defendants' original motions to dismiss, this Court noted that the question presented by a motion seeking dismissal of a lawfully returned criminal indictment "is not whether the government has presented enough evidence to support the charge, but solely whether the allegations in the indictment are sufficient to apprise defendants of the charged offense." Order on Defendants' Joint Motions to Dismiss (Docket Nos. 82, 84), Docket No. 106, at 6 (*quoting United States v. Savarese*, 686 F.3d 1, 7 (1st Cir. 2012)). An indictment will survive dismissal "'if it specifies the elements of the offense charged, fairly apprises the defendant of the charge against which he must defend, and allows him to contest it without fear of double jeopardy.'" *United States v. Stewart*, 744 F.3d 17, 21 (1st Cir. 2014). "At the indictment stage, the government need not 'show,' but merely must allege, the required elements." *Id*. Courts therefore "'routinely rebuff efforts to use a motion to dismiss as a way to test the sufficiency of the evidence behind the indictment's allegations.'" *United States v. Ngige,* 780 F.3d 497, 502 (1st Cir. 2015) (*quoting United States v. Guerrier*, 669 F.3d 1, 4 (1st Cir. 2011)).

An "indictment may use the statutory language to describe the offense, but it must also be accompanied by such a statement of facts and circumstances as to inform the accused of the specific offense with which he is charged." *Savarese*, 686 F.3d at 6. Reliance on contested and disputed evidence outside an indictment when adjudicating a pre-trial motion to dismiss is not appropriate because it usurps the role of the grand jury and inevitably results in delay of the trial. *See United States v. Gallant*, 2010 WL 1533379, at *2 (D.N.H. Apr. 16, 2010) (*citing*

*Costello v. United States*, 350 U.S. 359, 408-09 (1956)); *accord United States v. Welch*, 327 F.3d 1081, 1090 (10th Cir. 2003); *see, e.g., United States v. Litvak*, 2013 WL 5740891, at *6 (D. Conn. Oct. 21, 2013) (denying motion to dismiss indictment and noting that defendant "offers evidence outside of the Indictment" and thus "attempts to put on his case for why his alleged misstatements did not violate section 1031 in a pre-trial motion to dismiss"). Adhering to this framework, the facts, as drawn from the TSI, inform defendants of the specific offenses with which they are charged.

The allegations of the TSI track the elements of Hobbs Act extortion. 18 U.S.C. § 1951 (requiring a deprivation of property, with the victim's consent, through the wrongful use of actual or threatened force, violence, or fear). The TSI also uses the term "wrongful" to describe the overarching objective in using "fear of economic harm," and as such takes the allegation outside the Hobbs Act exception announced in *United States v. Enmons*, 410 U.S. 396 (1973).

The Motion does not raise any new arguments which would warrant the extraordinary remedy of dismissal. The First Circuit's decision in *Brissette* has not changed the fact that the TSI, for all of the reasons previously advanced by the government in its opposition to defendants' original motions to dismiss (See Docket Nos. 86, 164), more than adequately specifies the elements of the offenses charged, fairly apprises defendants of the charges against which they must defend, and allows them to contest the charges without fear of double jeopardy. Moreover, the First Circuit in *Brissette* dealt solely with the issue of the obtaining of property element of the Hobbs Act and specifically stated that it did not consider the wrongfulness element. Nonetheless, defendants seek to have one more bite of the apple by repeating the arguments previously rejected by this Court in their original motions to dismiss the first superseding indictment, with the only difference being a mischaracterization of the government's

theory of the case.[1]

### A. The TSI Properly Pleads The Element Of Wrongfulness

The government incorporates herein all of the arguments previously made in its oppositions to defendants' motions to dismiss (See Docket Nos. 86, 142, 164) with respect to the element of wrongfulness. Defendants have previously conceded that the TSI alleges that Crash Line's consent to hire members of Local 11 was "induced by the wrongful use of fear of economic harm." TSI, ¶¶ 20, 22. This language tracks the language of the statute and nothing more is required in an indictment. *Stewart*, 744 F.3d at 21. In fact, the TSI provided more notice than is constitutionally required by describing the wrongful conduct at issue, a description that the government supplemented with the Bill of Particulars and voluminous discovery. That should be the end of the analysis.

However, defendants again try and steer the Court well beyond the pleadings and, in their Motion, pose two questions regarding the viability of the government's prosecution, which they claim do not turn on contested facts. First, they argue that even if it were true that defendants used Crash Line's fear of economic harm in order to secure real jobs for members of Local 11 so that the union would not blow up a giant inflatable rat on City Hall plaza that would not be a

---

[1] Defendants argue that the government has "recently signaled a shift from a fear concerning the issuance of permits to a different 'fear of economic harm' specifically, that 'Crash Line Productions wanted an exclusive license from the City of Boston to use City Hall Plaza for the twice-yearly Boston Calling music festival beyond 2017. *See* Docket No. 244, p. 6). There is no "shift" in the government's theory of the case nor are the above-mentioned concerns and fears on the part of Crash Line mutually exclusive. In fact, Crash Line's need for a long-term licensing agreement has always been part of the government's anticipated evidence that Crash Line believed economic loss would result from its failure to comply with defendants' demands that the company use Local 11 for the September 2014 concert. *See, e.g.*, Docket No. 86, p. 9. Crash Line's need for a license agreement for City Hall Plaza beyond 2017 is nothing new, and is critical evidence of defendants' exploitation of Crash Line's fear of economic harm in order to extract from the company a promise to use Local 11 workers for the September 2014 concert.

"wrongful purpose" under the Hobbs Act.    For the reasons stated in its opposition to defendants' renewed motion to dismiss (Docket No. 142), the government disagrees.    The wrongful conduct at issue here involves not only defendants' threats of picketing but also threats involving the issuance of permits and the entertainment license[2], and the extension of a licensing agreement.    The effect of any threats of picketing made by defendants on Crash Line pale in comparison to Crash Line's serious concerns about issuance of its entertainment license and licensing agreement.

Defendants' conduct in this case was wrongful because defendants had no claim of right to bargain with Crash Line for a union contract (1) absent such a requirement in Crash Line's licensing agreement with the City of Boston, (2) absent the city's proprietary authority pursuant to *Bldg. & Constr. Trades Council of Metro. Dist. v. Assoc. Builders and Contractors of MA/RI, Inc. (Boston Harbor)*, 507 U.S. 218 (1993)[3], and/or (3) absent support by a majority of existing non-union employees as described in *A. Terzi Productions, Inc. v. Theatrical Protective Union*, 2 F.Supp.2d 485 (S.D.N.Y. 1998).    See Docket No. 86.    In addition, defendants' threats of picketing to coerce Crash Line to hire members of Local 11 was a wrongful use of fear of economic harm for purposes of Hobbs Act extortion because the threatened picketing is unlawful

---

[2] The terms "permits" and "entertainment license" are used interchangeably.    Crash Line was required to have all of its permits in place before the final entertainment license was issued.
[3] Defendants continue to argue that the City had the right to impose a requirement on a contractor such as Crash Line that they use union labor as a condition of use of government property.    *See* Docket No. 244, p.10.    While under certain circumstances, this might be true, it did not do so in this case.    The licensing agreement between the City of Boston and Crash Line provided that the hiring of the workforce was specifically the responsibility of Crash Line with no requirement that they employ union labor (with the exception of police and electricians).    Even the RFP issued by the City omitted any requirement that union labor be used. The demand that Crash Line use Local 11 was defendants' brainchild and not the result of any proprietary authority.

under the NLRA.[4]

Defendants, both government officials, exploited Crash Line's fear of economic harm – not just by threats of picketing, but also by implicit threats to withhold necessary permits and the entertainment license, and to deny Crash Line's long sought after licensing agreement – in an effort to induce Crash Line to enter into a collective bargaining agreement with Local 11. Unlike the First Circuit's description of the threats in *United States v. Burhoe,* 871 F.3d 1 (1st Cir. 2017), the threats here were inherently wrongful. Crash Line had a pre-existing right to be free from demands for its property absent any such authority by the City of Boston and/or support by a majority of existing non-union employees. Defendants concede that economic fear becomes inherently wrongful where "the plaintiff has a pre-existing statutory right to be free

---

[4] Even if this were a dispute between Local 11 and Crash Line, which it was not, the NLRA makes it an unfair labor practice for a union or its agent "to threaten, coerce, or restrain any person engaged in commerce, where … an object thereof is … forcing or requiring any employer to assign particular work to employees in a particular labor organization … rather than to employees in another labor organization or in another trade, craft, or class …" 29 U.S.C. § 158(b)(4)(ii)(D) (Section 8); *see Plumbers & Fitters, Local 761 v. Matt J. Zaich Constr. Co*., 418 F.2d 1054, 1056 (9th Cir. 1969) ("Section 8(b)(4) describes four purposes for which a union cannot strike or picket."). Union conduct is impermissible under Section 8 as long as "an" object is impermissible, even if the union is also acting in furtherance of permissible objectives. Moreover, Section 8(b)(4)(ii)(D) does not just apply to disputes between unions but applies to disputes between a union and a nonunion employer, here Crash Line. *See, e.g., N.L.R.B. v. Local 1212*, 364 U.S. 573, 584 (1961) (Section 8(b)(4)(ii)(D) "extends to jurisdictional disputes between unions and unorganized groups as well as to disputes between two or more unions"); see also *N.L.R.B. v. Fruit & Vegetable Packers & Warehousemen, Local 760*, 377 U.S. 58, 68 (1964) ("[T]he prohibition of [Section 8(b)(4)] is keyed to the coercive nature of the conduct, whether it be picketing or otherwise."); *Int'l Longshoremen's and Warehousemen's Union, Local 14, AFL-CIO*, 85 F.3d 646 (D.C. Cir. 1996) (affirming N.L.R.B.'s finding that § 158(b)(4)(ii)(D) was violated after company originally assigned new work to unrepresented employees and union picketed to force employer to assign that work to union members); *Millwrights Local 1026*, 266 N.L.R.B. 1049, 1051 (1983) (finding reasonable cause to believe that § 158(b)(4)(ii)(D) was violated where union picketed project and requested that employer reassign work to union employees).

from the defendants' demand for the property," *citing Sanchez v. Triple-S Management, Corp.*, 492 F.3d 1, 12 (1st Cir. 2007). See Docket 122, p. 6. That is precisely the case before this Court and the government's theory of prosecution.

Defendants knew they had no right to withhold permits or the entertainment license based on whether Crash Line utilized union or non-union labor and that any such requirement to use union labor would be discriminatory.[5] Moreover, Crash Line had a pre-existing right to operate in Boston without union labor and to be free of the fear that it would not be allowed to operate if it did not hire additional union employees or sign a labor contract with the union. *See A. Terzi Productions, Inc.,* 2 F.Supp.2d at 507.

In *A. Terzi Productions*, the district court upheld the sufficiency of a civil RICO complaint filed by a theatrical employer against a union which had attempted to obtain a labor contract in violation of the Hobbs Act by the wrongful use of picketing-related violence directed at the organizing of the employer's non-construction industry employees whom the union defendant did not represent for purposes of collective bargaining. In refusing to dismiss the complaint, then District Judge Sonia Sotomayor concluded that the labor claim of right defense announced in *United States v. Enmons*, 410 U.S. 396 (1973), which exempted from the Hobbs Act force that is used "to achieve legitimate labor ends," did not apply and that a labor union and its agents had no right to demand that an employer recognize or bargain collectively with the union unless it has first obtained the majority backing of that employer's employees and been certified as their bargaining representative. . . . [F]orcing a collective bargaining agreement upon

---

[5] In Brissette's post-arrest statement, he admitted that, "there is no policy or law stating productions had to be union or had to use union labor to get permits from the City of Boston." He then went on to ask the rhetorical question, "Did I do something wrong?" and answered, "yes."

unwilling employees and their employer is "wrongful" within the Hobbs Act's meaning; the union is an outside meddler with no lawful claim to the employer's property. *A. Terzi Productions*, 2 F. Supp.2d at 506-07 (citations omitted).

Crash Line had a right to negotiate or decline to negotiate with Local 11, and was entitled to compete for an entertainment license on a level playing field. This right is solidly embedded in public policy. *See, e.g., United States v. Addonizio*, 451 F.2d 49, 73 (3d Cir. 1971) (while victims had no right to obtain contract with city, they "have a right to expect that when they incur time and expense to bid on public projects, they will be awarded contracts when their bids are lowest . . . The City of Newark had systematically destroyed this right."); *United States v. Collins,* 78 F.3d 1021, 1030 (6th Cir), *cert denied*, 519 U.S. 872 (1996) (upholding Hobbs Act conviction of husband of Kentucky Governor charged with soliciting political contributions in exchange for right to contend for state contracts since "[payors] acted out of fear that without payments they could lose the opportunity to compete for government contracts on a level playing field, an opportunity to which they were legally entitled.").

Not only did Crash Line have a pre-existing right under both Massachusetts and federal law to operate without employing the services of Local 11, and thereby enjoyed a right to be free from threats of being denied an entertainment license or permit to operate within the City of Boston because of the absence of a union contract, but it had a licensing agreement with the City which did not require it to use union labor. Because Crash Line had a pre-existing right to be free from discriminatory threats of permit or entertainment license withholding, defendants' threats were wrongful and constitute a violation of the Hobbs Act.

The argument that defendants could not be guilty of extortion because the union members provided genuine services to Crash Line for which they were entitled to be compensated (Docket

No. 24, p. 9) ignores the critical fact that they obtained those jobs through illegal means. Defendants' supposition would mean that anytime a union was successful in its attempts to extort a non-union employer for work, they could demand compensation. That is not the state of the law. Local 11 had no right to Crash Line's work. Defendants had no right to demand that Local 11 receive the work. There was no strike or other *bona fide* dispute with an employer. Crash Line was not a signatory to a collective bargaining agreement or project labor agreement with any union and had already contracted with a non-union production company to provide labor for the September 2014 music festival. There were no petitions filed by the non-union employees of either Crash Line or the production company asking to join the union. Rather, the conduct before this Court involves public officials putting pressure on an employer, through threats of economic harm, aimed at coercing the employer into entering into an agreement to hire members of a labor union. That is extortion. Without a contract or collective bargaining relationship, defendants were not entitled to exploit Crash Line's fear of having city permits or entertainment licenses withheld or licensing agreements not extended in order to obtain wages and benefits from Crash Line to which members of Local 11 were not entitled. In other words, defendants' actions in assisting Local 11 to obtain property to which neither the union nor the city had a claim of right under the terms of the city licensing agreement, Massachusetts state law, and federal labor law, where the city has no justifiable proprietary interest in having a union work force, were wrongful.

There is more, however, on the issue of wrongfulness. Defendants' conduct was wrongful because it violated Massachusetts General Laws, Chapter 268A, which prohibits city employees, *i.e.* defendants, from using their official position to assist Local 11 in obtaining employment with Crash Line, knowing, or with reason to know, that defendants were using their

official position to secure for others unwarranted privileges, which were of substantial value and which were not properly available to similarly situated individuals.   *See*   M.G.L. 268A, sec. 23(b)(2)(ii).   Defendants' demands that Crash Line hire Local 11 deprived other non-union employees of work and constituted discriminatory regulation in violation of state law.

The second question posed by defendants is whether Crash Line's "desire" to obtain a future arrangement for the use of City Hall Plaza gives rise to a cognizable "fear of economic harm."   *See* Docket No. 244, p. 7.   First, the threats of economic harm must be viewed in their totality – Crash Line feared that if they did not hire union labor they would not get their permits or entertainment license in time for the music festival and the City would not approve a long-term licensing agreement.

Second, the cases cited by defendants actually support the government's position.   The First Circuit has interpreted Hobbs Act wrongful use of "fear" as including "fear of economic loss, ... including the possibility of lost business opportunities. " *United States v. Rivera Rangel,* 396 F.3d 476, 483 (1st Cir.2005) (*quoting United States v. Bucci*, 839 F.2d 825, 827–28 (1st Cir.1988)).   According to the First Circuit,

> [t]o establish extortion through fear of economic loss, the government must "show that the victim believed that economic loss would result from his ... failure to comply with the alleged extortionist's terms, and that the circumstances ... rendered that fear reasonable." [*Bucci*, 839 F.2d] at 828; *see United States v. Capo*, 817 F.2d 947, 51 (2d Cir.1987) (en banc) ("[T]he proof need establish that the victim reasonably believed: first, that the defendant had the power to harm the victim, and second, that the defendant would exploit that power to the victim's detriment." (emphasis in original)).   Significantly, the loss feared must be "a particular economic loss, not merely the loss of a potential benefit." *United States v. Edwards*, 303 F.3d 606, 635 (5th Cir.2002); *see United States v. Garcia,* 907 F.2d 380, 385 (2d Cir.1990) (reversing an extortion conviction where the jury was permitted to consider the theory of fear of economic loss because the evidence "did not establish that the company acted out of fear that without these payments it would lose existing contracts or even opportunities to which it was legally entitled").

396 F.3d at 483–84.    In *Rivera Rangel*, the First Circuit affirmed the conviction of the executive assistant to the governor, who took money in exchange for facilitating dealings with the government.    The Court concluded that in view of the defendant's "access to, and influence over, the officials who decided whether to grant the permits [the victim] needed, we cannot say that [the victim's] fear was unreasonable."   *Id*.    The same conclusion applies here, where defendants had access to, and were in a position to influence the officials who decided whether to grant the permits, the entertainment license, and the lease extension.

In *United States v. Edwards*, 303 F.3d 606, 635 (5th Cir. 2002), the Court found sufficient evidence of extortion by wrongful use of fear of economic loss.    In *Edwards*, much like the instant case, the Court held that the payees were not just attempting to obtain preferential access but rather a fair opportunity to compete for a gambling license and believed that if payments were not made then it would automatically shut off any chance that they would receive a license.    *See also United States v. Collins*, 78 F.3d 1021 (conviction for extortion on economic harm theory upheld where victim acted out of fear that without payments they could lose opportunity to compete for government contracts on a level playing field, an opportunity to which they were legally entitled.)    Just like the victims in *Rivera Rangel*, *Edwards, Collins* and *Garcia*, Crash Line reasonably feared that if they did not hire union labor as defendants demanded, the City would not give them their permits, entertainment license, or long sought after license extension, and they would lose existing contracts or even opportunities to which they were legally entitled.

In addition, Crash Line's ability to obtain financing and talent for upcoming music festivals was contingent upon Crash Line being able to obtain a long-term licensing agreement with the City of Boston.    Crash Line needed to obtain financial commitments from investors

11

and secure musicians years in advance of upcoming music festivals.  Indeed, in May 2015, while discussions about the licensing extension/RFP were ongoing, one investor threatened to back out of his financial commitment to Crash Line if he did not receive a prompt answer about the status of the licensing extension/RFP.  Without a long-term licensing agreement, Crash Line would not have been able to hold on to its investors and talent, obtain additional commitments from these individuals, or pursue new opportunities, in order to operate its music festivals, which would have resulted in a significant economic loss to Crash Line.  While Crash Line might have been motivated to obtain an exclusive agreement to use City Hall Plaza by "desire and opportunity," as defendants posit, Docket No. 244, p. 12, all the government need prove and what the evidence will show, is that defendants reasonably believed that economic loss would result unless they consented to defendants' demands to use union labor.

Crash Line had the right to operate in Boston without hiring union labor and to be free of the fear that it would not be permitted to operate if it did not hire additional union employees or sign a labor contract with the union.  Accordingly, even if the Court were to look beyond the TSI at this stage of the proceedings, it should find that there is enough evidence that defendants' threats were wrongful under the Hobbs Act for this case to move forward to trial.

    **B.**    **The Interests of Justice Do Not Require This Question Be Decided Prior to Trial**

The interests of justice do not require the question of wrongfulness to be decided prior to trial.  The question of wrongfulness is a question of fact for the jury and not a legal question to be decided on a motion to dismiss the indictment prior to the government having an opportunity to put on its case.  There are numerous contested issues of fact for a jury to determine.  As this Court in its Order (Docket No. 106, p.4), and defendants in their motions, (Docket No. 160, p.

18), acknowledged, the criminal rules do not provide a mechanism akin to summary judgment. Yet that is precisely what defendants now seek from the Court despite the fact that it is a basic tenet of constitutional law that factual issues are to be tried before a jury, which is in the best position to determine whether defendants violated the Hobbs Act.

While we can all agree that wasting judicial resources has significant consequences, defendants continue to utilize significant resources by filing motions to dismiss the various indictments in which they rehash the same issues.   The government has a right to have a jury decide the facts in this case, including those involving the element of wrongfulness.   As for the issue of wasting taxpayer dollars, unlike other similarly situated public officials under indictment, defendants have continued to receive a paycheck from City Hall throughout the pendency of this indictment.

## **CONCLUSION**

The TSI more than adequately apprises defendants of the charges against them.   For all of the above reasons, defendants' motion for reconsideration of their renewed motion to dismiss should be denied.

                                        Respectfully submitted,

                                        ANDREW E. LELLING
                                        United States Attorney

               By:    */s/ Laura J. Kaplan*
                        Laura J. Kaplan
                        Kristina E. Barclay
                        Assistant U.S. Attorneys
                        (617) 748-3100

## CERTIFICATE OF SERVICE

  I hereby certify that, on the date below, this document was served on counsel for the defendant by electronic mail.

*/s/ Laura J. Kaplan*
LAURA J. KAPLAN
Assistant U.S. Attorney

Dated: May 31, 2019