1           UNITED STATES DISTRICT COURT
             DISTRICT OF MASSACHUSETTS
2

3    - - - - - - - - - - - - - - - - - - - x

4    UNITED STATES OF AMERICA,                    :

5           Plaintiff,                            :   Criminal Action No.
                                                      1:16-cr-10137-LTS-1
6        v.                                       :   1:16-cr-10137-LTS-2

7    KENNETH BRISSETTE, et al.,                   :

8           Defendants.                           :

9    - - - - - - - - - - - - - - - - - - - x

10

11      BEFORE THE HONORABLE LEO T. SOROKIN, DISTRICT JUDGE

12
                          **JURY TRIAL**
13                          **DAY 8**
                       **PARTIAL TRANSCRIPT**
14

15

16

17                  Wednesday, July 31, 2019
                          9:06 a.m.
18

19
                John J. Moakley United States Courthouse
20                     Courtroom No. 13
                        One Courthouse Way
21                     Boston, Massachusetts

22

23                    Rachel M. Lopez, CRR
                     Official Court Reporter
24              One Courthouse Way, Suite 5209
                 Boston, Massachusetts  02210
25                   raeufp@gmail.com

1                        **A P P E A R A N C E S**

2

   On behalf of the Plaintiff:

3

        UNITED STATES ATTORNEY'S OFFICE - MASSACHUSETTS
4       BY:  LAURA KAPLAN AND KRISTINA E. BARCLAY
        John Joseph Moakley Courthouse
5       One Courthouse Way, Suite 9200
        Boston, Massachusetts  02210
6       (617) 748-3124
        laura.kaplan@usdoj.gov
7       kristina.barclay@usdoj.gov

8

9  On behalf of Defendant Brissette:

10      HOGAN LOVELLS US, LLP
        BY:  WILLIAM H. KETTLEWELL AND SARA E. SILVA
11      100 High Street
        20th Floor
12      Boston, Massachusetts  02110
        (617) 371-1037
13      bill.kettlewell@hoganlovells.com
        sara.silva@hoganlovells.com
14

15

   On behalf of Defendant Sullivan:
16

        COSGROVE, EISENBERG & KILEY, PC
17      BY:  THOMAS R. KILEY AND WILLIAM J. CINTOLO
        One International Place
18      Suite 1820
        Boston, Massachusetts  02110
19      (617) 439-7775
        tkiley@ceklaw.net
20      wcintolo@ceklaw.net

21

22

23

24

25

1              **A P P E A R A N C E S,   C O N T.**

2

3    On behalf of Defendant Sullivan:

4        ACUCITY LAW, LLC
         BY:  JAMES KELLEY
         One International Place
5        Suite 1400
         Boston, Massachusetts  02110
6        (617) 702-4000
         jkelley@acucity.com

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**TABLE OF CONTENTS**

**TRIAL WITNESSES**

On behalf of the Plaintiff:                          Page

 JESSE DU BEY

         By Ms. Kaplan                                 9

         By Mr. Cintolo                               24

         By Mr. Kettlewell                            50

         By Ms. Kaplan                                53

 JOYCE LINEHAN

         By Ms. Kaplan                                58

         By Mr. Kettlewell                           122

         By Ms. Kaplan                               166

         By Mr. Kettlewell                           169

 WILLIAM KENNEY

         By Ms. Kaplan                               170

**EXHIBITS**

|  | Admitted |
|---|---|
| Number 40 | 70 |
| Number 41 | 80 |
| Number 43 | 114 |
| Number 65 | 59 |
| Number 66 | 60 |
| Number 110 | 147 |
| Number 138 | 131 |
| Number 150 | 155 |
| Number 171 | 136 |

1                    **P R O C E E D I N G S**

2              (In open court, beginning of requested portion.)

3              THE COURT:  So Mariliz is going to go get the jury.

4    I'm going to explain to the jurors just why we're taking

5    Mr. Du Bey now, that he lives in Germany, and that -- so

6    we're taking him now, so we can put him on, finish, and be

7    done to accommodate that, and then everyone's agreed to that,

8    and then we'll resume with Ms. Linehan after that.

9              MS. KAPLAN:  Thank you.

10             MR. KETTLEWELL:  No objection at all, Your Honor.

11             THE COURT:  Fine.  And then the other -- a couple

12   times there's been references to grand jury testimony, which

13   is totally fine, or prior proceedings, which I understand to

14   be the grand jury testimony.  If it comes up again in the

15   case, what I'm intending to do, unless somebody objects, is

16   simply explain to them what -- like the grand jury is a

17   procedure that leads to the indictment, that people sometimes

18   testify under oath, and that's why there's transcripts of

19   that, and it's a proceeding conducted by the Government, and

20   without other people there, which is the way it's supposed to

21   work.  And that's -- when they heard reference to that,

22   that's what it is, and that's all.

23             MR. KILEY:  Would you also be doing any kind of

24   exploration on the other kinds of things, like 302s --

25             THE COURT:  Well, I'm going to do that if a grand

1   jury transcript comes up again in the trial.  Otherwise, I

2   won't do it.  I don't know if it's going to come up or not.

3   I don't think there's been any reference to 302s yet.

4            MR. KILEY:  I think they may be coming, Your Honor.

5            THE COURT:  If there is, I would talk to you all

6   about that before I did it, I think.

7            You think you're pretty quick with Mr. Du Bey?

8   About 15 minutes?

9            MS. KAPLAN:  Yes.

10           (The jury enters the courtroom.)

11           THE COURT:  Good morning, ladies and gentlemen.

12  Thank you for all being prompt today.  I'm sorry that we

13  weren't quite on time, and we're starting a couple of minutes

14  late.  That's not on you, that's on the lawyers and myself

15  and I apologize for that.  I'm trying to resolve and just

16  take care of issues so that we don't have to spend your time

17  in the courtroom resolving evidentiary or legal issues.

18           I just want to make sure nobody discussed the case

19  among -- no one discussed the case, nobody spoke to you about

20  the case?

21           Okay.  And no one read, saw, heard, or listened to

22  anything about the case, or had anyone speak to them about

23  the case and the participants?

24           Okay.  Great.

25           I want to -- who's your next -- so let me explain

1    to you --

2              Is the Government calling now Mr. Jesse Du Bey?

3              MS. KAPLAN:  Yes, Your Honor.

4              THE COURT:  All right.  So let me -- why don't

5    somebody, if they can have Mr. Du Bey come in.  Let me just

6    explain, when we broke yesterday, Ms. Linehan was on the

7    witness stand, and we're going to resume with Ms. Linehan's

8    testimony, but Mr. Du Bey, who's the next witness, lives in

9    Germany.  And so obviously coordinating schedule is more

10   complicated for someone who now lives in Germany.  So by

11   agreement with all the lawyers and with -- and I agree, as

12   well, we're interrupting Ms. Linehan's testimony, so that

13   first thing in the morning, we can take care of Mr. Du Bey,

14   he can testify, he'll be done, and then he goes on his way.

15   When we're done with his testimony, Ms. Linehan will come

16   back on the witness stand, and we'll resume with her

17   testimony.  So it's really just a scheduling accommodation.

18   We do that in cases to try to make it work smoothly as best

19   we can for the witnesses.  So that's what's happening.

20             Ms. Montez, would you administer the oath to

21   Mr. Du Bey.

22             (The witness was duly sworn.)

23             THE COURT:  Please be seated, Mr. Du Bey.

24             Ms. Kaplan, you can proceed with your examination.

25             MS. KAPLAN:  Thank you, Your Honor.

**JESSE DU BEY**

1

2          having been duly sworn, testified as follows:

3          **DIRECT EXAMINATION BY COUNSEL FOR PLAINTIFF**

4    BY MS. KAPLAN:

5    **Q.**   Good morning.

6    **A.**   Good morning.

7    **Q.**   Can you please state your name.

8    **A.**   Jesse Du Bey.

9    **Q.**   And where do you live, Mr. Du Bey?

10   **A.**   In Hamburg, Germany.

11   **Q.**   In 2014, where were you living?

12   **A.**   In New York.

13   **Q.**   Are you employed?

14   **A.**   Yes.

15   **Q.**   What do you do?

16   **A.**   I run an investment firm.

17   **Q.**   What's the name of it?

18   **A.**   Orkila Capital.

19   **Q.**   And prior to running Orkila Capital, what did you do?

20   **A.**   I was a partner at an investment firm called Providence

21   Equity.

22   **Q.**   Where were you working in 2014?

23   **A.**   New York, in Orkila.  I started Orkila in 2013.

24   **Q.**   What is Orkila?

25   **A.**   What is Orkila?

1  **Q.**  Yes.

2  **A.**  Orkila is the name of my summer camp when I was a kid,

3  but it is an investment firm.  We invest in companies and

4  help them grow.  That's what we do.

5  **Q.**  Do you know Brian Appel?

6  **A.**  Yes.

7  **Q.**  Who is he?

8  **A.**  Brian Appel is my cousin.

9  **Q.**  And are you familiar with Crash Line Productions?

10 **A.**  Yes.

11 **Q.**  What is Crash Line Productions?

12 **A.**  Crash Line Productions is the name of the music company,

13 the music festival company we started in 2012.

14 **Q.**  Who did you start it with?

15 **A.**  Brian and Mike Snow were the executives who were going to

16 run the company, who do run the company, and then myself and

17 a handful of other investors were all investors in the

18 company.

19 **Q.**  Is Brian Appel an investor in the company?

20 **A.**  Yes.

21 **Q.**  What about Mike Snow?

22 **A.**  Yes.

23 **Q.**  What about Brian's father?

24 **A.**  Yes.

25 **Q.**  And do you know Paul Sohn and Taylor Storm?

1    **A.**   Yes.

2    **Q.**   And are they investors?

3    **A.**   Yes.

4    **Q.**   Are there additional investors in the company?

5    **A.**   Yes.

6    **Q.**   What percentage of the company do you own?

7    **A.**   Do I own now, or did I own then?

8    **Q.**   In 2014.

9    **A.**   27 or so percent.

10   **Q.**   And what about now?

11   **A.**   Seven or eight percent.

12   **Q.**   Did you ever go above 27 percent ownership?

13   **A.**   I don't believe so.

14   **Q.**   Who makes the decisions for -- well, what is Boston

15   Calling?

16   **A.**   Boston Calling is the music festival that we started,

17   which began the company, in City Hall Plaza.

18   **Q.**   And who makes the decisions for Boston Calling?

19   **A.**   Brian Appel.

20   **Q.**   I'm sorry?

21   **A.**   Brian Appel.

22   **Q.**   Are you Brian Appel's boss?

23   **A.**   No.

24   **Q.**   Is Crash Line Productions a union or nonunion company?

25   **A.**   Nonunion.

1    **Q.**  And you mentioned Mike Snow.  Who is he?

2    **A.**  He's the operating officer of the company and he's

3    Brian's number two in the business.

4    **Q.**  Whose idea was Boston Calling?

5    **A.**  Brian Appel's.

6    **Q.**  And prior to making an investment in Crash Line, did you

7    place some conditions on agreeing to invest?

8    **A.**  Yes.  We had -- we had a number of conversations about

9    what it would take for us to feel comfortable investing money

10    to start the business.  The most important things to us were

11    that Brian had a venue agreement for a place to do the

12    festival.  That would give us some certainty that we could do

13    multiple events, so that we don't -- so we don't invest a

14    bunch of money and then not have the ability to grow the

15    business.

16    **Q.**  What do you mean by multiple events?

17    **A.**  I mean with the music festival business, which I have a

18    lot of experience in, generally you don't make money in the

19    beginning part of the business, you lose money as you build

20    the brand, and so you need to feel comfortable as an

21    investor.  You need to have some sense that you can do this

22    for a while.  And so multiple events, meaning usually

23    festivals are once per year.  In our case, we started off

24    doing them twice per year.  Multiple events meaning three,

25    four, five events.

1    **Q.**   So that would be for what period of -- what period of

2    years were you looking for?

3    **A.**   As long as possible, but I think -- I couldn't remember

4    exactly what line I would have drawn in my own mind, but

5    definitely two or three years would be important.

6    **Q.**   And you said you had experience in the music industry?

7    **A.**   Uh-huh.

8    **Q.**   Can you tell us about that?

9    **A.**   I've helped start three music festivals and been an

10   investor in six other music festivals in the US and Europe.

11   **Q.**   Was this prior to forming Crash Line Productions and

12   Boston Calling?

13   **A.**   No.

14   **Q.**   It was after?

15   **A.**   Uh-huh.

16   **Q.**   And did Crash Line get a multiyear agreement with the

17   City to operate Boston Calling on the City Hall Plaza?

18   **A.**   We had a multiyear license that laid out the terms, where

19   we could do the event, and it was -- I couldn't tell you

20   exactly the number of years, but I think it was four, but it

21   was an agreement of understanding.  I couldn't say whether

22   all of it was binding or some of it was binding, but it was

23   an understanding that we could do multiple events.

24   **Q.**   And what was your roll in Boston Calling at the

25   beginning?

1  **A.**   An advisor and minority investor and the most active

2  board member, advising Brian, who -- this was his first time

3  starting a company.   I have more experience than him, so as a

4  sounding board to him.

5  **Q.**   And was that your role in 2014, as well?

6  **A.**   Yeah.

7  **Q.**   Do you know Ken Brissette?

8  **A.**   I've met Ken Brissette.

9  **Q.**   When?

10  **A.**   I met Ken Brissette probably 2014.

11  **Q.**   Was it before or after the September 2014 music festival?

12  **A.**   I met Ken Brissette, I believe, after, but I might have

13  shaken his hand at a music festival, or something before.

14  It's possible.

15  **Q.**   Who did you understand him to be?

16  **A.**   The director of tourism or community events or some sort

17  of role that dealt with events in Boston.

18  **Q.**   Do you know Tim Sullivan?

19  **A.**   No.   I don't believe so.

20  **Q.**   In May and September of 2014, were you involved in the

21  day-to-day operations of running the two Boston Calling

22  festivals?

23  **A.**   No.

24  **Q.**   What was your role, if any, in the May and September 2014

25  festivals?

1    **A.**   Again, as an advisor to Brian on issues that he felt were

2    of high importance in the company.

3    **Q.**   In the spring or summer of 2014, did you become aware

4    that there was an issue with the union?

5    **A.**   Yes.

6    **Q.**   How did you become aware that there was an issue?

7    **A.**   Brian told me on a telephone call, or in an e-mail, I

8    can't remember.  Probably a telephone call, that --

9              MR. KETTLEWELL:  Objection to the substance, Your

10   Honor.

11             THE COURT:  Overruled.

12             You can answer.

13             THE WITNESS:  That there was a request or a

14   potential for us to use union labor for the first time and

15   that it would be more expensive and that was an issue that he

16   was concerned about.

17   BY MS. KAPLAN:

18   **Q.**   Did you want to use union labor?

19   **A.**   No.

20   **Q.**   Do you remember when you received this call from Brian

21   Appel?

22   **A.**   I don't remember exactly, no.

23   **Q.**   Had you also been made aware, in the spring or summer of

24   2014, that there were some issues with the curfew for Boston

25   Calling and the service of alcohol?

 1    **A.**   Yes.

 2              MR. KETTLEWELL:  Objection.

 3              THE COURT:  Overruled.

 4    BY MS. KAPLAN:

 5    **Q.**   I'm sorry, what was your answer?

 6              THE COURT:  Yes was his answer.

 7              THE WITNESS:  Yes.

 8              MS. KAPLAN:  Careful with that.

 9              THE WITNESS:  Sorry.

10              MS. KAPLAN:  That's all right.

11    BY MS. KAPLAN:

12    **Q.**   What was your understanding of what those issues were?

13    **A.**   From the first -- the first Boston Calling, there was

14    significant concern, particularly from the police, around

15    consumption of alcohol on the site of our festival.  And the

16    first festival, we had a penned-in area where you could buy

17    and consume alcohol.  And if I remember correctly, you could

18    only buy one beer at a time, which is -- which causes very

19    long lines.  So it's not great as an event operator, but

20    that's what we had to deal with and we accepted that, and we

21    ran the event.

22              In the second or third event, I can't remember

23    exactly when, that rule got relaxed because my impression was

24    the Police in the City saw us running very safe events and

25    people could then buy alcohol two at a time, which means they

1    could buy one for their friend, and then they could roam

2    freely around the site drinking it and we were very pleased

3    about that.

4            And I think, if I remember correctly, also we were

5    allowed maybe a half an hour more music in the evening, and

6    allowing the people to drink for an extra half an hour at the

7    festival, which is important, because we serve a pretty young

8    audience, and they don't really want to go home at 9:30.  So

9    we felt very good about that and we felt like that could

10   continue to relax and allow us to run the event the way we

11   wanted to.

12           Sometime -- I can't exactly recall, before the

13   fourth festival over the summer of 2014, Brian relayed to me

14   that things were moving the other way, that there was a point

15   of view that we should potentially go back to a beer pen,

16   that we should have a lower curfew, an earlier curfew, that

17   potentially -- I can't remember exactly the details of

18   whether people should buy one beer at a time again, but the

19   rules seemed to be constricting, and we didn't understand why

20   that would be the case, given how successful and safe our

21   festivals were.

22   Q.   And if the hours of operation changed and they were more

23   restrictive, and Boston Calling was only permitted to operate

24   until, let's say, 8:30 at night, what effect would that have

25   had on the festival?

1    **A.**   It would make it very difficult to provide an experience

2    to people that they would want to come back again, in my

3    opinion.

4    **Q.**   And what about beer gardens or the pens?  What, if any

5    effect, would that have on Boston Calling?

6    **A.**   It would dramatically reduce our beef revenue, which is

7    critical for any music festival event.  You typically

8    generate most of your profit, actually, from selling -- from

9    selling beer at these events.  Most of the ticket revenue you

10   pay to the artist.  So it's pretty fundamental to a healthy

11   business to be able to serve alcohol.  So it would have been

12   negative.  It would have been bad for the business if we had

13   to go back to the pens.

14            Would people not come?  I don't know.  But would it

15   hurt the business?  It would hurt the business.

16   **Q.**   Were you in Boston for the September 2014 festival?

17   **A.**   Yes.

18   **Q.**   And do you remember when you came to Boston?

19   **A.**   I believe I came the Thursdays before the festival

20   started.  It starts on a Friday.  I believe I came in on a

21   Thursday.

22   **Q.**   So there's a calendar to your left, if you want to just

23   check that.

24            Can you see it?

25            MR. CINTOLO:  Can you see it?

1          THE WITNESS:  Yes, I can see it.  I believe I came

2      in on Thursday, the 4th, in the early part of the day or the

3      middle part of the day, I believe.

4      BY MS. KAPLAN:

5      Q.   At some point did you become aware that Brian Appel and

6      Mike Snow had been called to a meeting with Ken Brissette and

7      Tim Sullivan on September 2nd?

8          MR. KETTLEWELL:  Objection, Your Honor.

9          THE COURT:  Overruled.

10         THE WITNESS:  I don't remember the date, but I

11     remember Brian telling me about a meeting that he went to

12     about a week before the festival or so.  Yes.

13     BY MS. KAPLAN:

14     Q.   Did they tell you that they had attended that meeting?

15     A.   Yes.

16     Q.   Do you recall when you learned this?

17     A.   I don't recall exactly, no.

18     Q.   Do you -- and you said that you learned it from Brian

19     Appel?

20     A.   I believe I learned it from Brian Appel.

21     Q.   Were you aware of what the topic of discussion was at

22     that meeting?

23     A.   I -- there was probably multiple topics of discussion.  I

24     recall the -- the specific discussion about the union and the

25     risk of potentially a picket of our event, which Brian told

1    me some details about what that could mean.

2    **Q.**  And what did you understand the issue was with the union?

3    **A.**  My understanding was that if we didn't use union labor,

4    that we could end up with a loud picket in front of our music

5    festival and that -- and that he was very concerned about

6    that.

7    **Q.**  Were you concerned about that?

8    **A.**  I was concerned about that.

9    **Q.**  Why?

10    **A.**  I was concerned about it primarily because Brian was very

11    concerned about it.  I mean, I wasn't in the meeting.  I -- I

12    didn't hear what words were said, so I reacted to Brian's

13    feeling of stress and concern.  That is the way I learned

14    information about that issue, and the business overall.  And

15    from my own perspective, I was concerned about the way it

16    would be perceived by our consumers, who paid a lot of money

17    to attend.  And besides the visuals, if it was really loud,

18    we have a lot of artists in Boston Calling who play music,

19    and it's a very soft style of music, and it could really be

20    problematic for the artists and for the fans.  So that

21    bothered me.

22            And then I had a general concern about -- just a PR

23    concern about the fact that we are operating a festival at

24    City Hall Plaza, which is very symbolic of the Government of

25    Boston, and we would have a big picket there wouldn't be a

1   very good thing probably for our PR.  So those were my

2   concerns.

3   **Q.**  At the time of that meeting that Brian Appel told you

4   about that occurred on September 2nd, do you know whether

5   Boston Calling had all of its permits and its entertainment

6   license?

7   **A.**  My recollection is that we had some permits and that we

8   didn't have all of our permits.

9   **Q.**  Are you familiar with Bill Kenney Productions?

10  **A.**  Yes.

11  **Q.**  How?

12  **A.**  Brian or Mike knew Bill Kenney from the very beginning

13  and we used Bill Kenney Productions for our stage set up and

14  stage labor since Boston Calling, 1.  And I've met Bill

15  Kenney many times.  We even used his company when we started

16  a new festival in Wisconsin.  So I know Bill Kenney

17  personally and I've worked with -- I've heard about his

18  company for a long time.

19  **Q.**  And were there any issues in 2013, 2014, 2015 with Bill

20  Kenney Productions?

21  **A.**  Were there any issues?  I mean, there's always issues.

22  Things can be improved and stuff.  But were we fundamentally

23  satisfied with the job they were doing?  Yes.

24  **Q.**  Did Crash Line have a contract with Bill Kenney

25  Productions for the September 2014 Boston Calling Festival?

1  **A.**  Yes.

2  **Q.**  And did you want to hire members of the union for that

3  festival?

4  **A.**  I don't believe Brian wanted to hire members of the union

5  for that festival.

6  **Q.**  Do you know why not?

7  **A.**  Because things were working well and because they were

8  more expensive.

9  **Q.**  What about the contract with Bill Kenney Productions?

10  **A.**  Yeah, I mean that would mean we would either have to pay

11  Bill Kenney for work we weren't receiving, or we'd have to

12  ask him to push the pain down to his guys, and that wouldn't

13  make them very happy.

14  **Q.**  Did Crash Line make a decision to hire members of the

15  union?

16  **A.**  Yes.

17  **Q.**  Who made that decision?

18  **A.**  Brian.

19  **Q.**  What role, if any, did you have in that decision?

20  **A.**  Brian called me and asked me what I thought.  I asked him

21  what he thinks.  We had a discussion about it, like you do

22  about a business issue.  We thought about the cost of doing

23  it, versus the potential risk of not doing it, and decided to

24  do it.

25  **Q.**  What, if anything, did that decision to hire union

1    members have to do with the extension of the licensing

2    agreement, or an RFP?

3    **A.**  I -- I don't know.

4    **Q.**  Can you tell us what would have happened if Crash Line

5    had not gotten its permits or entertainment license --

6              MR. KETTLEWELL:  Objection, Your Honor.

7    BY MS. KAPLAN:

8    **Q.**  -- in September of 2014?

9              THE COURT:  Overruled.

10   **A.**  If we didn't get a license to operate the week before the

11   festival, we would -- there are two things that could happen,

12   both of them end in the company shutting down, probably.

13   **Q.**  What are those things?

14   **A.**  We could either return ticketholders' money, return

15   sponsors' money, that we had already received, this is

16   millions of dollars, and then we'd turn around and negotiate

17   with our vendors and try to get them just to be nice people

18   and not make us pay the full amount.  They'd tell us you owe

19   us the full amount, we'd have to pay the bills or get sued,

20   and the company would liquidate or get sold to somebody for a

21   low price.

22              Option two, we don't return the ticketholder's

23   money, we don't return the sponsor's money.  We pay the

24   vendors.  We risk getting sued by the ticketholders in a

25   class action and the vendors -- and the sponsors, I mean, and

1  no one ever buys a ticket to Boston Calling again.

2          MS. KAPLAN:  If I could just have a moment, Your

3  Honor.

4          THE COURT:  Yes.

5          (Counsel confers.)

6          MS. KAPLAN:  No questions, Your Honor.

7          THE COURT:  Cross-examination.

8          MR. CINTOLO:  Yes, Your Honor.

9          THE COURT:  All right.

10      **CROSS-EXAMINATION BY COUNSEL FOR DEFENDANT SULLIVAN**

11  BY MR. CINTOLO:

12  **Q.**  Is that pronounced Du Bey?

13  **A.**  Yes.

14  **Q.**  D-U, small D?

15  **A.**  Big D.

16  **Q.**  Big D.  Mr. Du Bey, is it a venture capitalist, is that

17  what you do?

18  **A.**  It's not very different than what I do, but it's not

19  exactly what I do.

20  **Q.**  And the last couple questions that were asked of you and

21  those were, if you didn't get your license, what would

22  happen, correct?

23  **A.**  Yes.

24  **Q.**  And you knew that prior to the scheduled date and time of

25  the festival, all the licenses were in place.

1    **A.**   I'm sorry, what was the question?

2    **Q.**   You had all of the licenses?

3    **A.**   Are you asking me?  I don't understand the question.

4              THE COURT:  When?

5    BY MR. CINTOLO:

6    **Q.**   Okay.  On the September concert, September 2014, and

7    that's the one we're talking about where the concern was by

8    Brian, right?

9    **A.**   Yes.

10   **Q.**   Are you aware, did you understand that prior to the start

11   of that festival, that particular one, you already had the

12   licenses?

13   **A.**   No.

14   **Q.**   You didn't understand that?

15   **A.**   Prior, I guess, implies a long time frame.  I didn't

16   think we had the permits on September, say, or August 21st or

17   September 2nd, but I did understand we had them the minute

18   before we opened the doors.

19   **Q.**   And did you understand or were you told by Brian that

20   part of the reason why you didn't have them on, them being

21   the permits and permissions, on August 21 or on September 2nd

22   is because Brian had made a conscious decision not to submit

23   those approvals to Ms. Malone, who issued the entertainment

24   license?

25   **A.**   No.

1    **Q.**  You didn't know that?

2    **A.**  No.

3    **Q.**  And do you know when you received the entertainment

4    license for the September 2014 -- May -- the May concert, I'm

5    sorry, '14?

6    **A.**  I couldn't tell you exactly, no.

7    **Q.**  You know you got it the day of the concert?

8              MS. KAPLAN:  Objection.

9              THE COURT:  Overruled.

10             THE WITNESS:  What's the question, I'm sorry?

11   BY MR. CINTOLO:

12   **Q.**  Say that again.

13   **A.**  I don't understand the question.

14   **Q.**  You don't know that.  If you did --

15             MS. KAPLAN:  Objection.

16             THE COURT:  Are you asking him, you don't know that

17   as a question?  Is that the question?

18             MR. CINTOLO:  No.  That was a statement.  I'm

19   sorry.

20             THE COURT:  That statement is struck.  Lawyers just

21   ask questions.

22   BY MR. CINTOLO:

23   **Q.**  Let me start, rather than -- see if I can get this in

24   some order.

25             Mr. Du Bey, is it fair to say that you probably

1  had, before 2014, two formal meetings with the City of Boston

2  or somebody in the City of Boston with regard to Boston

3  Calling?

4  **A.**  Yes.

5  **Q.**  And when you say meetings, you meant you came up, spoke

6  with somebody, and they spoke with you, and thereafter, you

7  left, correct?

8  **A.**  Yes.

9  **Q.**  And with regard to everything else, you know about what

10  was happening with City officials and Brian Appel or

11  Mr. Snow, comes from Brian Appel.

12  **A.**  Correct, or Carole Brennan or Mike Snow.

13  **Q.**  Okay.  Either Carole Brennan, Brian, or Michael, correct?

14  **A.**  Correct.

15  **Q.**  And with regard to what Brian, Michael, or Carole would

16  tell you, you accepted, carte blanche, what they said.

17  **A.**  No.

18  **Q.**  Okay.  Did you -- when they told you something, did you

19  investigate to find out whether or not what they were saying

20  to you was, in fact, correct?

21  **A.**  Sometimes.

22  **Q.**  How often?

23  **A.**  It's hard to say.  It depends on what they told me.

24  **Q.**  Do you have a recollection of what you checked to find

25  out?

1    **A.**   Over the course of the years of the business, they told

2    me thousands of things or hundreds of things.  Some of them I

3    didn't investigate.  Some of them I would ask them questions

4    about, but if the question is, did I ever call somebody for

5    primary information, like call the source of the information

6    to Brian and ask them to verify it?  No, I wouldn't do that.

7    **Q.**   Okay.  Now let me -- let's see if how this started.

8    When -- when Brian brought the idea to you, you showed some

9    interest, correct?

10   **A.**   Yes.

11   **Q.**   This was something that was in your bailiwick, something

12   you did on a relatively regular basis?

13   **A.**   Yes.

14   **Q.**   And you have far more experience than Brian, correct?

15   **A.**   In some aspects.

16   **Q.**   With regard to business and how you raise money and

17   things of that nature, right?

18   **A.**   With raising money, yes.

19   **Q.**   Okay.  And you decided that you would make an investment

20   in this, but there was certain conditions that you needed,

21   correct?

22   **A.**   Yes.

23   **Q.**   And one of those conditions was a long time agreement,

24   correct?

25   **A.**   Yes.

1   **Q.**  And with regard to a long term agreement, the purpose for

2   that was some assurance and comfort to the investors that it

3   wasn't going to be a single concert at which you would never

4   make the money back, correct?

5   **A.**  Correct, except for the single concert comment.

6   **Q.**  And the intention was, was it not, to have multiple

7   concerts and to -- what you refer to, is build the brand.

8   **A.**  Correct.

9   **Q.**  And going into this particular venture, did you discuss

10  with Mike Snow and Brian Appel an alternate strategy that we

11  would build the brand, increase the name, jack up the income,

12  and then sell it off?

13  **A.**  No, that wasn't our primary purpose.

14  **Q.**  Is it fair to say that's what happened?

15  **A.**  Yes.  We didn't sell the whole thing off.

16  **Q.**  Okay.  It's just a word.

17  **A.**  We sold a piece.

18  **Q.**  Did you have a conversation at the very beginning, in

19  which you had said to either Brian or Michael, separately or

20  together, that we'll build the brand, jack up the income, and

21  we'll see if we can get a major partner, who will return the

22  money we invested and still give us an interest in going

23  forward?

24  **A.**  I don't recall that, but it's possible.

25  **Q.**  That's what you did, isn't it, ultimately?

1   **A.**   Did we start the business, build a higher profit, and

2   then take a strategic investor?  Yeah, we did that.

3   **Q.**   And when you took it -- that was Madison Square Garden

4   Company or Corp.?

5   **A.**   Yeah.

6   **Q.**   That's a pretty big company.

7   **A.**   Yeah.

8   **Q.**   Yeah.  Okay.  Bigger than Orkila Investments?

9   **A.**   Most companies are.

10  **Q.**   What?

11  **A.**   Yes, bigger than Orkila Investments.

12  **Q.**   Maybe not forever, but at least for now.

13  **A.**   I think forever, but thank you for the confidence.

14  **Q.**   And you had a lot of confidence in yourself, didn't you?

15  **A.**   Reasonable confidence in myself.

16  **Q.**   You knew what you were doing, don't you?

17  **A.**   I feel like I'm competent at my job.

18  **Q.**   Okay.  And with regard to the long-term event process,

19  more -- multiple incidents of concerts, you understood, did

20  you not, that that was something you had to work out with a

21  landlord, whoever that landlord might be?

22  **A.**   Work what out?  I'm sorry.

23  **Q.**   Well, if you had an interest in a particular site, a

24  particular venue, whether or not you could get a long-term

25  arrangement depended upon if the landlord said, yeah, we'll

1  do that.

2  **A.**  Yes.

3  **Q.**  Okay.  And in this particular case, when you first

4  started negotiating this matter, was it your understanding

5  that the way the rent would be paid was by making a donation

6  to a particular charity in lieu of paying rent?

7  **A.**  I don't recall that, no.

8  **Q.**  You don't recall that?

9  **A.**  No.

10  **Q.**  Do you recall that, in or about July of 2012, July of

11  2012, receiving information from Brian Appel that the rent

12  situation changed, it was no longer payment to a charity, but

13  we had to pay real money.

14  **A.**  I don't recall that, no.

15  **Q.**  You don't recall that?

16        Did you, at some point in time, indicate to Brian

17  Appel, or show some comfort with the fact that you were going

18  to be charged $200 an hour to use the Plaza?

19  **A.**  I don't recall that, no, but that's not a very high rate

20  to pay to rent a music festival property.  So that would have

21  been -- just doing the math in my head right now, that would

22  be acceptable to me.

23  **Q.**  And you don't recall a conversation with him as to how

24  that $200 would be paid?

25  **A.**  No, I don't recall that conversation.  That wouldn't, to

1    me, be a thing that I would remember seven years later.  It's

2    not --

3    **Q.**  Do you recall, at or about that time, reading an article

4    in the *Boston Globe* with regard to that particular number,

5    $200 an hour?

6    **A.**  I don't recall that, no.

7    **Q.**  And when you say you don't recall, you're not saying it

8    didn't happen, just as you sit there, you don't remember.

9    **A.**  I don't remember.

10   **Q.**  Okay.  Now, with regard to events that occurred in this

11   matter, there came a point in time -- and I'm going to give

12   it to you, July 31, 2017, when some agents of the federal

13   government presented to you and wanted to speak with you?

14   **A.**  My attorney called me and told me that, I believe, yeah.

15   **Q.**  And you met with them?

16   **A.**  I remember -- yes, I remember my attorney calling me and

17   saying they want to talk to me.

18   **Q.**  And you agreed to talk to them?

19   **A.**  Yes.

20   **Q.**  And you understood, did you not, that they wanted

21   information with regard to your knowledge of certain events

22   that occurred with regard to Boston Calling?

23   **A.**  Yes.

24   **Q.**  And you understood that when they were speaking to you,

25   they were taking notes?

1   **A.**   Yes, I saw someone take notes.

2   **Q.**   In fact, there were three of them.

3   **A.**   Are you asking me if there was three of them?

4   **Q.**   Yes.

5   **A.**   I can't remember exactly.  That sounds about right.

6   **Q.**   Was it these three ladies right in the front row here?

7   **A.**   I don't want this to come off the wrong way, but I don't

8 exactly remember everybody, but I do see some familiar faces.

9 Sorry, but that's possible, yes.

10   **Q.**   All right.  When you were speaking to these agents,

11 whoever they might have been.

12   **A.**   Yeah.

13   **Q.**   They explained to you that they wanted information with

14 regard to Boston Calling, correct?

15   **A.**   Yes.

16   **Q.**   And they told you that what they wanted was truthful

17 information.

18   **A.**   Yes.

19   **Q.**   And what they told you is they wanted you to respond

20 candidly to their questions, correct?

21   **A.**   I don't know that they said that, or I can't remember

22 that word, "candidly."

23   **Q.**   It might not be the word, but they wanted a full answer?

24   **A.**   Yes.

25   **Q.**   They didn't want you to hold anything back, correct?

1    **A.**   Presumably correct, yes.

2    **Q.**   Okay.  And they told you that if for some reason you did

3    not answer truthfully, that that was a crime, lying to a

4    federal agent.  Did you understand that?

5    **A.**   I understood that.  I don't recall them saying that to

6    me, but I understood.

7    **Q.**   But you understood.

8    **A.**   Yes, I know that, yes.

9    **Q.**   And as a result of that, knowing that, you tried as best

10   you could to be truthful and forthcoming in your answers.

11   **A.**   Yes.

12   **Q.**   After that meeting, did you know or were you informed

13   that a report of that meeting, purporting to memorialize what

14   you said, was created by the agents or somebody associated

15   with them?

16   **A.**   I don't remember them telling me that, but I assume that

17   they made a report.

18   **Q.**   Okay.  And in your business as a relatively -- and I

19   don't want to say relative.  As a successful investor, you

20   don't like people, during the course of any discussion, to

21   put words in your mouth.

22   **A.**   Could you ask me this?  What's a specific question?  As

23   an investor, I don't like people to put words in my mouth?

24   **Q.**   Yes.

25   **A.**   As a person, I prefer people to not put words in my

1    mouth.

2    **Q.**  Whether it's as a businessman or an individual person,

3    you don't like people to say you said something that you

4    didn't say.

5    **A.**  Right.

6    **Q.**  Did you ask the agents to provide for you, at any time

7    after that meeting on July 31, 2017, did you ask them if you

8    could read the report they read to make sure that it

9    accurately reflected what you had said?

10   **A.**  I don't think I asked that.  I don't recall.

11   **Q.**  Did they ever offer to show you that report and tell you

12   or give to you, so you could check to see what they perceived

13   you had said?

14   **A.**  I don't recall.  They were talking primarily to my lawyer

15   or entirely to my lawyer, so it would have come through my

16   lawyer.  I don't recall.

17   **Q.**  But it was your responsibility to tell the truth.

18   **A.**  Yes.

19   **Q.**  And you understood that if, for some reason, they wrote

20   down something that they believed you said, but it was

21   untruthful, that some bad consequences could happen to you.

22   **A.**  Is that -- the question is do I think -- what's the

23   question?  Sorry.

24   **Q.**  The question is, you understand the question of whether

25   an answer is truthful, is determined by the person listening

1    to it, as to whether or not they believe that answer to be

2    correct.  Correct?

3    **A.**  I don't think that's correct.

4    **Q.**  You don't think that's true?

5    **A.**  I understood my duty was to tell the truth.  That's what

6    I did.

7    **Q.**  And you did?

8    **A.**  Yes, I believe I did.

9    **Q.**  You believed you did?

10    **A.**  Yes, definitely.

11    **Q.**  And I'm not saying you didn't.  I'm just saying you

12    understood that's what you were required to do.

13    **A.**  Yes.

14    **Q.**  And after that meeting, you never saw the -- and I think

15    it was an FD-302.  You never saw the 302 report, correct?

16    **A.**  I don't recall seeing it.

17    **Q.**  And have you seen it before you came to testify in this

18    courtroom?

19    **A.**  No.

20    **Q.**  And again, what you're reporting was what Mr. Appel

21    reported to you.  That was the sole base of knowledge for

22    most of the things you told the AUSAs, and that's Assistant

23    United States Attorneys, and the agent, the FBI agent,

24    correct?

25    **A.**  Correct as it relates to the meetings he was in that I

1    wasn't in.

2    **Q.**   Correct.  Now, with regard to the meeting of September 2,

3    do you recall Brian talking to you about that meeting?

4    **A.**   Yes.

5    **Q.**   And at that meeting, or did Brian tell you that at that

6    meeting, he was threatened?

7    **A.**   I don't recall that word being used.

8    **Q.**   Say that again.

9    **A.**   I don't recall him saying the word "threatened."

10   **Q.**   Okay.  Do you recall whether or not Brian Appel told you

11   that his concern revolved around the reducing of hours of the

12   concert and the amount of time that beer could be served?

13   **A.**   I recall that general topic, yes.

14   **Q.**   Now, before that September 2nd meeting, did you also

15   learn from Mr. Appel that there was a telephone call in July,

16   from Mr. Brissette, during which the concept of using union

17   workers at the September festival was raised?

18   **A.**   I don't recall.

19   **Q.**   Do you recall having a number of conversations?  And when

20   I say conversations, I mean, in this context, did you recall

21   having a number of e-mails exchanged between yourself and

22   Mr. Appel, Mr. Snow, Carole Brennan, concerning what had been

23   said on July and I think it was the 31st, by Mr. Brissette?

24   **A.**   I don't recall the July 12th or 31st phone call, so I

25   don't recall what was said, so I don't know what the e-mails

1 would be about.

2 **Q.** Do you -- did you have any knowledge, or did you have any

3 understanding that a question was raised about using union

4 labor at Boston Calling, and you and your partners, in

5 essence, had to make a decision as to whether you would or

6 whether you wouldn't?

7 **A.** Yes.

8 **Q.** And during the course of that decision, is it fair to say

9 that you looked at it as a business decision?

10 **A.** Not entirely.

11 **Q.** Do you have a morale objection to unions?

12 **A.** No.

13 **Q.** Do you have some fundamental belief that what unions do

14 is wrong?

15 **A.** No.

16 **Q.** So what you really wanted to know was, what's it going to

17 cost?

18 **A.** Not entirely.

19 **Q.** Okay.  Now, you believed, did you not, that you had no

20 obligation to use union workers at the festivals, right?

21 **A.** Yes, that's true that my view was that we did not have an

22 obligation, by any kind of law, to use a union.

23 **Q.** And that belief was based upon the irrevocable license

24 agreement, correct?

25 **A.** I wouldn't say that entirely.  I didn't think about the

1   license agreement very often, because it wasn't --

2   technically speaking, it wasn't a binding lease.  It reserved

3   dates and provided intent.  So it wasn't the basis of me

4   thinking that, probably.

5   **Q.**   Okay.  The irrevocable license agreement wasn't a binding

6   contact.  It's simply reserved for you certain dates which,

7   if, during the course of time, you got the necessary permits,

8   you could put a concert on on a particular time and date,

9   correct?

10  **A.**   And provided for some windows of time where there

11  wouldn't be another event right before or right after, yes.

12  **Q.**   And but with regard to the irrevocable license agreement

13  itself, there was nothing in there that bound Orkila or

14  Boston Calling or --

15  **A.**   Crash Line.

16  **Q.**   -- Crash Line, correct?

17  **A.**   I don't believe so.  There was no --

18  **Q.**   And there was nothing in there that bound the City, no

19  matter what the writing might be?

20          MS. KAPLAN:  Objection.  Bound to what?

21          THE COURT:  Overruled.  If you understand.

22  BY MR. CINTOLO:

23  **Q.**   With regard to anything.

24  **A.**   I'm sure there were terms in there that would bind the

25  City to something, if something else happened, a conditional

1  binding.

2  **Q.**  Okay.  So it was a one-sided agreement?

3  **A.**  I wouldn't say that.  I think it was just a standard,

4  long-term intent to cooperate agreement.

5  **Q.**  Do you remember seeing -- and you've read the agreement?

6  **A.**  Once upon a time I read the agreement.  I haven't read

7  the agreement in seven years probably.

8  **Q.**  You put 400,000 of your money in this venture, correct?

9  **A.**  Yes.

10  **Q.**  And your friend -- am I pronouncing it correctly,

11  Mr. Sohn?

12  **A.**  Paul Sohn?

13  **Q.**  Paul Sohn.  He put 400,000 in this venture?

14  **A.**  Yup.

15  **Q.**  When you invest money for clients, would it be fair to

16  say you read and make yourself aware of the deal terms as

17  best you can?

18  **A.**  That's true.

19  **Q.**  Okay.  And was the $400,000 such a piddling amount to you

20  that you said I don't need to read this agreement?

21  **A.**  No.

22  **Q.**  No, you read it, and you understood it, didn't you?

23  **A.**  I believe that's true.

24  **Q.**  Okay.  Now, do you recall there being anything in that

25  irrevocable license agreement that mentioned unions?

1   **A.**   I don't -- I don't remember if the word was specifically

2   included, but I recall that it did not require it.

3   **Q.**   Okay.  Now, when you say it didn't require it, you

4   understood, or you implied or inferred from certain wording

5   that was within the agreement, your opinion was they don't --

6   that doesn't require you to use unions.

7   **A.**   Correct.

8   **Q.**   Did it prohibit you from using unions?

9   **A.**   I believe not.  I don't recall exactly.

10   **Q.**   So it didn't say, "You cannot use unions."

11   **A.**   Correct.

12   **Q.**   Okay.  And you wanted to know and you discussed with

13   Brian Appel, you know, it's not in the agreement, but hey,

14   I'd like to know, are we going to be asked to use union

15   labor?

16   **A.**   Sorry, what's the question?

17   **Q.**   You asked Brian Appel, even though the word "union" did

18   not appear in the contract, you, having put 400 of yours and

19   400 of Sohn's, you wanted to know whether or not you'd be

20   asked to hire union labor.

21   **A.**   I don't recall that.  It's possible.  It's possible.

22   **Q.**   Do you recall or do you have any understanding of a

23   conversation in the course of an e-mail, from Brian Appel to

24   Lisa Lamberti Menino, about whether or not unions had to be

25   used on City Hall Plaza?

1   **A.**   I don't recall that.

2   **Q.**   Did you ask Brian to check that out?

3   **A.**   I don't recall asking him to check it out or not check it

4   out.

5   **Q.**   Having negotiated as many deals as you have, and I assume

6   there were a lot, correct?

7   **A.**   A reasonable amount, yes.

8   **Q.**   More than me, probably.

9          THE COURT:  Sustained.  He doesn't have any

10   knowledge about you, Mr. Cintolo.

11          MR. CINTOLO:  Thank you, Your Honor.

12   BY MR. CINTOLO:

13   **Q.**   During your employment by Providence Equity, which has an

14   address on Wall Street or somewhere in New York City,

15   correct?

16   **A.**   It's based in Providence, Rhode Island, but we have an

17   office in New York, yeah.

18   **Q.**   And you're the one who manned the office in New York?

19   **A.**   Me and 50 other people.

20   **Q.**   And you were the directing -- what was your position?

21   I'm sorry?

22   **A.**   Managing director, but that's a pretty common title in

23   New York jobs.  So there was ten of us, probably, called

24   that.

25   **Q.**   And would you say that Providence Capital --

```
 1    A.   Equity.
 2    Q.   Providence Capital --
 3              MR. CINTOLO:  I'm sorry.
 4    BY MR. CINTOLO:
 5    Q.   Had some sort of expertise, or at least a lot of
 6    experience in investing in concerts and sports events and
 7    things of that nature?
 8              MS. KAPLAN:  Objection.
 9              THE COURT:  What's the relevance?  Sustained.
10              Can I see counsel at sidebar for a minute?
11              (The following discussion held at the bench.)
12              THE COURT:  I'm just wondering what the --
13              MR. CINTOLO:  I'm almost there, Your Honor.
14              THE COURT:  What did you say?
15              MR. CINTOLO:  I'm almost there.  I've got to lay a
16    foundation before I ask the question.
17              THE COURT:  Okay.  I don't know what the question
18    is, but --
19              MR. CINTOLO:  Well, I hope you'll learn.
20              THE COURT:  But I mean, I think, like you have
21    to -- if the foundation is is he an investor, an experienced
22    investor, someone who has invested in music festivals, I
23    think you have that.  I don't think anyone's contesting that
24    about him and that's been made clear.  But this whole
25    history, what his role was in Providence Equity, and whether
```

1    he was in charge of the whole office or not, who cares.

2              MR. CINTOLO:  Okay.  I'm getting to the substance.

3    I can probably do it right now.

4              THE COURT:  Good.

5              MR. CINTOLO:  That doesn't mean it will end right

6    now, Your Honor.

7              THE COURT:  I hope there's not too much more.

8              (Bench conference concluded.)

9    BY MR. CINTOLO:

10   **Q.**  Did you tell the agents that you understood that what

11   occurred at the September 2nd meeting was that Appel and Snow

12   had been asked to hire union labor?

13   **A.**  Could you -- could you define "asked" more?

14   **Q.**  Did you use the word "asked"?

15   **A.**  I can't recall that meeting.

16   **Q.**  Do you know what the word "asked" means?

17   **A.**  It means all range of things.

18   **Q.**  It doesn't mean "demand," does it?

19   **A.**  If I asked --

20             MR. CINTOLO:  May I approach?

21             THE COURT:  You may.

22             THE WITNESS:  If I ask my seven-year-old to clean

23   her room, I'm not asking.

24   BY MR. CINTOLO:

25   **Q.**  Were you dealing with seven-year-olds?

1    **A.**  No.

2    **Q.**  You were dealing with sophisticated men and women.

3    **A.**  I wasn't dealing with anybody directly.

4    **Q.**  Brian Appel was dealing with it and that's what he was

5    relating to you, correct?

6    **A.**  Is the question was he dealing with sophisticated men?

7    **Q.**  Yeah.

8    **A.**  Yes.

9    **Q.**  Okay.  And Brian Appel told you, at that meeting, "We

10   were asked to hire some union workers."

11   **A.**  What's the question?

12   **Q.**  At that meeting, Brian Appel -- strike that.

13          Brian Appel told you that, at that meeting on

14   September 2nd, he was asked to hire union workers.

15   **A.**  Are you asking me if he told me he was asked to use union

16   workers?

17   **Q.**  I'm asking you, did he tell you that my client over

18   there, Tim Sullivan, or anybody else at that second --

19   September 2nd meeting, did he tell you that they asked for

20   him to use or hire union labor?

21   **A.**  He might have used that word, yeah.

22   **Q.**  And you were trying to be as careful as you could,

23   because you know words are important, correct?

24   **A.**  Words are important.

25   **Q.**  Yeah.  And if you said something else, you would have

1    said it to the agents to be candid and forthwith with your

2    answers, right?

3    **A.**   Yes.

4    **Q.**   And do you know whether or not you said, "He told me they

5    asked"?

6    **A.**   I can't recall exactly, but I could have said that.

7    **Q.**   Do you -- I put a document up there, do you know what

8    that document is?

9              MS. KAPLAN:   Objection.   I'm not sure I know what

10   that --

11             THE COURT:   Show it to Government counsel first.

12             MS. KAPLAN:   Okay.   I know.   Thank you.

13             MR. CINTOLO:   Okay.

14   BY MR. CINTOLO:

15   **Q.**   Do you see that document?

16   **A.**   I see it.

17   **Q.**   And I ask you -- let me see if I can get the page that

18   I'm going to ask you to read.

19             MR. CINTOLO:   Bear with me one second, Your Honor.

20             THE COURT:   Can I see counsel one more time at

21   sidebar?

22             (The following discussion held at the bench.)

23             THE COURT:   The reason that I'm confused,

24   Mr. Cintolo, is I don't understand him to have said anything

25   on direct or on cross inconsistent with what's in the 302

1    about the September --

2              MR. CINTOLO:  It's not a question of what is

3    consistently here, Your Honor.  Mr. Appel, although in his

4    302 reports and in his grand jury testimony, used the word

5    "asked," used the word "asked," "request."

6              When he took the stand --

7              THE COURT:  Yeah, but this witness said asked --

8    there's nothing that this witness has said that is

9    inconsistent -- with what is memorialized on the 302 about

10   the September meeting.

11             MR. CINTOLO:  Yeah.

12             THE COURT:  So what is there to impeach him with

13   about the 302?

14             MR. CINTOLO:  I'm not impeaching him, Your Honor.

15   I'm here to impeach --

16             THE COURT:  So you're just wanting him to say that

17   this is what he said today and this is what he told the

18   agents in July of --

19             MR. CINTOLO:  Correct.

20             THE COURT:  2017.

21             MS. KAPLAN:  Yes, but requested, suggested, so

22   that's the entry date --

23             MR. CINTOLO:  You don't tell me what your questions

24   are about.  What it's about is --

25             THE COURT:  So why don't you ask -- just ask him

1    you told the agents the same thing that you've told us here

2    today?

3            MR. CINTOLO:  Yeah, and that it was -- all I want

4    to get from him is that he was trying to be forthcoming.

5            THE COURT:  You've gotten that.

6            MR. CINTOLO:  And he said, ask, and that came from

7    Mr. Appel.

8            THE COURT:  You've already got Appel told him he

9    used that word.

10           MR. CINTOLO:  I didn't think I had it sufficiently

11   enough, Your Honor, if they will concede.

12           THE COURT:  Well, the transcript is what it is.

13           MR. CINTOLO:  I understand.

14           THE COURT:  Okay.

15           MR. CINTOLO:  And I'll try, Your Honor -- Your

16   Honor, and I apologize.  I'm not trying to be a wise guy.

17   It's just that when you get old --

18           THE COURT:  I understand, but here's the thing,

19   like I just think --

20           MR. CINTOLO:  You don't understand.

21           THE COURT:  You made the point.  You said that

22   everything Appel nothing he said on direct to me seems

23   inconsistent with the 302 about that paragraph in the 302 is

24   really all that he testified about.

25           So do you have anything else, Mr. Cintolo?

```
1              MR. CINTOLO:  Five minutes, maybe.
2              THE COURT:  Okay.  Do you have anything,
3     Mr. Kettlewell?
4              MR. KETTLEWELL:  Well, I just have one or two
5     questions about the date of the meeting that he has in July
6     and I got to put back in August.
7              MR. KILEY:  And maybe something about drafting.
8              THE COURT:  Okay.
9              (Bench conference concluded.)
10    BY MR. CINTOLO:
11    Q.  Mr. Du Bey, I'm going to try to make sure you get that
12    flight to Germany.  So I'm going to start winding down now.
13    A.  Okay.  Thanks.
14    Q.  Is it fair to say that nobody, including Brian Appel,
15    ever told you they were extorted or threatened or anything of
16    that nature with regard to using union labor?
17    A.  I do not recall Brian or anybody telling me the words
18    "extorted," or "threatened."
19    Q.  And you believed it to be a business decision and I
20    believe you indicated that it really wasn't all that much
21    money involved in light of the festival taking in about
22    $4 million?
23              MS. KAPLAN:  Objection.  I don't believe that was
24    his testimony.
25              THE COURT:  Sustained as to the form.
```

1    BY MR. CINTOLO:

2    **Q.**  Do you know what the delta was between using the eight

3    workers that were used and using Mr. Kenney's people?

4    **A.**  I couldn't tell you exactly, but I agree with you that

5    the overall amount would not have been material in the

6    context of $4 million.

7            MR. CINTOLO:  Thank you.

8            THE COURT:  Mr. Kettlewell?

9        **CROSS-EXAMINATION BY COUNSEL FOR DEFENDANT SULLIVAN**

10   BY MR. KETTLEWELL:

11   **Q.**  Just a handful of questions, you're going to make the

12   flight.

13   **A.**  I'm going to make the flight no matter what, so I'm fine.

14   **Q.**  So Mr. Cintolo was asking you about a meeting that you

15   said happened in July.  Do you have a recollection, do you

16   recall the first time that Brian Appel mentioned the

17   possibility of hiring union labor was in August?  Do you

18   recall that?

19   **A.**  I don't recall that it was exactly in August.

20           MR. KETTLEWELL:  All right.  Your Honor, may I

21   approach?

22           THE COURT:  You may.

23           MR. KETTLEWELL:  Exhibit 120.

24   BY MR. KETTLEWELL:

25   **Q.**  I want to show you a document and ask you -- it's

1    previously been marked as Exhibit 120 for identification, and

2    ask you just to quickly read that to yourself.

3    **A.**  (Witness reviews document.)

4    **Q.**  Whether that refreshes your recollection that it was in

5    August.

6    **A.**  Yeah.

7    **Q.**  And without reading the document -- you're supposed to

8    put the document aside for a moment.  And do you remember

9    when in August it was that you had this conversation with

10   Mr. Appel?

11   **A.**  This conversation?

12   **Q.**  Yes.

13   **A.**  It looks like it was noon on August 21st.

14   **Q.**  And it was August 21st at noon, you received an e-mail to

15   the effect Mr. Appel wanted to discuss the union situation,

16   correct?

17   **A.**  Yeah.

18   **Q.**  And he also told you about the possibility of a

19   demonstration by the union that you mentioned on direct

20   examination, correct?

21   **A.**  Uh-huh.  Yes.

22   **Q.**  On that day?

23   **A.**  I can't recall that, but it's possible.

24   **Q.**  All right.  And do you recall him sending you an

25   additional e-mail about a separate union demonstration?

1    **A.**   I don't recall that.

2    **Q.**   On the same day.

3          MR. KETTLEWELL:  May I approach, Your Honor?

4          THE COURT:  You may.

5          MR. KETTLEWELL:  Exhibit 21.

6    BY MR. KETTLEWELL:

7    **Q.**   I'm going to show you a document that has previously been

8    marked Exhibit 21 for identification.  Take a look at it and

9    does that refresh your recollection, again, without -- when

10   you finish reading, look up.

11   **A.**   It's a link to articles.  I don't know what the article

12   says, but I can see what the link says.

13   **Q.**   All right.  And do you recall Mr. Appel sending you a

14   link --

15   **A.**   Yes, I can see that he sent me a link.

16   **Q.**   -- about union demonstration?

17   **A.**   Yes.

18   **Q.**   And that was sent to you on August 21st, correct?

19   **A.**   Yes.

20   **Q.**   Later in the day.

21   **A.**   Yes.

22         MR. KETTLEWELL:  All right.  That's all I have,

23   Your Honor.

24         THE COURT:  You don't have any redirect, do you?

25         MS. KAPLAN:  Just very briefly, Your Honor.

1          **REDIRECT EXAMINATION BY COUNSEL FOR PLAINTIFF**

2     BY MS. KAPLAN:

3     **Q.**  Mr. Du Bey, when you said on cross-examination that you

4     looked at it -- you were asked if you looked at this as a

5     business decision and you said "not entirely," can you tell

6     us what you mean -- what you meant by that?

7     **A.**  The implication of a business decision, I think where the

8     question was going, was whether it was purely a financial

9     decision.  I think that's where the question was going and I

10    reject that, because there are a lot of considerations around

11    hiring people who are hanging stages.  The first concern that

12    we have as concert organizers is safety.  And when you put

13    groups of people together and they build stages and they're

14    not working together for years and have all their roles

15    figured out correctly, bad things can happen.

16              Our primary consideration is around safety and the

17    biggest, the largest, most heaviest obvious element of a

18    concert safety plan has to do with building very heavy, huge

19    stages that need to be wind-rated.  So my concern wasn't just

20    about money, it was about in terms of making the decision, it

21    was about whether or not all the operational elements of the

22    business would be up to our standards.  It was about our

23    relationship with our production company, who we rely on,

24    Bill Kenney Productions.  It was about the PR aspect of not

25    doing it.  It was about Brian's concerns, his stress factors

1     around his relationship with the City.

2              There was a lot of elements in the conversations

3     that we had and the reason I said not entirely was because I

4     inferred from the question that it was a question purely

5     about the whatever thousand dollars of difference for nine

6     people's time.

7     Q.  And when you were asked about your knowledge of whether

8     Crash Line had an obligation to use union labor and if there

9     was any kind of law, and you said that your belief was not

10    based on the license agreement entirely, what was it based

11    on?

12    A.  Well, having done -- having had some experience in this,

13    usually there are a lot -- there are many more laws that

14    underlie whatever it was, five, ten page agreement.  I mean,

15    we had an agreement of understanding, but I would assume that

16    laws related to whether or not anybody applying for a permit

17    must use union would be something that would be established

18    in some other set of laws in the City or the State.  So when

19    the question was asked, do you think it was -- it was

20    entirely spelled out, your obligation or lack thereafter to

21    use union in the permit, I said no, because my bet is that it

22    refers to whatever the city codes are around what event

23    producers have to do.

24    Q.  And are you familiar with those codes?

25    A.  No.

1   **Q.**  Did anybody ever tell you that you needed to use union

2   labor to run an event on City Hall Plaza?

3   **A.**  No.

4   **Q.**  And finally, you were just asked about this meeting that

5   took place in August, where union labor -- the issue of union

6   labor had come up.  Mr. Brissette had asked that there be a

7   discussion about hiring union labor.

8           Do you recall that?

9   **A.**  Yes.

10  **Q.**  And when you were asked by the agents about what Brian

11  Appel had told you, with respect to that meeting, and you

12  said maybe, possibly he had said that he was asked.  Do you

13  recall that?

14          MR. KETTLEWELL:  Objection.

15          THE COURT:  What's the objection?

16          MR. KETTLEWELL:  It's hearsay.  It's a prior

17  statement and it's consistent.  I don't understand how it's

18  admissible.

19          THE COURT:  Well, the first question is fine.

20  You're just asking him does he recall being asked about what

21  Brian Appel told you with respect to a meeting in August.

22          So the question is simply, do you recall being

23  asked about that.

24          THE WITNESS:  I recall being asked about that.

25  BY MS. KAPLAN:

1   **Q.**  And do you recall that you -- that the question related

2   to what had happened at the August 21st meeting?

3   **A.**  The August 21st --

4   **Q.**  I believe you were shown an e-mail.

5   **A.**  Was there a meeting on August 21st?  I was shown an

6   e-mail that was sent to me on August 21st, with a request for

7   a phone call.  And then later on that day, the link was sent

8   to me by e-mail related to another union demonstration.

9   **Q.**  And at some point did you have a conversation with

10  Mr. Appel about that meeting?

11  **A.**  That day, on August 21st.

12  **Q.**  Yes.

13  **A.**  Did I have a conversation on August 21st?

14  **Q.**  Yes.

15  **A.**  I believe so, based on the e-mails.

16  **Q.**  And what did Mr. Appel tell you about being asked to use

17  union labor?

18          MR. KETTLEWELL:  Objection, Your Honor.

19          THE COURT:  Ever, or that day?

20          MS. KAPLAN:  That day.

21          THE COURT:  Overruled.  You can answer.

22          THE WITNESS:  What did he tell me that day on the

23  phone call?

24  BY MS. KAPLAN:

25  **Q.**  Or thereafter, about that meeting?

1    **A.**   About that meeting.  He told me that he --

2            THE COURT:  It was just with respect to that

3    meeting, what he told you.  That's what her question is.

4            THE WITNESS:  Okay.  I can't recall -- I cannot

5    recall exactly with respect to that meeting.  I can recall

6    generally what the topic of the union labor.  If the question

7    is what did he tell me exactly about that meeting, I can't --

8    BY MS. KAPLAN:

9    **Q.**   Well, let me rephrase it.  Do you recall telling the

10   agents that Mr. Appel had said that they had been

11   asked/requested/suggested to use union labor after that

12   meeting?

13           MR. KETTLEWELL:  Objection.

14           THE COURT:  Overruled.

15           THE WITNESS:  I don't recall using those exact

16   words, but that is consistent of my memory of the event.

17           MS. KAPLAN:  If I could have a moment, Your Honor.

18           THE COURT:  Yes.

19           (Counsel confers.)

20           MS. KAPLAN:  Nothing further, Your Honor.

21           THE COURT:  All right.

22           MR. KETTLEWELL:  Nothing here, Your Honor.

23           MR. CINTOLO:  Nothing.

24           THE COURT:  All right.  Thank you very much,

25   Mr. Du Bey, you're excused.

1          THE WITNESS:  Thank you.

2          THE COURT:  Now we resume with Ms. Linehan.

3          MS. KAPLAN:  Yes, Your Honor.  If I could just have

4     a moment, Your Honor, to regroup.

5          THE COURT:  Yes.

6          Ms. Linehan, if you'd return to the witness box, I

7     remind you that you remain under oath from yesterday.

8          MS. KAPLAN:  May I inquire, Your Honor.

9          THE COURT:  Yes.  I'm sorry.

10                         **JOYCE LINEHAN**

11     having been previously duly sworn, testified as follows:

12          **DIRECT EXAMINATION BY COUNSEL FOR PLAINTIFF, Cont.**

13     BY MS. KAPLAN:

14     **Q.**  Good morning, Ms. Linehan.

15     **A.**  Good morning.

16     **Q.**  I believe yesterday, when we left off, we had talked

17     about the Work Exchange, the volunteer program.  Do you

18     recall that?

19     **A.**  Yes.

20     **Q.**  Okay.  I want to go back to that for a second.  Do you

21     recall that you said you did not remember whether Tim

22     Sullivan was at the March 2014 meeting involving the Work

23     Exchange program?

24     **A.**  I do recall saying that, yes.

25     **Q.**  And I believe you had some folders in front of you, if

1  you can just look at Exhibit 65, please.

2           MS. KAPLAN:  And this will be just for the witness.

3           THE WITNESS:  Yes.

4  BY MS. KAPLAN:

5  **Q.**  And looking at that -- have you looked at that e-mail?

6  **A.**  Yes.

7  **Q.**  Does that refresh your recollection -- now, putting it

8  away, if you would, closing it up.

9           Does that refresh your recollection about whether

10  Tim Sullivan had any involvement with the issue of the Work

11  Exchange program?

12  **A.**  I clearly let Tim know that it was a national program.

13  **Q.**  And is this an e-mail that you sent to Tim Sullivan on

14  February 19, 2014?

15  **A.**  Yes.

16           MS. KAPLAN:  I would offer it into evidence, Your

17  Honor, it's Exhibit 65.

18           THE COURT:  Any objection?

19           MR. KELLEY:  No objection, Your Honor.

20           MR. KETTLEWELL:  None, Your Honor.

21           THE COURT:  All right.  Number 65 in evidence.

22           (Exhibit No. 65 admitted into evidence.)

23           MS. KAPLAN:  And then if we could, just for the

24  witness, Exhibit 66, please.

25  BY MS. KAPLAN:

1    **Q.**  And you can look in the folder, 66.

2         Do you see at the top, it's an e-mail from Brian

3    Appel, or Brian at Crash Line Productions to Joyce Linehan?

4    **A.**  Yes.

5    **Q.**  Is this an e-mail that you sent to Brian?

6    **A.**  It looks to me like it's an e-mail that Brian sent to me.

7    **Q.**  Oh, I'm sorry, from Brian to you, you received that.

8    Yes, I'm sorry.

9    **A.**  Yes.

10   **Q.**  And it's dated February 26, 2014?

11   **A.**  That's correct.

12        MS. KAPLAN:  I would offer this into evidence, Your

13   Honor.

14        THE COURT:  Any objection?

15        MR. KETTLEWELL:  No objection, Your Honor.

16        MR. KELLEY:  No objection, Your Honor.

17        THE COURT:  Admitted, number 66.

18        (Exhibit No. 66 admitted into evidence.)

19        MS. KAPLAN:  And Ms. Beller, if we could just start

20   at the bottom, please, highlighting it.

21   BY MS. KAPLAN:

22   **Q.**  So this is an e-mail from yourself to Elizabeth O'Brien,

23   on February 26, 2014, correct?

24   **A.**  Yes.  May I read the paper version?

25   **Q.**  Sure.

1   **A.**   Yes.

2   **Q.**   Who is Elizabeth O'Brien?

3   **A.**   She was one of the mayor's schedulers at the time.

4   **Q.**   And it's CCed to Brian at Crash Line, and is that Mike

5   Snow at Crash Line?

6   **A.**   That's correct.

7   **Q.**   And the subject is "Re: Boston Calling meeting," correct?

8   **A.**   Yes.

9   **Q.**   Okay.  And it says, "Good for me, Brian and Mike are

10   copied.  Hopefully it works for them."

11          And this is you saying, "From our staff, I would

12   also like Tim Sullivan to be there, as well as Joe Rull and

13   Chris Cook, if they're available."

14   **A.**   That's right.

15   **Q.**   Does this now refresh your recollection about whether Tim

16   Sullivan was involved in this Work Exchange issue?

17   **A.**   Well, it refreshes my memory to say that I asked that Tim

18   Sullivan be at the meeting, yes.

19   **Q.**   Do you recall whether he was at the meeting?

20   **A.**   I don't.

21          MS. KAPLAN:  I would offer this into evidence, Your

22   Honor, if it's not already.

23          THE COURT:  It's already in evidence.  66.

24   BY MS. KAPLAN:

25   **Q.**   And in April of 2014, when you --

1          MS. KAPLAN:  Ms. Beller, if we could have

2    Exhibit 39.  It's in evidence.

3          THE COURT:  39 is in evidence?

4          MS. KAPLAN:  Yes.

5    BY MS. KAPLAN:

6    **Q.**  This is an e-mail that you received from Brian on

7    April 13, 2014?

8    **A.**  Yes.

9    **Q.**  And he's telling you that he met with the Attorney

10   General's Office, and the issue of the volunteers were

11   resolved, correct?

12   **A.**  That's correct.

13   **Q.**  And is it your understanding that that issue was

14   resolved?

15   **A.**  I would take Brian at his word, yes.

16   **Q.**  Did it come up again at any time?

17   **A.**  I don't recall.

18   **Q.**  Prior to your going to City Hall in February of 2014 for

19   the Walsh Administration, were you aware that Boston Calling

20   had already held two festivals on City Hall Plaza in 2013?

21   **A.**  Yes.

22   **Q.**  And did you know that Boston Calling had a licensing

23   agreement with the City?

24   **A.**  I don't know that I knew that specifically.

25   **Q.**  And what, if any, involvement did Ken Brissette have with

1    the September 2014 Boston Calling Festival on City Hall

2    Plaza?

3    **A.**  I'm sorry, which one?  September --

4    **Q.**  September 2014.

5    **A.**  Well, he would have been the director of Tourism and

6    Special Events at that point.

7    **Q.**  And what does that mean?  What would his involvement be

8    with the festival?

9    **A.**  The director of the Special Events would have a role in

10   any festival that was taking place in the city.

11   **Q.**  What role would that be?

12   **A.**  Coordination.

13   **Q.**  Coordination of what?

14   **A.**  Of the festival.

15   **Q.**  And what would that include?

16   **A.**  Working with them through the Special Events process.

17   **Q.**  Would that include coordinating permits?

18   **A.**  Yes.

19   **Q.**  Would it include coordinating getting the entertainment

20   license?

21   **A.**  I believe so.

22   **Q.**  And Tim Sullivan, what was his role with respect to the

23   Boston Calling Festivals?

24   **A.**  Tim worked in the Intergovernmental Relations Department.

25   I'm not sure what his title was at that point.

1   **Q.**   By the way, does he still work there?

2   **A.**   Yes, he does.

3   **Q.**   Does he have the same position now that he had in 2014?

4   **A.**   He does not.

5   **Q.**   What is his position now?

6   **A.**   He's the director of Intergovernmental Relations.

7   **Q.**   What was he then?

8   **A.**   I'm not sure.  He was maybe third in command there.

9   **Q.**   So he received a promotion?

10  **A.**   Yes.

11  **Q.**   Do you know when that was?

12  **A.**   No.

13  **Q.**   I'm sorry?

14  **A.**   I don't.  I don't.

15  **Q.**   So again, what was his role with respect to the Boston

16  Calling Festivals?

17  **A.**   Well, in this particular instance, Tim was involved

18  because there was an issue that was being brought to the

19  attention of the Attorney General's office.  And Tim working

20  in Intergovernmental Relations would have been one of the

21  people who liaises with the state and federal offices, as

22  well as the City Council.

23  **Q.**   But after April of 2014, when that issue was resolved,

24  did Tim Sullivan continue to have involvement in the Boston

25  Calling Festivals?

1    **A.**  I don't know that I'm aware of that specifically.

2    **Q.**  Well, generally are you aware of it?

3    **A.**  I don't recall.

4    **Q.**  So you don't recall Tim Sullivan's involvement in the

5    Boston Calling Festivals after this issue of the volunteers

6    was resolved in April of 2014?

7    **A.**  I don't.  If there's something that you want to refresh

8    my memory with, I'm happy to speak to it.

9    **Q.**  And what was your involvement after April of 2014 with

10   the Boston Calling Festivals?

11   **A.**  It was a situation where Brian Appel would continually

12   come back to me for different things, when he hit any kind of

13   a barrier in working with Boston Calling, so it was not my

14   job to deal with Boston Calling or Special Events, but

15   because of my prior relationship with him, as well as my

16   prior experience in the industry, I found myself being

17   continually pulled into the conversation.

18   **Q.**  And what kind of issues would he pull you into?

19   **A.**  He was very focused on I would say three issues.  One was

20   the lack of consistency in budget quotes for police details.

21   The issue being that the police would tell them that the

22   police details were going to cost one thing and then when the

23   bill came in after the show, it would be entirely another.

24   He was also hyper-focused on this issue of beer pens, being

25   allowed to let patrons roam the grounds as opposed to -- with

1    alcohol, as opposed to being in a pen, where they could drink

2    that alcohol.  And he was also -- he also became very focused

3    on the notion of extended -- an extended agreement with the

4    City.

5    **Q.**  And he talked to you about all of those issues?

6    **A.**  He did.

7    **Q.**  And when you say that he -- there was a lack of

8    consistency on the part of the budget for the police, and

9    that the numbers kept changing, had they gone up or down?

10   **A.**  Up.

11   **Q.**  And small amount or a large amount?

12   **A.**  I'd have to check to know what the exact amounts were,

13   but it was a pretty considerable amount, if I recall

14   correctly, between the May 2014 -- sorry, what was quoted for

15   the May 2014 concert, versus what was on the final bill when

16   it came in.

17   **Q.**  Okay.  And with respect to the beer pens, what was the

18   issue there?

19   **A.**  The issue was that the -- the Boston Calling, Brian

20   wanted people to be able to buy beer and wine and not be kept

21   in a pen where they had to drink that beer and wine, but

22   rather to be able to roam the grounds of the entire festival

23   with their beer and wine.

24   **Q.**  And did you do anything when you heard that he had this

25   issue about let's focus on the beer pens?

1    **A.**   Yes, I did.

2    **Q.**   What did you do?

3    **A.**   I spoke to the police commissioner and tried to explain

4    that I thought that this was a good idea, that they should be

5    allowed to try.  They were willing to work on security issues

6    and things of that nature, so I tried to convince

7    Commissioner Evans that that was something that they should

8    try.

9    **Q.**   Do you remember when that was?

10   **A.**   I don't.

11            MS. KAPLAN:  If we could have Exhibit 13,

12   Ms. Beller.

13            Which is in evidence, Your Honor.

14   BY MS. KAPLAN:

15   **Q.**   Do you see that this is an e-mail from Brian Appel to

16   Carole Brennan and it's dated April 14th?

17   **A.**   Yes.

18   **Q.**   Okay.  And the first paragraph is, "We got curfew

19   approval for 11:00 p.m. for all three days of each festival."

20            She also wrote in the letter, "Including September

21   dates, which means no hearing needed for September.  All very

22   good news."

23            Did you help with that?

24   **A.**   With the curfew?

25   **Q.**   Yes.

1    **A.**   Yes, I did.  Thank you for refreshing my memory.  I did

2    talk to them about a curfew extension.

3    **Q.**   Who did you talk to?

4    **A.**   Commissioner Evans and I imagine some of my colleagues,

5    as well, but I don't recall specifically.

6    **Q.**   You don't remember which colleagues you would have talked

7    to about that?

8    **A.**   I would have spoken to Joe Rull, no doubt.  Beyond that,

9    I'm not sure.

10   **Q.**   And then the next paragraph, "Joyce just texted me

11   confirming that the beer garden restriction is officially

12   removed and has been signed off by both Mayor, Commissioner

13   Evan."

14          Were you involved in this -- well, obviously you

15   were involved in this issue?

16   **A.**   I believe I helped convince the Commissioner that he

17   should allow for this to happen, yes.

18   **Q.**   Do you remember when you did that?

19   **A.**   I don't.

20   **Q.**   Would it have been during the same conversation that you

21   talked to the Commissioner about the curfew?

22   **A.**   I'm not sure.  It could have been.

23   **Q.**   So -- and this was in April.  So this was prior to the

24   May 2014 festival, correct?

25   **A.**   Correct.

1    **Q.**  And for the May 2014 festival, were there beer gardens,

2    do you know?

3    **A.**  It's my understanding there was not a beer pen for the

4    May concert.

5    **Q.**  Okay.  And did -- after the May 2014 festival, did the

6    issue come up, these same issues come up again, specifically

7    about the curfew times and the service of alcohol and beer

8    pens?

9    **A.**  They did, though I remember more clearly the beer pen

10   issue than the curfew issue, but I do believe curfew was an

11   issue, too.

12   **Q.**  And what do you recall?

13   **A.**  That pretty close to the September concert, Commissioner

14   Evans expressed reluctance to allow them to not use beer pens

15   again.

16              MS. KAPLAN:  I'm going to show you, if we could,

17   Ms. Beller, Exhibit 40, please.

18              THE COURT:  Is that in evidence?

19              MS. KAPLAN:  No, Your Honor.  Just for the witness.

20              THE COURT:  Yes.

21   BY MS. KAPLAN:

22   **Q.**  So is this -- do you see an e-mail at the top from Joyce

23   Linehan?  Is this an e-mail that you sent?

24   **A.**  Yes.

25   **Q.**  Who did you send this to?

1    **A.**   I sent this to Joe Rull and Dan Koh.

2    **Q.**   And when did you send this?

3    **A.**   May 28, 2014.

4             MS. KAPLAN:  I would offer it into evidence, Your

5    Honor.

6             MR. KETTLEWELL:  No objection, Your Honor.

7             MR. KELLEY:  No objection, Your Honor.

8             THE COURT:  Admitted.

9             (Exhibit No. 40 admitted into evidence.)

10            MS. KAPLAN:  And if we can scroll down to the

11   second half, Ms. Beller, please, and highlight that.

12   BY MS. KAPLAN:

13   **Q.**   So you are forwarding this e-mail that you got from Brian

14   that went to Tom Foley and Kenneth Fong?

15   **A.**   Yes.

16   **Q.**   And who's Tom Foley and Kenneth Fong?

17   **A.**   I don't know who Tom Foley is.  Obviously, he's with the

18   Boston Police Department, based on the e-mail address that I

19   see there.  And Kenneth Fong is the -- -I'm not sure what his

20   title is, but he's the supervisor at A-1, which is the Boston

21   Police district that City Hall Plaza is in.

22   **Q.**   And in this e-mail, Brian is thanking them for their help

23   and keeping Boston Calling safe and smooth this past weekend.

24   Were you at the festival?

25   **A.**   I was not.

1    **Q.**  And he says, "attached is the EMS report.  If you have

2    not already received it, the overall summary is 88 total

3    interactions, vast majority for band aids, sun block,

4    aspirin.  15 total transports, eight for ETOH."

5         Do you know what ETOH is?

6    **A.**  I don't.

7    **Q.**  Of the eight, one person was under 21, she was 20.  He

8    goes on to say, "We felt the alcohol enforcement plan was

9    very smooth, our roaming event staff and bar staff have

10   minimal incidents to report for underage drinking."

11        And then you forward this -- if we can go up above,

12   you forward this e-mail.  Brian forwards it to you first and

13   he says, "Here is EMS report, along with my e-mail to BPD."

14        Correct?

15   **A.**  Yes.

16   **Q.**  And then you forward that, saying, "Not bad," to Joe Rull

17   and Daniel Koh?

18   **A.**  Yes.

19   **Q.**  Why did you forward that to Joe Rull and Daniel Koh?

20   **A.**  Because Brian understood that the beer pen -- the lack of

21   a beer pen in the May 2014 concert was an experiment, that we

22   were going to try it and see how it worked out.  Brian is

23   clearly setting up his case here with me and other City

24   officials that EMS felt that this was generally a pretty

25   smooth event.  Those numbers are very good in terms of EMS

1    incidents and I was forwarding it to Joe and Dan to

2    essentially send the same message.

3    **Q.**  But you were sending the same message that, in your

4    opinion, it was not bad.

5    **A.**  That's correct.

6    **Q.**  And through the summer of 2014, so this is May 28th, now

7    moving into the summer, were you in touch with Brian Appel?

8    **A.**  I don't recall.  It's quite possible I was.

9    **Q.**  Do you recall that these issues -- well, you said before

10   that you thought, prior to the September festival, that the

11   issues of BPD would continue in terms of the beer pens and

12   the curfew, correct?

13   **A.**  That's correct.

14   **Q.**  So did you continue to be involved with those issues

15   leading up to the September 2014 festival?

16   **A.**  Yes.

17   **Q.**  And did you reach out to anyone to deal with some of the

18   issues that Brian Appel had raised?

19   **A.**  I don't recall specifically, but if there's something

20   that you want to refresh my memory with, I'm happy to speak

21   to it.

22            MS. KAPLAN:  If I could have a moment, Your Honor.

23            THE COURT:  Yes.

24            (Counsel confers.)

25            MS. KAPLAN:  If we could have Exhibit 42, please.

1    I believe it's in evidence.

2            Ms. Beller, this is in evidence, correct?

3            MS. BELLER:  Yes.

4            MR. KETTLEWELL:  Yes, it's in evidence.

5    BY MS. KAPLAN:

6    **Q.**  Okay.  Do you see this e-mail, if --

7            MS. KAPLAN:  The bottom of it, Ms. Beller, if you

8    can highlight.

9    BY MS. KAPLAN:

10   **Q.**  This is August 20th from Brian to you?

11   **A.**  Yes.

12   **Q.**  And he's telling you in here that he's been told -- that

13   Favour has been told by Captain Fong's office the issues with

14   the liquor license and that there's going to be a meeting

15   with the Commissioner, correct?

16   **A.**  Yes.

17   **Q.**  And he tells you the problem with this time frame?

18   **A.**  Yes.

19   **Q.**  And if you go above, you sent an e-mail to Joe Rull,

20   Daniel Koh, and Kenneth Brissette on August 20th saying you

21   have a message into the Commissioner.  Do you recall that

22   now?

23   **A.**  Yes.

24   **Q.**  And why were you letting Ken Brissette know this?

25   **A.**  Because at that point, he was the director of Special

Events.

Q.   And so some of these issues with the beer gardens and the pens and the curfew would have come under Mr. Brissette's purview?

A.   He was in charge of Special Events, so anything pertaining to a special event, he would have had some knowledge of, yes.

Q.   Okay.  Do you recall learning that Boston Calling had been told that they had to add members of IATSE to the festival that September?

A.   Yeah.

        MR. KETTLEWELL:  Objection.  Leading, Your Honor.

        THE COURT:  Overruled.

        THE WITNESS:  Sorry, overruled?

        THE COURT:  You can answer.

        THE WITNESS:  Yes, I do recall.

BY MS. KAPLAN:

Q.   And how did you first find this out?

A.   Brian Appel told me.

Q.   Do you remember when he told you?

A.   I don't recall, but in conversations that I've had with you over the past several years.

Q.   Without saying what I may have said, do you have a recollection of what Brian Appel told you?

A.   Close to the September event.

1  **Q.**  Okay.  What did he tell you?

2  **A.**  That they had been -- that they were being asked to hire

3  some union labor.

4  **Q.**  And who was -- Crash Line was being asked?  Boston

5  Calling was being asked?

6  **A.**  Correct.

7  **Q.**  By who?

8  **A.**  By Ken Brissette.

9  **Q.**  And were you asked to attend a meeting in August about

10  that issue?

11  **A.**  I was asked, yes.

12           MS. KAPLAN:  If we could have Exhibit 119.

13           THE COURT:  Is that in evidence?

14           MR. KETTLEWELL:  Yes, Your Honor.

15           MR. KELLEY:  Yes, Your Honor.

16           THE COURT:  Okay.

17           MS. KAPLAN:  And if we could go down to the bottom,

18  please.

19  BY MS. KAPLAN:

20  **Q.**  And this is an e-mail to you from Brian?

21  **A.**  Yes.

22  **Q.**  And it's on August 17th, correct?

23  **A.**  Correct.

24  **Q.**  And he's telling you, "Hey, Joyce, Ken called me on

25  Friday to discuss adding union production staff to the

1  festival this September.  As a partner of the City, we are

2  open to this conversation.  Would you be able to join this

3  meeting with us?  Ken's office on Tuesday at 9:30.  I hope

4  you'll be able to come, as I think it could be a bigger/more

5  impactful conversation."

6  Do you recall receiving this e-mail?

7  **A.**  I do.

8  **Q.**  And did you respond?  Well, let's go up ahead and see.

9  And you responded, you said, "Tuesday morning

10  doesn't work for me.  I'm happy to take part, but this week

11  is really bad for me overall.  I can do 4:00 p.m. Tuesday or

12  4:30 Thursday and that's about it."

13  **A.**  Yes.

14  **Q.**  Okay.  And then he sent you back an e-mail saying, "Hi,

15  Joyce, confirmed for 4:00 p.m. Tuesday in Ken's office.

16  Thank you and see you then."

17  Do you recall that?

18  **A.**  Yes.

19  **Q.**  Do you recall attending that meeting?

20  **A.**  I don't have any recollection of the meeting.

21  MS. KAPLAN:  If we could have Exhibit 62, which is

22  in evidence, Your Honor.

23  BY MS. KAPLAN:

24  **Q.**  And then at the bottom, an e-mail from Brian Appel to

25  you, where he says, on August 19, 2014, he says, "Thanks for

1  coming to the meeting, Joyce.  I've been dealing with City

2  Hall for ten years and you were one of the most reasonable

3  and logical people I have worked with.  I appreciate your

4  willingness to participate when we are involved."

5          Do you see that?

6  **A.**  I do.

7  **Q.**  And can you read your response up above on

8  August 19, 2014, at 6:02 p.m.

9  **A.**  "My pleasure, I hope I can deliver some good news.  This

10  conversation should have happened in May, not now."

11  **Q.**  Does this refresh your recollection as to whether you

12  attended this meeting?

13  **A.**  It doesn't.  I have no recollection of the meeting.

14  **Q.**  What did you mean when you said this conversation should

15  have happened in May, not now?

16          MR. KETTLEWELL:  Objection, Your Honor.

17          THE COURT:  Overruled.

18          THE WITNESS:  There were multiple issues that Brian

19  continually seemed to have with the festival being put on at

20  the City and it could have been any one of those things.

21  BY MS. KAPLAN:

22  **Q.**  Was it the issue with having been asked to use union

23  labor by Ken Brissette?

24  **A.**  Not that I recall.

25  **Q.**  You don't recall that?

1    **A.**  As I said, he was hyper-focused on police details, beer

2    pens, and extension of the license.  Those are the three

3    things that I remember very well, over the course of 2014,

4    being asked continually to step in the middle of, going

5    outside of the purview of my job and being asked to -- asked

6    to intercede on their behalf.

7            MS. KAPLAN:  If we could have, for the witness,

8    Exhibit 41, Your Honor.

9    BY MS. KAPLAN:

10   **Q.**  Do you see what's on the screen, or in your folder?

11   **A.**  Yes.

12   **Q.**  Do you know what that is?

13   **A.**  Yes.

14   **Q.**  What is that?

15   **A.**  It's a memo.

16   **Q.**  And is it a memo that you wrote?

17   **A.**  It is a memo that I wrote.

18   **Q.**  Who did you write it to?

19   **A.**  I wrote it to the Mayor.

20   **Q.**  And when -- do you recall when you wrote it to the Mayor?

21   **A.**  It's dated August 19th, so I assume somewhere in that

22   time frame.

23   **Q.**  And looking at what the memo says, does that refresh your

24   recollection about whether you attended that meeting on

25   August 19th?

1   **A.**   It does not.  I certainly remember having lots of

2   conversations with Brian Appel in this time frame, but I

3   don't recall specifically that meeting.

4           MS. KAPLAN:  Your Honor, I would offer this exhibit

5   into evidence, since she has no recollection of this meeting,

6   and this memo would tend to refresh that recollection.

7           MR. KETTLEWELL:  Objection, Your Honor, for the

8   reasons we've discussed earlier.

9           THE COURT:  Well, this one -- this I would admit

10  under 803-5.

11          MR. KETTLEWELL:  I'm sorry, Your Honor, I didn't

12  hear you.

13          THE COURT:  I think why wouldn't this be admissible

14  under 803-5, or under 803-1.

15          MR. KETTLEWELL:  Well, she testified that she had

16  no recollection in the meeting.  She testified that her only

17  source of information was Mr. Appel.  It's not her memory,

18  it's what he's telling her.

19          THE COURT:  No, well, why wouldn't this fit under

20  803-1?

21          MR. KETTLEWELL:  For similar reasons.

22          THE COURT:  Overruled.  I'm going to allow this in

23  under 803-1.  Do you want me to explain?

24          MR. KELLEY:  Your Honor, if I may --

25          THE COURT:  Oh, yes, I'm sorry.

1          MR. KELLEY:  If you would remember, this is the
2     whole -- this is redacted part -- sorry, Your Honor, I have a
3     different one, I apologize.
4          THE COURT:  No other objection beyond the one that
5     Mr. Kettlewell made?
6          MR. KETTLEWELL:  Well, and the earlier ones we
7     discussed, Your Honor.  Yes.
8          THE COURT:  I'm only allowing it on the ground
9     of -- I'm only allowing it for the reasons that I've stated,
10    no other reason.
11         MR. KETTLEWELL:  I understand.
12         THE COURT:  Okay.  Do you want me to explain the
13    redacted part, or are you going to?
14         MS. KAPLAN:  Sure.
15         THE COURT:  So this is Exhibit 41 is in evidence.
16         (Exhibit No. 41 admitted into evidence.)
17         THE COURT:  You see, ladies and gentlemen, that a
18    lot of it is blacked out and that's because the rest of it
19    has nothing to do with this case.  So this was simply you
20    have -- already we've admitted a lot of exhibits, you're
21    going to have many things to consider.  The rest of this
22    document just pertained to other things related to the City
23    of Boston that have nothing to do with Boston Calling,
24    nothing to do with any of the issues that we heard anything
25    about.  You have enough already.  That's why it's redacted.

1    Okay.

2             Go ahead.

3    BY MS. KAPLAN:

4    **Q.**  Can you read that to us, please?

5    **A.**  It says, "Met with Boston Calling today, it did not go

6    well.  I will talk to you about it later, because I have to

7    run to a meeting now."

8    **Q.**  And it's dated August 19, 2014?

9    **A.**  Correct.

10   **Q.**  Does this not refresh your recollection as to whether you

11   attended a meeting with Boston Calling and Ken Brissette on

12   August 19, 2014?

13   **A.**  Well, it says I met with Boston Calling.

14   **Q.**  You said it did not go well.  What did you mean by that?

15   **A.**  Again, there were conversations that Brian was

16   conditionally having about the beer pens, about the lack of

17   consistency in prices quoted for police details, and in the

18   license extension.  Those are the things that I remember him

19   talking to me about all the time.

20   **Q.**  And is it your testimony that you didn't have discussions

21   with Brian Appel about the fact that Ken Brissette had said

22   that they were going to have to use union labor on the

23   September 2014 festival?

24            MR. KETTLEWELL:  Objection, Your Honor, that's not

25   the evidence.

1    THE COURT:  Sustained as to the form.

2  BY MS. KAPLAN:

3  **Q.**  Is it your testimony that you did not have conversations

4  with Brian Appel about Ken Brissette's talking to him about

5  adding union labor to the production?

6  **A.**  It's not my testimony.  We just saw an e-mail in which

7  Brian Appel did tell me that Ken was asking for union labor

8  to be hired.

9  **Q.**  And were you intending to talk to Mayor Walsh about that?

10  **A.**  Yes.

11  **Q.**  And that's what this memo, Exhibit 41, is, correct?

12  **A.**  I was intending to talk to him, as well as some other

13  colleagues about the issues that Boston Calling was telling

14  me that they were having with the City.

15  **Q.**  Well, I'm talking about the union issue?

16  **A.**  Okay.

17  **Q.**  So let's focus on the union issue.  Were you intending to

18  talk to Mayor Walsh, on August 19, 2014, about the issue of

19  Ken Brissette asking that union labor be added to the

20  production?

21  **A.**  I was intending to talk to Mayor Walsh about a host of

22  issues that Boston Calling was claiming to have as they were

23  trying to produce their festival.

24  **Q.**  And was the union one of those issues?

25  **A.**  Yes.  I was -- Brian had told me that Ken was asking for

1  union labor to be hired and I was going to talk to the Mayor

2  about it.

3  **Q.**  Did you communicate that day, on August 19, 2014, with

4  Mayor Walsh?

5  **A.**  I don't believe I did.

6  **Q.**  Did you communicate with him the next day about these

7  same issues?

8  **A.**  I don't believe I did.  I believe you had asked me at one

9  point to go back and look at calendars.  It appears to me

10  that he was on vacation that week and wasn't in the office.

11  **Q.**  Okay.  Well, did you communicate with him by memo or

12  e-mail during that week, the next day?

13  **A.**  Well, not that I -- by memo, not if he wasn't in the

14  office, no.

15  **Q.**  Do you recall sending him a memo on August 20th or

16  August 21st, that's a communication.  Did you communicate

17  with him by e-mail or memo on August 20th or 21st?

18  **A.**  I clearly wrote a memo.

19  **Q.**  But after that memo that we just showed you, did you

20  write any others?

21  **A.**  Yes.

22      THE COURT:  She doesn't mean did you write any

23  others in general on anything.  She means did you write any

24  others about Boston Calling, correct?

25      MS. KAPLAN:  Correct.  I'm sorry.

1              THE WITNESS:  Yes.

2              MS. KAPLAN:  If we could have Exhibit 44 and I

3     don't believe this is --

4              THE COURT:  44 for the witness?

5              MS. KAPLAN:  Yes, Your Honor.  It's not in

6     evidence.

7     BY MS. KAPLAN:

8     **Q.**   Do you see Exhibit 44?

9     **A.**   Yes.

10    **Q.**   And is this an e-mail that you wrote to someone?

11    **A.**   I did.

12    **Q.**   Who did you write this to?

13    **A.**   To the Mayor.

14    **Q.**   And what's the date?

15    **A.**   August 20th.

16    **Q.**   And that's a day after the memo that we just talked

17    about?

18    **A.**   Yes.

19              MS. KAPLAN:  I would offer it into evidence at this

20    time, Your Honor.

21              MR. KETTLEWELL:  Objection, Your Honor.

22              THE COURT:  Can I see you at sidebar.

23              (The following discussion held at the bench.)

24              MR. KETTLEWELL:  It's hearsay, Your Honor.  And if

25    it's offered to prove the Mayor's state of mind, that has no

1    relevance to this case that I can see, since he's not

2    denominated as anything in the case.

3         MS. KAPLAN:  It's not being offered to show the

4    Mayor's state of mind.  It's being offered to show her state

5    of mind.  She forwarded this e-mail from Brian Appel to the

6    mayor, and she's keeping him involved.  And it also helps

7    explain the discrepancy in the date, because she says, "I

8    sent you a note tonight in your efile about Boston Calling."

9    It's dated August 20th.  So the next memo where it says

10   August 21st, I think is actually August 20th.

11        THE COURT:  Well, if its only purpose is with

12   respect to a foundational point with respect to the next

13   memo, then I don't see why it comes into evidence at the

14   moment.  And --

15        MS. KAPLAN:  Well, it also goes to victims' state

16   of mind, that they were freaking out.  And then --

17        MR. KETTLEWELL:  Your Honor, the Government has

18   said that the meeting on September 2nd was the operative

19   meeting, not these earlier discussions and/or meetings.  So I

20   don't know how the victims' state of mind, necessarily, and

21   her characterization of it is relevant at this stage.

22        THE COURT:  I think you can ask about -- you can

23   ask her about this, and I think I'm allowing you to lead,

24   because I think she's not as cooperative witness for you.

25        MS. KAPLAN:  Right.

```
1              THE COURT:  So I think you can ask her about that,
2    but I don't think the Mayor's state of mind is relevant, and
3    we haven't heard anything that makes it an evidence of
4    urgency.  Her state of mind is relevant.  But she's dealing
5    regularly with Mr. Appel, that's pretty clear.  So her
6    perception of him, his state of mind, he's talking about his,
7    so you can ask her about that.
8              MR. KELLEY:  Certainly -- no, that's okay.
9              MS. KAPLAN:  Okay.
10             (Bench conference concluded.)
11             THE COURT:  But the relevant thing is her
12   perceptions of Appel and the issues.
13             MS. KAPLAN:  Okay.
14   BY MS. KAPLAN:
15   Q.  Do you recall that, on August 20th, you sent an e-mail to
16   Mayor Walsh talking about Brian Appel and his state of mind?
17   A.  Yes.
18   Q.  And do you recall -- putting that aside, if you can just
19   put that aside, not read from it.
20             What did you tell the Mayor?
21   A.  That Boston Calling was freaking out about police details
22   and the beer pen issue, I believe.
23   Q.  Does this memo refresh your recollection about whether
24   you said anything to the Mayor about the labor issue?
25   A.  Yes, I do say the labor issue, and I believe what I meant
```

1    there was the police detail issue.

2    **Q.**  Why would that be?

3    **A.**  I believe I would have used the word union and not labor.

4    And again, there were things that Boston Calling was

5    consistently calling me on, and they were the beer pen issue

6    and the police detail issue.

7    **Q.**  And -- but you said that prior to the August 19th

8    meeting, which you say you did not attend, Mr. Appel had told

9    you that --

10            MR. KELLEY:  Objection, Your Honor.

11            THE COURT:  I don't think that's what she said.

12   BY MS. KAPLAN:

13   **Q.**  What did you recall, prior to this e-mail, on

14   August 20th, Brian Appel had told you with respect to what

15   Ken Brissette had said about union labor?

16   **A.**  Brian Appel had told me that Ken had asked them to hire

17   union labor.

18   **Q.**  Okay.  So before you wrote this e-mail to the Mayor, were

19   you aware that Brian Appel and that Crash Line was having

20   issues with being told that Ken Brissette wanted them to add

21   union labor to the production?

22   **A.**  Yes.  Among a number of issues, yes.

23   **Q.**  Okay.  So when you say in the e-mail, you said that you

24   said something about the labor issue, what are you referring

25   to?

1   **A.**   I believe I was referring to the police detail issue.

2   **Q.**   And not the fact that Ken Brissette had told them that

3   they wanted them to add union labor to the production?

4   **A.**   I don't believe so.  In my mind, the police detail issue

5   and the beer pen issue and the license extension issue were

6   the three enormous issues that Brian kept coming back to me

7   on.

8   **Q.**   And then when you sent that e-mail to Mayor Walsh and

9   when you sent other e-mails to Mayor Walsh, what e-mail

10  address did you use?

11  **A.**   In this one, I used his personal e-mail address, which I

12  shouldn't have done, but I did.

13  **Q.**   Used his personal e-mail address?

14  **A.**   Correct.

15  **Q.**   And what about your e-mail address?

16  **A.**   From my personal e-mail address.

17  **Q.**   And was that something that you typically did, used your

18  personal e-mail to conduct business?

19  **A.**   I tried not to in that first year.  It was very

20  difficult, I was attempting to use one computer and signing

21  in and out of accounts.  And I was working a lot from home, I

22  think a lot of these -- this one actually went out at 7

23  o'clock at night, it looked like, and it was sloppy and I

24  shouldn't have done it, but I did.

25  **Q.**   And did you frequently send the Mayor e-mails on his

1  personal e-mail about city business?

2       MR. KETTLEWELL:  Objection, Your Honor.

3       THE COURT:  Sustained.

4  BY MS. KAPLAN:

5  **Q.**  Other than this e-mail, did you send other e-mails to the

6  mayor on his personal e-mail about City business?

7       MR. KETTLEWELL:  Objection, Your Honor.

8       THE COURT:  Sustained.

9  BY MS. KAPLAN:

10 **Q.**  Do you recall writing another memo to Mayor Walsh about

11 some of these issues that Boston Calling was having?

12 **A.**  Can you be more specific?

13 **Q.**  Well, do you recall writing a memo that's dated

14 August 21, 2014, to Mayor Walsh, about some of the issues

15 that you've been testifying about?

16 **A.**  I do recall a memo, yes.

17 **Q.**  Okay.  And what was the purpose of that memo?

18 **A.**  To relay some of the information that Brian was telling

19 me about difficulties they were having producing the

20 September concert.

21 **Q.**  And specifically, what information was that?

22 **A.**  Information about the beer pens, information about Brian

23 reporting that Ken had asked him to hire union labor.  I'd

24 have to look at it again to give you any more than that.

25 **Q.**  Okay.  If we could have Government Exhibit 45 for the

1   witness, please.  And I'd ask if you could review that.

2   **A.**   (Witness reviews the document.)  Yes.

3   **Q.**   Okay.  And do you recall what you told Mayor Walsh about

4   the problems with Boston Calling getting their license?

5   **A.**   Yes.  I told him that Commissioner Evans was giving them

6   a hard time about the liquor license, based on the fact that

7   he didn't like the beer pen setup.  I was telling him that

8   Brian Appel had relayed to me that he had been asked by Ken

9   to hire union labor.  Sorry, and also that Brian had again

10  expressed to me the company's interest in extending the

11  contract, extending the license.

12  **Q.**   Do you recall telling the Mayor that Ken Brissette told

13  them they would have to hire a few guys?

14           MR. KETTLEWELL:  Objection, Your Honor.

15           THE COURT:  Overruled.

16           THE WITNESS:  I recall writing that, yes.

17  BY MS. KAPLAN:

18  **Q.**   And what, if anything, do you recall you told the Mayor

19  about Tim Sullivan and the IATSE issue?

20  **A.**   I don't recall telling the mayor anything about that.

21  I'm sorry, I'm sorry, I do recall telling the mayor that

22  after Brian told me that he had been asked to hire union

23  labor, that I went to Tim and asked what the cost of that

24  might be.

25  **Q.**   Because you say you were not in this meeting, correct?

1   **A.**  I don't have any recollection of being in the meeting.

2   **Q.**  So you told Ken Brissette to ask Tim Sullivan or what?

3   Can you say that again?

4   **A.**  No, I asked him.

5   **Q.**  You asked him.  What did you ask him?

6   **A.**  I asked him what the amount of the union labor would be

7   that Brian was telling me that Ken was asking him to hire.

8   **Q.**  And what did Tim Sullivan tell you?

9   **A.**  I believe he told me that it was somewhere in the

10  vicinity of $14,000, though I'd have to look at the memo

11  again to tell you for sure.

12  **Q.**  And then did you continue on to express, talk further in

13  this memo about the IATSE issue?

14  **A.**  About IATSE?

15  **Q.**  Yes.

16  **A.**  Yes.

17  **Q.**  Okay.  And what did you tell the Mayor?

18  **A.**  I wrote to the mayor that the Boston Calling guys were

19  very, very interested in getting a license extension, and

20  wanted to know what they could do to get that, to make that

21  happen.

22  **Q.**  Okay.  Well, I had asked you about what else you had said

23  about the IATSE issue, right?  What else did you tell the

24  Mayor about the IATSE issue in this memo?

25  **A.**  That I -- I didn't tell the Mayor anything, I wrote a

1   memo.  And what I said was -- what I said in the memo was
2   that it wasn't fair to ask those guys to hire union -- it
3   wasn't fair to ask them to hire more labor three weeks before
4   their concert, that that was a budget impact that shouldn't
5   have to happen.
6   **Q.**  What, if anything, did you tell the Mayor about Boston
7   Calling having a contract with someone?
8   **A.**  I'm sorry, can you repeat the question?
9   **Q.**  What, if anything, did you -- let me go back for a
10  second.
11              Do you recall writing this memo that we're talking
12  about?
13              THE COURT:  What's the relevance of having told the
14  Mayor?
15              I'm happy to see you at sidebar, if you want -- I
16  tell you what, because it's a couple of minutes before 11:00,
17  I'll take the morning break now.
18              All rise for the jury.
19              (The jury exits the courtroom.)
20              THE COURT:  Ms. Linehan, we're going to take a
21  break until 11:20, you're excused.  We'll resume at 11:20.
22  I'll see counsel at sidebar.
23              (The following discussion held at the bench.)
24              MR. KILEY:  We're going to participate in this
25  sidebar for now, because I'm presuming that it relates to

1   these other exhibits.

2            THE COURT:  What's the relevance?

3            MS. KAPLAN:  It's not -- she's relying on this.

4            THE COURT:  You keep saying to her -- you,

5   Ms. Linehan said you were not at the meeting.  That's not

6   my -- that's very different than saying I don't recall.  I

7   have met you many times, Ms. Kaplan, I don't recall every

8   time I met you.  That's not me saying I didn't meet you on

9   August 21, 2007.

10           MS. KAPLAN:  Okay.

11           THE COURT:  And so you should just be careful of

12  that.  So I'm not persuaded that she's -- well, it doesn't

13  matter what I'm persuaded by, but I don't think you've

14  established that she's lied about that.  All she said is she

15  doesn't recall being at the meeting.  She doesn't recall

16  being at the meeting.

17           MS. BARCLAY:  But she's also saying that Brian told

18  her the information that she tells the Mayor came from --

19           THE COURT:  Right, but then it's not about what she

20  told the Mayor, it's what did Brian tell you.  You keep

21  bringing up the Mayor, and the Mayor is not a party of this

22  case.

23           MS. KAPLAN:  I understand that.  I understand that.

24  I'm just struggling to get this in or get this read, I'm not

25  trying to -- you know, to --

1          THE COURT:  Impugn the Mayor.

2          MS. KAPLAN:  Impugn the Mayor.

3          MS. BARCLAY:  It's about getting this.

4          THE COURT:  So it seems to me, then the questions

5     are -- you've got the foundation that she's talking to Brian

6     Appel, ask her what Brian Appel told you.  You can lead her.

7     I'm not preventing you to lead her, who told her this and

8     that.

9          MS. BARCLAY:  But it's not Brian Appel who tells

10    her --

11         MR. KILEY:  It is Brian Appel, she's testified

12    her --

13         THE COURT REPORTER:  Wait, one at a time.

14         MS. BARCLAY:  It says in this memo, I thought Ken

15    was supposed to be having it, but I got pulled into a meeting

16    with him and them yesterday.  Ken told them that they would

17    have to hire a few guys and he is clearly at that meeting and

18    knows what happened at that meeting and is refusing to

19    testify about it, and lying about where she gets the --

20         MR. KETTLEWELL:  She doesn't recall is what her

21    testimony is.

22         MS. KAPLAN:  But she's now saying it was from

23    Brian.

24         MS. BARCLAY:  She specifically testified it was

25    from Brian and that's not what this memo says, and that's not

1     what she told the mayor of the City of Boston.

2              MR. KETTLEWELL:  You don't know what the source is.

3     It's her.

4              MS. BARCLAY:  It's her.  I thought Ken was supposed

5     to have it.  I got pulled into a meeting with him and them

6     yesterday.  Him is Ken.

7              THE COURT:  So I guess if you're feeling -- I

8     understand her testimony is she said I don't recall being at

9     the meeting or not.  That's what I understand her to have

10    said.  So you can say to her, did -- you know, did Ken

11    Brissette say this at the meeting, you have a good-faith

12    basis to ask that question.

13             MS. KAPLAN:  Why isn't past recollection recorded

14    if she can't remember it?

15             THE COURT:  Well, I'm not sure -- I haven't said

16    that it isn't.  You haven't offered it as past recollection

17    recorded.  So I haven't had to rule on it.

18             MR. KETTLEWELL:  But if it's past recollection

19    recorded, the document doesn't come into evidence.

20             MS. BARCLAY:  That's fine.  She can read it.

21             THE COURT:  And so the issue is whether all of this

22    is a past recollection recorded is very different than

23    whether particular things are.  And so I guess you keep

24    framing like as if it's a state of -- what are you doing

25    about the Mayor, like we're talking about the Mayor's state

1    of mind, so that's why I raised it.  I get it, that's why

2    you're not interested in that.

3              MS. KAPLAN:  No.  That's why I'm saying this is a

4    memo that she wrote to the Mayor.

5              THE COURT:  I don't see why -- you can tell me if

6    you object and I'll consider that, but, to me, why wouldn't

7    you just ask her, didn't Ken Brissette say this at the

8    meeting and she says I don't recall.  I assume that's what

9    she's going to say.  Well, didn't you write this?

10             MS. BARCLAY:  And can we read it, then?

11             THE COURT:  And then offer it and then I might let

12   you read it, subject to whatever you have to say.

13             MR. KETTLEWELL:  Well, we'll be objecting, but yes.

14             THE COURT:  Why don't we talk about the objection

15   now, so we can vet it a little bit.

16             MR. KETTLEWELL:  Well, it will depend on the

17   questions that they ask, but I believe that this is -- this

18   is purportedly, at least, according to them, a recollection.

19   It's hearsay and what she says about what Ken says that she

20   doesn't remember, should not come before the jury.  I just

21   don't --

22             THE COURT:  But if I have a -- if she has a basis,

23   okay, under sort of preliminary admissibility findings, there

24   is a basis to conclude, notwithstanding that she says she

25   doesn't recall the meeting, she doesn't say she wasn't at it,

```
1   okay?  And there was all the other documents in evidence that
2   suggest that she was at it and we heard testimony, I think
3   Appel said she was there.
4           MR. KETTLEWELL:  He did.
5           THE COURT:  And so this memo, by its terms, when I
6   read it, looks like it was prepared on August 21st, it looks
7   like it was recounted in part, like it would be a reasonable
8   inference, not required, but for preliminary admissibility.
9   It was inferred that this was written at that time, and why
10  wouldn't that, for preliminary admissibility purposes, be
11  enough to conclude that that's a past recollection recorded.
12          MR. KETTLEWELL:  Well, she has to say -- all right.
13  At or near the time, and she would need to say that it was
14  accurately recorded and the woman says she has no memory.
15          THE COURT:  Okay.  So I think to have all those --
16  find those bases in the rule, there has to be evidence before
17  me to find those to make the preliminary findings.  I think
18  you, perhaps, would need some foundation that when she --
19  like the -- maybe you need to ask her a question about how
20  she prepares this or something to lay a foundation for the
21  accuracy, whether or not she remembers it, you know, what the
22  practice is, or something like that.
23          MS. KAPLAN:  That's what I tried to do yesterday
24  with the February memo.
25          MS. BARCLAY:  We have other witnesses, too, who
```

1       will say this was her writing.

2              THE COURT:  But I guess, in looking at this, I

3       mean, it might be -- behoove you to ask a question or two

4       about that, but it looks like the kind of thing, given the

5       date, and given what's memorialized, that I might think, on

6       its own, was sufficient to put in front of the jury for

7       accurate --

8              MR. KETTLEWELL:  Contents, not the document itself.

9              THE COURT:  Yeah, they would read this part.  We're

10      only talking about that one part.  There might be other parts

11      I don't know, but --

12             MR. KETTLEWELL:  Okay.

13             THE COURT:  -- it's --

14             MS. KAPLAN:  Well, I would say all of it, please

15      tell me what you want me to do, she's asking.

16             THE COURT:  I'll read my copy.  I won't take yours.

17             I'll get the rule book.  Hold on.

18             Well, I don't think all of it, because the

19      predicate for the rule is the cannot recall well enough to

20      testify fully and accurately.  And on some of these topics,

21      she's testified a fair bit about.  Some of them, you can ask

22      more about, because she -- it's not clear to me whether she

23      can testify fully or accurately.  The meeting, it's clear to

24      me, she doesn't remember.  She's testified she doesn't

25      remember the meeting.

```
 1            MS. KAPLAN:  Right.

 2            THE COURT:  And this is clearly -- or arguably,

 3   a -- sufficient for 104, I think, this being that one part we

 4   talked about, is her then recollection.  But, I mean like the

 5   next part, I don't think there's a basis.

 6            MS. KAPLAN:  What's the next part?

 7            THE COURT:  The next part about asking me to get a

 8   dollar figure.

 9            MS. KAPLAN:  Right, but that's an admission.

10            THE COURT:  But she testified to that.

11            MS. BARCLAY:  She didn't say "symbolic gesture."

12            MS. KAPLAN:  Yeah.  She didn't say "symbolic

13   gesture."

14            THE COURT:  Well, you can ask her about that.  But

15   she's testified a lot about that.  And she hasn't like

16   rejected, like say I don't remember anything.  Like you can

17   ask her about the symbolic gesture.  And some of these other

18   things are more like her state of mind, her impressions, not

19   recorded recollections.  So I don't think you get the whole

20   thing.

21            MS. KAPLAN:  Not opposed to union when the contract

22   runs out.

23            MS. BARCLAY:  This is their state of mind.

24            MS. KAPLAN:  Right.

25            This is their state of mind right here, the end of
```

1　　that part.

2　　　　　　THE COURT:  Why don't you just ask her, instead of

3　　do you recall, just say wasn't it -- didn't you understand,

4　　or didn't you say, or wasn't it your view, or isn't it true

5　　that they -- well, isn't it true that they had a contract

6　　with Bill Kenney, isn't it true this, or isn't it true that?

7　　You can ask her that.

8　　　　　　MS. BARCLAY:  I think her answer to all of that is

9　　Brian Appel told me and that's not the way this memo was

10　　written.  That's not recently --

11　　　　　　MS. KAPLAN:  Right.  It's something new that she's

12　　now saying that she's attributing all to Brian Appel.

13　　　　　　THE COURT:  Well, I don't know what the source of

14　　all of this is, but -- I mean, some of it clearly is a source

15　　of somewhere else, because she does refer to IATSE's basic

16　　misunderstanding of the concert business, but like they

17　　stressed, that's like -- like that presumably came from Brian

18　　Appel.

19　　　　　　MS. KAPLAN:  Right.

20　　　　　　THE COURT:  Or Mike Snow.

21　　　　　　MS. KAPLAN:  Right.

22　　　　　　THE COURT:  And I assume the tickets not selling

23　　well, it would be hard for me to infer that it came from

24　　anybody other than Crash Line.  It could have come from

25　　somebody else, and somebody told her that, but --

1        I presume the increase in production costs, I guess

2   that would have come from Appel.

3        MS. KAPLAN:  I guess I just don't know what's the

4   difference in my leading her through it, sentence by

5   sentence, or just having her read it.

6        MR. KETTLEWELL:  Because she has memory and she

7   should testify to her memory, not what was written four years

8   ago, five years ago.

9        THE COURT:  Because they've objected to it, and

10  unless -- if they object, unless there's a basis for me to

11  find that a document is admitted, that's why.  I think

12  leading is fair, because she's a hostile witness and you have

13  a good-faith basis to ask the kind of questions that we

14  talked about, based at least on the memo, if not on the -- so

15  you can lead her with those things and she'll agree with you

16  or she won't, and if she doesn't, then it seems me a portion

17  by portion issue about whether it's a past recollection

18  recorded.  I think that with respect to the paragraph we

19  talked about, which is just right under IATSE and the 45, is

20  that that is likely a past recollection recorded, because

21  she's testified --

22        And your argument is what, Mr. Kettlewell?

23        MR. KETTLEWELL:  I'm sorry?

24        THE COURT:  Your argument on that is what?  That

25  there isn't evidence to conclude that it's accurate?

1          MR. KETTLEWELL:  Correct.  Well, there's not

2   evidence to conclude that she's lost her memory on this.  She

3   just hasn't been confronted with portions of it I think she

4   should be.

5          THE COURT:  Well, she read it.  It's been put in

6   front of her.

7          MR. KETTLEWELL:  It's been put in front of her, but

8   the proper questions haven't been asked, as you just pointed

9   out.

10          MS. KAPLAN:  Well, she doesn't have any

11   recollection of attending the meeting, so how can she then --

12   if she didn't attend the meeting, how can she --

13          THE COURT:  Well, that's different.  Having no

14   recollection of the meeting and not attending the meeting are

15   different.  Right?  She said she doesn't have a recollection

16   of a meeting.  She hasn't said she didn't attend the meeting.

17   Not here.

18          MS. BARCLAY:  So the question do you remember

19   writing?  I thought --

20          MS. KAPLAN:  No, I think the question is, had you

21   had the full IATSE conversation.

22          THE COURT:  You can ask her that.  You can ask her

23   what that is and you can ask her what her IATSE conversations

24   were.

25          MS. KAPLAN:  Well, I've done that, and she keeps

1  coming back to the police detail.

2          MS. BARCLAY:  Oh, my gosh.

3          MS. KAPLAN:  Yeah.

4          Did you think Ken was supposed to be having it?  "I

5  got pulled into a meeting."

6          MS. BARCLAY:  I think she doesn't remember the

7  meeting.  This is a past recollection.

8          THE COURT:  The critical thing you want, I think,

9  in terms of past recollection recorded is that I got pulled

10  into a meeting with him/them yesterday and Ken told me they

11  would not -- Ken told them they would have to hire a few

12  guys.  That's -- so I think you've already established that

13  she can't testify fully or accurately to what happened in the

14  meeting, because she said she doesn't recall the meeting.

15          And you've established, I think, that she wrote a

16  memo on August 21st and the memo -- and to the extent that

17  you feel that you don't have it covered, you could ask her

18  did the memo talk about -- did you write a portion of the

19  memo about the meeting and presumably she'll say yes.  You

20  can say was that accurate when you wrote it?  Is it your

21  practice to write memos to try to accurately capture what

22  happened?  And then it seems to me -- either what you say,

23  but that seems to me it would be likely enough to the past

24  recollection recorded, as to the meeting and what she wrote.

25  And you could read it.

1    MR. KETTLEWELL:  We'll see what her answers are, if

2    it falls the way you said it might, then that would be

3    probably sufficient.

4    MR. KELLEY:  And the remainder, Your Honor?

5    THE COURT:  Well then, I think she can ask about

6    all -- I think that her state of mind is not at issue, but

7    she can ask about her communications with Crash Line, which

8    she understood was going on.  As I've heard the evidence,

9    she's a percipient witness as to what transpired here and she

10   had conversations with the defendants, she had conversations

11   with Brian Appel and Crash Line.

12   So you can ask her essentially, generally, about

13   all the things there, what happened related to all the issues

14   that she describes and what she knows about it.  To the

15   extent that there's a topic or something that she doesn't

16   recall, fully and accurately, sufficient to testify that she

17   has memorialized in here, than she can potentially read that

18   portion.  I don't think the whole thing comes out -- and when

19   I say the whole thing, I'm talking about 45 from IATSE down

20   is a past recollection.  All of it is not a recorded

21   recollection.

22   MS. BARCLAY:  So if she says that I did not

23   accurately record it?

24   THE COURT:  Then I'll have to decide whether

25   there's sufficient evidence -- I think it's a 104 question as

1    to whether, notwithstanding that, there would be enough that

2    you could conclude that you could offer it, notwithstanding

3    her testimony.  I don't think that her testimony controls

4    like the outcome of that.

5              MS. BARCLAY:  Okay.  I just -- that was what

6    Mr. Kettlewell was alluding to, so I just want to make sure.

7              THE COURT:  I don't think so.

8              MS. BARCLAY:  Okay.

9              THE COURT:  It would be the totality of the

10   circumstances.

11             MR. KETTLEWELL:  Well, I never talked to her, so I

12   have no idea what she's going to say.

13             (Bench conference concluded.)

14             THE COURT:  How much longer do you think you have

15   with her?

16             MS. KAPLAN:  Not that much longer, once I get

17   through these, but I think this is going to take me awhile.

18             THE COURT:  Okay.  All right.  Five minutes enough

19   for all of you?  Okay.

20             (Court in recess at 11:14 a.m.

21             and reconvened at 11:20 a.m.)

22             THE COURT:  Where's Ms. Linehan?

23             You can be seated.

24             MR. KELLEY:  I'm sorry, Your Honor.

25             THE COURT:  That's all right.  I'm waiting for

1   Ms. Linehan.

2            Mariliz, you can go get the jury.

3            Go ahead, Ms. Linehan.

4            (The jury enters the courtroom.)

5            THE COURT:  Go ahead, Ms. Kaplan.

6            MS. KAPLAN:  Thank you, Your Honor.

7   BY MS. KAPLAN:

8   **Q.**  Ms. Linehan, these memos that we've talked about,

9   Exhibit 41 and then the one you're looking at on your screen,

10  Exhibit 45, how is it that you -- how do you prepare these

11  memos?

12  **A.**  I type them on a computer.

13  **Q.**  Where?

14  **A.**  It varies.

15  **Q.**  In the office?

16  **A.**  At home, in my office.

17  **Q.**  And are they generally prepared at or around the same

18  time of whatever you're talking about in the memos this

19  happened?

20  **A.**  Not necessarily.

21  **Q.**  Well, how long after the -- something has taken place do

22  you prepare --

23            THE COURT:  I think she's asking about these two.

24  Not your general practice about writing memos, but these two.

25  BY MS. KAPLAN:

1  **Q.**  Exhibit 41 in evidence and the one you've got on the

2  screen?

3  **A.**  Sorry, the question again?

4  **Q.**  Were these two memos prepared at or around the same time

5  that this meeting happened on August 19th?

6  **A.**  I believe so, yes.

7  **Q.**  Okay.  And were they accurate when you prepared them?

8  **A.**  I'm sorry, again?

9  **Q.**  Were these memos accurate when you prepared them?

10  **A.**  They were, from my perspective, yes.

11  **Q.**  Okay.  And did Ken Brissette say in the meeting, on

12  August 19, 2014, that they would have to hire a few guys?

13          MR. KETTLEWELL:  Objection, Your Honor.

14          THE COURT:  Overruled.

15          THE WITNESS:  I don't have any memory of being in a

16  meeting on August 19th.  I could have been there.  I don't

17  remember being there.  You're asking me to remember things

18  with a degree of specificity that happened five years ago.  A

19  little sliver of an issue that was not part of my job.  So I

20  have general memories about what happened in the time frame,

21  but I don't recall being at a meeting on August 19th.

22          MS. KAPLAN:  Your Honor, at this time, I would ask

23  that the witness be permitted to read that one paragraph.

24          MR. KETTLEWELL:  Objection, Your Honor.

25          MS. KAPLAN:  Under the word "IATSE."

```
1              MR. KETTLEWELL:  Objection, Your Honor.
2              MS. KAPLAN:  On Exhibit 45.
3              THE COURT:  I think she can read --
4              Do you see Exhibit 45?  You have it in front of
5       you, Ms. Linehan.
6              THE WITNESS:  Yes.
7              THE COURT:  And there's a bold heading near the
8       bottom.  You can read the words --
9              I overrule the objection.  I find that the one,
10      two, three -- the first three sentences, beginning with the
11      words "I have," and ending with the words "a few guys," that
12      you can -- that that's -- I admit it under 803-5.  So the
13      objection is overruled.
14             So you can read that portion.
15             Do you know which portion that I'm referring to?
16             THE WITNESS:  Those first three sentences under the
17      bold heading?
18             THE COURT:  Yes.
19             THE WITNESS:  Okay.
20             "I have not yet had the full IATSE conversation.  I
21      thought Ken was supposed to be having it, but I got pulled
22      into a meeting with him and with them yesterday.  Ken told
23      them that they would have to hire a few guys."
24             MS. KAPLAN:  And the next sentence, Your Honor?
25             MR. KETTLEWELL:  Same objection, Your Honor.
```

1          THE COURT:  That's different.  It's not admissible

2     at this point.

3     BY MS. KAPLAN:

4     **Q.**  Did you believe that telling them this three weeks before

5     the concert was probably not the way it was to be -- to do

6     it, but that it was done?

7     **A.**  Did I -- sorry, yes.  Did I believe adding money to their

8     budget three weeks before the concert was not appropriate?

9     Yes.

10    **Q.**  Telling them that they had to hire union labor three

11    weeks before their concert is probably not the way to do it,

12    but that it was done?

13         MR. KETTLEWELL:  Objection, Your Honor.  Different

14    question.

15    BY MS. KAPLAN:

16    **Q.**  Did you believe that?

17         MS. KAPLAN:  Right.

18         THE COURT:  Overruled, you can answer.

19         THE WITNESS:  I believe that adding money to their

20    budget three weeks before the concert was not appropriate.

21         MS. KAPLAN:  I would ask that the witness read that

22    last line, please.

23         THE COURT:  It's not admissible under 803-5.

24    BY MS. KAPLAN:

25    **Q.**  Do you remember writing that telling them that three

1    weeks before the concert is probably not the way to do it,

2    but that's done?

3                MR. KETTLEWELL:  Objection, Your Honor.

4                THE COURT:  She's not disputing -- she's testified

5    to that.  It's not a recorded recollection of something she

6    doesn't recall.

7    BY MS. KAPLAN:

8    **Q.**  What was it that you thought, happening three weeks

9    before the concert, was not the right way to do it?

10   **A.**  Adding money to a budget three weeks before a concert.

11   **Q.**  And was that done?  Did that happen?

12   **A.**  I -- according to Brian Appel, yes.

13   **Q.**  Well, according to Brian Appel or according to you?

14   **A.**  According to Brian Appel, he was being asked to hire some

15   union labor.

16   **Q.**  And that's what was going to add money to the budget?

17   **A.**  Yes.

18   **Q.**  And at that meeting, do you recall a discussion about the

19   fact that he was going to have to add money to the budget for

20   hiring union labor, but that that was not the way to do it?

21   **A.**  Again, I don't recall.

22               MR. KETTLEWELL:  Objection.

23   BY MS. KAPLAN:

24   **Q.**  Do you recall that it was done, that he was told he had

25   to do that?

```
 1              MR. KETTLEWELL:  Objection, Your Honor.

 2              THE COURT:  Sustained.

 3              You've asked that already.  Asked and answered.

 4              MS. KAPLAN:  Okay.  Well, I would ask that the

 5    witness be permitted to read that last sentence and she does

 6    not recall.

 7              MR. KETTLEWELL:  Objection.

 8              THE COURT:  Sustained.  That's not a recorded

 9    recollection of that meeting.

10    BY MS. KAPLAN:

11    Q.  Was it part of your job to be involved with the Boston

12    Calling Festival on September of 2014?

13    A.  It was not.

14    Q.  And whose job was it?

15    A.  It would have -- there would have been a number of

16    departments that would have touched that.

17    Q.  And who primarily?

18    A.  I don't know about primarily.  Special Events is a

19    coordinating office, but Police would be involved, EMS would

20    be involved, the Office of Consumer Affairs and Licensing

21    would be involved.  Public -- sorry -- Public -- Property

22    Management would be involved.  There would be a number of

23    departments involved.

24    Q.  And how about Tim Sullivan?  Would he have been involved?

25    A.  Not specifically, I don't believe.
```

1   **Q.**   Okay.   So why were you asking Tim Sullivan for how much

2   money it would cost to add union labor?

3   **A.**   Well, because I should have been asking Joe Rull.   That

4   would have been his job, but I didn't feel like I could go to

5   Joe.

6   **Q.**   Why?

7   **A.**   Because Joe was barely speaking to me.

8   **Q.**   Was there a reason for that?

9   **A.**   Joe just never liked me, was always pretty hard on me for

10   the year that he was there.

11   **Q.**   Why did you choose Tim Sullivan?

12   **A.**   Because Tim was a reasonable man.

13   **Q.**   Should he have been involved in these issues?

14   **A.**   I don't know that that's for me to say.

15   **Q.**   But you're the chief of policy, right?

16   **A.**   Yes.

17   **Q.**   And what was your reaction when you heard that Ken

18   Brissette had told Brian Appel he needed to use union labor

19   on City Hall Plaza?

20           MR. KETTLEWELL:   Objection, Your Honor.

21           THE COURT:   Sustained.

22   BY MS. KAPLAN:

23   **Q.**   Are you aware of any policy that union labor must be used

24   on City Hall Plaza to put on an event?

25   **A.**   I am not.

1    **Q.**  And did you discuss that fact that there was no such
2    policy with Ken Brissette?
3    **A.**  No, I didn't discuss it with Ken, at all.
4    **Q.**  Did you discuss it with Tim Sullivan?
5    **A.**  Sorry, can you ask the question again?
6    **Q.**  Did you discuss the fact that there was no policy that
7    union labor had to be used on City Hall Plaza to put on an
8    event with Tim Sullivan?
9    **A.**  I recall just asking Tim for what the estimated cost was
10   for adding union labor to that event three weeks before the
11   concert.
12   **Q.**  So I take it you did not have a discussion with Tim
13   Sullivan about the fact that there was no policy requiring
14   Boston Calling to use union labor on City Hall Plaza?
15   **A.**  Not that I recall, no.
16   **Q.**  And the -- you said that there were these issues in
17   August and leading up to the September 2014 festival, with --
18   on the Boston Police Department and the alcohol license and
19   the beer pens and the hours of operation, correct?
20   **A.**  Yes.
21   **Q.**  Okay.  Do you recall that you let Dan Koh and Joe Rull
22   know what those issues were?
23   **A.**  I don't recall specifically, but that sounds like I could
24   have.
25               MS. KAPLAN:  Okay.  If we can have Exhibit 43,

1  Ms. Beller.

2          THE WITNESS:  Sorry, what was that number, again?

3          MS. KAPLAN:  43.

4  BY MS. KAPLAN:

5  **Q.**  Do you see this?

6  **A.**  Sorry, this is really fuzzy.

7          THE COURT:  Can you read it on the paper?

8          THE WITNESS:  Yup.

9          THE COURT:  I think you'll generally find the paper

10 easier to read than the screen.

11         THE WITNESS:  Okay.

12         MS. KAPLAN:  Is this -- if you could blow that up,

13 Ms. Beller, so I can see it.  Thanks.

14 BY MS. KAPLAN:

15 **Q.**  Is this an e-mail that you sent to Dan Koh and Joe Rull?

16 **A.**  There is.

17 **Q.**  And is there a date on it?

18 **A.**  My e-mail was on August 20, 2014.

19         MS. KAPLAN:  Okay.  And I would offer it into

20 evidence at this time, Your Honor.

21         MR. KETTLEWELL:  No objection, Your Honor.

22         MR. KELLEY:  No objection, Your Honor.

23         THE COURT:  Number 43 is admitted in evidence.

24         (Exhibit No. 43 admitted into evidence.)

25 BY MS. KAPLAN:

1   **Q.**  And so -- I think we've seen a version of this.  This is

2   from Brian Appel to you on August 20, 2014, correct?

3   **A.**  Correct.

4   **Q.**  So that's at or about the same time that this meeting

5   took place that you don't recall with Brian Appel and Ken

6   Brissette, correct?

7   **A.**  That's correct, yes.

8   **Q.**  Okay.  And in this e-mail to you, he's telling you, from

9   EMS, the alcohol related treatments, the Friday night,

10  Saturday night, and Sunday, and he says, "These are tiny

11  numbers in an event with 22,000 people."

12        Correct?

13  **A.**  Correct.

14  **Q.**  And then he goes on to say, "My huge concern is

15  Commissioner Evans, Captain Fong holding up our license

16  application to the point where we cannot get the license, or

17  refuse to sign it unless we go back to beer garden lay out.

18  We do not have stamps/maps for beer garden layout.  It would

19  be illegal for us to operate the event this way now.  This is

20  one of the safest events in the City.  We spend hundreds of

21  thousands of dollars on Police and EMS and Fire Department

22  staffing to make it so, and we're getting singled out for

23  unknown reasons now two weeks before our next event."

24        Do you recall that?

25  **A.**  Yes.

1  **Q.**  And then you forwarded this on to Dan Koh and Joe Rull

2  saying "more Boston Calling"?

3  **A.**  Yes.

4  **Q.**  And why did you forward it to them?

5  **A.**  Because I thought they should know.

6  **Q.**  And they should know what?

7  **A.**  That Boston Calling was having issues with BPD around

8  beer pens.

9  **Q.**  Okay.  And did you attach to this the EMS report that

10  Brian Appel had forwarded to you?

11  **A.**  I did.

12          MS. KAPLAN:  Okay.  If we could turn to the third

13  page, Ms. Beller.

14  BY MS. KAPLAN:

15  **Q.**  And you see that there's Friday, May 23rd.

16          What's your understanding of what this is?

17  **A.**  I believe this is a list of transports from EMS or

18  treatment from EMS on the ground to the Boston Calling

19  Festival.

20  **Q.**  Okay.  And this is for the May 2014 festival?

21  **A.**  I believe that's true, yes.

22  **Q.**  And you see in the request, it say "Tylenol, band aid,

23  band aid."

24          Do you know what ETOH is?

25  **A.**  I don't.

1    **Q.**  Tylenol, eye flush, ETOH, anxiety illness, band aid,

2    sunscreen.

3              THE COURT:  Side point, should we be redacting the

4    names of these people?

5              MR. KETTLEWELL:  Yes, Your Honor.

6              THE COURT:  I think these names should be redacted

7    under HIPAA.  So the document is in evidence and that's fine,

8    but I think it should be redacted, because the particular

9    names don't mean anything.

10             MS. KAPLAN:  They do not.

11             THE COURT:  Okay.

12             Thank you, Ms. Beller.

13   BY MS. KAPLAN:

14   **Q.**  And then going down, do you see that the next is Saturday

15   May 24th?

16   **A.**  Yes.

17   **Q.**  Okay.  And again, band aid, band aid, sun block, band

18   aid, band aid, right?  And then on to the -- if we can go to

19   Sunday, May 25th, without the names.

20   **A.**  Yes.

21   **Q.**  And you see, again, band aids, left ankle, Tylenol, sun

22   block, there's a couple of ETOH and then it goes on.

23   **A.**  Okay.  Yes.

24   **Q.**  So you were forwarding -- you forwarded this to Joe Rull

25   and Dan Koh, correct?

1  **A.**  Yes.

2  **Q.**  And do you know -- did you become aware, in late

3  August -- well, I think you said that you reached out to

4  Captain Fong about the fact that they were going back --

5  wanted to go back to the beer gardens and the time

6  restrictions?

7  **A.**  No, I never reached out to Captain Fong.  I reached out

8  to Commissioner Evans.

9  **Q.**  Commissioner Evans, I'm sorry.  Right.

10  **A.**  Yes.

11  **Q.**  And do you know how that issue got resolved?

12  **A.**  I don't.

13  **Q.**  Do you know whether, at the September 14th festival,

14  there were beer gardens?

15  **A.**  I don't know.  I don't know.

16  **Q.**  Did you ever talk to the mayor about those issues after

17  your conversation with Commissioner Evans?

18  **A.**  I certainly spoke to the Mayor about the beer pen issue.

19  I can't tell you what the timeline was.

20  **Q.**  And prior to the September 2014 festival, did anyone ever

21  tell you there was going to be a picket at the festival by

22  IATSE if union members were not hired to work?

23  **A.**  I do recall there being talk of there potentially being a

24  picket.

25  **Q.**  By who?

1    **A.**   Joe Rull.  There may have been others.

2    **Q.**   When did Joe Rull tell you that?

3    **A.**   I don't know.  Some time before the concert.

4    **Q.**   And what did you do when you heard that?

5    **A.**   I don't recall.  Nothing.

6    **Q.**   You weren't concerned about that?

7    **A.**   Certainly I was concerned about it.

8    **Q.**   But you did nothing?

9    **A.**   No.

10   **Q.**   And were you aware of a meeting that took place on

11   September 2nd between Crash Line and Ken Brissette and Tim

12   Sullivan at City Hall, where union labor was again discussed?

13   **A.**   I was not aware.

14          THE COURT:  Where?  When?  Today or at that time?

15   BY MS. KAPLAN:

16   **Q.**   Were you aware at the time, or shortly after it happened,

17   that there had been a meeting on September 2nd between Crash

18   Line and Ken Brissette and Tim Sullivan where union labor was

19   again discussed?

20   **A.**   I don't recall being aware of that in 2014.

21   **Q.**   Did anyone fell you about that meeting in 2014?

22   **A.**   Not that I recall.

23   **Q.**   Who was Kate Norton?

24   **A.**   Kate was the Mayor's press secretary in 2014.

25   **Q.**   Directing your attention to September 2nd, did you have a

1     discussion with her about Boston Calling?

2     **A.**   It's possible.  Could you be more specific?

3     **Q.**   Do you recall sending her an e-mail about Boston Calling?

4     **A.**   Yes.

5     **Q.**   On September 2nd --

6     **A.**   I don't know that that's the date, but yes.  I do recall

7     the e-mail that you're referring to.

8                MS. KAPLAN:  If we could have Exhibit 48, Your

9     Honor, for the witness only.

10               THE COURT:  Yes.

11    BY MS. KAPLAN:

12    **Q.**   What do you recognize Exhibit 48 to be?

13    **A.**   Yes, this is an e-mail between Kate and myself that is

14    making some jokes about -- well, it starts with an e-mail

15    that was sent to me by a *Boston Globe* reporter, who was

16    pitching a story on the Mayor's taste in music and there's a

17    fair amount of joking between Kate and myself, because he's

18    not known to be a sophisticated connoisseur of music, so we

19    go back and forth a bit about this and then we talk about the

20    fact that there --

21               MR. KETTLEWELL:  Objection, Your Honor, to whether

22    the e-mail is coming in or not.  I would object to it.

23               THE COURT:  Well, I think she more than answered

24    the question, when she recognizes what Exhibit 48 is.

25               MS. KAPLAN:  Okay.

BY MS. KAPLAN:

**Q.**  Did you tell Kate Norton -- did you ask Kate Norton if you could pull into the impending story about Boston Calling and their bad labor practices?  "I think that makes a trifecta, *Top Chef*, Boston Calling, Spotify."?

        MR. KETTLEWELL:  Objection, Your Honor.

        MR. KELLEY:  Objection.

        THE COURT:  What's the objection?  What's the relevance of all of this?

        MR. KETTLEWELL:  Well, that's the first part of it.  This is an e-mail between she and a fellow employee.

        MS. KAPLAN:  Well, again, Your Honor, it goes to her state of mind under 801(d)(2)(E).

        THE COURT:  Sustained.

        MS. KAPLAN:  If I can have a moment, Your Honor.

        THE COURT:  Yes.

        (Counsel confers.)

        MS. KAPLAN:  Your Honor, could we go back to Exhibit 45 for a moment?

        THE COURT:  Yes.

        MS. KAPLAN:  Just for the witness.

BY MS. KAPLAN:

**Q.**  And the paragraph that you read to the jury, under the word "IATSE," do you see that?  Do you see that?  That paragraph that you read previously?

1    **A.**   Yes.

2    **Q.**   I believe that there was a word or two that was read

3    incorrectly.  If you could read it again, please?

4            THE COURT:  Just -- without the commentary, but you

5    can ask her to read it again, if you wish.

6            THE WITNESS:  "I have not yet had the full IATSE

7    conversation.  I thought Ken was supposed to be having it,

8    but I got pulled into a meeting with him and with them

9    yesterday."

10           MS. KAPLAN:  Your Honor.

11           THE COURT:  Okay.  I read it as saying "and them."

12           THE WITNESS:  Sorry my mistake.  "With him and them

13   yesterday.  Ken told them they would have to hire a few

14   guys."

15           MS. KAPLAN:  No further questions, Your Honor.

16           THE COURT:  All right.  Any cross-examination?

17           MR. KETTLEWELL:  Yes, Your Honor, I have a few

18   questions.

19       **CROSS-EXAMINATION BY COUNSEL FOR DEFENDANT BRISSETTE**

20   BY MR. KETTLEWELL:

21   **Q.**   Good morning, Ms. Linehan.  My name is Bill Kettlewell

22   and I represent Ken Brissette.

23   **A.**   Good morning.

24   **Q.**   Now, I believe you testified that you had a background in

25   the music and concert business prior to going to City Hall.

1  **A.**  I did.

2  **Q.**  And you had an interest in that business, obviously,

3  having worked in it for several years?

4  **A.**  I did.

5  **Q.**  And you, I believe, testified that you worked on

6  Mayor Walsh's campaign in 2013 that led to his election in

7  November of 2013, right?

8  **A.**  That's right.

9  **Q.**  I believe you also told us you knew Brian Appel prior to

10  that point in time in 2013.  You've known him for almost a

11  decade prior to that, correct?

12  **A.**  That's correct.

13  **Q.**  You've crossed paths in the music and concert business

14  over the course of that time?

15  **A.**  That's right.  Many times.

16  **Q.**  And could you tell the jury whether or not -- well,

17  strike the question.

18       As I understand it, Mr. Appel contacted you some

19  time shortly after the election in November of 2013, correct?

20  **A.**  He did.  He contacted me within 24 hours of the election

21  in 2013.

22  **Q.**  All right.  And at that point, had you decided to take a

23  position or had even been offered a position in Mayor Walsh's

24  Administration?

25  **A.**  I had been very public about the fact that I wasn't going

1   to take a position.

2   **Q.**   All right.  And Mr. Appel contacted you within 24 hours?

3   **A.**   That's right.

4   **Q.**   And what did he ask you to do, if anything?

5   **A.**   Well, he congratulated us and then he said I wish you

6   would consider -- reconsider taking a position, City Hall --

7   something along the lines of City Hall could use people like

8   you.  They're sometimes difficult to deal with.  That was the

9   subtext.

10   **Q.**   All right.  And ultimately, you decided to take a

11   position, right?

12   **A.**   I did.

13   **Q.**   And I think we talked briefly and you talked briefly with

14   the organization of the Mayor's Administration yesterday.  I

15   just wanted to ask you a couple of questions on that?

16   **A.**   Sure.

17   **Q.**   And they would relate to, first, Mr. Brissette's position

18   in the administration.  Obviously Mayor Walsh is at the top,

19   right?

20   **A.**   That's right.

21   **Q.**   And you had a cabinet level position as head of policy?

22   **A.**   That's correct.

23   **Q.**   And I believe you testified that there were

24   approximately, I think you said 12 to 15.  I may be wrong on

25   the number, but there was at least between 10 and 20 cabinet

1    level positions?

2    **A.**   It's 15 to 18, depending on how you count them.

3    **Q.**   All right.  And that would be people, as you just

4    testified, like Joe Rull?

5    **A.**   Correct.

6    **Q.**   He was chief of operations?

7    **A.**   That's right.

8    **Q.**   Is that correct?

9           And I think we saw on that e-mail the name "Dan

10   Koh"?

11   **A.**   That's correct.

12   **Q.**   He was -- what was he?

13   **A.**   He was the chief of staff at the time.

14   **Q.**   All right.  And then there were various incendiary

15   cabinet level positions; is that right?

16   **A.**   That's right.

17   **Q.**   And were the chief of staff and the chief of operations

18   at a cabinet level?

19   **A.**   Yes.  Ex officio cabinet members.

20   **Q.**   All right.  And you testified, I believe, that -- well,

21   actually, I don't think you testified to this.  I'll ask you

22   this.  Mr. Barros was a cabinet level position, correct?

23   **A.**   That's right.

24   **Q.**   Head of economic development?

25   **A.**   He's the chief of economic development.

1   **Q.**  All right.  And do you know where the Office of Tourism

2   and Special Events fell within this constellation of cabinet

3   officials?

4   **A.**  Yes, it falls under the cabinet of economic development.

5   **Q.**  I'm sorry?

6   **A.**  It falls under the cabinet of economic development.

7   **Q.**  So the person who was director of that Office of Tourism

8   and Special Events would report to the cabinet level officer,

9   who was the head of economic development?

10  **A.**  That's correct.

11  **Q.**  And in 2014, after Mayor Walsh took office, that was a

12  man named John Barros, correct?

13  **A.**  That's correct.  It still is.

14  **Q.**  All right.  He's still there?

15  **A.**  That's right.

16  **Q.**  And you got in office and you got -- or took office as

17  the policy director for Mayor Walsh when in 2014?

18  **A.**  Officially February 3, 2014.  I ran -- I co-ran the

19  transition for him in November and December of 2013.

20  **Q.**  And the Administration officially started early in

21  January of 2014?

22  **A.**  Correct.  The first week of January.  I'm not sure the

23  date.

24  **Q.**  That's when the Mayor took office?

25  **A.**  That's right.

**Q.** You followed in February, correct?

**A.** Yes.

**Q.** And then one of the first things you did was -- and we're going to come to this in a minute, was to set up a meeting between Brian Appel and the Mayor in March of 2014, correct?

**A.** That's correct.

**Q.** All right. But before we come to that meeting, just to finish up with the organization of the cabinet level people, the Office of Tourism reports -- the director of that department reports to Mr. Barros, correct?

**A.** That's correct.

**Q.** Mr. Barros reports to the Chief of Staff; is that correct?

**A.** That's correct.

**Q.** And that would have been Dan Koh back in this period of time back in 2014?

**A.** That's right.

**Q.** And then Dan Koh, obviously, reports to the Mayor?

**A.** That's correct.

**Q.** And you had a direct report to the Mayor, correct?

**A.** That's right.

**Q.** And with respect to the Department of Intergovernmental Affairs, was that a cabinet level position?

**A.** No, it's a department.

**Q.** It was a department. And what department did -- or

1    strike that.

2         What cabinet level did that report to?

3    **A.**   At the time, it reported to Operations.

4    **Q.**   So that would have been Joe Rull you just told us?

5    **A.**   That's correct.

6    **Q.**   And so the Director of Intergovernmental Affairs would

7    report to Joe Rull, who was the Chief of Operations, correct?

8    **A.**   That's correct.

9    **Q.**   Mr. Rull reported to Dan Koh, the chief of staff?

10   **A.**   No, I would say it would be more accurate to characterize

11   Joe as a direct report to the Mayor.

12   **Q.**   All right.  So the cabinet officer for -- strike that.

13        Joe Rull was the person to whom Intergovernmental

14   Affairs reported and Joe reported directly to the Mayor?

15   **A.**   That's correct.

16   **Q.**   All right.  And Mr. Sullivan works somewhere in that

17   Department of Intergovernmental Affairs, correct?

18   **A.**   That's correct.

19   **Q.**   He wasn't the director of it at all, was he?

20   **A.**   He was not the director.

21   **Q.**   Okay.  So let's go to the meeting that we had -- or

22   strike it -- that you testified to yesterday, concerning

23   Boston Calling in March of 2014.  You testified that you

24   attempted to set that meeting up at the request of Brian

25   Appel, correct?

1   **A.**   That's right.

2   **Q.**   And you were trying to introduce Mr. Appel and Mr. Snow

3   to Mayor Walsh, correct?

4   **A.**   That's right.

5   **Q.**   The purpose of the meeting was kind of a meet and greet,

6   so that the Mayor could learn what Boston Calling could offer

7   to the City?

8   **A.**   That's right.

9   **Q.**   And were you the person, at least, inside of the

10  administration, who was kind of the proponent of Boston

11  Calling at this point?

12  **A.**   Yes, I was interested in -- I was a big fan of the

13  festival and big fans of festival in general, and interested

14  in trying to make sure that we could have many of them in the

15  City.

16  **Q.**   All right.  And I believe you testified that you

17  certainly were at the meeting, correct?

18  **A.**   Yes.

19  **Q.**   The Mayor was at the meeting, correct?

20  **A.**   That's right.

21  **Q.**   And I believe when you were shown an e-mail earlier, you

22  weren't sure Mr. Sullivan was at the meeting; is that

23  correct?

24  **A.**   That's right.

25  **Q.**   And Mr. -- Mr. Appel brought Mr. Snow, correct?

1    **A.**   That's right.

2    **Q.**   Did he bring Carole Brennan to the meeting?

3    **A.**   I'm not sure.  I know there was talk of it, but I don't

4    know if she ended up coming or not.

5    **Q.**   And who is Carole Brennan?  Do you know her?

6    **A.**   She's a lobbyist who was employed by Boston Calling, the

7    former -- Mayor Menino's press secretary.

8    **Q.**   And do you remember whether or not Ken Brissette was at

9    that meeting?

10   **A.**   I don't have a recollection, but he had not started his

11   job yet, so he would not have been there.

12           MR. KETTLEWELL:  Well, I want to show you a

13   document.

14           Your Honor, may I approach?

15           THE COURT:  You may.

16           MR. KETTLEWELL:  This is Exhibit 138.

17   BY MR. KETTLEWELL:

18   **Q.**   If you could take a look at Exhibit 138.  Do you

19   recognize it?

20   **A.**   Yes.

21   **Q.**   And what is Exhibit 138?

22   **A.**   It's printout of the Mayor's daily schedule for --

23   **Q.**   And -- I'm sorry.  Go ahead.

24   **A.**   I was going to say the date, but I don't see it here.

25   **Q.**   Well, could you look at the cover e-mail?

1    **A.**   Sorry, for Wednesday, March 5th.

2    **Q.**   All right.  And was this the type of e-mail that went

3    around on a daily basis?

4    **A.**   Yes.

5    **Q.**   For the staff to understand the Mayor's schedule?

6    **A.**   Yes.

7    **Q.**   And incidentally, there's an e-mail, a cover e-mail on

8    the document, correct?

9    **A.**   Yes.

10   **Q.**   And were you a recipient of this e-mail at the time?

11   **A.**   Yes.

12   **Q.**   Who is Erin Santhouse?

13   **A.**   She's one of the Mayor's schedulers.

14          MR. KETTLEWELL:  All right.  Your Honor, I'd offer

15   the e-mail and the attachment.

16          MS. KAPLAN:  No objection.

17          THE COURT:  All right.  138 in evidence.

18          (Exhibit No. 138 admitted into evidence.)

19          MR. KETTLEWELL:  And if you could expand that

20   e-mail to list, Mr. Cavallo.

21   BY MR. KETTLEWELL:

22   **Q.**   So we see you in this e-mail.  Are these people who are

23   the Mayor's senior staff, who would get the schedule every

24   day?

25   **A.**   No.  This is a wider list than that.

1    **Q.**  I'm sorry?

2    **A.**  This is a wider list than that.

3    **Q.**  Okay.  So there's more people on it than just the Mayor's

4    senior staff?

5    **A.**  That's correct.

6    **Q.**  Okay.  And if you could turn the page and go to the third

7    page in, please.

8         MR. KETTLEWELL:  And if you could expand that,

9    Mr. Cavallo.  And if you could go to the very top, first.

10   BY MR. KETTLEWELL:

11   **Q.**  You have the document in front of you, but you can see

12   that "MJW" stands for Martin J. Walsh, correct?

13   **A.**  That's right.

14   **Q.**  And this is his daily schedule for Wednesday, March 5th?

15   **A.**  Yes.

16        MR. KETTLEWELL:  All right.  And if you could go

17   down to the second page of the schedule, please, Mr. Cavallo,

18   about two-thirds of the way down the page.  And if you could

19   expand that.

20   BY MR. KETTLEWELL:

21   **Q.**  And while he's expanding that, Ms. Linehan, there are

22   numerous events scheduled for that particular day for the

23   Mayor, correct?

24   **A.**  Correct.

25   **Q.**  All right.  And if you draw your attention to -- back to

1    Exhibit 138, from 2:30 to 3:00, on the schedule is a meeting

2    with Brian Appel, Boston Calling, correct?

3    **A.**   Correct.

4    **Q.**   And that's the meeting that you attended.

5    **A.**   Yes.

6    **Q.**   And it says, at the bottom -- strike that.

7         The third line down from meeting, it says "staff."

8    And what does "staff" refer to?

9    **A.**   People who would staff the Mayor in the meeting.

10   **Q.**   All right.  And it could be Chris Cook, Joe Rull, Joyce

11   Linehan -- that's you, right?

12   **A.**   Yes.

13   **Q.**   And Tim Sullivan, right?

14   **A.**   Correct.

15   **Q.**   And Chris Cook was at that point in the Office of Special

16   Events and Tourism?

17   **A.**   I believe he was still there, yes.

18   **Q.**   And Ken Brissette, obviously, was not listed as being

19   present at the meeting.

20   **A.**   That's correct.

21   **Q.**   Does that refresh your recollection that he wasn't there

22   at all?

23   **A.**   I believe he started working with us in May.  He would

24   not have been there.

25   **Q.**   So he started working at least two, two and a half months

1    later?

2    **A.**   Correct.

3    **Q.**   All right.  In any event, you testified that there was

4    this meeting with the Mayor and certainly Ken Brissette

5    wasn't there for him to be introduced to Boston Calling at

6    that point in time, correct?

7    **A.**   That's correct.

8    **Q.**   And the Mayor didn't say Ken Brissette is your guy, or

9    words to that effect, to Brian Appel, correct?

10   **A.**   No.

11   **Q.**   Ken hadn't even been hired at that time, right?

12   **A.**   I believe that's correct.

13   **Q.**   All right.  Now, shortly after the meeting, I think you

14   testified that Mr. Appel was an individual who made repeated

15   requests to you.

16   **A.**   Yes.

17   **Q.**   Is that fair?

18   **A.**   That's fair.

19   **Q.**   And Boston Calling and the concerns raised by Boston

20   Calling weren't even your job, were they?

21   **A.**   That's right.

22   **Q.**   And yet Mr. Appel made all these requests to you?

23   **A.**   That's correct.

24   **Q.**   Did he tell you why he made all these requests to you?

25   **A.**   He told me that, because I understood the concert

1   business and because I was a friend to Boston Calling, he was

2   asking for my help when he was hitting any barriers with the

3   City.

4   **Q.**   Okay.  And you were willing to provide that help?

5   **A.**   Yes.

6   **Q.**   Okay.  In any event, did you receive a communication from

7   Mr. Appel shortly after the meeting?

8   **A.**   I don't recall specifically.

9           MR. KETTLEWELL:  May I approach, Your Honor?

10          THE COURT:  You may.

11          MR. KETTLEWELL:  I'll give you a hard copy.  This

12   is Exhibit 171.

13          THE COURT:  171?

14          MR. KETTLEWELL:  171 for identification.

15   BY MR. KETTLEWELL:

16   **Q.**   If you take a look at that document, Ms. Linehan.

17   **A.**   Yes.

18   **Q.**   And do you recognize the document?

19   **A.**   I do.

20   **Q.**   And is this an e-mail that you received from Brian Appel

21   at 4:30 p.m. on March 5th?

22   **A.**   It is.

23   **Q.**   And that is the day that we just saw that you had the

24   meeting with the Mayor between 2:30 and 3:00, right?

25   **A.**   That's correct.

1    **Q.**  And so Mr. Appel sent you an e-mail at 4:30?

2    **A.**  It would seem so, yes.

3            MR. KETTLEWELL:  All right.  Your Honor, I'd offer

4    the e-mail.

5            MS. KAPLAN:  No objection.

6            THE COURT:  171 in evidence.

7            (Exhibit No. 171 admitted into evidence.)

8            MR. KETTLEWELL:  If we could put that up,

9    Mr. Cavallo, and if we could highlight, please, the area

10   beginning "Joyce," in the middle of the page.

11           Actually, first -- and I apologize, we should go

12   back and show the time and the date and who sent it, so the

13   jury can orient themselves.

14   BY MR. KETTLEWELL:

15   **Q.**  This is an e-mail from Brian Appel to you, correct?

16   **A.**  That's right.

17   **Q.**  And the subject is "Thank you and follow-up," am I right?

18   **A.**  That's right.

19   **Q.**  Right.  And it's at 4:30 p.m. on that day on the 5th of

20   March, correct?

21   **A.**  Correct.

22   **Q.**  All right.

23           MR. KETTLEWELL:  And if we could go down and

24   highlight the next paragraph.  Well, you can highlight the

25   whole page, if you're able to, so the jury can read it.

1    Thank you.  I'm sorry.

2    BY MR. KETTLEWELL:

3    **Q.**  So I just want to move through this more quickly.

4    Mr. Appel was thanking you for setting up the meeting,

5    correct?

6    **A.**  Yes.

7    **Q.**  And he said he would follow-up regarding the job exchange

8    program, am I right?

9    **A.**  Yes.

10   **Q.**  And he said, "We love City Hall and the people there and

11   pride ourselves on the great relationships we've built

12   there."

13           Right?

14   **A.**  Yes.

15   **Q.**  And he wanted and was trying to curry favor with you and

16   keep you in his corner, so to speak, correct?

17   **A.**  I think that's right.

18   **Q.**  But you were already in his corner?

19   **A.**  I was.  Very much so.

20   **Q.**  Okay.  And then he said he had three housekeeping notes

21   from the meeting, when you have a moment.

22           And the first was, "We have our hearing with

23   Patricia Malone next Wednesday the 12th at 10:00 a.m.  We're

24   going in, attempting to permit for both May and September at

25   the same time.  I know this may already be on your calendar,

1    but just a reminder," -- if we're going to -- I'm sorry --

2    "just a reminder if you were going to come from it."

3              That was a meeting -- who is Patricia Malone?

4    **A.**   She was the director of the Mayor's Office of Consumer

5    Affairs and Licensing.

6    **Q.**   And Mrs. Malone had authority over entertainment

7    licenses, correct?

8    **A.**   That's right.

9    **Q.**   And Mr. Appel was inviting you to attend his hearing that

10   she was holding, correct?

11   **A.**   That's right.

12   **Q.**   And, in fact, you did attend that hearing, am I right?

13   **A.**   I believe I did.  I committed to attending.  I believe I

14   did.

15   **Q.**   And that's a hearing when Mr. Appel -- do you know who

16   Favour Jones is?

17   **A.**   I do.

18   **Q.**   Who is she?

19   **A.**   She's an event coordinator who was hired by Boston

20   Calling.

21   **Q.**   And she is a woman who specializes in assisting concert

22   production companies in getting -- in kind of navigating

23   through the permit process in the City?

24   **A.**   She does.  I knew her, because she worked with a client

25   of mine, the Boston Book Festival, prior to my coming to City

1   Hall.

2   **Q.**   All right.  In any event, Mr. Appel, and Ms. Jones were

3   at the meeting with Mrs. Malone, correct?

4   **A.**   Yes.

5   **Q.**   And you were there?

6   **A.**   I believe I was, yes.

7   **Q.**   Was that something that was part of your

8   responsibilities?

9   **A.**   It wasn't.

10  **Q.**   Had Mr. Appel complained at all about Mrs. Malone and her

11  conduct of those types of hearings and her conduct generally?

12  **A.**   Yes.

13  **Q.**   What did he say?

14  **A.**   That she was difficult, that she asked questions that

15  were -- that he thought were not relevant.  I think that

16  office had a reputation generally for being rather hard to

17  work with.

18  **Q.**   Were they sticklers?

19  **A.**   I'm not so sure it was sticklers.  It often seemed to me

20  like they were making things unnecessarily difficult.

21  **Q.**   And did you know Patricia Malone personally?

22  **A.**   I didn't -- well, I had been in hearings that she

23  presided over prior to my getting to City Hall, but I

24  wouldn't say I knew her.

25  **Q.**   You didn't really have any kind of relationship with her?

1   **A.**  No.

2   **Q.**  And she was a hold over from the Menino Administration?

3   **A.**  That's correct.

4   **Q.**  She had been in that position for, I think, over ten

5   years?

6   **A.**  A long time.  I'm not sure how long, but yes.

7   **Q.**  A long time.  Okay.  In any event, you attended the

8   hearing and Mr. -- Mr. Appel noted they were going in,

9   attempting to permit for both May and September at the same

10   time.  Do you remember that?

11   **A.**  Yes.

12   **Q.**  So that there would only be one hearing.  There wouldn't

13   need to be a hearing in both March and then at some point

14   prior to the September concert, correct?

15   **A.**  That's correct.

16   **Q.**  Do you know whether he did the exact same thing with the

17   Special Events office?

18   **A.**  I don't know.

19   **Q.**  Okay.  In any event, you attended the meeting and

20   Mr. Appel got his approval from Mrs. Malone in April.  Do you

21   remember that?

22   **A.**  Yes.

23   **Q.**  All right.  Now, the second thing he wanted to bring to

24   your attention at this point in time was this what we'll

25   call, if you've read that, the beer pen issue?

1    **A.**   Yes.

2    **Q.**   Correct?

3    **A.**   Yes.

4    **Q.**   Is this the first time he had mentioned the beer pen

5    issue to you back in March, or had he mentioned it earlier?

6    **A.**   I'm not sure.  He could have mentioned it earlier, but I

7    couldn't say with certainty.

8    **Q.**   Did he ever explain to you what the big deal was about

9    the beer pens, as opposed to allowing people to roam freely

10   throughout the concert with liquor and alcohol?

11   **A.**   Yes.

12   **Q.**   What was the issue?

13   **A.**   They would be able to -- they would make more money if

14   the beer pen wasn't in use, if people were able to roam free,

15   and that it was a better customer experience.

16   **Q.**   Was it the customer experience, or was it the money, or

17   was it both?

18   **A.**   You'd have to ask him.

19   **Q.**   All right.  In any event, he was raising the issue of the

20   beer pen, what he called the "open format beer and wine plan"

21   at the hearing, correct?

22   **A.**   That's right.

23   **Q.**   And were you opposed to that?

24   **A.**   I was not.  I was in favor of it.

25   **Q.**   Why were you in favor of it?

1    **A.**   I thought it was a better customer experience and I

2    wanted Boston Calling to succeed.

3    **Q.**   And did you know whether or not Mrs. Malone was in favor

4    of it?

5    **A.**   I don't know that.

6    **Q.**   Okay.  In any event, do you know -- well, strike it.

7    Were you aware that Boston Calling had a license from the

8    City and from the people who ran City Hall Plaza to operate

9    their concerts there twice a year?

10   **A.**   I became aware of a licensing agreement in the context of

11   there being requests for them to extend it.

12   **Q.**   Okay.  Were you aware that, in part, that licensing

13   agreement contained a provision that related to beer pens and

14   making sure the consumption of alcoholic beverages was

15   confined to particular areas?

16   **A.**   I was not aware of that.

17   **Q.**   Okay.  In any event, Mr. Appel wanted your help in

18   getting this beer pen restriction removed.

19   **A.**   He did, yes.

20   **Q.**   And you agreed to help him.

21   **A.**   I did.

22   **Q.**   And you saw, I think, on direct a few minutes ago, in

23   April, you were texting -- I think you were shown Exhibit 13.

24   You were texting Mr. Appel -- or he was reporting that you

25   texted him that the beer pen restriction had been removed,

1  correct?

2  **A.**  I think -- so I think that might have been a

3  communication between Carole Brennan and Brian Appel that I

4  just saw for the first time today.

5  **Q.**  Oh, okay, but were you responsible in helping him get the

6  beer pen restriction removed?

7  **A.**  I was.

8  **Q.**  And you testified this morning that it was an experiment.

9  What did you mean when you said it was an experiment?

10  **A.**  Commissioner Evans was reluctant, had some reticence

11  about how it would work.  And I spoke to both him and the

12  Mayor, an said I think that we should at least give this a

13  try.  So in that sense, I would say experiment, as opposed

14  to -- if it had been done and hadn't worked very well, then I

15  think the City wanted the option to not do it the following

16  time.

17  **Q.**  So it was a one time permission, let's try it in May, and

18  we'll see what happens?

19  **A.**  Yes.

20  **Q.**  And that would be May of 2014?

21  **A.**  That's correct.

22  **Q.**  Okay.  And you were instrumental in getting that done for

23  Mr. Appel, correct?

24  **A.**  I believe that's right, yes.

25  **Q.**  All right.  And now, if you turn the page on 171, there's

1    a third thing he wanted.  And the third thing he wanted was,

2    "An amendment to our lease agreement has already been signed

3    off by the Law Department and it's sitting on Lisa Menino's

4    desk, awaiting Chief Galvan's signature.  Any help you could

5    provide here would be great."

6              What was that issue?

7    **A.**   They wanted to extend their agreement, so that they could

8    continue to produce concerts on City Hall Plaza exclusively.

9    **Q.**  And was this the extension that took them through 2015,

10   2016, and 2017?

11   **A.**   I'm not clear on that.

12   **Q.**  All right.  In any event, you recall -- well, strike it.

13   Did you do anything to help Mr. Appel move this document off

14   Chief Galvan's desk?

15   **A.**   I don't know if I did anything specifically with regard

16   to moving something off Chief Galvan's desk, but I was

17   certainly in favor of a lease extension.

18   **Q.**   Who was Chief Galvan?

19   **A.**   He was the -- I don't even know what his title -- Chief

20   of Property Management, perhaps, at the time, in 2014.  He

21   was there for a while.  He was a holdover from the Menino

22   Administration.

23   **Q.**  He was the guy who signed the licenses for use of City

24   Hall Plaza?

25   **A.**   Correct.  He oversaw the Property Management Department.

1   **Q.**   All right.  And you can't remember what you did or didn't

2   do with respect to that issue?

3   **A.**   I'm sorry, no.

4   **Q.**   But the issue of extending their lease was an issue that

5   you testified, I think, came up frequently with Brian Appel?

6   **A.**   Yes.

7   **Q.**   And the issue of restrictions on alcohol and the terms of

8   their -- and conditions of their liquor license was the other

9   issue that came up all the time?

10  **A.**   That's correct.

11  **Q.**   And then I think you said on direct, a third issue that

12  came up all the time was the cost of police details.  Do you

13  recall that testimony?

14  **A.**   Yes, that's right.

15  **Q.**   And could you describe what Mr. Appel, what his

16  complaints were about police details?

17  **A.**   Yeah.  I don't remember the time frame exactly, but it

18  must have been the May concert.  After the May concert, he

19  sent me the bill that the Police had issued and it was -- it

20  far exceeded what they had been told in advance of the

21  concert they would -- they might be expected to pay for

22  police details.

23          MR. KETTLEWELL:  All right.  May I approach the

24  witness, Your Honor?

25          THE COURT:  You may.

```
 1              MR. KETTLEWELL:  Let me show you a document that
 2    has been marked Exhibit 110 for identification.
 3              Your Honor, before we move to 110, I would move 171
 4    in, in to evidence.
 5              THE COURT:  Any objection?
 6              MS. KAPLAN:  No objection.
 7              THE COURT:  171 in evidence.  I think it might --
 8              MR. KETTLEWELL:  Yeah, well, I didn't remember and
 9    I wanted to be certain, Judge.
10              THE COURT:  No problem.
11              MR. KETTLEWELL:  Have you had a chance to look at
12    110 --
13              THE COURT:  This is 110.
14              MR. KETTLEWELL:  110.
15              THE WITNESS:  Yes.
16    BY MR. KETTLEWELL:
17    Q.  And is this an e-mail that Mr. Appel sent to you?
18    A.  It is.
19    Q.  And it was sent in June of -- June 23, 2014?
20    A.  That's right.
21    Q.  And it was concerning the issue we just discussed,
22    correct?  Police details?
23    A.  That's right.
24              MR. KETTLEWELL:  Your Honor, I'd offer it.
25              MS. KAPLAN:  No objection.
```

1      THE COURT:  110 in evidence.

2      (Exhibit No. 110 admitted into evidence.)

3      MR. KETTLEWELL:  If you could display that,

4  Mr. Cavallo, briefly.

5  BY MR. KETTLEWELL:

6  **Q.**  All right, Ms. Linehan, this is an e-mail from Mr. Appel

7  that he sent you on June 23rd, correct?

8  **A.**  That's right.

9  **Q.**  2014, correct?

10  **A.**  Correct.

11  **Q.**  And that was after the May concert, correct?

12  **A.**  That's right.

13  **Q.**  And this is, for lack of a better word, he says, "Please

14  don't take this as a complaint.  It's not.  I understand that

15  it is, indeed, the cost of doing business in the City."

16      Correct?

17  **A.**  That's right.

18  **Q.**  But it really was a complaint, right?

19  **A.**  I would say so, yes.

20  **Q.**  He wants to point out to you how much it cost to pay the

21  police officers to provide security at the concert, correct?

22  **A.**  That's right.

23  **Q.**  And did you mention to him anything about the added cost

24  of security because of the lack of beer pens at this

25  particular concert?

1    **A.**   I know we had a discussion about that at some point, but

2    I don't remember specifically when.

3    **Q.**   In any event, did Mr. Appel ask you to do anything about

4    this cost and this bill he had received, or an invoice he had

5    received from the Police Department for the details at the

6    May 2014 concert?

7    **A.**   He wasn't asking me to do anything, so much as he was

8    offering to give some insight into how events might interact

9    with police details in a way that provided for more certainty

10   for organizations that wanted to look at their budgets before

11   they decided whether or not to do an event.

12   **Q.**   So he was looking for you to intervene in the process,

13   and try and figure out how he could better understand what it

14   was going to cost him to have police details at his events?

15   **A.**   That's right.  He wanted an estimate prior to his

16   festival that would actually give him an idea of what he was

17   actually going to be paying for details instead of being

18   surprised.

19           MR. KETTLEWELL:  Your Honor, I'd offer 110.

20           THE COURT:  I think I did and I think I admitted it

21   without objection.

22           MR. KETTLEWELL:  All right.  I guess I didn't get

23   enough sleep last night, Judge.

24   BY MR. KETTLEWELL:

25   **Q.**   All right.  You also were shown, I believe by Mr. Kaplan,

1    Exhibit 40 earlier this morning, correct?

2    **A.**   Yes -- I'm sorry, that was 40?

3    **Q.**   I think you have it in your file.

4    **A.**   4-0?

5    **Q.**   4-0.

6    **A.**   Oh, sorry.  Yes.

7    **Q.**   And that was Mr. Appel --

8              MR. KETTLEWELL:  Can you put that up, Mr. Cavallo?

9    BY MR. KETTLEWELL:

10   **Q.**   Again, on May 27th, which was the Tuesday after the

11   concert ended, correct?

12   **A.**   That's right.

13   **Q.**   Giving you information about EMS transports, correct?

14   **A.**   That's right.

15   **Q.**   And he didn't provide you -- well, strike that.  And you

16   said you didn't know what ETOH was, correct?

17   **A.**   I don't.

18   **Q.**   Okay.  In any event, why did you send this to Joe Rull

19   and Dan Koh on that day?

20   **A.**   Because it was -- Brian was trying to make the case that

21   Boston Calling was running a safe and healthy festival, so

22   that he could, perhaps, make it easier to get what he needed

23   to get for the September concert and I thought that Joe and

24   Dan should know that.

25   **Q.**   So he was trying to get ahead of any issues for the

1    September concert?

2    **A.**   I believe that's correct.

3    **Q.**   And did you know from any other source at that point what

4    the actual safety situation had been at the Boston Calling

5    concert in May?

6    **A.**   I do not.  All I knew was what was in the EMS report that

7    you sent.

8    **Q.**   And I think you told us, you didn't attend that event,

9    right?

10   **A.**   That's correct.

11   **Q.**   Okay.  And so the next thing I think we saw -- did

12   anything happen, as you can recall, with Boston Calling

13   between this point in time in June of 2014, and in the run up

14   to the event in August of 2014?

15   **A.**   Not that I'm aware of specifically.

16   **Q.**   Do you recall having any meetings with Mr. Appel

17   throughout that period of time at all?

18   **A.**   I don't recall, but it's possible that I did.

19   **Q.**   All right.  Would he have -- did he have the type of

20   relationship with you that he could just drop by my office?

21   **A.**   Drop by, no, but he certainly had my cell phone number

22   and was in pretty constant contact.

23   **Q.**   So he could pick up the phone and call you when he felt

24   like it?

25   **A.**   He could.

1    **Q.**   And he did.

2    **A.**   Absolutely.

3    **Q.**   And he had your City e-mail, right?

4    **A.**   Yes.

5    **Q.**   And he had your personal e-mail.

6    **A.**   Yes.

7    **Q.**   And he used them both?

8    **A.**   Yes.

9    **Q.**   All right.  Now, you were shown Exhibit 42.  If you could

10   pull that out.

11          MR. KETTLEWELL:  If we could put that up,

12   Mr. Cavallo.  And now we're shifting gears.  We're talking

13   about the liquor license issue for the September 2014

14   concert.

15   BY MR. KETTLEWELL:

16   **Q.**   You were shown this earlier today, correct?

17   **A.**   Yes.

18   **Q.**   And this is where Mr. Appel is saying that it's going to

19   be impossible for him to get the liquor board to issue a

20   license and it's going to be catastrophic for him, correct?

21   **A.**   Yes.

22   **Q.**   And let me just ask you this and I'll have some questions

23   in the future.  Did you do anything between when we've seen

24   your last contact with Mr. Appel in June of 2014, up to this

25   point, in August, on August 20, 2014, to impede or impair or

1    in any way try to slow down Mr. Appel's efforts to get a

2    liquor license for his September concert?

3    **A.**   No, quite the opposite.  I wanted to help them to get

4    what they needed to do a concert.

5    **Q.**   And I ask the same question about the entertainment

6    license.

7    **A.**   No.  Did I do anything to impede that?  No.

8    **Q.**   Okay.  Were you aware of any effort to try and impede or

9    impair Mr. Appel's effort to get the liquor license that he

10   needed for his concert in September?

11   **A.**   No.

12   **Q.**   Were you part of any effort to do that?

13   **A.**   No.

14   **Q.**   Same questions with regard to the entertainment license.

15   Were you a part of any effort to impede or impair Mr. Appel's

16   ability to get the entertainment license?

17   **A.**   No.

18   **Q.**   And incidentally, we talked about it, but that would have

19   been something that Ms. Malone, Patricia Malone, would have

20   issued, correct?

21   **A.**   That's correct.

22   **Q.**   And did you talk with her or met with her at all

23   regarding the Boston Calling entertainment licenses?

24   **A.**   I did not.  I did not have much of a relationship with

25   her.

1    **Q.**  All right.  Did you ever talk with her or meet with her

2    regarding the Boston Calling license issues for the

3    entertainment license at any point in 2014?

4    **A.**  I don't believe I did.

5    **Q.**  Okay.  Now, you replied to Mr. -- well, strike that.  If

6    we can go to the top of this e-mail string, Exhibit 42.

7            You told Mr. Appel you had a message into the

8    Commissioner, correct?

9    **A.**  That's right.

10   **Q.**  And we're talking now about Police Commissioner William

11   Evans?

12   **A.**  That's right.

13   **Q.**  And why did you have a message into the Commissioner?

14           MS. KAPLAN:  Objection, Your Honor.

15           THE COURT:  Yes.  I think you might have

16   mischaracterized who she sent the e-mail to.

17           MR. KETTLEWELL:  I'm sorry.

18           THE COURT:  That's what your objection is, right,

19   Ms. Kaplan?

20           MS. KAPLAN:  Yes.

21           MR. KETTLEWELL:  You're right.  Correct.  You're

22   correct.

23   BY MR. KETTLEWELL:

24   **Q.**  You sent this e-mail, you forwarded it to Mr. Rull,

25   correct?

 1    **A.**  Yes, among others.

 2    **Q.**  And Mr. Koh?

 3    **A.**  Uh-huh.

 4    **Q.**  We talked about who they were?

 5    **A.**  Yes.

 6    **Q.**  And to Ken Brissette, correct?

 7    **A.**  That's right.

 8    **Q.**  Okay.  And you said you have a message into the

 9    Commissioner, correct?

10    **A.**  That's right.

11    **Q.**  Did the Commissioner get back to you?

12    **A.**  I don't recall specifically, but probably.  He was always

13    very responsive.

14    **Q.**  All right.  Do you remember discussing the liquor license

15    issue with Commissioner Evans?

16    **A.**  I definitely, at some point, had a conversation with

17    Commissioner Evans about the -- not about the liquor license

18    so much so much as about the beer pen concept.

19              MR. KETTLEWELL:  All right.  And may I approach,

20    Your Honor?

21              THE COURT:  You may.

22              MR. KETTLEWELL:  150 for identification.

23              THE WITNESS:  Thank you.

24    BY MR. KETTLEWELL:

25    **Q.**  Take a look at that.

1          Have you had a chance to look at 150?

2  **A.**  Yeah.

3  **Q.**  All right.  And is this a continuation of the e-mail

4  string we just saw on Exhibit 42?

5  **A.**  Yes.  Yes.

6  **Q.**  And this is the commissioner's response to you; is that

7  correct?

8  **A.**  Yes.

9          MR. KETTLEWELL:  Okay.  Your Honor, I'd offer 150.

10         MS. KAPLAN:  Your Honor, I'm going to object to

11  that.  First of all, it's not a continuation, but it's also

12  hearsay.

13         THE COURT:  Why is it admissible?

14         MR. KETTLEWELL:  If they object, that's fine, Your

15  Honor, but I think it is admissible to show exactly what was

16  on the Commissioner's mind and with respect to these -- the

17  issues around the alcohol license.

18         THE COURT:  You mean, as to his state of mind?

19         MR. KETTLEWELL:  Yes.  But I believe that's

20  important here, with respect to --

21         THE COURT:  Okay.  Overruled, 150 in evidence for

22  that purpose.

23         (Exhibit No. 150 admitted into evidence.)

24         MR. KETTLEWELL:  And if you could please expand the

25  top half of this e-mail.

1   BY MR. KETTLEWELL:

2   **Q.**  And at the very bottom of the expansion, if you could

3   see, you wrote, "Commissioner, is there something we can do

4   here?  Thank you."

5            And you had relayed Mr. Appel's complaints to the

6   Commissioner at that point, correct?

7   **A.**  That's right.

8   **Q.**  And the commissioner responded to you, "Joyce, I talked

9   to you about this.  We had too many alcohol related medical

10  assists last concert.  We need a current plan, so we tighten

11  things up.  It's embarrassing to have this happen on the

12  Hall.  Maybe limit the consumption, or go back to a beer

13  garden again.  I've done this on every event that has been

14  problematic.  That's why we need a new proactive plan to

15  prevent overconsumption.  Your thoughts.  Billy."

16           Signed Billy, right?

17  **A.**  Yes.

18  **Q.**  And that's how Commissioner Evans signed e-mails,

19  correct?

20  **A.**  Yes.

21  **Q.**  And did you have an in-person conversation with the

22  Commissioner, or was it simply this e-mail exchange?

23  **A.**  I believe I did speak to him at some point.  I couldn't

24  say when, though.

25  **Q.**  And the discussion was about why he was trying to get

1    more restrictions on the liquor license?

2    **A.**   Well, I was trying to advocate for -- it appeared to me

3    that the EMS reports that had been forwarded seemed to paint

4    a picture of an event that was fairly well run and that

5    alcohol didn't seem to be a big problem, but obviously he

6    knows policing better than I do.

7    **Q.**   All right.  In any event, he said he was going to have

8    his meeting on August 28th with Mr. Appel, which had already

9    been set up at this point, correct?

10   **A.**   I am -- that's not in here, but I was aware of an

11   August 28th.

12   **Q.**   Well, were you aware of that?

13   **A.**   Yes, I was aware of an August 28th meeting.

14   **Q.**   And again, you forwarded this e-mail, with the

15   Commissioner's response, and your request and his response,

16   to Mr. Rull and Mr. Koh, correct?

17   **A.**   That's right.

18   **Q.**   You didn't forward this one to Mr. Brissette?

19   **A.**   I did not.

20   **Q.**   Why not?

21   **A.**   I was going over his head.  I was going to the top, to

22   people who might be able to help me advocate for what Crash

23   Line was asking for.

24   **Q.**   And did they help you at all?

25   **A.**   Not that I recall.

1   **Q.**   In any event, the meeting took place with Commissioner

2   Evans and the people at Crash Line, correct?

3   **A.**   I believe so, yes.

4   **Q.**   And did you know that they got their liquor license?

5   **A.**   I read that, yes.

6   **Q.**   Well, you read that, but did you attend the September

7   concert?

8   **A.**   I did not.

9   **Q.**   Okay.  So from what you know, they got it, but you don't

10  know for certain.  You haven't actually -- you weren't there?

11  **A.**   I was not there.

12  **Q.**   Okay.  Now, do you remember a conversation -- and I know

13  you were asked a lot of questions about a meeting on

14  August 19th.  And you don't remember being -- being at or

15  attending that meeting?

16  **A.**   I don't have a recollection of it.  I could have been

17  there.  I don't have a recollection of the meeting.

18  **Q.**   All right.  And you testified, I think, that that meeting

19  was between Mr. Brissette and Mr. Appel, and I think

20  Mr. Snow.  Do you recall that?

21  **A.**   I don't know that I testified to that.

22  **Q.**   Do you remember that?

23  **A.**   Yes.

24  **Q.**   And do you know, at the time that Mr. Brissette -- well,

25  strike it.

1              Did you know at the time that there was concern

2      that IATSE might have a leaflet or a demonstration at the

3      Boston Calling concert if they didn't get work on the

4      concert?

5      **A.**   I knew that generally IATSE had issues with Boston

6      Calling.

7      **Q.**   All right.  And did you know that at this point in time,

8      and we're talking about August 19th, did you know whether or

9      not there had been a big demonstration that the Teamsters had

10     done as a result of the *Top Chef*'s reality show coming to

11     Boston?

12     **A.**   Yes, I was aware of that.

13     **Q.**   You were aware of that at this point in time in August of

14     2014?

15     **A.**   Yes.

16     **Q.**   All right.  And I think you testified -- and I may be

17     wrong, but that what you recall from that meeting primarily

18     came from Brian Appel?

19     **A.**   I would say exclusively came from Brian Appel.

20     **Q.**   And it was Brian Appel complaining again or telling you

21     what he needed and what he wanted?

22     **A.**   Yes.

23     **Q.**   All right.  And I believe you testified that Mr. Appel

24     agreed to hire some union people, correct?

25     **A.**   I don't know that I said that.  He -- he says in an

1    e-mail to me at some point that they're open to a

2    conversation.

3    **Q.**   Do you know whether that happened?

4    **A.**   Whether he hired union labor?

5    **Q.**   Yeah.

6    **A.**   I believe he did, yes.

7    **Q.**   All right.  And do you know that he hired it because, at

8    least among other reasons, he wanted to avoid any kind of

9    demonstration by IATSE?

10            MS. KAPLAN:  Objection.

11            THE COURT:  Overruled, if you know that from

12   Mr. Appel.

13            THE WITNESS:  I believe that there were multiple

14   reasons why Brian did that, including the desire to extend

15   the contract and to avoid any unpleasantness.

16   BY MR. KETTLEWELL:

17   **Q.**   Well, the desire to extend the contract, are you talking

18   about the licensing agreement?

19   **A.**   Yes.

20   **Q.**   And Mr. Appel had a desire to extend it for how long?

21   **A.**   I'm not sure.  I want to say it was five years, but I'd

22   have to go back and look.

23   **Q.**   Was this part of his discussion with becoming a good

24   partner to the City?

25   **A.**   Yes.

1    **Q.**  And he -- he would do certain things for the City if he

2    could get this extension?

3    **A.**  He made it very clear that his objective was to extend

4    the -- Crash Line's ability to produce concerts exclusively

5    on City Hall Plaza.

6    **Q.**  All right.  Do you know whether he ever got that

7    extension?

8    **A.**  I don't believe he did.

9    **Q.**  And do you know why?

10   **A.**  Because at some point, corporation counsel -- and I'm

11   fuzzy on the timeline here, but at some point, corporation

12   counsel said that any use like that of City Hall Plaza would

13   have to be the result of an RFP process.

14   **Q.**  And do you know whether Crash Line filed or submitted an

15   RFP?

16   **A.**  So we would issue an RFP, a request for proposals.

17   **Q.**  And got a response --

18   **A.**  Sorry.  We would issue that and it's my understanding

19   that they attempted to respond to it, but missed the

20   deadline.

21   **Q.**  Okay.  And do you know whether or not -- well, strike it.

22   At some point you know they moved to the fields outside

23   Harvard Stadium, right?

24   **A.**  Yes.

25   **Q.**  And do you know how that happened or when that happened?

1   **A.**   I don't.

2   **Q.**   All right.  Could it have been in 2016?

3   **A.**   Yes.

4   **Q.**   All right.  Now, you testify -- well, strike that.  I

5   want to ask you a couple of questions about this particular

6   case involving Mr. Brissette.  And that is, were you -- did

7   you ever, between the time you took office in 2014 right up

8   through and including the time in November of 2014, did you

9   ever do anything to try and hinder or inhibit or stop

10  Mr. Appel from getting the permits he wanted?

11  **A.**   No, I would say I did quite the opposite.

12  **Q.**   Same question with respect to the liquor license, were

13  you ever part of an effort to hinder or stop Mr. Appel from

14  getting his liquor license?

15  **A.**   Same answer with respect to the liquor license.

16  **Q.**   Same question with regard to the entertainment license?

17  **A.**   Same answer with regard to the entertainment license.

18  **Q.**   Now, slightly different question.

19          Were you ever aware of an agreement between anybody

20  to try and force Boston Calling to hire union people against

21  their will?

22  **A.**   No.

23  **Q.**   Were you ever part of such an agreement?

24  **A.**   No.

25  **Q.**   Were you ever part of an agreement to get Boston Calling

1    to hire IATSE workers and, if they didn't, they wouldn't get

2    their liquor license?

3    **A.**   No.

4    **Q.**   Did you ever hear of such an agreement?

5    **A.**   No.

6    **Q.**   Did you ever talk to Mr. Brissette about such an

7    agreement?

8    **A.**   No.

9    **Q.**   Do you know whether such an agreement existed?

10    **A.**   I don't believe it did.

11    **Q.**   Did you -- same questions with regard to Mr. Sullivan.

12    Did you ever talk to him about such an agreement?

13    **A.**   No.

14    **Q.**   Do you know whether such an agreement existed regarding

15    him?

16    **A.**   I don't believe it did.

17              THE COURT:  All done?

18              MR. KETTLEWELL:  I'm going to ask the boss and I'll

19    tell you.

20              What do you say?

21              (Counsel confers.)

22              MR. KETTLEWELL:  All right.  Two more questions.

23    BY MR. KETTLEWELL:

24    **Q.**   You saw Mr. Appel in that Exhibit 42, where he showed you

25    where he said it would be impossible to get a liquor license,

1    if Commissioner Evans has the hearing -- has his meeting as

2    late as August 28th, correct?

3    **A.**   That's right.

4    **Q.**   And Mr. Appel got the liquor license.  Are you aware of

5    that?

6    **A.**   Yes, well, the concert went on.

7    **Q.**   Right.  And did Mr. Appel ever tell you he was concerned

8    about the concert being canceled because somebody was holding

9    up permits?

10   **A.**   He was pretty dramatic in here, talking about -- I think

11   he uses the word catastrophic, but I took it to be kind of

12   hyperbolic.

13            MR. KETTLEWELL:  Okay.  That's all I have, Your

14   Honor.

15            THE COURT:  Mr. Kelley, any questions?

16            MR. KELLEY:  Yes, Your Honor, just a couple.

17   BY MR. KELLEY:

18   **Q.**   Good morning, Ms. Linehan.  How are you?

19   **A.**   Good.

20   **Q.**   My name is James Kelly, I represent Mr. Sullivan.  I just

21   have a couple of questions, if you don't mind.  Going back to

22   the direct examination you were asked -- strike that.  Let me

23   follow up.

24            Brian Appel asked you, in or about August and

25   around August some time, to get the cost of IATSE workers; is

1    that correct?

2    **A.**  Yes.

3              MS. KAPLAN:  Objection.

4              THE COURT:  What's the objection?

5              MS. KAPLAN:  Brian Appel asked her to get the cost

6    of the IATSE workers?

7              THE COURT:  That's what he asked.

8              THE WITNESS:  Can I -- sorry, I misunderstood the

9    question.  Brian Appel didn't ask me to get the cost.  Brian

10   Appel told me that he was being asked to hire IATSE workers

11   and I asked him to tell me what the cost of that would be.

12             MR. KELLEY:  Fine.  Thank you.

13   BY MR. KELLEY:

14   **Q.**  So you had asked him to get you the contract or the cost

15   for the IATSE workers?

16   **A.**  I believe I solely asked for the cost.

17   **Q.**  And did Mr. Sullivan get you a draft agreement for IATSE?

18   **A.**  I don't recall seeing an agreement.

19             MR. KELLEY:  Could we put up Exhibit 30.  This is

20   in evidence, Your Honor.

21             THE COURT:  30?

22             MR. KETTLEWELL:  Yes.

23             THE COURT:  She's not on this e-mail.

24             Is it the attachment to?

25             MR. KELLEY:  The attachment.  Sorry, Mr. Cavallo.

1    That's it.  Thank you, if you just blow up the -- thank you.

2    BY MR. KELLEY:

3    **Q.**  Does this refresh your recollection of whether Mr.

4    Sullivan obtained a draft contact with you from IATSE?

5    **A.**  I don't recall ever seeing this.

6              MR. KELLEY:  That's good enough.  I'll all set,

7    Your Honor.  Thank you.

8              THE COURT:  You don't have any redirect, do you?

9              MS. KAPLAN:  Yes, Your Honor, brief.

10             **REDIRECT EXAMINATION BY COUNSEL FOR PLAINTIFF**

11   BY MS. KAPLAN:

12   **Q.**  Ms. Linehan, was there a reason that you asked Tim

13   Sullivan to get you a number of the amount of money for the

14   IATSE members, as opposed to telling him that IATSE should

15   contact -- IATSE should contact Boston Calling themselves?

16   **A.**  I asked for a number, because I was concerned that Crash

17   Line was being asked -- was being asked to add to their

18   budget three weeks before their event.

19   **Q.**  And did it cross your mind that you should have told the

20   IATSE folks or Tim Sullivan, to just put the two together,

21   rather than get involved?

22             MR. KETTLEWELL:  Objection, Your Honor.

23             THE COURT:  Overruled.

24             THE WITNESS:  I didn't have a relationship with

25   IATSE and I was concerned about their budget.  It's pretty

consistent through my relationship with Crash Line, that it's
about police details that cost more than they're supposed to
cost, and a beer pen that allows them to sell less alcohol,
and it impacts their bottom line, and the union labor being
added to an event at the last minute, that would impact their
bottom line.

BY MS. KAPLAN:

Q.  Did you think that was within the scope of your job or
Mr. Sullivan's job, to be asking how much money IATSE -- how
many jobs they needed and how much money?

MR. KETTLEWELL:  Objection, Your Honor.

THE COURT:  Overruled.

THE WITNESS:  As I said before, I don't think any
of this was within the scope of my job.  I just continually
got pulled into it by Brian Appel and I wanted to help.

BY MS. KAPLAN:

Q.  Was it in the scope of Mr. Sullivan's job?

A.  I don't know.

Q.  And how about Mr. Brissette's job?  Was it in the scope
of his job?

A.  I don't think so.

Q.  And do you know whether -- have you seen beer pens on
City Hall Plaza when there's a concert?

A.  Have I seen them?

Q.  Yes.

1  **A.**  No.  Well, from outside the gate, from very far away.

2  **Q.**  Do you know whether the guests who are at -- in the beer

3  pens can actually see the entertainers, if they're in the

4  beer garden?

5  **A.**  They can see the entertainers, but it definitely inhibits

6  their ability to enjoy the concert, I would say.

7  **Q.**  And on August 20th, when you said you had a call in to

8  the Commissioner about some of the issues that were being

9  raised by Boston Police, did you believe that Commissioner

10  Evans was being reasonable about the beer pens and the other

11  restrictions?

12  **A.**  I was -- my mindset was to try to advocate for them to be

13  able to have a concert that didn't have beer pens.

14  **Q.**  Did you believe that Commissioner Evans was being

15  reasonable?

16  **A.**  I think that Commissioner Evans understands policing

17  better than I do, but I made my pitch.

18  **Q.**  Did you believe he was being reasonable in his request?

19  **A.**  I don't -- again, I was making my pitch, I thought they

20  should be able to do it, but he had concerns with it.

21  **Q.**  Do you know whether there was an RFP in 2014?

22  **A.**  I don't believe there was an RFP in 2014.  I'm not

23  certain.

24  **Q.**  So that's not the RFP that you were just talking about

25  that Boston Calling may have missed the deadline for,

1    correct?

2    **A.**   Right.  I believe that was later.

3    **Q.**   And you work every day with Ken Brissette and Tim

4    Sullivan?

5    **A.**   I do.

6    **Q.**   They're your colleagues?

7    **A.**   Yes.

8    **Q.**   Your friends?

9    **A.**   We're friendly.

10   **Q.**   Did you do anything to help them out?

11   **A.**   They're my colleagues and we're friendly.

12   **Q.**   Would you do anything to help them out?

13   **A.**   I don't really know what that means.

14   **Q.**   Well, do you want to help them out?

15   **A.**   I like them, we work well together.  They're my

16   colleagues.

17           MS. KAPLAN:  I have no further questions, Your

18   Honor.

19           THE COURT:  All right.

20           MR. KETTLEWELL:  Just one, judge.

21       **RECROSS-EXAMINATION BY COUNSEL FOR DEFENDANT BRISSETTE**

22   BY MR. KETTLEWELL:

23   **Q.**   Would you lie for them?

24   **A.**   Absolutely not.

25           MR. KETTLEWELL:  All right.

1          THE COURT:  You don't have any questions.

2          Do you, Mr. Kelley?

3          MR. KELLEY:  No, Your Honor.

4          THE COURT:  All right, thank you very much,

5     Ms. Linehan.  You're excused.

6          Next witness.

7          MS. KAPLAN:  Government calls Bill Kenney.  If I

8     can have --

9          THE COURT:  Yes, you can have a moment.

10         Ladies and gentlemen, if you want to stretch for a

11    moment.

12         Mr. Kenney, if you come forward to the witness box

13    and remain standing for a moment.

14         THE COURT:  You need another moment, Ms. Kaplan?

15         MS. KAPLAN:  Yes, Your Honor.

16         (The witness was duly sworn.)

17         THE COURT:  Please be seated.

18         THE WITNESS:  Thank you.

19         THE COURT:  When you're ready.

20         MS. KAPLAN:  Thank you, Your Honor.

21                         **WILLIAM KENNEY**

22         having been duly sworn, testified as follows:

23         **DIRECT EXAMINATION BY COUNSEL FOR PLAINTIFF**

24    BY MS. KAPLAN:

25    **Q.**  Can you please state your name for the record?

1   **A.**   My name is William Kenney.  I also go by the name of Bill

2   Kenney.

3   **Q.**   And can you tell us what you do for a living?

4   **A.**   Yes, I'm a production manager and a producer, as well as

5   I own and operate a non-benefitted -- a nonunion benefitted

6   company, a labor provider in the entertainment industry.

7   **Q.**   What's the name of your company?

8   **A.**   It's called Bill Kenney Productions, Inc.

9   **Q.**   And you're the owner of that company?

10   **A.**   I am.

11   **Q.**   Tell us what type of company it is.

12   **A.**   Well we're a -- actually, there are two facets to it.

13   It's a production company, which we produce anything from a

14   nonprofit event, to a show for hire, such as a rock and roll

15   concert, festivals, etc.  And also we have a labor company,

16   which we provide anywhere from one person, to two or three

17   hundred people, you know, if it was a stadium show, building

18   stages, setting up equipment, et cetera, et cetera.

19   **Q.**   How long has your company been in existence?

20   **A.**   32 years.

21   **Q.**   How many employees do you have?

22   **A.**   We currently have -- as far as employees go, we have

23   22 currently today, as we sit today.  We have 25 benefitted

24   employees and we have an additional 25 to 27 part-time

25   employees.

1    **Q.**  And in 2014, was it the same or different?

2    **A.**  No, it was lower.  It was probably like 20 that were

3    benefitted that time.  And by benefits, we have people for

4    qualifications that we require that they work 25 hours a week

5    for three months and then continue that spectrum of it.  So I

6    would say that we had 20 at that time, because it was five

7    years ago.  And probably another 22 or 23 that were what we

8    call on the books employee part-timers.

9           THE COURT:  Mr. Kenney, would you move that like a

10   half-inch further away?

11          THE WITNESS:  Sure.  You would think as an audio

12   guy, I would have it better.  You can see that I know this.

13   You can see I'm a production guy, not a stagehand.  That's

14   okay.  Sorry, sir.  Sorry, Your Honor.

15   BY MS. KAPLAN:

16   **Q.**  And when you say benefitted employees, as opposed to

17   part-timers, can you just explain that to us.

18   **A.**  They will be our full-timers, like in other words, just

19   explain the criteria, they do 25 hours, but more than likely

20   40 hours, 60 hours, 80 hours depending on the particular

21   week.

22   **Q.**  And are these employees of Bill Kenney Productions?

23   **A.**  Yes, they are.

24   **Q.**  And how are they paid?

25   **A.**  They're paid through our payroll service that we have,

1   okay, through the company.  And we also, you know, the

2   benefits, taxes, et cetera, all come out of our payroll

3   service.

4   **Q.**   What's the name of the payroll service?

5   **A.**   The payroll service is a company out of -- they're called

6   Brooks Accounting and they're a small company, just like us.

7   **Q.**   And the casuals, or the part-timers, how are they paid?

8   **A.**   Same way.

9   **Q.**   And tell us about the benefits that you offer?

10  **A.**   The benefits that we offer is we offer health benefits,

11  which is Harvard Pilgrim.  We also have an eye program and

12  dental program, which is -- excuse me, I'm going to move

13  forward.  So -- Delta Dental is another thing we offer, we

14  also offer a --

15          THE COURT:  That's a little too close.

16          THE WITNESS:  I'm going to find the happy medium, I

17  promise.

18          Is that good, everybody?  Okay, cool.

19          We also offer an insurance plan, which we pay for

20  as a company.  We offer to them, which gives them $100,000.

21  It's a life insurance thing, it doesn't matter whether

22  they're 25 or 55.  In addition, we have long and short-term

23  disability, as well.

24  BY MS. KAPLAN:

25  **Q.**   What about training?

**A.**   Training.  We do paid training, because we do a lot of
technical work, which that means basically we do like audio,
we might run a console, we might plug in, you know, video
monitors like we have here, et cetera.  So we do paid
training, and a lot of times we do that in our off season,
which is the fall, because we're not in particularly a
building, like a lot of instances like the union has
buildings that they're in all the time.  We're not.  So we
work at different like conference centers or, you know,
hotels and stuff, so we do do paid training, yes.

**Q.**   And are you familiar with the term "area standard wages"?

**A.**   I beg your pardon?

**Q.**   Are you familiar with the term "area standard wages"?

**A.**   Yes.

**Q.**   What do you understand that to mean?

**A.**   I understand that to be just prevailing rates and what
should be paid to employees for their particular skill level
work, et cetera, and that's my understanding.

**Q.**   In 2014, did you pay your employees area standard wages?

**A.**   To the best of my knowledge, yes.

**Q.**   How long have you been in the music business?

**A.**   Too long.  36 years.

**Q.**   And can you tell us about your employment history?

**A.**   My employment here has been -- I toured for many years as
a tour manager.  I was involved with major acts, very -- a

1    lot, to quote.  I also worked as a stagehand locally here.

2    When I came off the road, I worked at Great Wood, and started

3    as a stagehand there and moved up the ladder a little bit,

4    start as just a general stagehand and then eventually became

5    one of the crew chiefs and then eventually a stage manager,

6    production manager for that company, which was the Dan Lok

7    company.

8              In addition to I worked as a casual for a number of

9    years, for about three years for the local union, IATSE Local

10   11.  I worked as a casual for a couple of years.

11   **Q.**  What's a casual?

12   **A.**  A casual means you're on call.  You either call in or

13   they call you, when there's availability, and if you're

14   available, we work.  And so that's what we do now for us.

15   **Q.**  You do that as well?

16   **A.**  Yes, I do.

17   **Q.**  For how many of your employees do you do that?

18   **A.**  My current employees?

19   **Q.**  Yes.

20   **A.**  They don't call in as much as I'd like them to, but I

21   would say we have 40 to 50 people that do that, that they

22   check with us or we check with them and use them whenever

23   they're available.

24   **Q.**  Okay.  In 2014, how many did you have?

25   **A.**  Probably about the same numbers.

1    **Q.**   So you weren't telling us about those people before.  The

2    people you were telling us about before, that you had 20

3    employees with benefits and 20 to 23 part-timers.  That's

4    different, right?

5    **A.**   Yeah, these are casuals that will call you randomly for

6    work.  They'll call our office and they're not people we

7    necessarily hire, unless there's a need for them, such as if

8    we've surpassed 50 people, we have what they call a group

9    call.  You have to have 70 people, we need 20 more.  That's

10   when we go outside that box, or that's when we say, oh, Joe

11   Smith called us that day, so then we'll reach back out to

12   them at that point in time.

13   **Q.**   And how do those people get paid?

14   **A.**   It depends.  We encourage everybody to go on the books;

15   even if it's day one with us.  Sometimes they're a little

16   evasive to that, so they want to be 1099.  So some people

17   will be 1099.  There's also people that have their own little

18   companies like, for example, a person that's an electrician

19   might work on movies, or he might have his own little company

20   that sets up lights and stuff, so we would pay his company

21   directly, which also be a 1099.

22   **Q.**   Has Bill Kenney Productions won any national awards?

23   **A.**   Yes, for the last five years in a row, we've been very

24   honored and blessed to be awarded what they call a "Top Dog,"

25   which is industry awarded and it's voted by industry

1   professionals and companies, as well as international

2   companies, as well.

3   **Q.**   And what was the award for?

4   **A.**   The award was basically for the first four years, it was

5   regional.  And it was called Best Production Company for the

6   regional East category.  Last year it was for the entire

7   nation.

8   **Q.**   Is Bill Kenney Productions a signatory to any union?

9   **A.**   No, we're not.

10   **Q.**   Has it ever been?

11   **A.**   No, we are not.

12   **Q.**   Are you a member of a union?

13   **A.**   I am not.

14   **Q.**   Have you ever been?

15   **A.**   No, I was a casual, as I said before.

16   **Q.**   Are you familiar with IATSE Local 11?

17   **A.**   Yes, I am.

18   **Q.**   Can you tell us what they are?

19   **A.**   They do the same thing that we do, the difference being

20   that they're a union organization, and work at different

21   venues and so forth.

22   **Q.**   Can you tell us what stagehands are?

23   **A.**   Stagehands are people that do everything from pushing a

24   road case, offloading a truck, to, on a rock and roll level,

25   to setting up speakers, lights, sound, video, usually under

1     the direction of a tour, or a particular vendor.

2     **Q.**   Are you familiar with the music festival called Boston

3     Calling?

4     **A.**   Yes, I am.

5     **Q.**   And in 2014, did your company do any work for them?

6     **A.**   Yes, we were the labor company for it, yes.

7     **Q.**   What does that mean that you were the labor company for

8     them?

9     **A.**   We provided everything.  We built -- in 2014, I believe

10    we had a mobile stage at that point.  So we built the stages,

11    as well as set up lights, sound, video, barricade by tractor,

12    et cetera, and we ran the overall set change.  The set change

13    means that, basically, when a band is on and the next band

14    comes on, we would then move that gear off and move the next

15    band on, so the schedule keeps rolling along.

16    **Q.**   Prior to 2014, did you have a relationship with Boston

17    Calling?

18    **A.**   I did.

19    **Q.**   For when?

20    **A.**   I was their production director, as well.  I helped

21    create and bring vendors to them, because it was new to them

22    and I helped, basically, on the production side introduce

23    them to lights, sound, options, video companies, et cetera,

24    et cetera, because we started from square one, so I basically

25    helped them develop that.

1   **Q.**   When did you start your relationship with Boston Calling?

2   **A.**   I knew Mike Snow for many years, but I want to say

3   probably somewhere around 2011, maybe.

4   **Q.**   So were you involved with the Boston Calling music

5   festivals from its inception?

6   **A.**   I would say, yes.

7   **Q.**   And so you say you had two jobs, you were the production

8   director and the company, too?

9   **A.**   Exactly, yes.

10   **Q.**   And what did you do as a production director?

11   **A.**   Excuse me, as production director, my job is basically to

12   put all the vendors together.  I did the production schedule,

13   I set the crew calls under the direction of the producers, so

14   it wasn't like, oh, my god, you need 900 guys.  I mean, there

15   was also some latitude and also to do what we thought was

16   best for the festival.

17         And then also my job was to advance.  What that

18   advance means is I would coordinate with the artist, what

19   their needs were, how many people they needed to get their

20   show in, what particular lights and sound, video components

21   we might need to assist them with, and basically, the overall

22   generalization and running of that event.

23   **Q.**   And in addition, you provided stagehands?

24   **A.**   That's correct.  And I had people that would be the crew

25   chief.  And basically, they ran the crew as if I wasn't on

1    site, other than if I had a question for them.  We had just

2    like -- you know, I'm sure IATSE does the same thing, we have

3    crew chiefs and stewards that run the crew.

4    **Q.**   Does IATSE have production directors?

5    **A.**   I don't know.  I can't answer that.

6    **Q.**   So how did you come to know Mike Snow?

7    **A.**   Mike Snow and I met a long time ago.  Mike Snow, who is

8    one of the producers of Boston Calling, he used to work as a

9    promotion director for WFNX Radio and we met.  And I used to

10   do some their show, even some at City Hall Plaza.  I would

11   come in and basically run the shows for him.

12   **Q.**   Who did you first learn about Boston Calling from?

13   **A.**   From Mike.

14   **Q.**   Did you know Brian Appel?

15   **A.**   I had met -- I knew Brian just vaguely, because he worked

16   for -- at the end of the run of Phoenix Radio and then they

17   stopped, they went away.  I met Brian just briefly at that

18   point in time.  He was working for the station at that time.

19   **Q.**   Okay.  And in 2011, you said you started your

20   relationship with them in 2011.  What were you doing for

21   them?

22   **A.**   Basically having discussions about how could we create

23   this event.  You know, what's involved in production, you

24   know, what do you think based on your many years' experience,

25   blah, blah, blah, kind of a consulting thing.

1  **Q.**  And prior to 2013, had you already helped produce other

2  events on City Hall Plaza?

3  **A.**  I did.  I did.  I worked for -- as I worked for Dan Lok

4  company, also known as Live Nation for a number of years as

5  well.  And I did all sorts of events there from Best Buy

6  having like three or four semis on that little side of the

7  stage, we were called periodically by the City.  It was

8  probably like 10 or 12 years before Boston Calling to come

9  and help out when there was a show on the City Hall Plaza,

10  where they had -- they did have in-house crew.  When I mean

11  that, there was staffing with college kids and so forth that

12  worked for the City, so we would work beside them and use

13  them when they needed more people or needed more of a skill

14  level to help them get a pro show in there.

15  **Q.**  How many times did you help produce events in City Hall

16  Plaza?

17  **A.**  Well, I don't really know, to be honest with you.  I

18  would say 20, 30, I don't know.

19  **Q.**  And were these all while you were working for Don Lock

20  or --

21  **A.**  Oh, no, there was some without, too.  I mean, like Mix

22  Radio, we did some stuff there.  I worked with Mix 104.  We

23  did some shows there, which were independently hired by them,

24  you know, by the station itself.  And I mean, when I worked

25  for FNX, I worked for them directly.  They would pay us when

1    they rented the Plaza.

2    **Q.**   When you say "we," are you talking about Bill Kenney

3    Productions?

4    **A.**   "We" as in me.

5    **Q.**   So, as Bill Kenney Productions, had produced events at

6    City Hall Plaza before your involvement with Crash Line?

7    **A.**   Correct.

8    **Q.**   Okay.  And who are you paid by, when you help produce

9    these events?

10   **A.**   I'm paid by whoever the producer of that event is, or

11   whatever the cause is, or whoever the actual company that's

12   producing it.

13   **Q.**   Okay.  And in -- with respect to Boston Calling, were you

14   paid by Boston Calling, or by the City?

15   **A.**   I was paid by Boston Calling.

16   **Q.**   Now, did you also put events on City Hall Plaza under

17   Mayor Menino's Administration?

18   **A.**   We did, yes.

19   **Q.**   And how about under the Walsh administration?

20   **A.**   The only ones that I did, that I was privy to and

21   involved in, was just Boston Calling.

22   **Q.**   Have you ever been involved in training of people who

23   work at City Hall in connection with events on City Hall

24   Plaza?

25   **A.**   Yeah, roughly about -- time passes so quickly, about 20

1    years ago, we had a bunch of kids and we would help out, and

2    we would basically train them and intertwine them.  Like if I

3    did a show for Best Buy, for example, there was a show with

4    Lenny Kravitz.  We involved them with our team, so that they

5    got to see a little bit more of just the smaller shows that

6    they were doing, and how you do it on a bigger scale, that

7    type of event.

8              THE COURT:  Go ahead, are you asking who the we is?

9              MS. KAPLAN:  Sure.  Yes.

10             THE COURT:  Who's the "we" that you just --

11             MS. KAPLAN:  We, when I talk about it, it's my

12   company.  I'm sorry for doing that.  So when I say "we," it's

13   Bill Kenney Productions.  I'm sorry.  That's kind of how I

14   operate.  I'm sorry for not being clear on that.

15   BY MS. KAPLAN:

16   **Q.**  Who had asked Bill Kenny Productions to do that?

17   **A.**  At that time, it was Patti Papa and Louie -- forgive me,

18   but Louie was there for a long time.  He is with Parks and

19   Rec now.

20   **Q.**  But it was City of Boston who was asking?

21   **A.**  That's correct, yes.

22   **Q.**  And did the -- well, strike that.  Who was your point of

23   contact at City Hall for that type of work?

24   **A.**  It was Louie.

25   **Q.**  You don't remember his last name?

1    **A.**   Chante (phonetic).  I'm really sorry and I feel horrible

2    now, because I'm slandering this guy that was a friend of

3    mine for 20 years, so I apologize.

4    **Q.**   That's all right.  Who did he work for?

5    **A.**   Who did he work for?  City of Boston.

6    **Q.**   And which department?

7    **A.**   No, it would be -- no, he works with Parks and Rec now

8    and stuff like that.  I guess it would be the Recreation

9    Department.

10   **Q.**   And how would you describe your relationship with the

11   City of Boston in 2013?

12   **A.**   Fine.

13   **Q.**   And were you aware of the Work Exchange program?

14   **A.**   I was not.

15   **Q.**   Did Bill Kenney Productions have anything to do with the

16   Work Exchange program?

17   **A.**   No.

18   **Q.**   Did you ever have any issues involving safety at any of

19   the events where your employees worked prior to 2014?

20   **A.**   I did.  We had an OSHA situation, which was brought to us

21   on 2013, not '14, and it was questions of whether the biggest

22   thing that we didn't do is now all my people didn't have

23   steel-toed shoes.  That was an infraction.  There were a

24   number of other charges that were brought against us, three

25   and four, and after an appeal hearing with the regional --

1    the regional district here, all those were let go and

2    exonerated.  They were talking about the size of a lanyard,

3    which a lanyard is a harness that our guys wear, a lanyard

4    you clip around.  And you know, if it's not the right size or

5    the right integrity, you can slip and fall.  The secondary

6    thing are hard hats, which were compliant.  And then of

7    course, we'd know chain, hard hat.  So needless to say, so

8    the answer is yes, but those were the issues at hand.

9    **Q.**  And in 2013, did you have a contract with Crash Line

10   Productions?

11   **A.**  I did.

12           MS. KAPLAN:  If we could just put up Exhibit 10,

13   Ms. Beller.

14           THE COURT:  It's already --

15           MS. KAPLAN:  It's in evidence, Your Honor.

16           THE COURT:  Yes, that's what I thought.

17           THE WITNESS:  May I move this?  Is that all right

18   to move this guy out of the way?

19           THE COURT:  Yeah, you can move that.

20           THE WITNESS:  Can you make it a little bit bigger,

21   because I'm old and I'm sorry.

22           MS. KAPLAN:  Does he have a copy up there?

23           THE COURT:  In the folder, Mr. Kenney.  It will

24   probably be easier to read the paper copy.

25           THE WITNESS:  Okay.  Cool.  Thank you.  I'm all

1    set.

2    BY MS. KAPLAN:

3    **Q.**   Can you just look through that and tell us if that's the

4    contact that you have?

5    **A.**   Yes, it is.

6    **Q.**   And do you see, page nine of ten -- well, let's go to --

7    yeah.  Page nine of ten?

8    **A.**   I do.

9    **Q.**   And do you see your signature?

10   **A.**   The signature, on the independent contractor, is my

11   ex-wife and former, at that time, secretary and treasurer of

12   Bill Kenney Productions, Faith Kenney.

13   **Q.**   Okay.  And the date that you signed this contact?

14   **A.**   Yes, I see that.

15   **Q.**   Did she sign this contact?  Sorry.

16   **A.**   That's correct.

17   **Q.**   And what date is that?

18   **A.**   It looks like 1/16/14.

19   **Q.**   And this is a contract that covered --

20          MS. KAPLAN:  If you can go back to the first page,

21   Ms. Beller.

22   BY MS. KAPLAN:

23   **Q.**   Paragraph A, covered the May and September 2014 festivals

24   for Boston Calling?

25   **A.**   That's right.

1  **Q.**  And according to this contract that Bill Kenney

2  Productions had with Crash Line, who was responsible for

3  choosing the labor, if you know?

4  **A.**  It was in addition to Mike Snow, approving them, as well.

5       THE COURT:  Ms. Kaplan, I want to pause you here, I

6  just want to talk to all of you about the schedule before I

7  let the jury go, at sidebar.

8       (The following discussion held at the bench.)

9       THE COURT:  So I just want to update them about the

10  schedule.  So you have -- obviously, the rest of Mr. Kelly.

11  Is there any idea how long you'll have?

12       MS. KAPLAN:  15.

13       THE COURT:  15, 20 minutes with him.

14       MR. KETTLEWELL:  20 minutes.  I don't know about

15  Mr. Cintolo.

16       THE COURT:  Not long, I'm sure.

17       And then after, who else is there?

18       MS. BARCLAY:  We have Joe Rull.

19       THE COURT:  And is he long?

20       MS. BARCLAY:  No, I don't think.  Maybe half an

21  hour.

22       MS. KAPLAN:  Half an hour for direct.

23       THE COURT:  Are you guys going to be a long time

24  with him?

25       MR. KETTLEWELL:  I don't think we're going to be a

1    real long time, half hour, 40 minutes.

2            MR. KILEY:  That's Mr. Kelley with Mr. Rull.

3            THE COURT:  He seems very succinct.

4            So Rull --

5            MS. BARCLAY:  Maribeth Cusick.  I think she's less

6    than 30.  She should be on direct.

7            MR. KILEY:  I'll have some.

8            MS. BARCLAY:  Mr. Kiley is going to use her to get

9    all his laws in.  So that will take what, an hour?

10           MR. KILEY:  Less than an hour.

11           THE COURT:  The City of Boston has ordinances that

12   go back a long time.

13           MR. KETTLEWELL:  1623, Your Honor.

14           MR. KILEY:  But she's involved in a lot of -- in

15   several stages.

16           THE COURT:  And then?

17           MS. BARCLAY:  Rich Rogers.

18           THE COURT:  Oh, the guy who was the liaison person.

19   Okay.

20           How long do you think he'll be?

21           MS. KAPLAN:  20 minutes, I believe.

22           THE COURT:  And then Snow and Koch?

23           MS. BARCLAY:  Yeah.  I think he's probably --

24           THE COURT:  One thing I suggest to all of you, I

25   understand all these people have relevant information about

1    like various events that we've already heard about, but we've

2    heard about all of them and a lot of the -- so my suggestion

3    to all of you -- and this isn't directed at you or you, all

4    of you, is we could have less detail at this point about all

5    those things.  They've heard a lot of things, you can get the

6    key points from them, and what -- their perspective, if

7    there's something particular to them.  But we don't need the

8    whole history of everything from everybody.  They got this.

9    The jury understands that.

10        MS. BARCLAY:  And Snow wasn't involved in

11   negotiating the license agreement or very much.

12        THE COURT:  Is he more about August and September?

13        MS. BARCLAY:  The September 2nd meeting and the

14   relationship with Bill Kenney.

15        THE COURT:  Right.  So basically, all of that is

16   15 -- an hour.

17        MS. BARCLAY:  So I think -- and then Special Agent

18   Koch shouldn't be long for us.  It's moving the phone charts,

19   explaining the phone charts, moving them into evidence, the

20   statements of the defendants, that the defendants made.

21        MR. KETTLEWELL:  There's going to be an issue with

22   the statement.

23        THE COURT:  We'll get to that.  So that's pretty

24   short.

25        MS. BARCLAY:  She's probably.

1      THE COURT:  30 minutes.

2      MS. BARCLAY:  30, maybe 40.

3      THE COURT:  So an hour and a quarter and two and a

4  quarter.  Two and a half, three hours is direct, in theory.

5  Okay.

6      So basically, like, it's realistic to think that we

7  finish the Government's case on Friday.

8      MR. KETTLEWELL:  Sometime Friday morning.  Then our

9  witnesses.

10     THE COURT:  And then --

11     MR. KETTLEWELL:  Well, we have Commissioner Evans

12  and we'll have Patricia Malone.

13     THE COURT:  How long is she?

14     MR. KETTLEWELL:  I think it's going to be very

15  focused.  We're not going to go through the whole process.

16  Probably 20 minutes.

17     THE COURT:  Okay.

18     MR. KETTLEWELL:  And then I don't know what the

19  cross will be.

20     THE COURT:  Okay.

21     MS. BARCLAY:  Who else?

22     MR. KILEY:  Potentially, we still have to decide

23  with Captain Fong.  It will depend on what happens with Evans

24  this afternoon, obviously.

25     THE COURT:  So this is what I'm going to do.  We're

1   on track for them to get the case on Tuesday, as I told them

2   that I anticipated the Government has a few more witnesses

3   and we anticipate the Government might close on Friday, then

4   there will be some defense witnesses, and I anticipate that

5   all of that, they'll get the case on Tuesday.  I think we're

6   going to need to get them the case on Tuesday.

7           MS. BARCLAY:  And just to flag one more time and we

8   do this after we get the jury out, but can we do the charge

9   conference Friday afternoon?

10          THE COURT:  Yeah.  Let me just talk to the jury.

11          (Bench conference concluded.)

12          THE COURT:  Okay.  Ladies and gentlemen, I talked

13  to the lawyers.  I'm sorry to keep you over past the time at

14  the moment, but I wanted to go over the schedule with them.

15          So this is where we are.  First, after conferring

16  with them, I again think you're going to receive the case no

17  later than Tuesday -- I anticipate that no later than Tuesday

18  and probably on Tuesday, you will receive closing

19  arguments -- hear the closing arguments of the lawyers and my

20  final instructions to you on the law.  And then you'll retire

21  to the jury room with all the exhibits that will come into

22  evidence, so you can commence your deliberations.

23          Where I anticipate the schedule between now and

24  then is that I anticipate that the Government will likely

25  conclude their presentation of evidence on Friday and that

1    the defense, then, will begin their presentation of evidence

2    and I anticipate that presentation of evidence will conclude,

3    all of it, in time to give you the case no later than

4    Tuesday.  So that's the schedule.

5           So right now, you should anticipate 9:00 to 1:00

6    tomorrow, 9:00 to 1:00 on Friday.  That isn't going to

7    change, no matter -- even if I -- if they speed up and I

8    could speed everything up, it will still be 9:00 to 1:00

9    tomorrow and Friday, given where we are today.  Monday right

10   now, seems like 9:00 to 1:00.  Tuesday you're receiving the

11   case.  If something changes and I think you're going to get

12   it earlier, then I will alert you to that.  Okay?

13          Don't discuss the case among yourselves, don't

14   discuss it with anyone else.  Don't read, see, hear, or watch

15   anything related to the participants.  Thank you for your

16   attention and your timeliness.  All rise for the jury, I'll

17   see you tomorrow morning.  We'll resume tomorrow at 9:00 a.m.

18          (The jury exits the courtroom.)

19          THE COURT:  Mr. Kenney already left?

20          MR. KILEY:  He did.

21          THE COURT:  You'll tell him to be here tomorrow

22   morning at 9:00 a.m.?

23          So I understand why you want the charge conference

24   then.  I'll try to do that.  I'm certainly free Friday

25   afternoon.  I don't have some other conflict.  The issue is I

1   would like to, if possible -- I have a sense, I think, of

2   what the video deposition of the Commissioner would be from

3   seeing the e-mails and from what you've all talked about, so

4   I'm going to need to hear that, but I would at least need to

5   hear the Government's evidence before I conclude writing the

6   charge.

7           But I understand it's a vacation issue for you and

8   we'll try and accommodate you, and we can talk about that.

9           MS. BARCLAY:  We appreciate it.  Thank you.

10          THE COURT:  All right.  So we'll see you tomorrow

11  morning at 8:30.

12          Thank you very much, we'll stand in recess.

13          (Court in recess at 12:04 p.m.)

14

15

16

17

18

19

20

21

22

23

24

25

1          **CERTIFICATE OF OFFICIAL REPORTER**

2

3

4          I, Rachel M. Lopez, Certified Realtime Reporter, in

5     and for the United States District Court for the District of

6     Massachusetts, do hereby certify that pursuant to Section

7     753, Title 28, United States Code, the foregoing pages

8     are a true and correct transcript of the stenographically

9     reported proceedings held in the above-entitled matter and

10    that the transcript page format is in conformance with the

11    regulations of the Judicial Conference of the United States.

12

13                    Dated this 31st day of July, 2019.

14

15

16

17                    /s/ RACHEL M. LOPEZ

18

19

20          _____

21          Rachel M. Lopez, CRR
            Official Court Reporter

22

23

24

25