1           UNITED STATES DISTRICT COURT
              DISTRICT OF MASSACHUSETTS
2

3    - - - - - - - - - - - - - - - - - - x

4    UNITED STATES OF AMERICA,              :

5           Plaintiff,                      :    Criminal Action No.
                                                 1:16-cr-10137-LTS-1
6        v.                                 :    1:16-cr-10137-LTS-2

7    KENNETH BRISSETTE, et al.,             :

8           Defendants.                     :

9    - - - - - - - - - - - - - - - - - - x

10

11       BEFORE THE HONORABLE LEO T. SOROKIN, DISTRICT JUDGE

12                          **SEALED**

13                     **MOTION HEARING**

14

15

16
                       Thursday, July 11, 2019
17                        10:59 a.m.

18

19
              John J. Moakley United States Courthouse
20                    Courtroom No. 13
                      One Courthouse Way
21                   Boston, Massachusetts

22

23                    Rachel M. Lopez, CRR
                      Official Court Reporter
24             One Courthouse Way, Suite 5209
                  Boston, Massachusetts  02210
25                     raeufp@gmail.com

```
1                    A P P E A R A N C E S

2
     On behalf of the Plaintiff:
3
          UNITED STATES ATTORNEY'S OFFICE - MASSACHUSETTS
4         BY:  LAURA KAPLAN AND KRISTINA E. BARCLAY
          John Joseph Moakley Courthouse
5         One Courthouse Way, Suite 9200
          Boston, Massachusetts  02210
6         (617) 748-3124
          laura.kaplan@usdoj.gov
7         kristina.barclay@usdoj.gov

8

9    On behalf of Defendant Brissette:

10        HOGAN LOVELLS US, LLP
          BY:  WILLIAM H. KETTLEWELL AND SARA E. SILVA
11        100 High Street
          20th Floor
12        Boston, Massachusetts  02110
          (617) 371-1037
13        bill.kettlewell@hoganlovells.com
          sara.silva@hoganlovells.com
14

15
     On behalf of Defendant Sullivan:
16
          COSGROVE, EISENBERG & KILEY, PC
17        BY:  THOMAS R. KILEY, WILLIAM J. CINTOLO,
          AND MEREDITH G. FIERRO
18        One International Place
          Suite 1820
19        Boston, Massachusetts  02110
          (617) 439-7775
20        tkiley@ceklaw.net
          wcintolo@ceklaw.net
21        mfierro@ceklaw.net

22

23

24

25
```

1     **A P P E A R A N C E S,   C O N T.**

2

     On behalf of Defendant Sullivan:

3

         ACUCITY LAW, LLC
4        BY:  JAMES KELLEY
         One International Place
5        Suite 1400
         Boston, Massachusetts  02110
6        (617) 702-4000
         jkelley@acucity.com
7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                    P R O C E E D I N G S
 2              (In sealed session.)
 3              THE DEPUTY CLERK:  The United State District Court
 4    for the District of Massachusetts is now in session.
 5    District Judge Sorokin presiding.
 6              The matter before this court, US vs. Brissette,
 7    case 16-cr-10137.
 8              Counsel, please state your name for the record.
 9              MS. BARCLAY:  Good morning, Your Honor, Kristina
10    Barclay for the United States.
11              THE COURT:  Good morning.
12              MS. KAPLAN:  Laura Kaplan for the Government, Your
13    Honor.
14              THE COURT:  Good morning.
15              MR. KETTLEWELL:  Good morning, Your Honor.  William
16    Kettlewell for Mr. Brissette.
17              MS. SILVA:  Good morning, Your Honor.  Sara Silva,
18    here on behalf of Mr. Brissette.
19              MR. KILEY:  For Timothy Sullivan, Your Honor,
20    Thomas Kiley.  Standby, counsel, I don't think I've
21    introduced before, James Kelley, who would be here --
22    appeared in the case yesterday.  He's here because he may
23    have to examine witnesses I previously represented.
24              THE COURT:  Okay.
25              MS. FIERRO:  Good morning, Your Honor, Meredith
```

1    Fierro for Mr. Sullivan.

2              THE COURT:  Good morning.

3              MR. CINTOLO:  May it please the Court, Your Honor,

4    my name is William Cintolo, C-i-n-t-o-l-o, and I'm here on

5    behalf of Timothy Sullivan.

6              THE COURT:  Have you been in the case before?

7              MR. CINTOLO:  Yup.

8              MR. KILEY:  Yes, Your Honor.

9              THE COURT:  Oh, okay.  I know you, Mr. Cintolo, I

10   just don't remember you in this case, but maybe you were

11   here.

12             I take it everybody who's in the audience is with

13   one or both -- either of the two sides?

14             MS. BARCLAY:  As far as the Government understands,

15   yes, Your Honor.

16             THE COURT:  Okay.  Fine.

17             All right.  So your motion, defendants, I'll hear

18   you first.

19             MS. SILVA:  Thank you, Your Honor.  Your Honor, we

20   are here to discuss the very delayed disclosure of what we

21   believe to be statements that are exculpatory on their face.

22   And not only are they exculpatory on their face, but they go

23   to the very core of this prosecution.  Apparently, on June 7,

24   2017, Jesse du Bey met with the prosecutors and lead case

25   agent that have been pursuing this case.  That date is

1    significant, Your Honor, because it's actually a year after

2    this case was indicted.  This was not an interview that took

3    place at the beginning of the investigation, rather the

4    issues had been fully joined and expressed in a first

5    superseding indictment on that date.

6         On that day, Mr. Du Bey said several things to the

7    Government that we believe are -- constitute core exculpatory

8    information.  The first is that Mr. Du Bey helped Brian

9    Appel, the person who has been represented to this court as

10   Crash Line's principal, Crash Line being the victim that's

11   been identified here, established a company called Orkila

12   Holdings, doing business as Crash Line Productions, the

13   identified victim in this case.

14        Du Bey and his friend, Paul Sohn were 80 percent

15   investors in this company.  Appel, his father Marty Appel,

16   and some of Appel's other friends made up the remaining 20

17   percent of the investors.  Du Bey was the lead investor,

18   arranged the company, was a mentor, presumably to Mr. Appel,

19   and was the board director.

20        Mr. du Bey was asked later on in the 302, which is

21   the document from which I'm reading, about an August 21,

22   2014, e-mail between himself, Mr. Appel, and Carol Brennan,

23   who was Crash Line's lobbyist at the time.  And in the

24   context of answering that question, Mr. du Bey told the

25   Government they, Crash Line, were being

1    asked/requested/suggested to take union labor.  What he

2    thought would happen if they said no was there would be a

3    loud, ugly picket, and it would be bad for the brand.  Du Bey

4    wanted to know what the cost would be to say yes and take

5    union labor.  It would not be a big number in the larger

6    context and they would avoid the branch problem.

7            Later on, du Bey says, Mr. du Bey, told the

8    Government he probably would have been told about the

9    September 2, 2014 meeting, where Appel and Snow were called

10   into Brissette's office off of the Plaza, that is the

11   meeting.  The meeting that the Government alleges our clients

12   extorted Crash Line.  But Mr. du Bey, quote, "Did not have a

13   specific recollection of it."

14           That's particularly interesting, Your Honor,

15   because Mr. du Bey told the Government that he came into

16   Boston on the Thursday before the September 2014 Boston

17   Calling concert.  In other words, he was here in Boston two

18   days after his company was allegedly -- allegedly extorted

19   and he did not remember that meeting.  We believe all of that

20   is core exculpatory information, Your Honor.

21           There's one more piece that we believe is

22   exculpatory.  And again, I'm not suggesting this is

23   everything, but I just want to hit the core pieces.

24   Mr. du Bey told the Government that the decision to move the

25   Boston Calling concerts off of City Hall Plaza was made

before many of the issues arose with the City and well before
the September 2014 concerts.  He also went on to explain the
business reason, why Crash Line wanted to move the concerts
off of City Hall plaza.

So Your Honor, those statements taken together, we
believe absolutely contradict the Government's theory in this
case, that any extortion could have conceivably taken place.
Mr. du Bey is the majority owner of this company that is the
victim of extortion presumably.  He did not say he was
impliedly threatened, or that his company was, what he said
was they were asked, requested, suggested to hire union
labor, something that the Government has conceded repeatedly
before this Court would not constitute extortion.

He didn't say that he thought Mr. Brissette or
Mr. Sullivan, or even the City of Boston, in all of its many
employees, would do anything to harm his company if they said
no.  What he said was he thought there would be a big, ugly
picket that would hurt his company's brand.  He didn't say he
was forced to hire union labor or had no choice.  He said he
wanted to know what the cost would be and he didn't think the
cost was large in the grand total of what the cost of putting
on the concert was.  And he said that he had either -- or the
company had either decided, if you believe the 302, or
discussed, if you believe the Government's opposition, moving
the concerts off of City Hall Plaza, well before the

1 September 2014 concerts.

2          So Your Honor, we think that that's core

3 exculpatory information, it's clearly covered under *Brady*,

4 it's clearly covered under our local rule 116.2(a)(1), as

5 just one provision of that local rule that it fits and we

6 should have had it right away.  The statements were not

7 produced to us, however, until June 4, 2019, nearly two years

8 after the statements were made to the Government.  And

9 that's, we submit, a significant, somewhat unprecedented,

10 maybe, violation of the defendants' constitutional rights.

11          But layered on top of that, Your Honor, and the

12 reason that we are here seeking sanctions with our motion is

13 because of the positions that the Government has repeatedly

14 taken in this case and the affirmative statements of fact

15 made to this Court that are fundamentally contradicted by the

16 statements of Mr. du Bey.

17          First, the state of mind.  The Government filed a

18 trial brief with this Court back on February 26, 2018.

19 That's docket number 184 in the record.  That trial brief, in

20 part, focused heavily on the Government's need to put in

21 state of mind evidence.  The state of mind evidence the

22 Government asked this Court to allow was the state of mind of

23 Brian Appel and Michael Snow, as representatives of Crash

24 Line.  And at page 8, the Government cited *Goodoak*, a First

25 Circuit decision for the proposition that the jury is

1    entitled to know whether the defendants' conduct, quote,

2    "Did, in fact, induce fear," i.e., what the victim believed

3    about the situation.  That document was submitted eight

4    months after the Government spoke with Mr. du Bey.

5          The Government went on to reference *Goodoak* and why

6    the representatives of the company's subjective belief was

7    relevant.  In fact, the Government stated to this Court that

8    the state of mind evidence is, quote, "highly relevant."  At

9    that point, we were gearing up to trial.  And, in fact, the

10   last time we were before the Court, we were days from

11   beginning trial.  We never saw Mr. du Bey's statement, we had

12   no idea it existed.

13         In addition, the Government argued in its

14   opposition that Mr. du Bey's investment status in the company

15   is, quote, "neither exculpatory nor relevant."  Well, that

16   was interesting, because also on February 26, 2018, the

17   Government submitted proposed jury instructions.  And that is

18   at docket number 183, at page 20 -- sorry, at page 27, the

19   Government included request number 24, second element,

20   consent induced by actual or threatened use of fear.  And at

21   page 28, as part of that instruction request, the Government

22   asked this Court to instruct the jury as follows:

23         The person who's consent is induced by the wrongful

24   use of fear of economic harm, as alleged in the indictment,

25   is not limited to the owners of the particular property to be

1    obtained.  But may include the officers and agents of such

2    owners or persons in control of such property.

3             Your Honor, in hindsight, that would appear to be

4    an effort to instruct the jury around the Jesse du Bey

5    problem, a problem that neither the defendants nor the Court

6    was aware of at the time that requested instruction was

7    submitted.

8             And finally, of course, there's the issue of Crash

9    Line's purported need to have access to City Hall Plaza in

10   2018 and beyond and their fear of losing that access on

11   September 2, 2014.  That piece of the indictment was added

12   five months after Mr. du Bey was spoken to by the Government.

13   The grand jury that heard -- returned the second superseding

14   indictment that added the language -- the extension of the

15   licensing agreement to the charging document never heard

16   Mr. du Bey's statements.  They --

17            It appears that the only live witness, based on

18   *Jencks* that we received on June 28th of this year, it appears

19   the only live witness was Special Agent Koch, who attended

20   Mr. du Bey's interview, and the only testimony read into the

21   record was her prior testimony before other grand juries.

22   Brian Appel's grand jury testimony and Michael Snow's grand

23   jury testimony, another employee of Crash Line.

24            On March 12, 2018, again, in the run up to trial

25   the first time around, the Government filed an opposition to

1    defendants' motion in limine to exclude that extension of the

2    licensing agreement from the evidence in this trial, because

3    the facts were undisputed that Crash Line had that extension

4    in hand, on March 26, 2014, before any conspiracy alleged in

5    this case began and before Mr. Brissette was even beginning

6    to work at City Hall.  The Government opposed that motion by

7    arguing that Crash Line, quote, "needed additional dates

8    beyond those available to it in the irrevocable license

9    agreement with its extension."  And that agreement with its

10   extension, carried Crash Line out into 2018, but the

11   Government argued Crash Line needed dates in 2018 and beyond

12   and that it was in fear of losing those dates.

13           The Government made that exact same argument, Your

14   Honor, on May 31, 2019, to this Court, four days before it

15   produced the du Bey statement to defendants.  That was the

16   close of the briefing on that motion.  And Your Honor, we

17   submit that the Government knew, or at the very least

18   recklessly disregarded the fact that the majority owner had

19   already told them that that wasn't so and had told them that

20   two years prior.

21           Now, the Government, I understand, claims that that

22   was a mistake in the 302.  We submit that, Your Honor, that's

23   just not credible on its face.  We know from Exhibit F of the

24   Government's opposition that one of the assistant US

25   Attorneys specifically called out the words that the

1    Government now claims were incorrect in the 302 two years

2    ago.  She specifically called that out when the 302 was still

3    in draft form on July 7th -- or 6th, I'm sorry, Your Honor,

4    2017.  She called that out in connection with other mistakes

5    she thought she saw in the draft 302.  We have not seen the

6    draft 302, Your Honor, and we have not seen the notes.

7    Obviously, we didn't attend the interview, but just on the

8    face of that e-mail, putting that e-mail, which is Exhibit F

9    to the Government's opposition, next to the final 302, which

10   was finalized on July 31, 2017, and that's Exhibit E, I

11   believe, we can see on its face, some of the suggestions were

12   accepted, some weren't.

13           One of the suggestions was to change the date of an

14   e-mail.  Well, that's a verifiable fact.  That suggestion was

15   not accepted because the suggestion actually had the wrong

16   date.  The only other suggestion that was not accepted is the

17   suggestion that is now before you.  The agent was asked to

18   change the word "decision" to "discussion."  She did not do

19   so in the final 302.  That issue was not flagged when the

20   document was produced to us, as the defense, on June 4th of

21   this year.  It was not flagged in our meet and confer, after

22   we have provided a draft motion for sanctions to the

23   Government.  It was only identified by the Government after

24   that meet and confer.  And Your Honor, we just submit that

25   that is simply not credible in light of the record.

1          As for prejudice, the defense never reached out to

2    Jesse du Bey.  The defense had no idea that Jesse du Bey had

3    this kind of exculpatory information.  Mr. du Bey has been

4    represented by counsel, as had Crash Line throughout this

5    prosecution, and counsel was unwilling to make other members

6    of Crash Line available to defense counsel.  Had we known

7    Jesse du Bey made these statements to the Government two

8    years ago, we could have tried harder to lock him in.  We

9    could have put an investigator on him.  We could have

10   explained to his counsel the statements that were in

11   existence.  We didn't know any of this.

12         And we also might have been able to use those

13   statements as part of our strategy.  We have been defending

14   this case as though there was at least probable cause to

15   believe that the victim entity believed it had been extorted.

16   Jesse du Bey's statements completely undercut that belief.

17   We might have -- it certainly changes the quantum of proof.

18   And to such a degree that we may have pursued a different

19   strategy on our motion to dismiss and we may have pursued a

20   different strategy in our motions in limine.  It's difficult

21   to say, definitively, what we would have done, because we

22   didn't know they existed.

23         As for the relief, the Government has offered, they

24   have subpoenaed, I guess, Mr. du Bey's lawyer, and have

25   offered to let us call him in our case.  That's not good

enough, Your Honor.  In light of the core exculpatory nature
of the statements, in light of the extensive delay in the
disclosure, and in light of the repeated affirmative
misrepresentations to the Court, we think that that offer is
not good enough.

We would essentially be forced now to conduct our
investigation on the stand in front of the jury.  We have
laid out in lavender, in our briefing, what our position is
on those dates in 2018 and beyond, that Crash Line apparently
needed.  The Government has a massive tactical advantage now
in preparing Mr. du Bey for any testimony.  So we've asked
Your Honor for dismissal with prejudice.  We think that's the
right result.  Given this record, we think that that is
supported by the case of *United States vs. Chapman* that we
cited to the Court in our papers.

If the Court is not inclined to go that far, we
think, at a bare minimum, the Court -- and we would suggest
that the Court exclude the evidence certainly of Crash Line's
need for dates in 2018 and beyond and exclude the Government
from arguing that Crash Line -- that the jury can find Crash
Line had some sort of actionable fear of losing those dates.
And we would also request that the Court instruct the jury as
to Mr. du Bey's exculpatory statements.  And if that is where
the Court might be inclined to go, we would be prepared to
submit a proposed instruction on that ground.

```
1            THE COURT:  What do you mean by that last request?
2            MS. SILVA:  Your Honor, for example, the statements
3   that I read into the record today, we would ask the Court to
4   actually instruct the jury that Mr. du Bey met with the
5   Government, for example, on June 7, 2017, and made the
6   following statements.  We would identify the statements.  And
7   the jury would be instructed, for example, that it should
8   consider those -- that the Government chose not to call
9   Mr. du Bey into the grand jury, chose not to present -- did
10  not present Mr. du Bey as a witness at trial, but that the
11  jury's entitled and should take those statements as though he
12  had appeared before them and testified.
13           THE COURT:  Okay.
14           MS. SILVA:  Thank you, Your Honor.
15           THE COURT:  Anything, Mr. Kiley, or do you rest on
16  Ms. Silva's statement?
17           MR. KILEY:  It's foolish for me to get up after
18  that very well prepared presentation.  I simply want to make
19  two points.  With respect to Exhibit F, there are, indeed,
20  six suggested changes.  One of the changes is in the first
21  paragraph and it relates to the word "venue."  And
22  Ms. Barclay was suggesting in that e-mail that the word
23  "venue" be substituted for "plan," and says in that e-mail
24  that it is important to quote that theory of the case.  The
25  brand in this case, Your Honor, that Ms. Silva has alluded to
```

1    is Boston Calling, a plan to deal with the brand and Boston

2    makes sense.  Whether that was on City Hall Plaza or some

3    other place in Boston had no relevance with respect to the

4    brand.  But with respect to what went on in this case, the

5    theory of the case, which has changed over and over is the

6    substance of at least one other suggestion in Exhibit F.

7         Second, the request in Exhibit F with respect to, I

8    think, the date of the e-mail, was November 9th.  There are

9    e-mail dates that are in the document.  And the document, the

10   302 that we are talking about, says expressly that the

11   documents that were shown to Mr. du Bey are in file 1-A.

12   That's at the bottom of the 302, as it is in all of them.

13        The e-mails on August 21st that have been provided

14   to the Court make Mr. du Bey aware of the union issue that --

15   as you had requested from the Government, the production of

16   particular e-mails.  They are e-mails that are referenced

17   in -- in the 302.  And Mr. du Bey not only was in Boston the

18   Thursday before the concert, but involved in discussions with

19   respect to the union issue on August 21st.  The union issue,

20   we submit, the Government contends was in play earlier, but

21   you will see -- I'm going to go beyond what the record is

22   now, so I'm going to stop there.

23        Mr. du Bey, when he was testifying, providing

24   information in the 302 interview, had knowledge of the union

25   issue, addressed it directly in the 302, and whether it was a

1    decision or a discussion, they were seriously considering

2    moving the case, moving the concert off of City Hall Plaza,

3    at the very time the Government was telling you there was a

4    critical need for them to have an extension on City Hall

5    Plaza.

6            Now, our Ms. Silva referenced a series of docket

7    numbers.  Our motion in limine on the reference to the

8    license agreement is docket 188 and the Government's

9    response, I think, is 197.  We had this pending motion in

10   limine to address the inadequate use of vocabulary, perhaps,

11   that was pending at the time the case was dismissed.  We

12   were -- there was an irrevocable license.  The irrevocable

13   license was issued to Orkila, Orkila is the license holder.

14           The argument, the indictment indicates that there

15   was a desire to extend its licensing agreement.  The

16   opposition to that motion concedes that they already had

17   everything they needed with respect to that licensing

18   agreement and suggests that it's a distinction that makes no

19   difference with respect to the case, that they were looking

20   for something new.  This new, exclusive license.

21           Your Honor, that goes to the very essence of the

22   case, whether anything was wrongful.

23           And -- but I do -- I almost apologize for getting

24   up after Ms. Silva.

25           THE COURT:  Okay.

1           Ms. Barclay or Ms. Kaplan.

2           MS. BARCLAY:  Thank you, Your Honor.  First, we

3    just want to make clear that all of the e-mails attached to

4    the du Bey 302, Your Honor had requested that we submit some

5    under seal.  I just want to -- and all of the e-mails that

6    were mentioned in the party's brief, the e-mails between the

7    parties back in 2014, those were all disclosed to the

8    defendants in 2016 and 2017.  So really, the only new thing

9    that we're talking about here is the actual du Bey 302, just

10   to be clear.  And that disclosure was five weeks ago, Your

11   Honor, almost seven weeks before trial.

12          And I think, as I understand it, I thought that

13   there were three statements in the 302 that the defendants

14   pointed to as -- and I'll use Ms. Silva's term of core

15   exculpatory, but I think there's four that she talked about

16   today, so I'm happy to talk about all of them.  And I would

17   just note that core exculpatory information, Your Honor, is

18   sort of a term of art that doesn't necessarily have a

19   definition.  It's sort of thrown around there as, you know,

20   something different than *Brady*, something different than

21   materially exculpatory.  So it was just not clear to me

22   exactly what Ms. Silva means by that.

23          But regardless, the first statement is that

24   Mr. du Bey and his friend, Paul Sohn, were 80 percent

25   investors in Crash Line and the structure of the

1   organizations, the Orkila Holdings, all of that information,

2   that was all disclosed.  That's set forth in the Government's

3   opposition.  This wasn't a secret.  The defendants have

4   actually had this information, along with Mr. du Bey's

5   address and Mr. Sohn's address, since no later than July 12,

6   2016.  They actually had to disclose it to the City of Boston

7   in 2015, in connection with their written submissions to the

8   request for proposals.  So the breakdown of their company,

9   who owns what, I believe that that is all disclosed there.

10          Regardless, this information simply doesn't come

11   close to *Brady*.  The fact of the matter is, du Bey is an

12   investor in the company, but Appel and Snow are Crash Line,

13   as multiple witnesses will testify and as they will testify.

14   This was their company.

15          THE COURT:  What does that mean, they are Crash

16   Line?

17          MS. KAPLAN:  This is their company.  They're the

18   boots on the ground.  They're the ones who had this idea and

19   du Bey simply invested money in the company.  Sure, he's

20   involved in some high level discussions, as I'm sure the

21   defendants will elicit testimony about on cross-examination,

22   but he's not on the ground --

23          THE COURT:  Do the people who own something think

24   it's theirs?  In other words, usually people who own

25   80 percent of an entity think that the entity is theirs, they

1    usually don't -- I don't think most 80 percent owners of a

2    business, if told by a Government official that it's not

3    their company, would think that that's an accurate statement.

4             MS. BARCLAY:  Maybe that --

5             THE COURT:  I understand what -- if what you're

6    saying is Mr. Appel, this was his baby, it was his idea, he

7    created it, I understand that.

8             MS. BARCLAY:  And Mr. Appel and Mr. Snow were also

9    investors in the company.  They also owned a piece of the

10   company, they're owners, as well.  So again, this was not

11   information that was hidden.  It was fully disclosed.

12            THE COURT:  Uh-huh.

13            MS. BARCLAY:  The second piece of information that

14   Ms. Silva talked about is that --

15            THE COURT:  But what do you mean by they are Crash

16   Line?

17            MS. BARCLAY:  This is their company.  Brian Appel

18   is the CEO of Crash Line.  And they went to Jesse du Bey, his

19   cousin, and asked for funding.  And again, this is all

20   disclosed in Mr. Appel's grand jury testimony.  This is

21   nothing new.  Defendants knew this.  So Jesse du Bey provided

22   them with financing to start the company.  And then they are

23   the ones that were responsible for booking the bands, they

24   are the ones responsible for getting the permits and the

25   entertainment license, they are the ones negotiating the

```
 1    lease for City Hall Plaza.  So these are the guys on the
 2    ground and these are the guys who, it's the Government's
 3    position, and I believe the indictment says "Crash Line and
 4    its agents and officers" were extorted.
 5              The second statement is this -- the statement
 6    Mr. du Bey --
 7              THE COURT:  But the property allegedly extorted is
 8    Crash Line's property.
 9              MS. BARCLAY:  Yes.  It's the wages that they had to
10    pay to Local 11.
11              THE COURT:  The property is the wages and the wages
12    that were paid, which is the property, or Crash Line's money.
13              MS. BARCLAY:  Yes -- I -- correct.  I don't know if
14    it was necessarily Crash Line or Orkila, but it was --
15              THE COURT:  I thought Crash Line -- I thought
16    Orkila is the entity doing business under the name of Crash
17    Line.
18              MS. BARCLAY:  Right.
19              THE COURT:  So the wages is the property, right?
20              MS. BARCLAY:  Yes.
21              THE COURT:  And the property is Orkila's, because
22    it's their -- they are the ones paying the wages.
23              MS. BARCLAY:  Right, but I believe Orkila -- there
24    are several levels of Orkila, Your Honor.  There's an
25    investment company and then there's a holding company.  So
```

1    Orkila LLC is doing business as Crash Line.  So that's the

2    company that I'm talking about --

3              THE COURT:  Orkilla LLC.

4              MS. BARCLAY:  That is Appel and Snow.

5              THE COURT:  And who owns Orkila LLC?

6              MS. BARCLAY:  Who owns it?  It is --

7              THE COURT:  When you say -- like it's the

8    80 percent, is it that Appel and Snow own 20 percent of

9    Orkila LLC and du Bey and the other guy Sohn own the other?

10             MS. BARCLAY:  Yeah, I'm not sure it's necessarily

11   broken down like that, but back then, the interest that was

12   disclosed to the City of Boston was that 75 percent was this

13   guy Sohn, S-o-h-n, and du Bey, and then the other pieces of

14   it were Appel and other members of their families.

15             THE COURT:  I see.  Okay.

16             MS. BARCLAY:  The other statement of Mr. du Bey is

17   this statement that he understood that they were being asked

18   or requested or suggested to take on union workers and that

19   what he thought would happen if they didn't do it is a big,

20   ugly picket.  And you know -- and those types of statements.

21   And I think it's important to understand that those

22   statements were made in -- in response to being shown, in an

23   August 21, 2014 e-mail, between him, Appel, and Crash Line's

24   lobbyist.  And at that point, there had been ongoing

25   discussions between the defendants, Snow, and Appel, about

1    the use of union labor, but it was not until the

2    September 2nd -- so weeks later -- meeting, that Appel and

3    Snow felt they had no choice but to hire Local 11 workers.

4    So du Bey's statement that he recalled being asked,

5    requested, suggested to take union labor was not exculpatory,

6    because he was talking about what he knew in August of 2014.

7              THE COURT:  What's the time period you alleged in

8    the indictment?

9              MS. BARCLAY:  I don't have it in front of me, Your

10   Honor, but I believe it was --

11             MS. SILVA:  Your Honor, I think it's May 2014

12   through September of 2014.

13             MS. BARCLAY:  Right.

14             THE COURT:  That's the alleged time period of

15   criminal activity.

16             MS. BARCLAY:  But my point, Your Honor, is that the

17   statements leading up to that meeting were certainly laying

18   the foundation for that meeting, but at that point, the

19   statements were slightly more innocuous than they became at

20   that September 2, 2014, meeting.  And so that explains

21   du Bey's statement.  And I think what they're -- the

22   defendants are conflating is that they're saying that this is

23   what du Bey thought after the September 2nd meeting and

24   that's not true.  The question was, in relation to this

25   August 21st e-mail about a meeting, I think it was on

1    August 19th was the meeting.

2           THE COURT:  So your position is, it's not

3    exculpatory, and the reason it's not exculpatory is because,

4    in fact, what he said was -- what -- the words that are

5    described in the theory is what he said, but he was saying

6    them with respect to his state of mind on August 21st.

7           MS. BARCLAY:  Yes.  Yes.  And it is -- it is

8    consistent with Appel and Snow.  I mean, there's an increase

9    in pressure, but at that point, they are being asked,

10   requested, suggested to take union labor and it's not

11   until --

12          THE COURT:  So the conclusion was drawn that it

13   wasn't exculpatory *Brady* material, or exculpatory by the

14   rule, it wasn't disclosed initially -- not initially,

15   obviously not 28 days after the arraignment, because it

16   didn't exist them.  But it wasn't disclosed as that kind of

17   exculpatory information, because that's the conclusion that

18   was drawn?

19          MS. BARCLAY:  Well, Your Honor, as we stated in our

20   filing, obviously the Government admits that this should have

21   been turned over as 21-day material, in March of 2018.

22          THE COURT:  Right, but if it's not.

23          MS. BARCLAY:  So it's not core *Brady*.  There's no

24   statement in here --

25          THE COURT:  Forget core *Brady*.  It's not --

```
 1              MS. BARCLAY:  They didn't do it.
 2              THE COURT:  -- information -- you told me that core
 3    Brady is a word that you don't know what it means.  Fair
 4    enough.  I understand the world, unless you guys explain it
 5    to me differently, is there's Giglio material and there's
 6    what's colloquially referred to as Brady material,
 7    information that tends to indicate guilt.  And I'm just
 8    asking you, you explained to me why it's not -- as I
 9    understand, why it's not Brady material, and what I
10    understand from your filing is you think it's Giglio
11    material, or at least arguably Giglio material.  And so I'm
12    just trying -- I guess, do I understand, so far?
13              MS. BARCLAY:  This is not exculpatory.  It's not
14    inconsistent with anything that the Government has said thus
15    far about what the defendants did in the days leading up to
16    the September 2nd meeting.  So that's the Government's
17    position is that it wasn't inconsistent with what the
18    Government's position is, so it's not exculpatory, in that it
19    doesn't suggest that the defendants didn't, in fact, extort
20    Appel and Snow on September 2nd.
21              THE COURT:  And it wasn't disclosed as such,
22    because the conclusion was it wasn't that.
23              MS. BARCLAY:  Right.  That's true, Your Honor.
24              THE COURT:  And why wasn't it disclosed -- is it
25    the Government's position that it's Giglio material, or not
```

1    *Giglio* material?

2              MS. BARCLAY:  Is it the Government's position that

3    it is a potential -- it certainly -- I mean, it's not a

4    statement of Appel or Snow, and it's not inconsistent with

5    statements of Appel or Snow.  It's merely repetitive

6    information of information that's already been produced to

7    the defendant.  So again, there are other pieces of

8    information --

9              THE COURT:  Is that why you're conceding that it

10   was an error not to disclose it three weeks before the last

11   trial?

12             MS. BARCLAY:  Because of the other statement that

13   I'm going to get to, Your Honor.

14             THE COURT:  So this statement, you had no

15   obligation to disclose, period.

16             MS. BARCLAY:  Well, Your Honor, I'm not saying

17   that.  I think that we probably would have disclosed it

18   21 days before trial, as potential impeachment.

19             THE COURT:  I'm not asking you what you would have

20   done.  I mean, there's a lot of things you could do in your

21   discretion that you're required to do by the law.  I'm asking

22   you whether that statement -- so I understand you to be

23   saying is that statement wasn't *Brady*, right?

24             MS. BARCLAY:  Right.

25             THE COURT:  And that statement wasn't *Giglio*, and

1   therefore, that statement wasn't a statement -- you might

2   have chosen to disclose it for your own reasons, but that's

3   not a statement that you had to disclose.

4          MS. BARCLAY:  Yeah, that's the Government's

5   position, Your Honor.  Again, it's entirely consistent with

6   what we've told the Court and what the witnesses have said.

7          THE COURT:  Okay.  Next statement.

8          MS. BARCLAY:  With respect to the statement du Bey

9   probably would have been told about the September 2nd

10  meeting, where Appel and Snow were called into Brissette's

11  office off the Plaza, but he didn't have a specific

12  recollection of it, this is, again, the Government doesn't

13  consider this statement necessarily exculpatory.  It's not

14  that du Bey didn't say that the meeting never happened, or

15  that the defendants didn't tell Appel and Snow that they had

16  to use union labor.  He simply said three years later that he

17  didn't have a specific recollection of being told about the

18  meeting.  So at most, it goes to the credibility of Appel and

19  Snow's testimony about that meeting.  And this is classic

20  21-day material and, again, the Government should have

21  produced it three weeks before the March trial date.

22         THE COURT:  So that's a statement you think is not

23  Brady, but it is *Giglio*, in the way we're using those terms

24  and should have been disclosed 21 days before the last trial?

25         MS. BARCLAY:  Yes, Your Honor.

```
 1            THE COURT:  Okay.  Go ahead.
 2            MS. BARCLAY:  It was an oversight.  As soon as we
 3    realized it, we turned it right over and it was seven weeks
 4    before --
 5            THE COURT:  This trial.
 6            MS. BARCLAY:  -- this trial date.
 7            THE COURT:  So you're happy that I dismissed the
 8    case last time, because I saved you from proceeding to a
 9    full-blown federal trial, where you hadn't met your discovery
10    obligations.  You don't have to answer that.
11            MS. BARCLAY:  With respect to the fourth statement,
12    the decision to move the Boston Calling concert off of City
13    Hall Plaza was made before many of the issues arose with the
14    City, as well as before the September 2014 concert.  As the
15    Government has explained in its response brief and in the
16    submissions under seal and ex parte, the 302 contains a
17    mistake, Your Honor.  My notes and Special Agent Koch's
18    notes, which we produced in full to the Court and in redacted
19    form to the defendants, they both have the terms "started"
20    and "before," they don't have made, and they don't have
21    decision.
22            And my July 7, 201, e-mail to Special Agent Koch,
23    my memory was that he said that the discussion began before
24    the September 2014 concert, not that the decision was made
25    before that concert.  And that -- that the decision to
```

relocate had not been made before that concert is entirely
consistent with all of the other evidence in this case.  The
302 itself, du Bey himself said, we're always trying to
extend our lease.  And there are many e-mails and texts
regarding lease extensions between Appel, Brissette, and
others before and after the September 2014 concert.

And then in 2015, in April and August of 2015,
Crash Line, in fact, submitted written responses to the
City's request for proposals saying we want to use City Hall
Plaza through -- I think one of the, said 2020 and the other
one said 2022.  So there's simply a mistake in the 302, the
Government should have been more careful reviewing the final
302 and flagged the mistake before March 2018, when the
Government produced potential impeachment material for Appel
and Snow for the March trial date.

THE COURT:  So as you -- as -- assuming it's
discussion rather than decision, was that disclosable?

MS. BARCLAY:  Well, Your Honor, it was disclosed.

THE COURT:  I know it was disclosed now.  My
question was --

MS. BARCLAY:  No, it was actually disclosed before.
I'm going to get to that.  So the defendants and Mr. Kiley,
just now -- the defendants, in their reply, and Mr. Kiley
have suggested that even the discussion about moving Boston
Calling out of City Hall Plaza was exculpatory information

1    that we withheld from the defendants.

2            First of all, it's not inconsistent or exculpatory

3    as far as the Government's position is.  They needed a backup

4    plan, right?  They're getting strung along by Mr. Brissette

5    and others within in City Hall, so they need to look for

6    other options.  They need to have something in case 2017

7    comes and they don't have somewhere to do a concert and these

8    take a lot of time to set up.  They take a lot of time to

9    negotiate the leases.  It makes sense.  And by the way, they

10   needed it.  They needed the backup plan, because the City

11   never awarded the RFP, so they ultimately needed that.

12           Second, it's not new information.  The Crash Line

13   folks discussed moving off City Hall Plaza.  That they

14   discussed it was fully disclosed to the defendants in e-mails

15   produced no later than May of 2017.  And those include a

16   May 2013 e-mail string, in which Brian Appel and Jesse du Bey

17   discussed Jesse du Bey making a trip to other locations.  And

18   the locations include Harvard, where the concert --

19           THE COURT:  Is that your opposition?

20           MS. BARCLAY:  It isn't, Your Honor.  It was in

21   their reply that they suggested for the first time that a

22   discussion about moving Boston Calling would have been

23   exculpatory.  Your Honor, this is an e-mail that's actually

24   on the defendants' exhibit list.

25           THE COURT:  Uh-huh.

1          MS. BARCLAY:  So I anticipate, the Government

2     anticipates that they were planning to cross-examine

3     Mr. Appel about this very issue.  And I have an e-mail here,

4     if Your Honor wants a copy of it.

5          THE COURT:  Yes.

6          MS. BARCLAY:  And Your Honor, if you want me to

7     point you to the page where this conversation happens.

8          THE COURT:  Yes.

9          MS. BARCLAY:  If you flip to BR-51.

10         THE COURT:  51?  Sorry.

11         MS. BARCLAY:  Yeah.  And right -- the second

12    paragraph, it says, "Original message from Brian, Monday, May

13    13th, 9:05 a.m., to Jesse du Bey," and then the following.

14         THE COURT:  So is it that -- the fact that they

15    were considering moving is not exculpatory or *Giglio*, or is

16    it that they knew about -- that the discussions were

17    occurring and they knew that Mr. du Bey was part of those

18    discussions, so they knew he was at least involved with

19    discussions from this, which they had.  And, therefore,

20    it's -- to the extent the issue and the information is

21    exculpatory, there isn't really anything new.

22         MS. BARCLAY:  Your Honor, the Government 's

23    position is that it's both.  It's not exculpatory.  Again,

24    this is a backup plan.  It was, you know, not inconsistent

25    with also wanting a lease from City Hall through 2020, to be

1    looking at venues beyond there.  The company was growing, the

2    concert was growing, it would make sense that they would want

3    something bigger than City Hall Plaza at some point.

4         And then the second -- the Government's second

5    point is, yes, this information was disclosed.  And because

6    it's on the defense witness -- or exhibit list, it seems they

7    knew about it, and were going to cross-examine Mr. Appel

8    about it.

9         THE COURT:  Okay.

10        MS. BARCLAY:  Your Honor, just back to the issue of

11   the mistake in 302.  I may have misunderstood, but I think

12   what Ms. Silva was implying is that our jury instructions

13   were somehow tailored to cover this up.  And I guess I just

14   want to note that that's sort of a preposterous -- the jury

15   instruction that she read is the law.  And I think you'll

16   probably find that the Government submitted the same type of

17   instruction in the *Burhoe* case.  We probably just copied it.

18        Again, there was no ill intent here.  There was

19   certainly a mistake.  There was a mistake in the 302, there

20   was a mistake in us not catching it, and there was a mistake

21   in us not disclosing it.

22        THE COURT:  How did -- I'm sorry, I didn't want to

23   cut you off, if there was something that you wanted to say.

24        MS. BARCLAY:  Well, I was going to cover, you know,

25   prejudice, as well, Your Honor, because I think it's

1    important to the extent that Your Honor thinks that any of

2    this rises to the level of exculpatory information that

3    should have been disclosed --

4              THE COURT:  Go ahead.

5              MS. BARCLAY:  -- in 2017.

6              I just first want to say to the Court that there

7    was no Government misconduct here.  As I've said several

8    times, as we've said in our brief, this was a mistake, there

9    were two mistakes here.  And comparing this case to a case

10   like *Chapman* or to *Jones* is completely not an appropriate

11   comparison.  This is one 302, it's not 600 documents.  As

12   soon as we realized the mistake, we turned it over.  This

13   wasn't during trial while someone was testifying, or even on

14   the eve of trial.  They had seven weeks to get ready for

15   this.

16             And in terms of prejudice, even if the 302

17   contained *Brady* material, it's black letter law that there's

18   no *Brady* violation if the disclosure occurs in time for the

19   defense to make effective use of it at trial.  Here they had

20   99 percent of the information in the 302 by May of 2017 when

21   we produced all these e-mails and the RFPs.  And they've had

22   the 302, itself, now for five weeks, it will be almost seven

23   weeks when we go to trial.  And we've made the witness

24   available to them.

25             So the limiting instruction to the jury or the

1   instruction about what Mr. du Bey said or would say, they can

2   call him and, you know, present his testimony live to the

3   jury.  There's no need for an instruction like that.

4            And if the defendants do need more time to

5   investigate, they talked about a private investigator and all

6   of these things, we've agreed to a continuance, if that's how

7   they want to proceed.  And that's how actual *Brady* violations

8   are handled.  You give the defense enough time to figure out

9   how they can use the information at trial, but I think that

10  they're refusing a continuance and instead they've made sort

11  of these scurrilous allegation of flagrant Government

12  misconduct, in an effort to convince the Court to dismiss the

13  case again or to limit the Government's proof again.  And

14  there was no Government misconduct.  The du Bey 302 is not --

15           THE COURT:  In fairness, it's not really limited

16  again.  I didn't limit your proof last time.  I dismissed the

17  case.

18           MS. BARCLAY:  They're asking you to limit.

19           THE COURT:  They've asked, yes, but that's like --

20  have you ever had a case where the defense didn't ask to

21  limit the Government's proof?

22           MS. BARCLAY:  Your Honor, look.  The license

23  agreement extension is a powerful piece of Government

24  evidence, right, so we expect the defense to argue to keep

25  that piece of evidence out.  But simply because it's powerful

1  doesn't mean it's prejudicial or wrong or that we can't

2  introduce it.  We made a mistake, we corrected it in plenty

3  of time before trial and we subpoenaed the witness for the

4  defendants.  Sanctioning the Government is unwarranted and

5  unnecessary at this point and the motion should be denied.

6          THE COURT:  A couple of questions.  Why was it

7  disclosed on June 4th?  I don't mean why.  I mean, I guess,

8  like how did it come up at that time that all of the sudden

9  you thought you needed to disclose it?

10          MS. BARCLAY:  Well, I'm trying to think of when the

11  order of the trial date was set and we were reviewing the

12  case file.

13          THE COURT:  Basically, you're just preparing for

14  trial.

15          MS. BARCLAY:  Getting ready for trial, making sure

16  that everything had been done that needed to be done.

17          THE COURT:  I see.

18          MS. BARCLAY:  Last time when there was an issue

19  with the jury instruction and the dismissal, it was hard to

20  figure out what we had done and what we hadn't done at that

21  point.  We had to go back through the file and ensure that

22  everything had been turned over that needed to be turned

23  over.  And it hadn't and we did it, so --

24          THE COURT:  And why not then -- like when did you

25  come to the view that -- I guess it's turned over in a cover

1    e-mail that's like, oh, here's this other thing.  It's not

2    turned over like here's this thing, sorry, we should have

3    disclosed before, this is what it is.  It's just -- so I'm

4    wondering about that.

5            MS. BARCLAY:  Well, we found it.  We knew it wasn't

6    right.  We turned it over and then we conducted our

7    investigation to figure out -- because none of us remembered

8    this having been said.  We found our notes, we found the

9    e-mails and, you know, this is -- we basically did an

10   investigation to figure out why that statement was in there

11   and where it came from.

12           THE COURT:  So that commenced when?

13           MS. BARCLAY:  When we found the 302.

14           THE COURT:  Not when they gave you the sanction

15   motion?

16           MS. BARCLAY:  No, because when we saw that

17   sentence, we knew it was not what any of us remembered and it

18   didn't make any sense.  It doesn't make any sense with

19   respect to the rest of the evidence and it doesn't make sense

20   to what the other witnesses have told us, and it just didn't

21   make any sense to us.

22           THE COURT:  And is it routine practice to review

23   302s?  For AUSAs to review 302s?

24           MS. BARCLAY:  Yes, Your Honor.

25           THE COURT:  And is it routine practice to tell the

1    agent that certain changes are critical to the theory of the
2    case?
3            MS. BARCLAY:  Well, it's my routine -- I wouldn't
4    say it's routine practice to review the 302s.  Some agents
5    don't send them, some do sometimes.
6            THE COURT:  I'm talking about ones where you
7    participated in the interview.
8            MS. BARCLAY:  No, I understand that, but there are
9    302s that we don't necessarily review.  I wouldn't say it's
10   routine practice for all AUSAs, but it's not unusual
11   certainly.  And I think in some instances, it's even
12   recommended.  If there are multiple people there for an
13   interview and there's a lot going on, then everyone should
14   take a look at it and if there's disagreement, they should
15   talk about it.  And the reason I put that in the e-mail is so
16   that if Special Agent Koch had an issue with it, she would
17   call me and we discuss it and then our practice would be
18   ordinarily to either reinterview the witness or talk to the
19   witness's lawyer, figure out exactly what was going on here,
20   because it is a critical distinction and I didn't remember
21   him saying that.  So that's generally why -- that's why I
22   said that in that e-mail.
23           THE COURT:  Of course, you know, there's a simple
24   thing that would solve -- that whole dispute is about what
25   the witness said, right?

1          MS. BARCLAY:  If we recorded it?

2          THE COURT:  Yes.  You have -- in fact, I would bet

3     that, in that interview, there were, on the Government's

4     side, three recording devices, probably.

5          MS. BARCLAY:  I understand your point, Your Honor.

6          THE COURT:  Right.  And I understand it may be FBI

7     policy to not record interviews, but it's FBI policy that

8     creates this -- that creates not the whole problem, but this

9     aspect of the problem.  And if they had it -- if there were a

10    tape recording, in all likelihood, there wouldn't be having

11    this part of that discussion.  And I understand why, in 1960,

12    they might not have been recording it frequently, but it is

13    difficult to understand why there would be an affirmative

14    decision -- I understand it may not be your decision, to not

15    collect evidence, when an agency's job is to collect evidence

16    carefully to prepare cases.  And there's an affirmative

17    policy, essentially, to not collect the kind of evidence that

18    could easily be collected that would be -- presumably, it

19    would be actually better for the Government and the FBI,

20    because presumably, most of the time, whatever, it would be

21    what it is, but it would be -- it's the same reason why, in

22    drug cases, you record the transactions, right?

23         MS. BARCLAY:  Right.

24         THE COURT:  Because it's better evidence than the

25    testimony of the agent or the CI.

1          MS. BARCLAY:  I understand your point, Your Honor.

2          THE COURT:  Okay.  So I -- with respect to du Bey,

3    he's under a subpoena, so if somebody wants to call him, he's

4    subject to subpoena.  He's not off in Germany and not been

5    served and not --

6          MS. BARCLAY:  No, he is in -- I believe he is in

7    Germany, but his attorney has been served and if the defense

8    wants to put him on the stand, they can --

9          THE COURT:  And his lawyer hasn't said that he's in

10   Nepal for a month hiking and I can't reach him and he's

11   not -- I can get service, but I can't get him.

12         MS. BARCLAY:  No, he's not.

13         THE COURT:  Okay.

14         Anything either of you want to add?

15         MS. SILVA:  Thank you, Your Honor.  I think -- so

16   understanding consistency is the hobgoblin of small minds,

17   what the Government has said to you are two totally

18   contradictory things today.

19         The Government just said the licensing agreement is

20   a powerful piece of the Government's evidence, but

21   Mr. du Bey's statement about the licensing agreement was not

22   exculpatory information that tended to cast doubts on the

23   Government's guilt.  Your Honor, that's simply totally

24   inconsistent.  The Government just said to you that the 302

25   was important.  That that newly discovered error in the 302

1   is important for you, because there is a critical distinction
2   between a decision and a discussion.
3          Well, the document that we marked and that was
4   produced to us is from 2013, from May 13, 2013, before a
5   single Boston Calling concert had ever been held and a year
6   before any alleged conspiracy developed.  That's a
7   discussion.  Mr. du Bey wasn't asked about discussions in
8   2013.  He was asked when the decision to move Boston Calling
9   happened and why.  And he was asked by it by the Government a
10  year after the defendants were arrested and charged with
11  federal felonies.
12         His answer then was that they made a decision to
13  move the concert well before the September 2014 concert.  If
14  that's powerful evidence for the Government, we should have
15  had it, because what du Bey told them completely undercuts
16  their theory and they know it.  And that's why, frankly,
17  assistant US Attorney Barclay sent her e-mail on July 6,
18  2017, to Special Agent Koch.  She said it in writing.  It is
19  a critical distinction.  And Special Agent Koch did not make
20  that change.  She finalized the 302 two weeks later and she
21  did not make that change.  She made others, not that one.
22         The Government told you that they produced the
23  statement on June 4th of this year, because they saw it and
24  knew it wasn't right that they hadn't produced it before.
25  They said none of us remembered Mr. du Bey saying this and it

1    didn't make any sense.  And Your Honor, I submit that that is

2    precisely the problem.  It didn't make sense to the

3    Government's theory.  But that doesn't mean that he didn't

4    say it and it doesn't mean that it's not exculpatory.  The

5    Government has said that we are conflating what Jesse du Bey,

6    the owner of the victim that had a fear of economic harm,

7    knew on August 21st, with what happened on September 2nd.

8    And that the Court should and the jury should draw a line

9    between those, even though both of those dates fall well

10    within the charged crimes here.

11          Well, Your Honor, I would point you to an e-mail

12    that the Government actually attached to their opposition at

13    Exhibit D.  This is an e-mail that Jesse du Bey wrote on

14    Monday, September 8, 2014.  Again, to orient the Court,

15    September 2nd is the date --

16          THE COURT:  I remember.

17          MS. SILVA:  Thank you, Your Honor.  Jesse du Bey

18    wrote, on page BR 00178 -- sorry, Your Honor, one more page.

19    BR 00179, "Adding insult to injury, we were 'asked' by the

20    City to use union labor," and Mr. du Bey put quotes around

21    that word "asked," and the Government cited that to this

22    Court in opposing our motion for sanction.  They said, well,

23    see that's proof, that what Jesse du Bey told us isn't

24    actually accurate.

25          Well, Your Honor, they didn't finish that sentence,

1    because what Jesse du Bey wrote was, "We were 'asked' by the

2    City to use union labor in the two weeks prior to the event."

3         That's August 21st, Your Honor.  That's the date

4    that Jesse du Bey is talking about and he's talking about it

5    to Mr. Appel, after the alleged extortion, after the concert

6    happens, when they are putting together their list of all of

7    their woes.

8         When the Government says that the pressure amped up

9    by September 2nd, one would think, based on the record, that

10   the 80 percent owner of Crash Line would have been told the

11   pressure amped up.  In fact, this case has been all about

12   what the defendants didn't say on September 2nd.  There was

13   no express threat.  The Government has admitted that from the

14   beginning of this case.  This was about what was implied.

15   Well, I submit, Your Honor, what's important is not what was

16   implied, not what the Government wants people to have said,

17   but what they actually said.  And in this case, what they

18   said to the Government two years ago.

19         It's not enough to say, well, this is how *Brady*

20   violations are typically handled.  We turn over the stuff,

21   the defense scrambles, we put the witness on the stand, and

22   the jury decides.  That's not how it works.  There's a

23   Constitution for a reason.  It prejudices people accused of a

24   crime to have to conduct an investigation in front of a jury,

25   while the Government has made misrepresentations in their

1    trial brief, in their request for jury instructions, in their

2    arguments and motions in limine, quite frankly, in the

3    indictment itself.

4         So for all of those reasons, we do believe

5    dismissal with prejudice is the absolute right thing to do,

6    but we appreciate that there may be lesser standards, if the

7    Court believes that's the appropriate way.  But certainly the

8    jury should be instructed as to the exculpatory nature of

9    these statements, the fact that the Government did not

10   present Mr. du Bey as a witness to the grand jury, or to

11   them, and they should be allowed to consider those

12   statements.

13        MS. BARCLAY:  Just to be clear, Your Honor.  I'm

14   sorry, I actually had another e-mail that I forget to hand

15   up.  This one was from March of 2015, so this was six months

16   after that September 2014 meeting.  And this was another

17   e-mail from Brian talking about possibly going to other

18   locations.  Did we confirm a site visit with Suffolk Downs,

19   introduction to Harvard.  And then number three is lease

20   extension.  "This feels to me like it's falling apart,

21   perhaps you feel differently.  But we're like 16 weeks into

22   this now."  This is actually Chris -- this is Brian Appel.

23        So it's clear that as of this point, in March of

24   '15, they have not made a decision to leave City Hall Plaza.

25   They're still talking about the lease extension, and again,

this was produced in September of 2016 to the defendants.  So they had this information, the fact that discussions happened before '14 and after '14, always discussing about what they're going to do.  They need a future plan.  So this is nothing new, Your Honor.  And it's certainly not exculpatory or inconsistent with anything that the Government has said.  And, in fact, in the e-mail attached is Exhibit D to our brief.  It says we need clarity in two areas.  And one of the -- I'm sorry, the --

It says, "If we cannot get a near term clarity on these points, as well as a long term commitment from the City as our partner."

So again, this is right after that September 2, 2014 meeting and right after the concert that they're wanting a long term commitment from the City.  So -- and that's from Mr. du Bey himself, actually, as Ms. Kaplan pointed out to me.

Your Honor, the Government has not made misrepresentations in the indictment or in any filings that they've made with this Court.  We've explained what we think are the issues with the 302.  We've turned it over.  We've admitted a mistake here, and again, there's been no prejudice, and the Government's position is, at this point, we should move forward with trial and there should be no sanctions.

1        THE COURT:  Okay.  So let me tell you all a couple

2   of things.  The argument is very helpful.  I appreciate that

3   I'm going to take this under advisement and think about it,

4   but I think it's fair that I tell you a number of things.

5   One is, I don't think dismissal is the outcome of this

6   motion.  I'm not conclusively ruling that I'm not dismissing

7   it, but I don't think you should -- I think you should all be

8   proceeding to prepare for trial.  I don't see dismissal as

9   the likely outcome from this sanction motion.  And I think

10  it's fair for you all to have some understanding of that now,

11  given that we're a week and a couple of days from the

12  beginning of trial.

13         Second, I'm going to think about everything that

14  was said, but I'll make a couple of observations.  I guess I

15  don't agree with the Government's view of this.  There's some

16  things you've told me today that I didn't know about before

17  and I need to think about that and I'm going to look at those

18  e-mails and look back at what Ms. Silva said and so that goes

19  particularly to the statement -- the decision discussion

20  comment, whatever that comment is.  And obviously to the

21  extent that it was known, it's different than if it wasn't

22  known.

23         But as I understand it, maybe I mis- -- maybe I

24  misunderstood the Government's case and if I do, I'm sure

25  you'll correct me.  But I understand that one primary theory

1    of the Government's is that the defendants impliedly said to

2    the Crash Line that hire union or you won't get your permits,

3    am I correct -- that's not your only theory, but that's one

4    theory.

5              MS. BARCLAY:  Yes, Your Honor.

6              THE COURT:  And that's been my understanding from

7    the first time that I read that the indictment and that

8    that's been a primary theory of the case.  And as I

9    understand it, the property at issue is the wages that were

10   paid to the union members and that the property is Crash

11   Line, Orkila LLC's property.  And as I understand from what

12   you've all told me, that and LLC owned, as is typical with

13   LLCs, by a number of different people.

14             And so putting aside the precise analysis of what

15   date Mr. du Bey was talking about when he was interviewed in

16   July of 2017, which by my calculation is then almost exactly

17   six months before the then trial date, because I think the

18   trial date was January 8, 2018 and then got continued after

19   the -- if I remember right, got continued in the Fall of

20   2017, to the March date, when it was the superseding

21   indictment, and they wanted to move to dismiss again.

22             So six months before trial, a major owner of the

23   company says -- frames the issue as do I -- we had a choice,

24   we could suffer this picket or we could pay money that we

25   didn't want to pay to these union people.  Nowhere in that --

that's how he frames the choice.  He doesn't say -- there's

no indication in that that he was worried about not getting

his permits.  He doesn't say -- like the rat appearing and

hurting their brand implicit in that statement, if not

expressed, is that the concert would be occurring.  Their

brand would not be harmed if the union showed up at City Hall

Plaza, with an inflatable rat on a day there wasn't no

concert, that wouldn't affect them.  That seems like,

contrary to the Government's theory.

So it seems like *Brady*, as opposed to *Giglio* -- it

certainly seems like *Brady* under the local rule and which

doesn't involve the weighing of the effect on the trial.  It

certainly, I think, seems like it would be a pretty

significant anyway.  It just strikes me -- and it's not --

sometimes you just come up and you say on the side of the

case, it was a long time ago, but it was six months before

the trial.  Both AUSAs prosecuting the case are in the

interview, heard this statement, they're there, the case

agent is there, although disclosure is not necessarily the

case -- in this case, It's not the case agent's

responsibility.  So it seems like *Brady*.

He's under subpoena.  I get that.  And that's,

obviously, significant.  But one of the things that it raises

in my mind is a concern is that the entire premise of a

criminal trial is that exculpatory information will be

1    disclosed by the Government, if there is any.  And that, like

2    many discovery obligations, but even more so than on the

3    civil side, is fully self-executing on the Government.  It's

4    the Government's responsibility, the Government and we, the

5    entire system, depend on the Government to execute that

6    responsibility faithfully, responsibly, and what concerns me

7    about it is -- there's two issues.

8         There's the prejudice that they identify they got

9    it late and it's obviously very different that the witness is

10   available and there's a lot of components of that and how

11   much prejudice is it, and we have to think about that, and

12   even what would be the proper remedy, if there was a remedy,

13   and I have to think about all that.

14        But the other aspect that it raises is the

15   entire -- what about the discovery process.  Because the

16   entire premise is that you will -- understanding your

17   obligations, go over it, and disclose things that need to be

18   disclosed.

19        And so what -- like what I think when I look at

20   this, in part, that gives me -- that I find very concerning

21   is not -- it's not a du Bey statement only issue in my mind,

22   because it's -- it raises a question in my mind about what

23   else, if anything, there is, because -- you know, I'm going

24   to think about -- I'm not doing anything today, I'm going to

25   take it under advisement and think about it, but what you're

1    telling me is, essentially, that this was either not -- it

2    wasn't anything that you had to disclose at all, in certain

3    instances, or it was just *Giglio* and whatever the -- but one

4    aspect was that the process, to the extent that what happened

5    is you had this interview that was like a serious interview,

6    because you both went and I assume you both didn't go to

7    every interview in this case, or every witness, maybe I'm

8    wrong.

9              MS. KAPLAN:  We did.

10             THE COURT:  I can't hear you.  You did.  All right.

11   So you went to every interview.  So the fact that you both

12   went doesn't suggest that it's more or less important, but

13   you're both there.  It seems to me it is what I described it

14   to be.  You're settled, thoughtful position, after seeing the

15   motion -- after conferring after seeing a motion for

16   sanctions after filing an opposition, coming to a hearing,

17   it's not exculpatory, and so what it gives me pause about is

18   the process.

19             And do I think that's going to lead -- before you

20   get too excited at the back table -- do I think that that

21   leads me to dismissing the case?  I don't, but it gives me

22   pause.  It's a serious issue, I think.  And it's not just --

23   it's the series of events -- and when I say the series of

24   events that transpire with respect to that.  I'm not talking

25   about anything else in the case, just that and that makes

1    me -- that gives me pause.  Now, what would I do about that?

2    To be perfectly frank, I'm not sure.  And you know, one thing

3    they've asked for is I should exclude the whole licensing

4    agreement.

5            On Monday, at the pretrial conference, I'll hear

6    you have both on the argument about whether, separate and

7    apart, neither of you should bring up the sanction issue with

8    respect to the licensing agreement there.  You argue it just

9    on the -- like you would in any other case, as should it come

10   in or not, based on the evidence and the arguments and the

11   law, with respect to that and I'll consider that and I

12   understand you've made your arguments as to why it should be

13   a sanction and I'll consider that.  And I'm not -- I -- the

14   answer is I don't know.  Whether -- the answer is maybe --

15   maybe I don't ever reach that.  Maybe I do reach that and

16   it's not enough.  Maybe I reach that and that's a straw on

17   the scale that weighs in it.  I'm not sure, but don't bring

18   it up on Monday.  Because I have heard about that and the

19   rest turns on the evidence and I want to think about that

20   first with respect to just the evidence or issue, not as a

21   sanction issue.

22           So I'm not sure, I'll tell you one thing that

23   occurred to me as a --  as a response to that.  I'm not

24   telling you I'm going to do this and if I come to the place

25   that I think this is something that I would like might do,

1    then I would have another sealed hearing and raise it with

2    you and give you all a chance to think about.  One of the

3    things that I though about is should I tell the jury, not

4    what -- I mean, there's the request Ms. Silva has and I

5    understand your argument about that, but should I tell the

6    jury how this process works, that there's this exculpatory

7    obligation, that there's this obligation to disclose this

8    exculpatory information on the Government and something about

9    that and let them draw some inferences from that.

10            Because that's the foundation of the trial, is that

11   basically we have an adversarial system, but it's not two

12   complete warriors.  It's the Government has this burden and

13   responsibility to be sure it's fair and that, in the ordinary

14   course, it's self-executing on you to do that.  And I don't

15   inquire about it.  You make your disclosures, it is what it

16   is, but here we have this.  It gives me pause about that.

17   I'm not --

18            To be clear, I'm not just going to issue such a

19   jury instruction, if I were to do that.  I want to think

20   about the whole sanctioning, if that was something that I was

21   thinking about doing, I think you would be fairly entitled to

22   weigh in on whether I should do that, whether it's proper,

23   and even if I were to do something, should I do that, and

24   what should I do.

25            All of those issues and I would certainly give you

1    the full and fair opportunity to do that.  And I don't think

2    at the moment -- now is the moment to do that, only because I

3    want to think about all of these issues, the argument has

4    been helpful.  And I think -- and I want to think about all

5    of these issues and how to proceed, other than at the moment,

6    I am proceeding toward the trial -- in this case it's called

7    a pretrial conference on Monday and I don't see dismissal as

8    the likely outcome of this.  Whatever conclusions I draw

9    about all this, so that is --

10              MS. KAPLAN:  Your Honor, if I may just for a

11   moment, you said just to correct you if you're wrong.

12              THE COURT:  Yes.

13              MS. KAPLAN:  I just want to point out, again, that

14   this meeting on September 2, 2014, was with Appel and Snow as

15   representatives of Crash Line and the defendants.  Jesse du

16   Bey was not there.  So whether we are right or whether we are

17   wrong about that being exculpatory, in our minds, you know --

18   I don't see how somebody who doesn't go to a meeting, who's

19   not a participant, saying he has no recollection about

20   something that happened, could possibly be exculpatory.  The

21   testimony is from Appel and Snow about what happened at that

22   meeting, where they were present, and the fear that was in

23   their mind.  So --

24              THE COURT:  Do you want me to explain it to you?

25              MS. KAPLAN:  Sure.

1          THE COURT:  So first of all, all of what I've just
2     been talking about is not his statement that he didn't
3     recall.  Number one.  I was talking about a different
4     statement.
5          MS. KAPLAN:  Your Honor talking about the decision
6     versus --
7          THE COURT:  No, I'm not talking about that.  First,
8     he's talking about his statement that the way he framed it,
9     which Ms. Barclay said was just about August 21st, was we can
10    have the concert and suffer a picket, or we can pay some
11    union guys and it's an extra cost.  Nowhere in there was
12    anything about we won't have our concert.
13          And you told me, if I recollect correctly, that if
14    the City officials came and said there's a pissed off union
15    and they're going to picket, do whatever you want.  If that's
16    what they did and if there was no implied threat or anything
17    like that, it was just -- and here's your permits, you go
18    have at it, do whatever you want, that wouldn't be extortion.
19    And what his statement -- that's my recollection of what you
20    told me and I think that's an accurate reflection of the law.
21          What his statement is is that they're not -- he
22    didn't think about it as the permits being threatened.  And
23    as to the recollection statement, that he didn't recall, the
24    way you framed the case is here's a company that's a small
25    company and they -- their entire company is about putting on

1   concerts, right?  They're going to a meeting where a couple

2   of days before their concert, if this concert doesn't go off,

3   they're in deep trouble.  And there's some e-mails that

4   they've been -- I think you've even said, or maybe there's

5   e-mails or arguments, were like the company might go down the

6   tubes if they don't have -- if the concert got canceled, or

7   if it's sufficiently unsuccessful, I suppose.

8           I'm fully aware he's not at the meeting and I'm not

9   sure that the statement that he doesn't recall anything about

10  such a meeting is less -- is the most significant of all the

11  different ones that we've been talking about.  But -- and I

12  didn't bring it up, but that strikes me as one, if I were

13  you, I'd want to disclose, because one would think that

14  the -- it's his money.  Like either -- if either all of money

15  is him and Sohn's, or most of the money.

16          In one looking at this, one would ordinarily expect

17  that Appel and Snow are the guys with the idea and they do

18  the work and the New York guy who's in Wall Street or venture

19  capital or hedge fund, and his friend, or whatever, are the

20  ones who put up the cash, or most of the cash.  And so it's

21  quite possible that -- it's theoretically possible that he

22  wouldn't know about a meeting, but where they went to a

23  meeting where they thought that their permits and therefore

24  their whole company was on the line and he doesn't recall it,

25  that is kind of significant, because you would, in the

1    ordinary course, think that the people who were running the

2    business would tell their partners about something that might

3    implode the entire company.  It might not, but it might, so I

4    think it could be exculpatory, but that isn't the one I was

5    talking about.

6            MS. KAPLAN:  Okay.  So -- and I just don't want

7    there to be any misunderstanding.  Between Ms. Barclay and I,

8    we have over 30 years of experience doing this and we do take

9    our discovery obligations very seriously and understand your

10   concerns and I'm not arguing whether it's exculpatory or not

11   and whether it should have been turned over.  It should have

12   been turned over.

13           My point is just more of a factual point.  I just

14   want Your Honor to understand that Appel and Snow were the

15   CEO, the manager, they signed the contracts, they're the ones

16   in the meeting, they're the ones hearing what the defendants

17   are saying.  And, you know, I think what possibly contributed

18   to what our understanding of who du Bey was in this, is the

19   e-mail that Ms. Silva referred to, which was attached as

20   Exhibit D, which is six days after the September 2nd meeting,

21   where du Bey is writing and he says, "We were 'asked.'"

22           Now, there's a reason he puts quotes around "asked"

23   and in my mind, in our mind, that's because it wasn't a real

24   ask, it was a demand, and everybody knew it.  And the other

25   thing, Your Honor, is that the other reason that it was not

1    so -- did not loom so large in our mind is because this

2    notion that they were, you know, looking around for other

3    venues prior to the September 2nd meeting anyway, didn't

4    really need the licensing agreement, is belied by all the

5    other documentary evidence in the case.

6            THE COURT:  That's all about the question, the

7    decision/discussion question.

8            MS. KAPLAN:  Yes.

9            THE COURT:  As to two other points.  One, just to

10   be clear, you are arguing, you being the Government, that

11   it's not exculpatory.  That's not *Brady* exculpatory, that's

12   expressly what's said in the filing.  And that's what's

13   reiterated in the argument and some of it was argued that

14   it's not exculpatory at all.  So unless you're filing

15   something to withdraw that, which I don't think you are, but

16   that's up to you, that's the position you took.  I understand

17   the facts.

18           Just so we're clear, with respect to him saying,

19   quote/unquote asked, assuming that that suggests that what he

20   really means is it was demanded of us, okay, to the extent

21   you have a witness who says -- who is the owner of the

22   company whose property is at issue and who said that one --

23   describes what happened one way as we were -- it was just a

24   choice and we weren't -- our permits weren't at issue and the

25   other way, it's arguably demanded that we do it or else.

1          One of the statement -- they're contradictory with

2     each other arguably and one is exculpatory -- there's

3     certainly not only *Giglio* with each other, but I understand

4     you might not be calling him, but it's exculpatory, because

5     it goes to your theory and he's an owner of the company and I

6     would -- maybe I'm wrong about this, but I would assume that

7     if it's -- or if it's the LLC's property, the question is was

8     the LLC extorted?  I would think that Appel's state of mind

9     is evidence of whether they were extorted.  It may be more

10    powerful evidence and more weighty evidence, because he's the

11    one in all the meetings and he's doing all the things and

12    he's signing the contracts and he's having the discussions,

13    but to the extent that the other owners of the company have a

14    view about this, then their state of mind may be relevant to

15    what the company was doing.

16         MS. BARCLAY:  Just to be perfectly -- I just want

17    to make sure, again, that the facts that we all understand.

18    So the statement that you're talking about is at the bottom

19    of page 3 of the 302.  And in general, they were being asked,

20    requested, suggested to take union labor?  That's the one

21    that is the concern.  And I just -- what he thought would

22    happen if they said no is they would do a loud, ugly picket,

23    and it would be bad for the brand and I just -- again, we

24    flagged this in our brief and I flagged it in the argument,

25    but I just want to be clear that that is about the

1    August 21st e-mail, it's not about the September 2nd meeting

2    that he wasn't at.  And I just want to make sure that --

3              THE COURT:  Now, I understand, (a), factually

4    that's what you're describing happened there.

5              MS. KAPLAN:  One last thing, Your Honor, and then I

6    will sit down.  I think if you had had an opportunity to hear

7    Jesse du Bey on the witness stand, you would see that he

8    really was not very involved at all in the September 2014

9    music festival, which is one of the reasons that we weren't

10   going to call him as a witness, because he really didn't

11   remember and he wasn't the boots on the ground.  He wasn't

12   running the operation, it was Appel and Snow.  And that's why

13   the Government wasn't calling him as a witness, because he

14   really didn't --

15             THE COURT:  I don't have any quarrel that you're

16   not calling him as a witness.

17             MS. KAPLAN:  No, I understand.  My point is, you

18   know, you keep saying, well, he was the owner, he must have

19   known.  He really was not -- I think he would testify that he

20   was not involved --

21             THE COURT:  No, I didn't say because he's the owner

22   he must have known, said with respect to the recollection, so

23   we're clear, that one would reasonably infer, although it's

24   not necessarily the case, that if the entire existence of a

25   company were threatened in a meeting, that this -- the people

1    who were -- the 20 percent owners in running the company,

2    Apell and Snow, right?  That it's reasonable inference that

3    they might tell the people who are the 80 percent owners and

4    the people who put up all the cash, or presumably, I'm

5    guessing, put up all the cash.  That's just with respect to

6    that.

7            But his other statement clearly suggests he's in

8    the loop to some degree.  I'm persuaded that whatever the

9    evidence is, that at the end of the trial, it would be clear

10   and I would be stunned if there's any other evidence, other

11   than Appel and Snow are the ones who dealt with everybody,

12   nobody -- they concede that, I think.  But I'm not -- my

13   statements don't depend on that not being correct.  I think

14   that is correct, from what you've all told me, I don't

15   understand the defendants to have a different view.  But from

16   reading the 302 and the little bit that you all submitted to

17   me, it seems that he was not un- -- utterly uninvolved.  He

18   was involved to some degree, he had an understanding of what

19   was going on.  And so that's why I said what I said.

20           But that said, I'm going to think about it and take

21   it under advisement and I'll see you all on Monday.  Thank

22   you very much.

23           THE DEPUTY CLERK:  Court's adjourned.  All rise.

24           (Court in recess at  12:24 p.m.)

25

1               **CERTIFICATE OF OFFICIAL REPORTER**

2

3

4         I, Rachel M. Lopez, Certified Realtime Reporter, in

5 and for the United States District Court for the District of

6 Massachusetts, do hereby certify that pursuant to Section

7 753, Title 28, United States Code, the foregoing pages

8 are a true and correct transcript of the stenographically

9 reported proceedings held in the above-entitled matter and

10 that the transcript page format is in conformance with the

11 regulations of the Judicial Conference of the United States.

12

13                Dated this 20th day of July, 2019.

14

15

16

17                /s/ RACHEL M. LOPEZ

18

19

20                _____

                  Rachel M. Lopez, CRR

21                Official Court Reporter

22

23

24

25