1

2

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

3   - - - - - - - - - - - - - - - - - - x

4   UNITED STATES OF AMERICA,                    :

5          Plaintiff,                            :    Criminal Action No.
                                                       1:16-cr-10137-LTS-1
6       v.                                       :    1:16-cr-10137-LTS-2

7   KENNETH BRISSETTE, et al.,                   :

8          Defendants.                           :

9   - - - - - - - - - - - - - - - - - - x

10

11        BEFORE THE HONORABLE LEO T. SOROKIN, DISTRICT JUDGE

12

13

**MOTION HEARING**
**SEALED**

14

15

16

Monday, July 15, 2019
1:57 p.m.

17

18

19

John J. Moakley United States Courthouse
Courtroom No. 13
One Courthouse Way
Boston, Massachusetts

20

21

22

23

24

25

Rachel M. Lopez, CRR
Official Court Reporter
One Courthouse Way, Suite 5209
Boston, Massachusetts  02210
raeufp@gmail.com

1              **A P P E A R A N C E S**

2

    On behalf of the Plaintiff:

3
        UNITED STATES ATTORNEY'S OFFICE - MASSACHUSETTS
4       BY:  LAURA KAPLAN AND KRISTINA E. BARCLAY
        John Joseph Moakley Courthouse
5       One Courthouse Way, Suite 9200
        Boston, Massachusetts  02210
6       (617) 748-3124
        laura.kaplan@usdoj.gov
7       kristina.barclay@usdoj.gov

8

9   On behalf of Defendant Brissette:

10      HOGAN LOVELLS US, LLP
        BY:  WILLIAM H. KETTLEWELL AND SARA E. SILVA
11      100 High Street
        20th Floor
12      Boston, Massachusetts  02110
        (617) 371-1037
13      bill.kettlewell@hoganlovells.com
        sara.silva@hoganlovells.com

14

15
    On behalf of Defendant Sullivan:
16
        COSGROVE, EISENBERG & KILEY, PC
17      BY:  THOMAS R. KILEY, WILLIAM J. CINTOLO,
        AND MEREDITH G. FIERRO
18      One International Place
        Suite 1820
19      Boston, Massachusetts  02110
        (617) 439-7775
20      tkiley@ceklaw.net
        wcintolo@ceklaw.net
21      mfierro@ceklaw.net

22

23

24

25

1                **A P P E A R A N C E S,   C O N T.**

2

   On behalf of Defendant Sullivan:

3

        ACUCITY LAW, LLC
4       BY:  JAMES KELLEY
        One International Place
5       Suite 1400
        Boston, Massachusetts  02110
6       (617) 702-4000
        jkelley@acucity.com
7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
1                    P R O C E E D I N G S
2              (In open court.)
3              THE DEPUTY CLERK:  The United States District Court
4    for the District of Massachusetts is now in session, the
5    Honorable Leo T. Sorokin presiding.
6              MS. BARCLAY:  Good afternoon, Your Honor, Kristina
7    Barclay for the United States.
8              MS. KAPLAN:  Good afternoon, Laura Kaplan for the
9    Government.
10             THE COURT:  Good afternoon.
11             MR. KETTLEWELL:  Good afternoon, Your Honor,
12   William Kettlewell for Mr. Brissette, together with my
13   partner Sara Silva.
14             MS. SILVA:  Good afternoon, Your Honor.
15             THE COURT:  Good afternoon.
16             MR. KILEY:  Good afternoon, Your Honor, Thomas
17   Kiley with Meredith Fierro, Bill Cintolo, and Mr. Kelley,
18   James Kelly, for Mr. Sullivan.
19             THE COURT:  Okay.  Good afternoon.
20             So I thought there were a couple of things to go
21   over.  I thought, first, I would just hear you a little bit
22   on the different pending motions, and then we can talk about
23   jury selection and the like, but I've read all of the papers,
24   so I don't need a lot on that, unless there's something that
25   you want to add that's not in the papers.
```

1          I'll tell you, as a general matter, on the motions

2     in limine, a lot of those seem like trial questions rather

3     than resolution now, but I hear you, if there's -- if you

4     want to be heard.

5          MR. KILEY:  I think we do want to be heard on

6     those.

7          THE COURT:  All right.

8          MR. KILEY:  And I do think with what we'd like to

9     lead with is Ms. Fierro arguing the renewed motions to

10    dismiss and then get straight to the motions in limine.

11         THE COURT:  Okay.  Go ahead.

12         MS. FIERRO:  Thank you, Your Honor.  We think that

13    reconsideration is appropriate in light of part 5 of the

14    First Circuit decision in this case.  Now, both the

15    defendants and Your Honor have previously expressed concerns

16    about the reach of the Government's theory, particularly as

17    it applies to public officials.

18         Now, though the First Circuit disagreed with us on

19    the meaning of obtaining, it indicated that we weren't off

20    base in questioning the reach of the Government's theory, but

21    that we were simply focused on the wrong element.

22         Now, of course, we all know that the issue of

23    wrongfulness was not presented in the case before the First

24    Circuit, but they didn't simply drop a footnote saying that

25    they were declining to reach the issue.  Instead, they

1    dedicated an entire section to the discussion of

2    wrongfulness, and I want to particularly turn the Court to

3    the final page of the First Circuit's decision, which I think

4    is really what gives us grounds for pretrial dismissal now.

5            THE COURT:  Go ahead.

6            MS. FIERRO:  The defendants have been charged with

7    threatening fear of economic harm, a type of fear we have

8    explained that is not necessarily wrongful for Hobbs Act

9    purposes.  In fact, just as fear of economic harm is part of

10   many legitimate business transactions, fear of economic harm

11   may also be a necessary consequence of many legitimate

12   exercises of official authority.

13            Now, I think that this sentence is important,

14   because it indicates that it's not necessarily or inherently

15   wrongful for public officials to use economic fear.  Instead,

16   it may be a necessary consequence of a legitimate exercise of

17   an official's authority, and that seems to be contrary to

18   what, at times, the Government has been suggesting in this

19   case.

20            Second, the First Circuit says, "In the end,

21   whether the use of economic fear is wrongful within the

22   meaning of the Hobbs Act extortion provision, turns, at least

23   in part, on whether it was employed to achieve a wrongful

24   purpose."

25            And again, this is important because the defendants

have always maintained that the Government must prove both
wrongful ends and wrongful means, but in particular, wrongful
ends is the most important element, given that this is a fear
of economic harm case.

So then the question becomes, what was the
defendants' purpose under the indictment?  And the First
Circuit answers this question.  The First Circuit says, "The
conduct that is alleged in the indictment here concerned the
use of economic fear by Government officials to secure real
work for members of a specific union and for which the
officials would receive no personal gain."

So the defendants' purpose under the indictment,
that's an uncontested fact, that they were looking for real
jobs for members of the union.  That's taken straight from
the First Circuit's decision, which was taken from
representations that the Government has made to the Court.

Now, of course, the test for wrongful ends is
whether the person who obtained the property obtained it
without a claim of right to it.  Here, the property that's
alleged in the indictment is wages.  And the person who
obtained it, the union workers, obtained it in return for
real work and real services that they provide to Crash Line.
So it seems obvious that someone who got paid wages in return
for work that they actually provided, that they had a claim
of right to those wages and so I think that dismissal is

1 appropriate just under that ground of wrongful ends.

2   Now, I also want to just address a few points in

3 the Government's opposition.  Let me just take that out.

4   So the Government's opposition mostly focuses on

5 wrongful means and they seem to indicate that wrongful ends

6 is not necessarily something that needs to be proven here.

7 And so I'll just start with -- hold on.  Let me get to the

8 right page.  Page 5.

9   The Government says, "The defendants' conduct in

10 this case was wrongful, because defendants had no claim of

11 right" -- and I'll just stop there.

12   Of course, the test for wrongful means is whether

13 the person who obtained the property obtained it without a

14 claim of right to it.  Here, the Government's proceeding on a

15 third party theory of obtaining and so the relevant person

16 who you would ask, if they had a claim of right to the

17 property, is a person who obtained it.

18   Now, the Government is proceeding under a wrongful

19 means theory, based on a test that has been cited in some

20 civil RICO cases and that's whether the plaintiff, or here it

21 would be the victim, had a preexisting right to be free from

22 the defendants' demand.  That question looks at whether the

23 victim has a preexisting right, not whether defendants had a

24 claim of right to demand it.  I'll continue.

25   The Government says that the defendants didn't have

1    a claim of right to bargain with Crash Line, absent such a

2    requirement in Crash Line's licensing agreement.  As we said

3    in our reply, the absence of a requirement does not mean --

4    does not equal a prohibition.

5          Second, and this is something that I know has been

6    briefed before the Court many times and that the Court is

7    familiar with, that absent the City's proprietary authority,

8    pursuant to the *Boston Harbor* case, that we had no right to

9    make the demand.

10         I would just contend that it's a problem for the

11    Government to rely on applying the market exception within

12    machinists -- I'm sorry, machinists preemption.  The

13    Government is relying on machinists preemption to say that

14    it's wrongful.  And of course, we contend that these

15    Government officials do have a right to impose the union

16    requirement, under the market participant exception to

17    machinists preemption, and that is something that comes right

18    from the *Boston Harbor* case.

19         But unfortunately, and this is discussed in many

20    law review articles, the *Boston Harbor* case isn't exactly the

21    model of clarity for applying that test and for what makes

22    someone a market participant.  And so courts -- there's been

23    a wide variety of ways that courts have had held that that

24    test should be applied and general courts have been confused

25    about how to apply the market participant exception.  So to

1    say that if courts are having trouble applying this, I think

2    it's problematic to then say that if defendants don't

3    necessarily understand the difference from when they're

4    acting as a market participant and when it's someone's

5    regulatory authority, that then if they get that wrong, that

6    that's suddenly wrongful and it's a crime, that that raises

7    some due process concerns.

8             And actually, if you'll look at the bottom of

9    page 5 here, there's the footnote.  The Government says that

10   one of the reasons that proprietary authority that the market

11   participant exception doesn't apply is because the use of

12   Local 11 was defendants' brain child and not the result of

13   any authority that they got from the city, that they didn't

14   have authority from higher-ups to do this, but I would just

15   suggest to the Court that that argument goes both ways.  If

16   the Government can't -- if the defendants can't have --

17   impose this requirement because they didn't have a

18   proprietary authority, then how is it that they had authority

19   to issue a regulation on behalf of the City.

20            The Government's third point is that the defendants

21   had no right to make this -- this conduct is wrongful,

22   rather, because they didn't have support of a majority of

23   existing nonunion employees as described in *A. Terzi*.

24            Of course, in this case, the defendants -- there

25   was no demand for Crash Line to sign a collective bargaining

1   agreement.  The demand was that Crash Line would hire a few

2   union members and so I don't think that you need a majority

3   of existing nonunion employees to say that that's okay, in

4   order to hire a few union members.  And again, and that case

5   just has no relevance to us whatsoever, because first, it was

6   about a demand to sign a collective bargaining agreement.

7   And second, it was a force case.  The facts are actually very

8   similar to the facts of the Steel & Rye incident in *Top Chef*,

9   because that case involved there -- a production company was

10  putting on a televised fashion show and Local 1 was upset

11  that they were nonunion, so they came to the fashion show,

12  they blocked the entrances and exits, they were verbally

13  assaulting the production crew, making racist remarks.  So,

14  again, that really has nothing to do with this case.

15        If you'll turn to page 9, the other reason that the

16  Government says that defendants' conduct was wrongful was

17  because the conduct before this Court involves public

18  officials putting pressure on an employer through threats of

19  economic harm, aimed at coercing the employer into entering

20  an agreement to hire members of a labor union.  That is

21  extortion.

22        Well, what that sentence leaves out, of course, is

23  the crucial element of wrongfulness, so they seem to suggest

24  that just by public officials using economic fear that that's

25  necessarily wrongful, or that by someone putting on --

1    pressuring an employer to hire a particular person, that

2    that's inherently wrongful, and there's really no support for

3    that proposition.

4            At the bottom of page 9, another alternate theory

5    of many theories given here of why the defendants' conduct

6    was wrongful, wrongful means, is because it violated the

7    state ethics law.  Now, of course, this has never been

8    mentioned, since the defendants were indicted three years

9    ago.  I believe this is the first time that the Government

10   has cited the state ethics law as a reason for why the

11   defendants' conduct was wrongful, and of course, wrongful is

12   really one of the most important elements of why the

13   defendants' conduct was extortion, so it seems like the

14   Government's just roaming at large here, trying to find a

15   violation.

16           But in any case, the state ethics law, first of

17   all, requires that the defendants' conduct was unwarranted,

18   an unwarranted privilege.  So I won't totally go into it, but

19   we would make the argument that the defendants' conduct here,

20   that there was some justification for it, justification for

21   asking Crash Line to hire some members of the union, given

22   the circumstances where there was going to be a giant wrap

23   blown up at City Hall Plaza, where everyone was drinking

24   during Boston Calling.

25           But more importantly than that 23(b)(2) under

1    Chapter 268A, which is the provision that the Government is

2    relying on here, what that does is it prohibits officials

3    from using their official position to gain an unwarranted

4    privilege for themselves or others.  Now, that sounds a lot

5    like extortion under the color of official right.  And so it

6    seems like the Government is trying to charge us with

7    wrongful use of economic harm, but then rely on the state

8    ethics law in order to get around the requirement in

9    extortion under color of official right, which would require

10   them to prove a *quid pro quo*.  They're trying to basically

11   back-door in conduct that the Supreme Court threw out in

12   *McCormick*.

13            Now, I'll just finally say that on our argument on

14   wrongful ends, that pretrial dismissal is appropriate at this

15   stage, because there's no wrongful ends.  I recognize that

16   the Government has objected to this procedure and that one of

17   the factors the Court has looked to in deciding whether to

18   resolve a pretrial motion to dismiss based on legal

19   insufficiency, is whether the Government has objected.  But

20   here, I can't understand the basis for the objection, at

21   least on a wrongful ends argument, because that turns on sole

22   being uncontested facts, that the defendants' purpose was to

23   get jobs for members of a labor union, real jobs that they

24   would work for.  And so I don't see what's gained by going

25   through a two-week trial, if you agreed with our argument on

1    wrongful ends, for you then to throw the Government's case

2    out on a Rule 29 motion.

3              And of course, as the solicitor general himself has

4    said, people who are indicted on incorrect legal theories are

5    innocent people.  And so if the Government agrees with us

6    that wrongful ends is necessary to support the Government's

7    case and there's no wrongful ends here, and the Court

8    therefore dismisses the indictment at this stage, the Court

9    will have saved the defendants from trying innocent people.

10   Thank you.

11             THE COURT:  Thank you.

12             Ms. Silva or Mr. Kettlewell, do you want to add

13   anything to that?

14             MS. SILVA:  Just very briefly, Your Honor.

15             Ms. Fierro certainly covered our arguments

16   extremely well.  Just to focus on one issue, which is this

17   motion of the overlap between use of -- wrongful use of fear

18   of economic harm and under color of official right.  It

19   seems, from the Government's most recent pleadings, and also

20   from their proposed jury instruction, that what the

21   Government is seeking to do is to supply a missing fact

22   element, when that is a threat, with the fact that the

23   defendants worked for the City when they met with the

24   putative victims' representatives.

25             And specifically, Your Honor, there's clearly no

1    express threat.  There's not one alleged.  There's not an

2    implied threat alleged by any word or action of the

3    defendants themselves.  What is apparently alleged, according

4    to the Government's pleadings, is that the defendants were --

5    had an official position at the time that they met with the

6    putative victim.  And we submit, Your Honor, that using the

7    official position language necessarily requires the

8    Government to also plead and prove all of the elements of an

9    under color of official right case that have been developed

10   by the Supreme Court specifically to protect against a

11   constitutional problem.

12          And that problem is where is the line between

13   perfectly legitimate public official conduct and Hobbs Act

14   extortion.  The line is clear, it is with payment and a *quid*

15   *pro quo* to do an official act.  The Government has

16   represented over and over to this Court that it doesn't

17   allege that, it can't allege that, and so on that basis

18   alone, Your Honor, we submit that either the Government has

19   to prove, allege and prove, that the defendants themselves

20   said or did something, or if the Government wants to rely on

21   their employment status, then they need to prove a payment, a

22   *quid pro quo*, and an official act.  Thank you.

23          THE COURT:  Okay.

24          Anything you want to say, Ms. Kaplan?

25          MS. KAPLAN:  Yes, Your Honor.  First of all, I just

1    want to address this last point that Ms. Silva made, because

2    I wasn't planning on it, but I don't see a single citation

3    for this theory that because the defendants are public

4    officials and the Government has alleged as much in the

5    indictment, that there's any requirement that the defendants

6    be charged under a color of official right theory, and that

7    the Government prove a *quid pro quo*.  There's no citation for

8    it, because that's just simply not the law.

9           Your Honor, this is the third time that this Court

10   is hearing argument on a motion to dismiss based on

11   wrongfulness.  It's the third time that the defendants have

12   argued that the Government cannot prove wrongfulness and

13   there's absolutely nothing new, since the last time we argued

14   these motions.  And for that reason, the defendants' motion

15   should be denied.  There is nothing in the First Circuit's

16   decision in the *Brissette* case that requires dismissal.  The

17   decision dealt solely with the issue of obtaining property.

18   The last few pages of the opinion, which discussed the case

19   in wrongfulness, is not a holding, nor did the First Circuit

20   have the benefit of a full record on which to rule on the

21   issue of wrongfulness.

22          The indictment currently before the Court tracks

23   the elements of Hobbs Act extortion.  It uses the statutory

24   language to describe the offense and it informs the

25   defendants of the specific offenses with which they're

1    charged.  So on the four corners of the indictment, dismissal

2    is not an appropriate remedy, yet I believe as Your Honor

3    alluded to, the defendants are, once again, before the Court,

4    asking you to rely on contested and disputed facts to dismiss

5    the indictment, which is completely inappropriate.

6            On the issue of wrongfulness, the defendants make

7    two arguments.  The first is that even if the defendants used

8    fear of economic harm to obtain wages and benefits for the

9    union, it was not for a wrongful purpose.  The second

10   argument is that Crash Line's desire to obtain a future

11   arrangement for the use of City Hall Plaza does not give rise

12   to a cognizable fear of economic harm.

13           The Government agrees that the Government must

14   prove that the defendants used fear of economic harm for a

15   wrongful purpose, for which the First Circuit has defined as

16   a threat made where the extortionist has no lawful claim or

17   right to the property commanded.  And that's the Cotter case.

18   And I believe the district court in the Cotter case gave just

19   such an instruction.

20           There are several things about the defendants'

21   conduct which make it wrongful.  And because we have multiple

22   theories does not mean that the theories have changed.  It's

23   just that there are multiple things that were wrong with what

24   the defendants did.

25           Generally speaking, what makes the conduct of the

1    defendants' wrongful is that they had no claim of right to

2    the wages and benefits or a contract for union labor and they

3    exploited the victim's fear of economic harm to obtain that

4    property.  As to the defendants' first argument where they

5    claim that the defendants' purpose was not wrongful, the law

6    is not as settled as the defendants would have you believe.

7    The Government is not required to prove that both the means

8    and the ends were wrongful and nothing in *Burhoe* or Brissette

9    has changed that.  In fact, the First Circuit in Cotter and

10   *Sturm* made clear that the Government was not required to

11   prove both wrongful means and ends, that wrongful ends was

12   enough.

13          In *Sturm*, the Court said that it might very well be

14   possible that an economic threat may be wrongful, even if

15   made to achieve legitimate ends.  And in Cotter, the Court

16   said we don't mean to suggest that no economic threat is

17   wrongful where there exists a legal right to the property

18   obtained.  So in other words, an economic threat can be

19   wrongful, regardless of the ends, and there's no requirement

20   that both the means and the ends be wrongful.

21          In any event, defendants' conduct was wrongful,

22   because the defendants simply were not entitled to the

23   property and they knew it.  And there were several ways the

24   Government can show this.  The evidence will show that the

25   defendants had no right to withhold permits or to effect the

terms of the permits or the entertainment license, based on
whether Crash Line used nonunion labor, and they knew it.  It
was wrongful because there was a licensing agreement between
Crash Line and the City, which did not require the victim to
use union labor.  And in fact, it provided that they could
choose labor of their own.  And even the RFPs, which were
issued by the City, did not call for the applicants to use
union labor, and the defendants knew this, as well.

And it was wrongful, because there is a state law,
Mass. General Law 268(a), which prohibits defendants from
using their official position to help the union obtain these
jobs in a contract, and any requirement to use union labor
would be discriminatory regulation.  And the evidence will
show that the defendants knew that, as well.  And the fact
that this may be the first time the Government is arguing it
is irrelevant to a motion to dismiss the indictment, where
the Government is not required to put its theory of the case.

Another way the Government can prove defendants'
conduct was wrongful was because the victims had a
preexisting right to be free from this type of interference
or economic harm, whether it be because of the licensing
agreement, or the Mass. General Law, or the National Labor
Relations Act, which prohibits this type of interference.
This is an area where the defendants were not -- where they
were regulators, they were not proprietors, and they were not

1    free to wade into whether an employer enters into an

2    agreement with the union.  That's an issue that the parties

3    are entitled to resolve without interference.  That's what's

4    contemplated by the NLRA.  These defendants were public

5    officials and they cannot interfere with or require private

6    individuals or a business to enter into an agreement with the

7    union.

8            And on that note, just so there's no

9    misunderstanding, because I think you mentioned something the

10   other day about picketing.  And I just want to say that while

11   threatening to picket is generally permissible, unions can

12   leaflet, they can ask for, and they can say they're going to

13   picket, but threats to picket for the purpose of coercing a

14   private employer to reassign work from a nonunion company to

15   a union company is not permissible under the NLRA.

16           As for the defendants' second argument that the

17   victim's fear that their license would not be extended, not

18   giving rise to a fear of economic harm, they are simply

19   wrong.  The evidence will establish beyond a reasonable doubt

20   that the victim needed certainty about future events, event

21   dates to satisfy their investors, and to book talent.

22   Without this, they couldn't operate in the future, and they

23   would suffer significant economic harm.  There's no question

24   that the -- Crash Line had their dates through 2017, but

25   there's also no question that they were looking for and they

1    were negotiating whether, through an extension of their lease

2    or through the RFP, dates through 2020.

3           It was not just the victim's fear of not obtaining

4    the extension of the licensing agreement or the RFP, it was

5    also the fear that if they did not agree to hire members of

6    IATSE, they would be issued permits for severe restrictions

7    for their operations and the sale of alcohol.

8           Their fear was also that they would not get their

9    entertainment license in time to open the gates for the

10   festival, which was three days away, and for which tickets

11   had been sold.  Their fear was also that they would not have

12   the dates extended through 2020, through either the licensing

13   agreement or the RFP.  And none of these fears or concerns on

14   their part are mutually exclusive.  They all are part of what

15   went into the decision by Crash Line to give into the

16   defendants' demands, their 11th hour demands, that they hire

17   members of the union.  We haven't changed our theory of the

18   case.  All of these fears contributed to the victim's

19   decision to hire IATSE and enter into a contract with them,

20   and they do give rise to fear of economic harm.

21          Your Honor, the First Circuit in the United States

22   versus Dedona, held that in the last analysis, it was for the

23   jury to say, in that case, whether the defendant was seeking

24   a payment for his silence, as the Government contended, or a

25   payment for his services, as the defendants contended.  And

1    the First Circuit in the *United States v. Olbres* also

2    explained that a jury is free to choose among alternative

3    interpretations of the evidence, so long as the jury's choice

4    is reasonable.

5            I think, if nothing else, Your Honor, these

6    arguments highlight that there are legitimate questions of

7    fact in this case, just as you said when we started today and

8    not just legal questions.  These are questions which the

9    Government is entitled to have a jury decide.  We've made all

10   of these arguments in our first opposition to the defendants'

11   motion to dismiss and the Court denied this very same motion,

12   with the same arguments, and that was on May 2, 2017, in

13   which you held that "The allegations in the indictment simply

14   do not permit the Court to decide this motion now, its

15   resolution will depend on the evidence offered at trial and

16   this is a question properly reserved for the jury.  There is

17   nothing new now to warrant dismissal."

18           The indictment adequately apprises the defendants

19   of the charges against them, coupled with the voluminous

20   discovery, and these multiple arguments at these hearings.

21   They know the Government's case and they are well armed to

22   try it.  And we, therefore, ask the Court to deny the

23   defendants' motion to dismiss.

24           THE COURT:  Thank you.

25           MR. KILEY:  I'm not getting up to rebut, Your

 1    Honor, when I started to rise.

 2              THE COURT:  Okay.

 3              MR. KILEY:  I was going to move to a motion in

 4    limine.

 5              THE COURT:  Yes.  That would be fine.

 6              MR. KILEY:  I think that's an appropriate segue.

 7    And it is the motion in limine with respect to the licensing

 8    agreement.  And with respect to that particular motion, it

 9    has morphed, I think -- the position that we take has morphed

10    over time as we think the Government's theories have morphed

11    over the course of time.

12              In our original motion to -- which was filed and

13    pending at the time that you dismissed the case, it had been

14    filed, the request was that you exclude evidence concerning

15    the licensing agreements.  And we didn't properly, at that

16    point in my mind, label it as the irrevocable licensing

17    agreement, because we thought we were only talking about one

18    thing, which was that irrevocable license agreement.  That is

19    a document.

20              It is a document that, in reality, will be

21    discussed in the case.  The argument that we were advancing

22    was one that had a vocabulary issue, in part, but more

23    importantly, it dealt with, as has been argued here and what

24    the segue is, is to the notion of wrongfulness.

25              One -- the third superseding indictment, in

1   paragraph 16, tells you that -- essentially, on

2   September 2nd, while these individuals -- and I shouldn't say

3   it.  It says between July and September, while Crash Line

4   Productions was awaiting certain permits and approvals and an

5   extension of its license agreement, the reality that we

6   addressed in the motion in limine was there was no question

7   about an extension of its license agreement.  They already

8   had everything that they could get under that license

9   agreement and had had it since March of the -- of 2013.

10          The comeback was, well, everybody knows that they

11  had everything they could get under that particular document,

12  but we're using the phrase "generically," as people in City

13  Hall did, as people on the Crash Line sides did, and

14  everybody knew that there was a desire, that they wanted a --

15  permission to operate after the year -- after the five-year

16  period was up.

17          THE COURT:  After 2017.

18          MR. KILEY:  After 2017.  They wanted something --

19  they wanted to be able to operate.  And what you -- what we

20  know from the pleadings that have been filed is what they

21  wanted wasn't an extension of the license agreement, the

22  irrevocable licensing agreement and the terms that were in

23  it.  They wanted something else instead.  And what they

24  wanted instead was a five -- they ask, as described in the

25  Government's papers, was a five-year exclusive, within a ten

1      mile radius, of ticket and events.  And Your Honor, in terms
2      of whether that distinction makes a difference, with respect
3      to the element of wrongfulness that we have been talking
4      about earlier today, it makes a world of difference, because
5      every entrepreneur in every business dealing that ever occurs
6      has a desire to get something.  That is -- that desire to get
7      something isn't a -- is not a fear of economic loss, it is a
8      desire for a particular process.

9            And yes, a threat or violence with respect to such
10     a thing can constitute Hobbs Act extortion, but in this case,
11     we got no threats, we got no violence.  Instead what we got
12     is this novel theory, a novel application of the case law to
13     a fact pattern that is based upon a desire for something in
14     the future and that's what animates the motion in limine now.
15     It is the difference between the two.  We're not -- I'm not
16     standing here today asking you to ban all evidence with
17     respect to the irrevocable license agreement.

18            THE COURT:  What are you asking?

19            MR. KILEY:  I'm asking you to not permit the
20     Government to merge two distinct things under this generic
21     term.  When we're dealing with the irrevocable license
22     agreement and the Government wants to tell you it contains a
23     right for them to determine entirely who they're going to use
24     in terms of labor.  Well, I'll be asking you to look through
25     the document for that, but that isn't controlling -- whatever

1    would be in that document isn't controlling with respect to

2    whether they have, in a future document, that would embody

3    the things that they are asking for, or want to ask for, in

4    September of 2014.  They're two entirely different things.

5         So precision, precision in vocabulary, and not

6    merging, as they merge in the third superseding indictment,

7    the references to Brissette and Sullivan.  They -- in other

8    words, as they refer to it, as you're going to hear with

9    respect to the City Hall motion in limine.  The use of

10   generic terms in this case to things that are very specific

11   is very harmful and prejudicial to the defendants.  And so

12   our motion asks you to limit -- what we want you to do now is

13   to prevent the conflation, if you deny the motion to dismiss,

14   and we proceed to trial as scheduled next week.

15        Again, my reference is to paragraph 16 in the third

16   superseding indictment, between July and September 2014,

17   while company A was awaiting the issuance of certain permits

18   and approvals from the City of Boston required for the

19   September 2014 music festival, as well as an extension of its

20   licensing agreement.

21        The irrevocable licensing agreement is attachment 1

22   to our original motion -- memorandum in support of that

23   motion to dismiss.  It's Document 188-1.  With respect to the

24   rights of Crash Line, there is a section, it's section 4, I

25   believe.  It is 4 that deals with the licensee's

1    responsibilities.  I think that's where you're going to find

2    that the Government is looking to find reference to rights,

3    as opposed to responsibilities.  And the provisions that deal

4    with extension of license, extension of this agreement, this

5    irrevocable license agreement, are on page two through the

6    bottom of the page, when you get a chance to read it.  So

7    that's what we're asking for on this motion in limine, as

8    things have changed, as this case has changed.

9         THE COURT:  So you're not asking me to exclude any

10   evidence right now.  You're just asking me to ensure

11   precision in the -- or difference between the license

12   agreement and the hope for, if you will, extension in --

13        MR. KILEY:  Let me try to clarify.  I am not asking

14   you to exclude evidence and testimony about the irrevocable

15   license agreement, Capital I --

16        THE COURT:  Yeah.

17        MR. KILEY:  I am asking you and I think you should

18   exclude evidence as to something other than what is charged

19   in paragraph 16 of the third superseding indictment and that

20   would be a reference to some other agreement, down the line,

21   that they knew also, unequivocally, undisputed, they already

22   knew they were not going to get as an extension, a simple

23   extension, without going through the RFP process, prior to

24   September 2, 2014.

25        So I think what is happening is we keep injecting

1    new things in what Your Honor and the First Circuit have

2    looked at as a case about whether permits and approvals were

3    needed to conduct the September 2014 festival.  That thing,

4    that noncompetitive, exclusive arrangement that they were

5    seeking to get without going through an RFP process that

6    existed, it should not be admitted in the case.  That's my

7    point.

8            THE COURT:  Okay.

9            MS. BARCLAY:  Okay.  Thank you, Your Honor.  I

10   think part of the problem here is that Defendant Brissette

11   used the term "extension of the license agreement"

12   interchangeably with a "new license agreement."  This is

13   laymen talking about whether they're going to be able to have

14   security for concerts on City Hall Plaza for '18, '19, '20,

15   and beyond.  Right?

16            So they're talking about it in terms of, you know,

17   we have an agreement until '17.  We need an extension of that

18   agreement.  It's not technically a legal extension of that

19   agreement, if they have to go through the RFP process, but

20   even that's not entirely clear.  There's definitely a meeting

21   on July 31st, where the City officials say you're going to

22   have to go through the RFP process, but at that same meeting

23   Ken Brissette says, you know, I'm on the committee, and

24   essentially, there are some subjective factors here.  So they

25   have this -- it's the fear, the victim's fear, that they're

1    not going to be able to get those dates, whether it's called

2    an extension of the irrevocable license agreement that's in

3    place, or whether it's a new irrevocable license agreement.

4    Again, it's a distinction without a difference, and the

5    pleading, the paragraph 16, is generic enough to encompass

6    both.  And that's what the intent of the indictment was.

7          It's not to say that necessarily they believe they

8    were entitled to get three more years in that piece of paper

9    that the defendants have referenced and attached to their

10    motion.  So the evidence regarding Crash Line's need for a

11    long term license agreement to use City Hall Plaza for

12    concerts beyond 2019, that's crucial proof of the victim's

13    fear of economic harm and the defendants' wrongful

14    exploitation of that fear, in order to force Crash Line to

15    hire IATSE workers for the September 2014 concert.

16          The evidence regarding the license agreement, it's

17    highly relevant evidence that both the threat of economic

18    harm inherent in the defendants' crunch time demand that

19    Crash Line used Local 11 for that concert and the victim's

20    fear of economic harm if they did not accede to the

21    defendants' demands.

22          Just in terms of the issue of wrongfulness, I think

23    it bears looking at *Rivera Rangel*, which is the First Circuit

24    case on this point.  The Government will prove what the law

25    requires, that the victim believed that economic loss would

1    result from its failure to comply with the defendants' terms,

2    and that the circumstances rendered that fear reasonable.

3           We're mindful that we must demonstrate that the

4    loss feared must be a particular economic loss, not merely

5    loss of a potential benefit, but that doesn't mean that we

6    have to prove that the victims were entitled to a license

7    agreement beyond 2017.  It's the possibility of lost business

8    opportunities to Crash Line, should the defendants not give

9    them a fair opportunity to obtain a long-term license

10    agreement that falls within the heartland of the fear

11    economic loss required under the Hobbs Act.

12           Whether the victims' ability to use City Hall Plaza

13    was accomplished by a license extension or by submitting a

14    response to the RFP, which they did do in 2015, twice, it's

15    irrelevant.  And any prejudice caused by introduction of the

16    licensing agreement is far outweighed by the probative value

17    of the evidence to the victims' state of mind when they're

18    sitting in Ken Brissette's office on September 2, 2014.

19           THE COURT:  Okay.

20           MR. CINTOLO:  Your Honor.

21           MR. KILEY:  Your Honor, one quickie.

22           THE COURT:  Yes.

23           MR. KILEY:  *Rivera Rangel*, I'd like you to look at

24    it.  I'd like you to look at the passage that is on page --

25    oh, it's under head notes 10 and 11, and I'll quote.  They're

1   describing a situation in which Ventura was merely attempting

2   to obtain preferential access, thought that even without the

3   payments, he would have a fair opportunity to obtain permits.

4          Your Honor, fear is not the same as a desire for

5   preferential treatment.  We have statutory systems in place

6   in Massachusetts on procurements that include places like

7   City Hall Plaza, that require open, fair, competitive

8   processes.  And what was being sought in July, on July 31st,

9   was something different.  It was preferential treatment, not

10  unlike the preferential treatment that they obtained in 2012.

11  Thank you for allowing me that.

12          MR. KETTLEWELL:  Judge, this is like the democratic

13  debate.  So when Ken Brissette's name was mentioned, I'd like

14  just a minute to deal with that and it's this.  The

15  indictment in paragraph 16 says "awaiting an extension of the

16  licensing agreement."

17          When you read the two exhibits, one and two, to

18  that motion, it's the licensing agreement and the only

19  extension they could get and the documents are clear.  It

20  cannot be extended.  It has to be done by RF P.

21          With respect to Mr. Brissette's so-called using

22  different words, well, there's going to be evidence in the

23  case about that.  And here's what the putative victim wrote

24  on July 31st after meeting with Mr. Brissette and Ms. Cusick

25  about this licensing agreement.

1           "Carol and I just met with Ken Brissette (the new

2     Chris Cook)" -- by the way it was the day he met him.  The

3     first day he met him.  "And Marybeth Cusick from City Hall.

4     At this moment, we are unable to extend our current lease

5     agreement.  What we are able to do is change some dates."

6           And I won't read about the exchange of dates to

7     waste -- so I don't waste time.

8           "In January of 2015, they are going to issue a new

9     RFP for dates and events on the plaza.  At that moment, we

10    will be able to submit and secure our festival dates."

11          So it's no question that agreement can't be

12    extended.  They're not awaiting an extension in September.

13    They know in July 31st, they can't get it extended, and

14    that's as simple as it is.

15          That's all I have to say about it.

16          THE COURT:  Okay.

17          MS. BARCLAY:  Okay.  If I could just one quick

18    thing, Your Honor.  The desire for preferential treatment.

19    Again, these are all fact questions, right?  And so this is

20    a -- something that's entirely appropriate for a closing

21    argument, but at this point, not appropriate for exclusion of

22    evidence before the trial even starts.

23          THE COURT:  Okay.  Next motion.

24          MR. KETTLEWELL:  The next two are quick ones, Your

25    Honor.  They're mine.  The first relates to the motion

1    regarding reference to City Hall.  And I understand we're not

2    going to get through the trial without referring to City

3    Hall, but what I am seeking is some clarity in connection

4    with what the Government is saying and who they're saying and

5    who their witnesses are saying did something to them.  And

6    while I thought at the outset, this would be kind of a

7    simple, straightforward motion, I got the Government's

8    response, and they do exactly what I fear they're going to do

9    at the trial.  As part of what the Government said in their

10   opposition of this motion, they said, in fact, when asked

11   how -- this is the victim, felt about the September 2, 2014

12   meeting in which the defendants demanded that Crash Line hire

13   IATSE workers for the imminent concert, Appel told

14   investigators, these guys are my landlords and he believed

15   Brissette and Sullivan could have issued the permits with

16   reduced times that would ultimately lead to the demise of

17   Boston Calling.

18        Well, now, they know and the jury will know that

19   Brissette and Sullivan had absolutely nothing to do with

20   those permits.  Then I looked at the Department of Labor --

21   it's not a 302, it's a 103.  And I go to paragraph 10 and 11,

22   which appears to be the meeting the Government was talking

23   about at the time.  And the report reads, "Appel stated

24   'these are my landlords,' when asked about how he felt in the

25   meeting with City Hall.  Appel said he did not think City

1    Hall would have withheld his permits, but they would have

2    issued bad ones with reduced times and poor hours, eventually

3    leading to the end of the show.  He was worried about

4    blowback on future shows and needing to keep a good long-term

5    relationship with the City."

6            And then he says, "Appel always grouped the City

7    Hall departments together as one entity.  He did not view it

8    as Brissette and special events or Malone at licensing and

9    consumer affairs, but all together."

10           And that's the problem here.  We have an individual

11   charged with extortion.  It's not a color of right case, it's

12   not a RICO case where the City Hall is the enterprise.

13   They're individuals, they happen to be public officials, but

14   for them to speak and the victim to understand that it's all

15   City Hall and to refer to it as all City Hall is hugely

16   prejudicial to this guy and to Sullivan, as well.  And I

17   think that I'm not sure what we can do, but I think that the

18   Court has to instruct and give some instructions to the

19   Government about how they're going to present these witnesses

20   and how this evidence is going to come in.  Because in the

21   final analysis, the jury has got to determine what Brissette

22   said, what Brissette did, and what Sullivan said and did, and

23   not what somebody else -- not what the victim might have

24   believed somebody else might have been doing behind the

25   curtain.  This is not a color of right case.  It's not an

1    official act case.  It's individuals charged with threatening

2    fear of economic harm.  And you're going to learn, there were

3    no threats, there was no fear, but today's not the day for

4    that.

5              MS. KAPLAN:  Your Honor, just briefly.  The issue,

6    in an extortion case is what the victims reasonably believed

7    about the defendants and their demands and it just so happens

8    that in this case --

9              THE COURT:  Do you know whether the defendants

10   intended to extort?

11             MS. KAPLAN:  I'm sorry?

12             THE COURT:  Isn't it whether the defendants

13   intended to extort?

14             MS. KAPLAN:  Well, and it's also what

15   the victims --

16             THE COURT:  Would be evidence of the defendants'

17   intent?

18             MS. KAPLAN:  Yes.  Yes.  But the fact is that the

19   defendants were employed by the City of Boston and the

20   meetings took place at City Hall.  And the Boston Calling,

21   September 2014 festival took place on City Hall Plaza.  So

22   just as with the last motion, the Government, we'll be as

23   precise as we can.  And we're not going to be looking to

24   elicit testimony that City Hall, in quotes, did anything.

25   But we --

1          The victim in this case is entitled to testify

2     about their state of mind.  And I don't think this is going

3     to be an issue.  To the extent that we can ask the witnesses

4     who said what and who did what, we will do that.  I don't

5     think that this is going to be an issue, Your Honor.  The

6     Government is not looking to blow this up into a City Hall

7     case.

8          However, having said that, we are stuck with what

9     the victims in this case, what they believed and what they

10    felt.  What Mr. Kettlewell was just talking about here, those

11    are statements from the victim in this case and we can't

12    tailor their testimony, or change their testimony, but to the

13    extent that we can use follow-up questions of who said what

14    to you, who was there at the meetings, we intend to do that.

15         THE COURT:  Okay.  Thank you.

16         Anything else on that?

17         MR. KETTLEWELL:  Next one.  Your Honor, the next

18    and last motion in limine is the motion with respect -- and

19    this is a redo, to some extent, and I don't intend to argue

20    what we argued before.  I've read your order, I understand

21    your order.  But what I do suggest, Your Honor, is this.  To

22    the extent that the order --

23         THE COURT:  Wait, which one is this?

24         MR. KETTLEWELL:  This is the one -- I'm sorry.  I'm

25    getting ahead of myself.  Too much coffee at lunch.

1          This is the one with respect to statements about

2     illegality and about the -- some of the *Top Chef* evidence

3     related to somebody saying to Mr. Brissette, what you did is

4     not appropriate, or not legal, and some of the other evidence

5     about what he did or didn't do regarding permits in *Top Chef*.

6     Now, I still believe it's apples and oranges, but you -- we

7     covered that and you ruled, but I would suggest to Your Honor

8     that with -- with Appel in particular, the putative victim

9     here, if -- if he doesn't say --

10          Let's just say, when he testifies, he doesn't say

11    that the permits were threatened by Brissette, or he says, as

12    he said to the agents, it was City Hall that I was scared

13    about and not Brissette, then the hook for the admissibility

14    of these statements is common plan.  The hook for the

15    admissibility of these prior statements --

16          THE COURT:  You mean you're talking about *Top Chef*

17    now?

18          MR. KETTLEWELL:  The *Top Chef* statements.

19          THE COURT:  The ones that were the subject of my

20    prior order?

21          MR. KETTLEWELL:  Correct.  Starts to fall away and

22    the connection starts to fall away and as that falls away,

23    the prejudice goes up.  And so my simple suggestion is this:

24    That the Court regulate the order of proof in the case to

25    some degree, and hear Mr. Appel first and understand what he

1  says and what he's going to say about permits being withheld,

2  permits being impacted, about what Brissette and/or Sullivan

3  said or did about permits, before you permit the Government

4  to put in this *Top Chef* evidence, because to the extent that

5  the permit issue starts to wash away with Appel, then I would

6  suggest to you, as I've said, that the relevance hook

7  disappears with respect to the *Top Chef* evidence.  And those

8  statements about prior illegality and whatever conduct the

9  Government appears to want to put in, about what

10  Mr. Brissette said or did in May and June of that same year,

11  2014, becomes much more attenuated.  That's my suggestion and

12  my request.

13            MS. BARCLAY:  Um --

14            THE COURT:  I guess, as a practical question, if

15  you're just calling Appel first anyway, that's doesn't

16  really --

17            MS. BARCLAY:  Yeah, we're not.  Your Honor, we

18  intended to get the *Top Chef* evidence out of the way quickly

19  at the beginning of the case and then move on to the crux of

20  this case, which is what we had said in response to the

21  original motion to sever and to keep out all of the *Top Chef*

22  evidence, is that we don't anticipate it's going to take a

23  long time.  And to the extent -- I think what Mr. Kettlewell

24  is missing is one of the other points in your order, which is

25  that that evidence from *Top Chef* is relevant to why Brissette

1    didn't specifically verbally threaten to withhold a permit

2    when it came to Appel and Snow.  Right?  So it's relevant to

3    why it's an inherent threat, as opposed to a direct threat --

4              THE COURT:  Inherent or implied?

5              MS. BARCLAY:  Implied and inherent, both.  I mean,

6    it's sort of a distinction without a difference as far as

7    this.

8              THE COURT:  But one implies intent and one doesn't

9    necessarily imply intent.  Implied threats would presumably

10   come with intent, because you intended to imply what you

11   implied and inherent threats might be intended and might not

12   be.

13             MS. BARCLAY:  So it's an implied -- an implied

14   threat.

15             THE COURT:  You weren't making that distinction?

16             MS. BARCLAY:  I was not making that distinction,

17   I'm just saying it was not a verbal, direct threat.  And

18   that's one of the points on which you declined to exclude

19   that evidence, is that you found that it would be relevant to

20   why the defendants didn't actually come right out and say,

21   you know, we're going to take your permits or we're not going

22   to give you the license agreement, or anything like that,

23   because at that point, Mr. Brissette was aware that any

24   discriminatory action, not just permits or anything like

25   that, on the basis of whether someone employs union members

1    or doesn't employ union members was inappropriate, and yes,

2    as one witness will say, he said it's illegal to do that on

3    the basis of whether they're a union employee or not.

4            So again, I just point to Your Honor's order, you

5    know, especially on the *Top Chef* stuff.  I did sort of read

6    back through everything and I just want to make clear that we

7    do not intend to ask lay witnesses whether it would be

8    illegal to condition the grant of a permit or a license to

9    use City Hall Plaza.

10           THE COURT:  You're only asking the people what they

11   said to Mr. Brissette or Mr. Sullivan?

12           MS. BARCLAY:  Yes, although we may ask certain

13   current and former City Hall employees whether they have any

14   personal knowledge of a requirement that someone has to use

15   union labor in order to have an event on City Hall Plaza.

16   For example, Mr. Brissette's predecessor in that role would

17   testify that he knows of no requirement.  Again, it's his

18   personal knowledge.  It's not this is well-known or this is

19   illegal, or this is not a legal requirement, and the

20   defendants' can cross-examine him on that issue.  But it's

21   relevant that the person who was in Mr. Brissette's job

22   immediately prior to him knew of no requirement that people

23   had used union labor in order to put on a concert on City

24   Hall Plaza.

25           THE COURT:  Okay.

1          MS. BARCLAY:  So just to be clear.

2          MR. KILEY:  I didn't hear a lot about Mr. Sullivan.

3     And with respect to the order of proof, I don't know that

4     allowing people to talk about what somebody said to Mr.

5     Brissette, even, or what Mr. Cook, who preceded Mr.

6     Brissette, but not Mr. Sullivan, thought about it had any

7     relevance whatsoever to Mr. Sullivan.

8          THE COURT:  Go ahead.

9          MS. BARCLAY:  I can address that, Your Honor, and

10    again, I just point to your February of 2018 order.

11         THE COURT:  The phone --

12         MS. BARCLAY:  Right.  I think what the Government

13    has said in the past is that there is evidence that Mr.

14    Sullivan was at least aware of the *Top Chef* events and

15    that's, I think, as Your Honor held, evidence of those events

16    bears on his knowledge and intent during the interactions

17    giving rise to the charges in this case.

18         MR. KETTLEWELL:  Your Honor, could we just

19    understand what she means by the *Top Chef* events.  I mean,

20    that could mean -- because they talked about a statement to

21    Brissette by one of his fellow colleagues.  There is also

22    conduct by Brissette alleged by the Government with respect

23    to dealing with the production company.  Then there is a

24    riot, more or less -- well, there's two things.  There's a

25    huge and ugly demonstration at the Hotel Revere in Boston on

1    June 5th and then there's a very large and ugly demonstration

2    that was the subject of the *United States vs. Fidler*, where

3    everyone was acquitted in the following week.  So --

4              Excuse me.

5              MS. KAPLAN:  Not everyone.

6              MR. KETTLEWELL:  The guy pled to a misdemeanor.

7              MS. KAPLAN:  It wasn't a misdemeanor.

8              MR. KETTLEWELL:  The jury convicted -- anyway.

9              THE COURT:  You know, in the future, for both of

10   you.

11             MR. KETTLEWELL:  I'm sorry?

12             THE COURT:  You guys in court -- I don't think this

13   is unusual for either of you, but you speak to me.  You want

14   to speak to each other, you can ask for a break.

15             MS. KAPLAN:  I apologize, Your Honor.

16             MR. KETTLEWELL:  Sorry, Your Honor.

17             THE COURT:  Go ahead.

18             MR. KETTLEWELL:  In any event, I think we need to

19   get more clarity and precision about what the events are, so

20   that we know what we're talking about here.  Because some of

21   the people on the witness list are percipient witnesses about

22   what took place at the Hotel Revere and down in Milton and

23   other people are not.  But there are four -- there are three

24   or four of them that might be.

25             THE COURT:  I think I remember, but why don't you

1    tell me?

2           MS. BARCLAY:  Yeah, we briefed this before, Your

3    Honor, and the events at the Hotel Revere and the events at

4    Milton are not part of the Government's anticipated evidence.

5    It's what happened between Mr. Brissette and the production

6    company.  And I believe there's -- I believe there's only two

7    witnesses on this.

8           Right?

9           MS. KAPLAN:  Yeah.

10          MS. BARCLAY:  Right.  I think we just have two

11   witnesses on the particular *Top Chef*, so to the extent that

12   *Top Chef* events -- my use of that sort of expanded it, it's

13   exactly what we told Your Honor before.

14          THE COURT:  Okay.  With respect to those motions, I

15   will think about them.  Just a couple observations about the

16   evidentiary motions, which are that I sort of stand by what I

17   said at the beginning, which is that I think a lot of those

18   issues are issues that I need to hear the questions -- hear

19   the evidence, hear to rule on and -- and then see.

20          To the extent that the motion in limine about the

21   period between 20 -- January 1, 2018 and 2020 and rights to

22   have concerts during that period of time, whatever you want

23   to call that, be it an extension as the indictment says, or

24   an RFP agreement process, or whatever else you want to call

25   it, I think I need to hear the evidence to evaluate it.  I'll

think about it a little more, but I'm just telling you all this, because we're a week from trial and you should be thinking about that.  And you should think about all of that and what follows from that.

The motion to dismiss, I don't have any more questions for you and I'll think about.

Let me talk to you about jury selection, a couple things on that.  First, with respect to the -- it's my practice to read to the jurors a statement of what the case is about before I ask the questions, because I feel, otherwise, they don't know what you're talking about when you ask them the questions.  So I don't think either of you exactly wrote something, or if you did -- maybe you did.  I don't recall.

So anyway, I wrote something, I'll read it to you and if you don't like it, you can tell me what you don't like, whether you don't like my "the" should be an "an" or whatever, but I'll read it to you.  So this is what I was thinking of telling them.

"This is a criminal case.  The defendants Kenneth Brissette and Timothy Sullivan are employees of the City of Boston.  Boston Calling is a music festival held twice each year.  The federal charges in this case arise from events related to the Boston Calling festival held in September 2014 on Boston's City Hall Plaza.  The Boston Calling festival is

1   produced by a company called Crash Line Productions.

2        The International Alliance of Theatrical Stage

3   Employees, Local 11, which you might hear referred to

4   "IATSE," or just "Local 11," is a labor organization

5   representing technicians, artisans and craftpersons in the

6   entertainment industry in Boston, including live theater,

7   motion picture and television production, trade shows, and

8   other live entertainment events.

9        In this case, the Government has charged Mr.

10   Brissette and Mr. Sullivan with two federal crimes.

11   Conspiracy to commit extortion and extortion.  The Government

12   alleges that Crash Line was the victim of these crimes.

13   Essentially, the indictment alleges that Mr. Brissette and

14   Mr. Sullivan insisted that Crash Line hire members of Local

15   11 to work at the September 2014 Boston Calling festival and

16   that they induced Crash Line's consent to their demands by

17   wrongfully using Crash Line's fear of economic harm.

18        The Government alleges that Crash Line's fear of

19   such harm arose from the fact that it was awaiting certain

20   permits it needed for the September 2014 concert and it was

21   seeking an extension of the contract allowing it to conduct

22   future concerts on City Hall Plaza.  Mr. Brissette and Mr.

23   Sullivan each deny the charges."

24        MR. KILEY:  Are you looking for responses now?

25        THE COURT:  Well, for starters, for now.  I mean,

1     we have --

2              MR. KILEY:  A couple of nits, true nits.  I don't

3     think Boston Calling is still now twice a year -- I don't

4     think the festival is twice a year.

5              THE COURT:  Maybe I should just say held several

6     times each year?

7              MR. KILEY:  Well, I think it's one now.  I think

8     it's one now.  It was two at the time.

9              I appreciate the Court's reference to --

10             THE COURT:  How about if I just say it's a music

11    festival held each year?

12             MR. KETTLEWELL:  Yeah.  It's a nit.

13             To the extent that you want to explain to the

14    jurors what IATSE is, I know if I refer to it, I'm going to

15    refer to it as IATSE at some point.  So consider that at some

16    point in the matter.  Those are the two nits.

17             THE COURT:  Don't say IATSE, call it IATSE?

18             MR. KILEY:  I know if I refer to it, that's what

19    I'm going to say.

20             MS. KAPLAN:  I think that's what the witnesses will

21    say, Your Honor.  They'll say IATSE.

22             THE COURT:  All right.  I'll call it that.  I'll

23    use that, as well -- instead of the letters.

24             MR. KILEY:  Those are the nits and I would like the

25    opportunity to further address what may not be a nit, with

1    respect to an extension of a contract, because it isn't what

2    was happening, but you've heard from me on that point.  And

3    Your Honor --

4               THE COURT:  That's what the indictment says, that's

5    why I used those words.

6               MR. KILEY:  I know it does.

7               THE COURT:  I know.

8               MR. KILEY:  And what -- what I'm going to do is

9    order a transcript and I'd like the opportunity, if I see

10   something else --

11              THE COURT:  Sure.  If you see something, either of

12   you can raise it.

13              MR. KETTLEWELL:  Your Honor, I have just one word

14   issue and that is you used the word "insisted" when you --

15              THE COURT:  I took that from the indictment, too.

16              MR. KETTLEWELL:  I'm sorry?

17              THE COURT:  I took that from the indictment, as

18   well.

19              MR. KETTLEWELL:  I understand, but I think it

20   should be demanded, but that would be my suggestion.

21              THE COURT:  Okay.  Do either of you have anything?

22              MS. KAPLAN:  When you said "induced them with

23   wrongful use of fear of economic harm," you said they were

24   awaiting permits, seeking extension of the contract, it

25   actually says "awaiting the issuance of certain permits and

1    approvals," because the evidence will be also about the

2    entertainment license, which was outstanding at the time of

3    the September 2nd meeting.

4            THE COURT:  I thought of that as a permit, as well,

5    but you think of that as an approval, not a permit?

6            MS. KAPLAN:  Well, they needed that in order to

7    actually operate, so that was the key document.

8            THE COURT:  Here's what I'm thinking about.  These

9    aren't jury instructions.  This is what I'm telling them, so

10   that they have -- armed with sufficient information to be

11   able to answer the questions and I don't want to make it

12   too -- I just am wondering, if it fits your purposes, I could

13   put in permits and approvals that it needed.  That's what

14   you're suggesting, right?

15           MS. KAPLAN:  Yes, Your Honor.

16           THE COURT:  I'm just trying to keep it simpler,

17   what if I just said it was awaiting certain authorizations.

18   I mean, it's just one word, but if you want me to say permits

19   and approvals, I'll say permits and approvals.  I mean,

20   that's what the -- fine.  Permits and approvals.

21           MS. KAPLAN:  Either way is fine, Your Honor.

22   Authorization is fine, as well.

23           THE COURT:  Okay.  What about Mr. Kettlewell's --

24           MR. KILEY:  From my perspective, Your Honor, the

25   more precision, the better.

1          THE COURT:  Fine.  So I'll say permits and

2     approvals.

3          What about Mr. Kettlewell's suggestion that it

4     should be "demanded" instead of "insisted"?

5          MS. BARCLAY:  I think Your Honor said that it

6     was -- that it said insisted in the indictment.

7          THE COURT:  It does say insisted in the indictment.

8     I was looking for a word and I looked in the indictment

9     and --

10          MS. BARCLAY:  It's a colloquialism, where at the

11     beginning, at the outset of the case, and it says in

12     paragraph 18, that they insisted that half of the labor force

13     consist of union members.  I don't see anything wrong with

14     using that term.

15          THE COURT:  I'm not asking if it's wrong.  I don't

16     think it could be wrong.  I am just wondering whether

17     demanded would be a better word for the purposes of telling

18     people about what's going on to answer the questions about

19     what this is for jury selection.

20          MS. BARCLAY:  I don't think demand -- I don't think

21     it's necessary at the outset of the case.  I think insisted

22     is consistent with the indictment.  That's what we would

23     agree with.  We don't think that we need to say "demanded,"

24     or the Court needs to say "demanded" at the outset.

25          THE COURT:  All right.  So for the -- a lot of what

1    you both suggest that I'm doing, but -- in the voir dire

2    questions, but not all of it.  And I think the simplest way

3    for me to do this is let me just tell you what -- the topics

4    that I am covering and then if I didn't cover one of your

5    topics, you either know I'm not including it, or you can ask

6    me about it.

7          So initially, I'll be asking sort of the standard

8    questions, if they know all of you and the defendants

9    themselves, and have they ever worked with them, and the

10   like.

11         You'll need to provide me a list of names.  I don't

12   need it today, but I need it for the jury selection, a list

13   of all the people who will be called, or that you both will

14   anticipate calling as witnesses, and if you think there's

15   another person who might not be called as a witness, but you

16   think they're -- given who they are, if a juror knows that

17   person, we should know, you need to put them on the list and

18   I explained the list in that way.  It may be a lot of names

19   and I say the jurors don't worry -- it doesn't mean, because

20   you hear a name, they're being called, but these are people,

21   if you know them.

22         And to the extent they're appearing in a -- some

23   sort of -- have some sort of capacity that relates to the

24   case, if it's like the case agent, you would obviously say

25   special agent and FBI, right?

1          MS. BARCLAY:  Yes, Your Honor.

2          THE COURT:  So it will say that, or what have you,

3   the usual way will be fine.  And so that's the first section

4   of questions.  Then case specific, I'd also -- I'm also going

5   to ask them, in addition to involved or with lawsuits or work

6   with the like with the law firms and the US Attorney's Office

7   and the FBI, or the Department of Labor, I'll ask them

8   whether they have -- I'm just finding it here -- whether they

9   have worked with the union, Local 11.  And have you and a

10  family member, or a close friend ever been a member of,

11  worked for, or dealt with IATSE.  That's how you say it?

12         MS. KAPLAN:  Yes.

13         THE COURT:  I'll ask them the same about Orkila,

14  Crash Line and Bill Kenny.  They know about the case, have an

15  interest in the outcome.  Have you formed an opinion about

16  the case, expressed an opinion, do you have any strongly

17  positive or strongly negative views about any City of Boston

18  employees, or public officials in Boston?  Do you have any

19  strongly positive or strongly negative views about labor

20  unions?  Have you, a family member, or a close friend ever

21  held public office or worked for an elected official.  Are

22  you aware of bias, prejudice, or a reason that would make it

23  difficult serve as an impartial judge of the facts.  Is there

24  anything about the case that would make it difficult for you

25  to do that, have you ever worked for or attended the Boston

1    Calling music festival.  Are you a family member, or a close

2    friend trained or experienced in large event planning or

3    concert promotion.  Did any of you work on or otherwise know

4    about the filming of the reality television show Top Chef in

5    Boston in 2014.

6            And then I'll explain to them the various general

7    principles of law that apply in every criminal case, the

8    presumption of innocence, reasonable doubt, that the

9    Government has the burden of proof, the right not to testify.

10   That they have to follow my instructions and not the laws as

11   they make it up.  That they can't discuss the case with

12   others, they can't do research, post about the case, or

13   anything like that.  They have to serve fairly and

14   impartially and what that means, and would they have any

15   difficulty doing that.  Do they have any religious, moral,

16   political and the like beliefs about sitting in judgment of

17   another person that would interfere, or that they can't

18   consider punishment, would they hesitate to find the

19   defendant guilty because of the possibility I might impose a

20   jail sentence.

21           All of that is pretty standard.  I'm sure you've

22   heard it all before.  I'll ask them about whether the

23   potential juror, family member, or a close friend have been

24   employed by law enforcement agencies, including the FBI,

25   Department of Labor, and the various local more generically

1    local state and federal agencies and corrections offices.

2    They'll hear testimony from law enforcement -- they will or

3    may hear testimony from law enforcement officers?

4              MS. KAPLAN:  They will.

5              THE COURT:  Will.  They will hear testimony in the

6    case from law enforcement officers and they have to weigh

7    that the same as any other witness.  Do they have difficulty

8    following that?  Have you had any dealings with law

9    enforcement, whether favorable or unfavorable, might

10   influence your consideration of the case.  Have you, a family

11   member or close friend been involved in a lawsuit or a claim

12   against a law enforcement, or officer agency.  Have you a

13   family member or a close friend ever been involved in a

14   criminal case in any court as a victim, witness, lawyer,

15   court employee, or person charged.  Prior service, hearing,

16   difficulty understanding English language, physical

17   disability, schedule, we'll come back to in a schedule, and

18   then a catch-all, is there anything else that --

19              Before I hear -- well, we'll come back to schedule,

20   after I hear if you have any issues about any of that.

21              MS. BARCLAY:  I think just one.  I think you talked

22   about whether you or any family member or close friend has

23   held a public office and I think the Government included in

24   its requests also whether you or a family member or a close

25   friend or a member -- or have been a member of a union.  So

1   we would ask for -- you may have already said it, but I --

2            THE COURT:  I didn't ask that question.  I did ask

3   if they have any strongly positive or negative views about

4   unions and I asked them whether they've -- that you, a family

5   member, or a close friend, ever been a member of or worked

6   with or dealt with IATSE.  I don't have a question of just

7   whether you, a family member, or a close friend is a member

8   of a union.

9            MS. BARCLAY:  The Government would ask, just for

10  the same reason, that there's a question about whether you've

11  held public office, it just -- it's a little close to home

12  here and we just want to know about it and be able to ask the

13  potential juror about that issue.  It wouldn't, in and of

14  itself, be disqualifying, but it's something for further

15  follow-up.

16           THE COURT:  I'll think about that.

17           All right.  That's it for you?

18           MS. KAPLAN:  Yes.

19           MR. KETTLEWELL:  Just one thing, Your Honor.  This

20  case has been somewhat highly publicized, both in -- in news

21  papers and on television and the radio.  So I'd ask that you

22  ask the general question, we proposed one, about any exposure

23  to pretrial publicity and whether, if you were exposed, it

24  has any way influenced or made you unable to be fair in the

25  case.

1          THE COURT:  I ask the general question, have you --

2     any of you heard or read anything about this case.  I might

3     have sped over it a little bit, because I ask it --

4          MR. KETTLEWELL:  Or maybe I missed it.

5          THE COURT:  I ask it in every case.  And do you

6     know anything about the case, Mr. Brissette or Mr. Sullivan.

7     And if they answer yes -- so if they answer yes to any of

8     these questions, I'll get to that in a minute, in sort of the

9     jury selection, but then they'll come over to sidebar and

10    we'll ask them follow-up.

11         MR. KILEY:  In our proposed voir dire, we raised

12    issues with respect to applications for permits, interactions

13    with the Government, and whether the experiences in seeking

14    such things from Government, again, generated any kind of

15    response, and I would ask you to -- I don't think that any of

16    the things that I heard captured that.

17         THE COURT:  So I thought about that, Mr. Kiley, but

18    some of that is so broad, like have you ever sought a permit

19    from the Government and we've had a lot of discussions about

20    extensions and agreements, permits and licenses, but I would

21    imagine all of you, for example, have a license from the

22    Commonwealth of Massachusetts.

23         MR. KILEY:  I have one in my pocket.

24         THE COURT:  Right.

25         MR. KILEY:  I have two in my pocket.

1                    THE COURT:  Two.  Right.

2                    MR. KILEY:  And I don't mean --

3                    THE COURT:  I know you don't mean that.

4                    MR. KILEY:  And I don't mean that.  And that's why

5      I frame it in the broad, general sense.  If we've got

6      somebody who has had an interaction with Government, a

7      developer -- a lot of people apply for permits and licenses

8      that are not the run of the mill that every citizen has, or

9      even some -- a lot of people have, so I didn't capture it.  I

10     don't think I captured any of that and I think it important.

11                   THE COURT:  I'll think about that.  Okay.

12                   How long -- if I recall, you said two weeks, plus

13     jury selection.  That's what I remember from last time.

14                   MS. BARCLAY:  That's still the case.

15                   THE COURT:  You both agree with that?  What I'll

16     tell you what I'm thinking about when I ask the question and

17     if it causes you to think about it more now that we're

18     further along, that's fine.  I like to tell the jurors the

19     outermost date.  In other words, if I say to them two weeks,

20     that means to me that they will, irrevocably, receive the

21     case in two weeks or less.  It's fine if it's less.  But so

22     that's -- and telling them this for them planning their

23     schedule, so that when they come up to sidebar and say, well,

24     two weeks is fine, Judge, but in three weeks I'm going away

25     on my preplanned vacation that I'm saving my whole life for,

1    I'm going to say to them, you're good, because you're going

2    to have this case in two weeks.

3            And so, in that sense, just to remind you about the

4    schedule, we'll hear evidence from 9:00 to 1:00, we'll take a

5    break around 11:00 for about 15 minutes, 20 minutes.  I meet

6    with the juror -- I'm sorry, I meet with the lawyers every

7    morning.  We'll start with 8:30.  If -- and the purpose of

8    meeting in the morning is so that we can review whatever

9    issues that you anticipate might be coming up that day and

10   then we can hash them out then.  I might not be able to

11   resolve them for you then, but you've made your arguments and

12   we don't need a sidebar.  I'm not saying that there's never a

13   sidebar, but you've made the argument about some questioning

14   and then I hear the questioning, and an objection, and I

15   heard it.  Unless there's something different, I don't need

16   to have the jurors sit there while we have that legal

17   discussion.  I can have that legal discussion in the morning

18   and then make the ruling once I hear the evidence, once I

19   know what it is.

20           That could vary to 8:15 to 8:45, depending on I

21   really take the lead from all of you, as to what you think is

22   coming up.  And likewise with that, if you think that it's

23   Wednesday and you think on Friday you're going to get to a

24   witness that there's a big issue about and it would actually

25   be helpful to read their grand jury testimony to figure out

1    whatever the issue is, give me on Wednesday or Thursday the

2    grand jury testimony, so I can read it Wednesday or Thursday.

3    So when we come in Friday morning, I've read it, as opposed

4    to hand it to me Friday morning at 8:30, I can't read the

5    whole grand jury testimony and hear you all out and start at

6    9 o'clock.  So --

7            And we'll go until 1:00.  If it's coming upon 1:00

8    and you're done with one witness, call the next witness.

9    Don't like, say, well, it's ten of 1:00, so -- we can't

10   forget those ten minutes.  So that's -- if you think about it

11   that way, given with that, I guess then the question would be

12   how long do you reasonably think it is in terms of telling

13   the jury?

14           MS. BARCLAY:  So Ms. Kaplan just reminded me of an

15   issue that came up last week, I think late last week.  I

16   think the defendants have -- they are not going to stipulate

17   to the admission or to the authenticity of phone records, so

18   we actually have to call a couple of keepers of records that

19   we weren't originally anticipating calling.  So -- and again,

20   I'm not sure -- we filed a notice of a 1006 summary to try to

21   do that quickly and not have a witness on the stand for days,

22   but I think the defendants intend to cross-examine and

23   potentially ask for additional witnesses on this issue, so

24   that could bring it beyond the two weeks.

25           THE COURT:  Does that add another day?

1         MS. BARCLAY:  I think that's probably a reasonable

2    estimate of time.  But again, I don't know.  I don't know

3    what they intend to do.

4         THE COURT:  So in terms of if we pick the jury on

5    Monday and let's just say we got all the jurors on Monday,

6    then we would do opening statements and preliminary

7    instruction on Tuesday, and start the evidence on Tuesday.

8    So originally, I would say two weeks.  That would be four

9    days that week, five days the following week, one day the

10   following week would be August 5th, I think.  So for

11   evidence.  So what you're saying is, best estimate, tell the

12   jurors that really, that they receive the case on the 6th or

13   the 7th?

14        MS. BARCLAY:  That's the Government's best

15   estimate, yes.

16        THE COURT:  Do you agree with that?

17        MR. KETTLEWELL:  I think it will be shorter, but

18   that falls within your exception?

19        THE COURT:  Right.

20        MR. KILEY:  Did I understand that to be the

21   Government's case?

22        THE COURT:  Well, I'm thinking about the whole

23   case?  In other words, what I'm thinking about now is --

24        MR. KILEY:  You're thinking about the whole case.

25   And I'm just not sure whether that's the way the Government

1    responded.  If that's --

2            THE COURT:  I understood them to mean that that's

3    what they anticipated for their -- presentation of their

4    evidence.  What they anticipated as cross-examination and

5    whatever they understand about your case, what they

6    anticipate the time for your case?

7            MS. BARCLAY:  That was my response, but again, it's

8    difficult for us to determine, based on how many witnesses.

9    But I think that's what we discussed last March, is that, I

10   think that's what the parties had agreed, but I could be

11   wrong.

12           MR. KILEY:  Again, speaking practically, I think

13   it's conceivable that we would go -- I think we will finish

14   within that time period, but if you want to give people a

15   maximum because of their lifetime travel trips, weekends

16   matter, and to me, it's conceivable that we'll get into --

17   that they'll have to come back the beginning of --

18           THE COURT:  What I want to be able to tell them is

19   when they'll receive the case.

20           MR. KILEY:  Yeah.

21           THE COURT:  So what I guess I'm hearing from all of

22   you is I should tell them they can receive the case between

23   the 5th and the 9th of August.  I will have to pick a date,

24   but that's -- within that time frame.

25           MR. KILEY:  I agree.

1          THE COURT:  All right.  I just want to make a note

2     of that.  Okay.

3          Let me just go over how we'll pick the jury.  First

4     of all, how many -- there will be 12 jurors.  How many

5     alternates do you both suggest?

6          MR. KETTLEWELL:  I would say two, Your Honor.

7          MS. BARCLAY:  The Government would say three.  We'd

8     err on the side of just where we're getting into that third

9     week there.

10          THE COURT:  What do you say, Mr. Kiley?

11          MR. KILEY:  No view.

12          THE COURT:  Okay.  All right.  I'll probably seat

13     three.

14          So that would mean -- the next question is, under

15     the rules, we do two rounds; the jury and the alternates,

16     unless you all agree to do it as combined.  That's up to all

17     of you.  I'm not going to do it as combined -- when I say

18     combined, what that means is we -- if we do it in two rounds,

19     there's 12 and they're the jury and the next three are the

20     alternates.  And then you exercise the strikes you get for

21     the jury, on the jury.  And then separately, you exercise the

22     strikes you get on the alternates on the alternates.  If we

23     do a combined, you get to combine your alternate and jury

24     strikes together and I'll just sit 13 -- 15.  Sorry.  15.

25     And you can just combine and we'll do it and the three

1   alternates would be the last three seats, so to speak.

2            MS. BARCLAY:  The Government takes no position.  We

3   would agree if the defendants agree.

4            THE COURT:  Okay.

5            MR. KILEY:  We're in agreement.

6            THE COURT:  To what?

7            MR. KETTLEWELL:  To combine.

8            THE COURT:  To combine.  Fine.  All right.  I think

9   it's simpler, but not everybody agrees.

10           Okay.  So then this is how it will work.  I go over

11  it, so -- and if you have any questions, just ask.  Because

12  I'd rather you ask questions now, then tell me after we're

13  done or in the middle of it, that, oops, you did it wrong,

14  because I'll be less sympathetic then, because I'll have told

15  you about it now.

16           So the venire will come in.  I give them a little

17  introduction, which is pretty standard, and I say pretty much

18  the same thing in every case.  And then I'll read them the

19  statement that I read to you.  And then I'll begin to ask

20  them all the questions that I read to you, we talked about.

21  And each time we ask a question, we'll ask the jurors to tell

22  us their juror number, which will be between one and however

23  many jurors we have.  Okay.  And they will be sitting in the

24  gallery.  Juror number 1 will be sitting in the row closest

25  to the bar, to my far left, and they'll be going all the way

1    across, one to -- I think it's five -- 20.  I think it's

2    five, all the way across, it will be one to 20 in the first

3    row and across to the second row on my far left number 21 and

4    across like that.  And you'll get the list, you all have seen

5    it before, listed one to whatever number we have.

6              And so on the first question, do they know the

7    lawyers for the Government.  And if somebody raises their

8    hand, I'll say, okay, you're juror number 12, or what have

9    you, and so you'll all know that.  And I'll -- on my list,

10   I'm keeping track of that, that they answered yes to question

11   one.  And we'll go through that until I'm done with all the

12   questions.  And then when I'm done with all the questions,

13   one by one, call the people up to sidebar.

14             The people who did not raise their hand -- so if

15   juror number one answered yes to that question, we call them

16   up, we'll ask about it.  If juror number 2 never answered yes

17   to any questions at all, I will ask juror number two if

18   there's anything that they want to come up for, because I'll

19   tell people at some point in this process, if you don't raise

20   your hand, but you have something you want to bring to my

21   attention, you can come up.  So usually to my experience, the

22   people who didn't raise their hand say they pass, but once in

23   awhile someone -- either they thought of something or what

24   have you, so they'll come up.  And we'll go through them one

25   by one, asking the questions at sidebar.

1          I will initially ask the questions of whatever is

2    related to -- brought them up to sidebar.  If -- I will then

3    give all of you the chance to ask follow-up questions related

4    to the things that brought them up to sidebar.  So it's not

5    the chance to ask them about some other thing that's totally

6    unrelated, but reasonable follow-up related to the questions

7    that brought it up, that brought them to sidebar.  And if you

8    think that I didn't ask -- they answered yes to question 22

9    and I didn't ask them about question 22, feel free to say,

10   Judge, they also said yes to question 22, and I'll ask them

11   about that and then --

12         And then when we're done with that process, I'll

13   send the person back to the audience.  At that point, before

14   I bring the next juror up, is when you should make a motion

15   to strike for cause, if you wish to strike the person for

16   cause.

17         MR. KILEY:  Would you repeat that, Judge, at which

18   point?

19         THE COURT:  Yes.  That is we're done with the --

20   I'm done with my questions, all of you lawyers are done with

21   your questions to the juror.  I will say to the juror, thank

22   you very much, have a seat.  And then -- and I'm not going to

23   like bring the next one up before you get the chance, I will

24   give you the chance, but then, before the next one comes up,

25   before I call the next person, that's when you should make

your motion to strike.  And then I will hear you then, I'll

decide then, either to strike them or not.  Or sometimes I'll

call the person back for more questioning, if I think that

will be helpful.  But that's when they're fresh in my mind,

that's when it's the easiest opportunity to ask further

questions, if necessary.  They go back and sit down, we get

to the next one, I'm done with that juror.

I will tell you that there are occasions when I

will say about somebody, this is mostly about scheduling.  If

someone has a scheduling issue and I might say to you, I'm

thinking about excusing them, but I'm kind of reserving,

depending on how many people have scheduling problems, in

which case, when we get to the end, I'll come back, and then

we can talk about that person and that scheduling issue then.

But usually -- but make it then and I'll rule then, unless I

tell you otherwise.

MR. KILEY:  Do you anticipate that counsel will

be --

THE COURT:  Counsel will be at sidebar the whole

time.

MR. KILEY:  And we'll make our motions from there?

THE COURT:  Yes.  In other words, we'll just come

up to sidebar.  The first person will come up, I'll talk to

them, send them back.  Second person will come up, send them

back.  You can have your clients there, if you wish, but they

1    don't have to be there.  That's up to you.  And so -- but

2    they obviously don't ask the questions.  So it will be a

3    little crowded, but we'll make it work.

4            So we'll go through them one by one, until, if I do

5    my math right, it will be 15 jurors.  So we're three -- how

6    clever, three.  And so three alternates gives you each two

7    extra strikes.  So -- all right.  So then we'll go through

8    the venire, until we have a few more clear -- I think that

9    means we would need 35 cleared jurors.  So we have a few more

10   than 35 cleared, just in case something comes up after we --

11           So once we're done with that, that might take us

12   through all the people in the room and maybe this is easy,

13   it's summertime, and everyone wants to be on a federal jury,

14   and maybe it doesn't.  So when we reach that point where we

15   have enough cleared, then I'll stop.  I don't see the point

16   of bringing more people up to sidebar, once we get to a few

17   more than that.  And then the next part --

18           So the next part -- so once we have enough cleared

19   people, I'll seat 15 in the box, because we're doing

20   combined.  And I will ask each juror to -- each potential

21   juror to state just what does he or she do for work.  If he

22   or she is retired or doesn't work, what they formerly did.

23   If they live with a partner, spouse, significant other, or

24   something similar, what that person does for work.  And so

25   you get to hear, at least -- because some people won't have

1    come up.  You'll get to hear something from everybody.  And

2    it will be the same thing and we'll just go through the line

3    for the first 15.

4           And then we'll go -- we'll do -- I'll give you a --

5    some time, probably not as much as you want, but some time to

6    review everyone, what you want to do.  And you'll come up to

7    sidebar and the first round, Government/defense.  And I have

8    a question for the defendants, but we'll come back to it.  So

9    the first round, Government/defendants.  And we're -- if this

10   were one defendant, it would be Government makes one strike,

11   defendant makes two, back and forth, until you're even in the

12   number of strikes and then one and one.  In the first round,

13   you strike no one or everyone, whatever you want.  And then

14   when you both tell me you don't want to exercise any more

15   strikes on the people on the box, I'll excuse the people in

16   the box you struck by either side, just to send them on their

17   way.  And then I'll fill the next seats, just the empty

18   seats.  And then I'll ask just the new people to answer the

19   same question and then we'll do round two.

20          Round two we'll start with the defense --

21   defendant, Government, back and forth, but no back strikes.

22   So in round two, you can only strike the new people in the

23   box and we'll go back and forth like that and then I'll

24   excuse those people, round three, Government goes first in

25   round three, back and forth, but again, no back strikes.  So

1   the universe of people you can strike in each round is

2   getting narrower.  And then either when you say you don't

3   want to make it -- no one has any more -- either is out of

4   strikes or doesn't want to exercise any more, we're done.

5          The way I will call them up is juror number 1

6   first.  So I'll start with the people being seated by -- in

7   the jury box, juror number 1, juror number 2, juror number 3

8   was excused, so then I'll go one, two, four.  Like that.  And

9   if the first 15 people were cleared for cause and they'd be

10   the first 15 jurors and then juror 16 to 20 had been struck

11   for cause, when -- the next person in the box would be juror

12   number 21.

13          Is that clear?  I don't think I'm the only one who

14   does it this way.  Okay.

15          So -- and once we're done, we're done with that,

16   then I'll send everybody else on their way.  Maybe I'll --

17   depending on what other trials are going on, I might send

18   some of the people back, once we clear enough, I might send

19   them back earlier, but you don't really care about that, I

20   don't think.

21          Okay.  So are you exercising your strikes jointly?

22          MR. KILEY:  We haven't talked about it.  I think

23   so.

24          MR. KETTLEWELL:  Yes, Your Honor, I think we will.

25          THE COURT:  Okay.  All right.  Fine.

1          All right.  Any questions about any of that?

2          MS. BARCLAY:  Not from the Government.

3          MR. KILEY:  I just have one housekeeping.

4          THE COURT:  Sure.

5          MR. KILEY:  Is the courtroom going to be open to

6     family?

7          THE COURT:  Of course.  The courtroom is not

8     sealed.

9          MR. KILEY:  Are they going to interfere with the

10    seating arrangement to --

11         THE COURT:  No, so what they'll do is we'll --

12    people who want to be here, whether it's the press, the

13    public, family members, we will -- I'll work with Jim McAlear

14    of the jury clerk, to be sure that there are at least some --

15    the doors remain unlocked the whole time, obviously, and

16    there will be some seats, at least, for people.  If --

17         You know, there is the possibility, but I'm not

18    sure -- I could issue -- there are a couple courtrooms on the

19    end that are a little bigger and they have like I think

20    another row or two, with a few more seats, I could possibly

21    move there for just the jury selection.  We can think

22    about -- I'll think about that.

23         MR. KILEY:  But there's no preconceived place where

24    they're going to be?

25              THE COURT:  Not yet, but I'll work on that and I'll

1    tell you.

2              MR. KILEY:  Okay.

3              THE COURT:  Okay.  Anything else?

4              (The Court and the law clerk confer.)

5              THE COURT:  All right.  So preliminary

6    instructions, let me just talk to you briefly about that.  A

7    lot of what -- what I typically say in criminal cases is two

8    things.  One is just what's evidence, what's not evidence.

9    It's pure boilerplate.  I'm not going to sit here and read it

10   to you, you won't find it exciting, and if you're really

11   interested, you can pull the transcript from almost any other

12   criminal case, and it's the same.  It just tells them what is

13   and isn't evidence, that lawyers have a duty to object, but

14   you know what's evidence, not the lawyer's statement, it's

15   the question and the answer, things like that.

16             And then there's -- sometimes I would tell them

17   something of the elements.  What I'm thinking of here, but

18   I'm just thinking about it, and I want to know what you

19   all -- you all can weigh in on this, is simply saying

20   something like this:  They're charged with two crimes,

21   they're -- one is conspiracy to commit extortion, one is

22   extortion.  Here's the elements of what extortion is and I'm

23   going to give you the further detail and the final

24   instructions about obtaining and wrongfulness and economic

25   harm and all of those things that you've submitted jury

1    instructions on about which you disagree, in greater detail

2    later, and you should pay attention to those.  I anticipate

3    the evidence will focus a lot on those concepts or evidence

4    related to those legal concepts.  It gives them some picture

5    of what it is, but -- so that's what I'm thinking about.

6            I'm open to -- I know you've -- I think the defense

7    has requested more.  So anyway, that's what I'm thinking

8    about.  You can comment about that if you wish.

9            MS. KAPLAN:  That's fine with the Government, Your

10   Honor.

11           MS. SILVA:  Your Honor, we did ask for a little bit

12   more.  And that's on this issue of wrongfulness that we've

13   identified.  I know we talked about it briefly today, we've

14   briefed it.  The issue that we see is this juxtaposition

15   between wrongful use of fear of economic harm and under color

16   of official right.

17           We think it would be helpful to orient the jury to

18   say what the defendants have not been charged with, because

19   in light of the overlapping, what I will say, theories that

20   the Government has put forward, I think it's important for

21   the jury to know, for example, the defendants have not been

22   charged with accepting any payment.  The defendants have not

23   been charged with agreeing to take any official act.  We

24   presented a proposed jury instruction to you on that ground.

25   I appreciate it may be longer than the Court might be

1    inclined to do as a preliminary basis, but we do think it's

2    important to orient the jury before the jury begins to hear

3    evidence what precisely the defendants have been charged

4    with, understanding as we do, the jury won't, obviously,

5    understand this at this point, but as we do, that the

6    defendants have not been charged with an under color of

7    official right extortion case.

8               THE COURT:  Okay.  I'll think about that.  I'll --

9    I think I'm inclined to tell you all more --

10              Yes, go ahead, Mr. Kiley.

11              MR. KILEY:  I just want to flag that I am

12   anticipating perhaps filing another requested preliminary

13   instruction.  I haven't filed it yet.

14              THE COURT:  All right.

15              MR. KILEY:  And I am anticipating -- I am planning

16   on conferring with the Government on another motion, but we

17   have, again, not filed.  There are a couple of open issues

18   that I'm not prepared to address today, because I haven't

19   done the filings.

20              THE COURT:  Fine.

21              MS. KAPLAN:  Your Honor, just on that last issue, I

22   think the Government would object to that.  I think that's

23   going to be extremely confusing to talk about --

24              THE COURT:  I'm sorry, which -- about what

25   Ms. Silva has said?

1          MS. KAPLAN:  Yes, what Ms. Silva said.  To talk

2     about a charge that the defendants are not charged with.  I

3     mean, we can come up with ten other charges that they're not

4     charged with.  So I think it's confusing, I think it would be

5     prejudicial.  The defendants can certainly talk about it in

6     their opening, I suppose, and certainly in their closing.

7          THE COURT:  I will think about it.  I think that

8     the way I think about the sort of preliminary instruction on

9     the charge is that it should be helpful to the jurors who

10    aren't as familiar with this area of law and what they're

11    going to hear, to help them understand what it is that

12    they're hearing in the course of the trial and why they're

13    hearing, to some degree, what they're hearing.

14          So I think that I will probably, with respect to

15    the preliminary charge, not the whole thing, but the part

16    about the elements and the like, read that to you Monday

17    after you pick the jury, but before you do your openings,

18    just so you know what it is, because I don't think that the

19    rules necessarily require that, but I don't know that they

20    speak to that, and you'd have that to think about.  But the

21    framework of what I'm thinking about is what I described to

22    you.

23          There was another motion I haven't addressed that

24    the Government filed, I think, Friday, about certain *Top Chef*

25    evidence, wanting to keep it out.  So you can respond to it

1    now, I can give you a little bit of time to file something if

2    you want to later in the week.  That's fine.  And then --

3         MR. KILEY:  That's what we had anticipated doing,

4    filing.

5         THE COURT:  Fine.  When do you think you'll file?

6         MR. KILEY:  When you tell us to, and we propose

7    Wednesday.

8         THE COURT:  Wednesday is fine.  End of the day

9    Wednesday.  Okay.

10        All right.  I don't think there are any other

11   motions?

12        MR. KILEY:  None pending.

13        THE COURT:  Okay.  All right.  Monday, the last

14   word I'd heard was we'd have jurors at 9:30, so I think we

15   should meet at 9:00, if these other -- the pending motion or

16   if the -- whatever you're going to confer about leads to

17   something else.  If we need another hearing, you can ask for

18   it, or I'll schedule one.  Otherwise, I'll see you Monday.

19        MR. KETTLEWELL:  Judge, can I just take up a few

20   housekeeping matters, just so we're all on the same page?

21        THE COURT:  Yes.

22        MR. KETTLEWELL:  In other cases I've had, tried in

23   this court, not yours, but other judges, there is a

24   notice requirement -- well, not a requirement, but an ask by

25   the Court that the Government tell us 36 hours in advance who

they're calling, and that would facilitate, obviously, a

meaningful discussion at 8:30 in the morning before you,

because we would know who's coming, we would be prepared and

we could address the concerns, the issues, the objections and

all the legal issues that flow from that.  So I would ask

that the Court consider that.

Secondly, just some guidance from the Court on the

numbering system for the exhibits so that we do it the way

you want it done.  Everyone in the building has a slightly

different view on it and I want to make sure we do it the way

that you wish --

THE COURT:  So as to the numbering, the most

important thing to me to the numbering is that they're

accurately numbered and uniquely numbered.  The view of like

sequentially numbered as they come into evidence, one to

whatever, versus you premark your exhibits as 1 to 100 and

you go 101 to 200 and only some subset of those 200 exhibits

comes into evidence, that's also fine with me.  I intend to

explain to the jury whether -- however you do the numbering,

that the numbers mean nothing other than a method of

referring to the documents and they don't have any -- the

numbers have no significance.  So I suggest the two of you,

in the first instance, work it out.  The biggest issue for me

is I don't want to waste time in the courtroom with the jury

marking the exhibits and putting stickers on and numbering

1  them.  You should -- that may come up with a particular

2  exhibit that someone didn't anticipate or something, but

3  generally, you should have them premarked.  And I don't care

4  if you use two numbering systems like Government and

5  defendant or you use one sequential.  I will, either way,

6  tell them that there's like all the evidence is relevant to

7  whatever consideration and the numbers don't have any

8  independent significance.

9          MR. KETTLEWELL:  We'll work that out, your Honor.

10          THE COURT:  As to the time, that seems reasonable,

11  it's what typically happens.  I don't know if you've talked

12  to the Government about that or not.  Just about the notice

13  on each side of who's being called.

14          MS. BARCLAY:  Your Honor, it's generally been my

15  practice and I don't know what the Court -- but to give, at

16  the end of each day, the next three witnesses, and that

17  generally takes you -- just a 36-hour requirement seems a

18  little bit set in stone and difficult to predict, but

19  certainly at the end of the day, we can tell the defense who

20  we anticipate the next three witnesses will be, which should

21  carry us through the next day.  If it's not going to, then

22  we'll definitely ensure that they know who the next witnesses

23  are for the next day.

24          THE COURT:  So I think you at least have to tell

25  them who they are for the next day.

1        MS. BARCLAY:  Certainly.

2        THE COURT:  Because otherwise, three -- I

3   understand three could be three days, three could be an hour.

4        MS. BARCLAY:  Right.

5        THE COURT:  So if it's an hour, that doesn't

6   really --

7        MS. BARCLAY:  We're not going to be in a position

8   where we are getting to five witnesses in one day and have

9   not told the defendant who the fourth and fifth witnesses

10   are, that's just not our practice, so --

11        THE COURT:  You want more than the day before

12   notice?

13        MR. KETTLEWELL:  Judge, I just want to know who's

14   coming up the next day, really.  And that way we can, as I

15   say --

16        THE COURT:  If you're content with that, then fine.

17        MR. KETTLEWELL:  I would prefer 36 hours, because

18   then it keeps us on track, but, you know, I --

19        THE COURT:  So in the first instance, I'm going to

20   leave it to all of you.  My suggestion is this:  This is

21   not -- a lot of the evidence is not a secret.  So I would

22   suggest you tell them like two days, because I think it will

23   be more practical and will run more smoothly, but at the

24   moment, I'm not ordering you to tell them two days in

25   advance, but they're going to know everyone, anyway, and you

1   already told them one or two days right now and so I'll leave

2   that in the first instance to work out.  I think I issued a

3   sequestration order before the last trial, but if I didn't, I

4   assume you all want that, accepting the case agent?

5           MS. BARCLAY:  That was the one request that we had

6   was the case agent.

7           MR. KETTLEWELL:  No objection.

8           THE COURT:  Right.  You don't object to that,

9   Mr. Kiley, do you?

10          MR. KILEY:  Oh, I don't.

11          THE COURT:  So the case agent is accepted and all

12  of the other witnesses are sequestered and all of you on both

13  sides have to enforce that, because I don't know who these

14  people are.

15          MS. BARCLAY:  And just one housekeeping matter,

16  Hannah Beller is a paralegal with our office, who will be

17  sitting at counsel table, if it's all right with Your Honor,

18  to operate the equipment and things like that.

19          THE COURT:  Sure.  Yes.  I actually prefer that.

20          MR. KETTLEWELL:  And Your Honor, finally, is there

21  a time this week -- and we can work this out with your clerk,

22  that we can have our person who's going to operate the

23  equipment come in and just make sure that everything is

24  working, so that we're --

25          THE COURT:  Just work that out with Maria, there

1    will be plenty of time this week to do that.  That reminds me

2    of one more thing.

3              (The Court and the clerk confer.)

4              THE COURT:  So you have to decide if you all want

5    to use JERS -- I think she's used JERS before in my

6    courtroom, am I --

7              MS. KAPLAN:  Oh, yes.

8              THE COURT:  But you should work with each other,

9    because either it goes in with all the evidence, the JERS, or

10   it doesn't go in.  And there's both the evidence on it, but

11   there's a list of what is the evidence, kind of like the list

12   that Maria takes of each exhibit with the description, but

13   you all need to sign off on the descriptions if it's going to

14   to go back, because the jurors will see the descriptions.  So

15   I don't want to have someone later saying I didn't like that

16   description, I want to give you the chance to address it and

17   have it be satisfactory to everybody.

18              So you can work together on that.  Because at the

19   end, what -- the paper exhibits, it would be helpful for me

20   to have two sets, if there are a lot.  I take it there are a

21   fair number of documents.

22              At the end, what I would want to give the jurors is

23   a set of the paper exhibits.  And if we give them JERS, JERS.

24   And you all -- just pretty standard, you all agree on the

25   record before it goes in that these are the things that are

1    going in.  But to the extent you can get JERS done along the

2    way, or the paper exhibits, so we don't -- once they go back,

3    they're going to be like itchy for all of those things, it

4    will be nice to have it all done and take care of it in five

5    minutes, rather than scramble for a while to do it, but I'm

6    sure you'll be able to take care of that.

7            Anything else?

8            MS. KAPLAN:  Just a simple question.  Where do the

9    witnesses --

10           THE COURT:  Over there.  Unless there's a specific

11   reason to do it differently, but I don't think there is in

12   this case, so over there.  And generally, examining the

13   witness from over there.

14           Any other?

15           MR. KETTLEWELL:  Do you have a rule about length of

16   openings, Your Honor?

17           THE COURT:  Oh, yes.  How long do you all want to

18   open for?  Thank you for reminding me about that.

19           MR. KETTLEWELL:  Well, I think Mr. Kiley and I have

20   been talking and we've been working together.  We would like

21   a collective amount of time of an hour and a half.

22           THE COURT:  How long were you planning to do?

23           MS. BARCLAY:  30 minutes.

24           THE COURT:  That seems long, an hour and a half.  I

25   mean -- so I don't -- in answer to your first question, I

don't have a rule across all cases.  My typical practice is

to ask, first, the lawyers how long do they want, and if it

seems reasonable, then generally that's all right.  And if it

seems too much, then I'll think about it.

So 30 minutes seems fine.  I don't have a problem

with that.  What I would typically tell you if you're going

to say 30 minutes is, at 25, I'll tell you five, and 29, I'll

tell you one, and I'm not going to drop the hammer, but if

you tell me 30, I would figure you to be done around 30, you

know, like finish up.  If you're near the end, I'm not going

to make you sit down on the -- when the secondhand hits the

30 minutes.  But you're really telling me just how long you

think it will be.

An hour and a half -- and I will do the same for

you.  I don't think I have a problem with the two of you

sharing your time, but an hour and a half, I'm just

wondering, it seems kind of long.

MR. KETTLEWELL:  Well, it's not a negotiation.  I

understand that.

Let me speak to Mr. Kiley.

MR. KETTLEWELL:  One hour for both of us.

THE COURT:  You're going to go back and forth,

continue it?

MR. KETTLEWELL:  No, no, no.  I'll probably start

and open.

1          THE COURT:  You might go 20 minutes, he might go

2     40.  You might go 40, he might go 20.

3          MR. KETTLEWELL:  Correct.  And we're working that

4     out, because we don't want repetition and we don't want to

5     bore the jury with other things that are covered.

6          THE COURT:  All right.  Okay.  That kind of sharing

7     is totally fine.  And I suppose an hour is reasonable, given

8     that you're taking half and there's two of them.  Okay.  And

9     I'll do the same reminder at the end.

10          MS. KAPLAN:  Can we just talk to you at sidebar for

11     a moment, Your Honor?

12          THE COURT:  Sure.

13          (The following discussion held at the bench.)

14          THE COURT:  Sealed.

15          (Bench conference sealed at 2:51 p.m.)

16          MS. KAPLAN:  So as to Jesse du Bey, if we're going

17     to bring him here, we need to make arrangements because he's

18     in Germany, and as well as his attorney has a paid vacation

19     on July 27th.  So if we're going to put him on, we need to

20     put him on next week, and we need to make travel

21     arrangements.  I just want to alert you to that.

22          THE COURT:  Okay.  Nobody is -- nobody has asked

23     me -- like I'm not calling him.

24          MS. KAPLAN:  I know.  But you are going to rule

25     upon the motion.  And perhaps some part of your ruling may

1     make whether we call him important or whether they call him.

2     I don't know if they want him.  But we need to alert his

3     attorney to the fact that we need to make travel arrangements

4     for him, if they're calling him or if we're calling him.

5               THE COURT:  I see.

6               MR. KILEY:   We have been exploring, with his

7     counsel, areas, and we're getting nowhere.  So I'm not

8     prepared to tell you that we will or we won't call him yet.

9     We're trying to get information now.  We're not -- I would

10    not think that I would be in a position to take him -- for us

11    to take him out of order and do it in the first week.

12              MR. CINTOLO:  Right.

13              MR. KILEY:   I don't think.

14              THE COURT:  What do you want from me?

15              MS. KAPLAN:  Do you have any idea when you're going

16    to make a decision?  Because that may inform our decision and

17    what we're going to do.

18              THE COURT:  Well, I'm thinking about it.  I --

19    nothing has changed from what I said in terms of like

20    dismissal.  I don't see that I'm likely to dismiss the case.

21    I told you that we were going to go forward, because I

22    thought it was fair for all of you to know that I intend to

23    go forward.  I haven't issued an order that denies that

24    relief, but I don't think anybody should expect that I'm

25    dismissing the case because of that motion.

1          And the other two things you asked for were

2     reading -- certain portions of the 302 to the jury.

3          MR. KILEY:   Yes.

4          THE COURT:   And there was something else.

5          MR. KILEY:   The motion proposing an instruction

6     with respect to us.

7          THE COURT:   Oh.   Right.   So you asked about

8     excluding the licensing agreement and the 302.   So I'm not

9     saying -- in terms of reading the 302, that seems -- or

10    portions of the 302 that he requested, I'm -- that seems like

11    a -- I haven't come to the place that I think I should do

12    that right now, in part because it just seems like an unusual

13    way to proceed and so -- and to give the jury a part of the

14    302, so I'm not so inclined to do that.

15         In terms of the licensing agreement issue, I meant

16    what I said last time.   I will first decide the licensing

17    agreement issue based on the issue, without regard to that.

18    And then, you know, with respect to that, I'll probably hear

19    the evidence, in terms of where we are.   And so I don't know

20    how that informs any of you about what you do.

21         MS. KAPLAN:   So if they -- if they're going to call

22    him, you need to understand he's in Germany and can't be here

23    the next day.   So that's not going to be on the Government.

24    We've made him available.   He's been subpoenaed.   They can

25    bring him here.   We can bring him here.

1          MR. KILEY:  We've been working through his
2     attorney, and we have gotten nowhere to this point working
3     through the attorney.
4          MS. BARCLAY:  Can we put a deadline on, you know,
5     by the end of the day Wednesday, can you let us know one way
6     or the other so that --
7          THE COURT:  About what?
8          MS. BARCLAY:  About whether they intend to call
9     him.  We don't want to be in the position where they intend
10    to call him, and we haven't made the arrangements to get him
11    here.
12         THE COURT:  You know, you can like -- you should
13    certainly tell them, if and when you decide you want to call
14    him, you should tell them, because you know about this issue.
15    And obviously, the sooner you tell them, if you decide, the
16    easier it will be.  I don't know what -- Hoopes has teed
17    vacation?
18         MS. BARCLAY:  Yes.
19         MR. CINTOLO:  It all depends on what Mr. Appel and
20    what Mr. Snow say on direct examination.
21         THE COURT:  As to whether you want to call him.
22         MR. CINTOLO:  Yes.
23         THE COURT:  As.
24         MR. CINTOLO:  Yeah, as to whether we call him.  If
25    they testify the way we think they'll testify, well, we don't

1    need them.  But we're not sure that they will.

2             THE COURT:  Okay.

3             MS. KAPLAN:  Well, the other issue is I don't

4    believe that Mr. Hoopes is aware that these proceedings are

5    going on, and it would be helpful if we could at least alert

6    him to the fact that he may may need to bring his client

7    here.

8             THE COURT:  Do you have an objection to that?

9             MR. KETTLEWELL  No.

10            THE COURT:  Basically, she wants to be able to

11   alert Mr. Hoopes, who is the lawyer for Mr. du Bey of the

12   fact that there is this pending sanction motion and

13   possibility that you wish to have his client appear to hear

14   his testimony.

15            MR. KETTLEWELL:  No problem.

16            THE COURT:  So the reason that I see it as more

17   more with respect to the publicity any jury issues, not some

18   other reason.  I just think that that would be -- that that's

19   sufficient -- that and having the possible effect of having

20   the witnesses and speaking to people in this will -- it's

21   not --

22            MR. KILEY:   I am going to want a transcript,

23   because I heard half.  But I think I understood everything.

24   I want a transcript of today's proceeding and the prior

25   sealed hearing, please.

```
 1              THE COURT:  Okay.

 2              MR. CINTOLO:  And the lowest, the softest I've ever

 3   spoken in my life.

 4              MR. KILEY:   And truthfully, the press is out there

 5   wondering whether we agreed to dismiss the case again.

 6              MS. BARCLAY:  Yeah, sure.

 7              MR. KILEY:   Sorry for not speaking to you on that,

 8   Your Honor.

 9              (Sealed bench conference concluded at 2:58 p.m.)

10              THE COURT:  Okay.  So anything else from anybody?

11              MR. KETTLEWELL:  No, Your Honor.

12              MS. BARCLAY:  No, Your Honor.

13              THE COURT:  Okay.  Then I'll see you Monday.  Thank

14   you very much.

15              THE DEPUTY CLERK:  All rise, this matter is

16   adjourned.

17              (Court in recess at  3:57 p.m.)

18

19

20

21

22

23

24

25
```

1            **CERTIFICATE OF OFFICIAL REPORTER**

2

3

4            I, Rachel M. Lopez, Certified Realtime Reporter, in

5     and for the United States District Court for the District of

6     Massachusetts, do hereby certify that pursuant to Section

7     753, Title 28, United States Code, the foregoing pages

8     are a true and correct transcript of the stenographically

9     reported proceedings held in the above-entitled matter and

10    that the transcript page format is in conformance with the

11    regulations of the Judicial Conference of the United States.

12

13                        Dated this 19th day of July, 2019.

14

15

16

17                        /s/ RACHEL M. LOPEZ

18

19

20    _____

21                        Rachel M. Lopez, CRR
                          Official Court Reporter

22

23

24

25