**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

_____

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | Case No. 16-cr-10137-LTS |
| | ) | |
| KENNETH BRISSETTE and | ) | **Leave to file excess pages** |
| TIMOTHY SULLIVAN | ) | **granted on 8/21/19 (dkt # 387)** |

_____

### DEFENDANT KENNETH BRISSETTE'S SUPPLEMENTAL MEMORANDUM IN SUPPORT OF MOTION FOR JUDGMENT OF ACQUITTAL

Defendant Kenneth Brissette ("Mr. Brissette") should be acquitted of all charges against him because at trial, the government pursued a theory of Hobbs Act extortion that relied on Mr. Brissette's title and office as a substitute for proof of the wrongful use of fear of economic harm on Mr. Brissette's part. Indeed, the government went so far as to urge the jury to find that Mr. Brissette was guilty of Hobbs Act extortion <u>because</u> of the office that he held. An extortion case that relies upon the existence or use of official authority to prove coercion is extortion committed "under color of official right." The problem, of course, is that the government never charged or proved <u>any</u> of the essential elements of such a case, including (1) a payment made for the personal benefit of the defendant (2) a quid pro quo or (3) a promise to take or refrain from taking an official act.

Each one of those elements is required in an "under color of official right" case for precisely the reason that this prosecution was, and remains, so insidious – because taken together, those elements permit public officials, federal prosecutors, judges, juries and the public at large to fairly distinguish between lawful public service and criminal conduct. Here, by <u>charging</u> extortion committed through the "wrongful use of fear of economic harm" but <u>arguing</u>

1

an "under color of official right" case, the government avoided proving the essential elements of either theory. The upshot – as the evidence at trial unmistakably showed – is that Mr. Brissette faced criminal prosecution simply because while employed at City Hall, he asked Crash Line to hire union workers at a time when Crash Line wanted and was "concerned" about not getting better permits and other concessions from the City of Boston.

That conduct was not criminal, and the fact that a jury returned a guilty verdict in this case should be a reminder of just how critical the essential elements of an "under color of official right" prosecution are – not just to Mr. Brissette and Mr. Sullivan, but to every public servant who strives to do their job without fear that a federal prosecutor might decide years later to second guess their choices and charge them with committing federal felonies. In this case, the government has repeatedly asserted that it is a crime for a public official to help constituents if those constituents supported him or his colleagues in the past or might support them in the future. That is not just a "novel" interpretation of the Hobbs Act; it is a lawless and unconstitutional interpretation of the Hobbs Act which flies in the face of decades of settled Supreme Court precedent.

Given the novel theory advanced by the government, it is unsurprising that it failed to prove several elements of a "wrongful use of fear of economic harm" Hobbs Act case. These failures included a proof of a threat made by Mr. Brissette and perceived as such by Crash Line; proof of a payment induced by reasonable fear that Mr. Brissette could and would harm Crash Line; wrongful conduct on the part of Mr. Brissette; and that Mr. Brissette "obtained" the wages and benefits at issue in this case. Any one of those failures of proof requires that Mr. Brissette be acquitted of the charges against him.

For the reasons more fully set forth below and in both defendants' other Rule 29 papers which are incorporated by reference here, this Court should acquit Mr. Brissette and Mr. Sullivan – because the government pursued a legal theory in this case that violates fundamental principles of settled constitutional law and representative government and because each defendant is factually and legally innocent of any wrongdoing.

## ARGUMENT

### I. Kenneth Brissette Is Innocent of Committing or Conspiring to Commit Hobbs Act Extortion Through the Use of His Official Position

Mr. Brissette was charged with committing and conspiring to commit Hobbs Act extortion through the wrongful use of fear of economic harm. *See* Third Sup. Ind. (dkt # 177) at 6-7 ¶¶ 20, 22. That theory required the government to prove that Mr. Brissette used wrongful threats of economic harm to induce Crash Line to part with its property; that Mr. Brissette "obtained" the property, i.e., the wages and benefits paid to IATSE Local 11 workers, and that he did so willfully, intentionally, and for a wrongful purpose. *See, e.g., United States v. Brissette*, 919 F.3d 670, 684-85 (1st Cir. 2019); *United States v. Burhoe*, 871 F.3d 1, 8-9 (1st Cir. 2017); *Sanchez et al. v. Triple-S Mgt. Corp. et al.,* 492 F.3d 1, 12 (1st Cir. 2007); *George Lussier Enter. v. Subaru of New England, Inc.*, 393 F.3d 36, 44-45, 50 (1st Cir. 2004). At trial the government presented zero evidence that Mr. Brissette personally threatened Crash Line by word or by deed; that Crash Line perceived any such threat from Mr. Brissette; that Crash Line "feared" a cognizable economic harm; that Crash Line believed Mr. Brissette could and would cause the company that harm; or that Mr. Brissette "obtained" any of the wages and benefits at issue. In fact, as set forth in Part II, *infra.*, the trial testimony of the three Crash Line representatives alone refutes the charges brought by the Government against Mr. Brissette.

These failures of proof arise, in part, from the fact that the government sought to "prove" the elements of a "wrongful use of fear of economic harm" prosecution by using Mr. Brissette's title and office as a substitute for the essential elements of that crime. In so doing, the government pursued an "under color of official right" theory without charging or proving the constitutionally required elements of a personal benefit, a quid pro quo, and an agreement to take or refrain from taking an official act.

A. **A Public Official Does Not Violate the Hobbs Act Unless He Uses His Official Position to Solicit or Accept a Personal Payment as a Quid Pro Quo in Exchange for a Promise to Take or Refrain from Taking an Official Act.**

In *McCormick v. U.S.*, 500 U.S. 257 (1991), the government alleged that the defendant committed Hobbs Act extortion by accepting undisclosed "campaign contributions" paid by a lobbyist to secure the defendant's continued support of legislation beneficial to the lobbyist's client. *Id.* at 259-60. At trial, the district court instructed the jury that "[i]t would not be illegal, in and of itself, for Mr. McCormick to solicit or accept political contributions from foreign doctors who would benefit from this legislation," but that the defendant could be found guilty of extortion if the payments were made "with the expectation" that they "would influence Mr. McCormick's official conduct, and with knowledge on the part of Mr. McCormick that they were paid to him with that expectation by virtue of the office he held." *Id.* at 265.

On appeal, the defendant argued that "conviction of an elected official under the [Hobbs] Act requires, under all circumstances, proof of a quid pro quo, i.e., a promise of official action or inaction in exchange for any payment or property received." *Id.* at 265-66. The Fourth Circuit affirmed his convictions, but the Supreme Court disagreed and reversed. *Id.* at 265-67. In so doing, the Supreme Court took pains to explain the importance of drawing clear lines between legitimate conduct and Hobbs Act extortion when it comes to public officials:

Serving constituents and supporting legislation that will benefit the district and individuals and groups therein is the everyday business of a legislator.  It is also true that campaigns must be run and financed.  Money is constantly being solicited on behalf of candidates, who run on platforms and who claim support on the basis of their views and what they intend to do or have done.  Whatever ethical considerations and appearances may indicate, to hold that legislators commit the federal crime of extortion when they act for the benefit of constituents or support legislation furthering the interests of some of their constituents, shortly before or after campaign contributions are solicited and received from those beneficiaries, is an unrealistic assessment of what Congress could have meant by making it a crime to obtain property from another, with his consent, "under color of official right."

*Id.* at 272.  Thus, even cash payments for the personal benefit of an official may lead to Hobbs Act charges "only if the payments are made in return for an explicit promise or undertaking by the official to perform or not to perform an official act."  *Id.* at 273; *accord McDonnell v. United States*, __ U.S. __, 136 S. Ct. 2355, 2365 (2016). "To hold otherwise, would open to prosecution not only conduct that has long been thought to be well within the law but also conduct that in a very real sense is unavoidable so long as election campaigns are financed by private contributions or expenditures, as they have been from the beginning of the Nation," and "[i]t would require statutory language more explicit than the Hobbs Act to justify a contrary conclusion."  *McCormick*, 500 U.S. at 272-73.

In *Wilkie v. Robins*, 551 U.S. 537 (2007), a plaintiff brought a civil action against federal officials, alleging in relevant part that their conduct constituted extortion under color of official right.[1]  The district court refused to enter summary judgment for the officials, and the Tenth Circuit affirmed, holding that public officials "who engage in lawful actions with an intent to extort . . . rather than with an intent to merely carry out their regulatory duties commit extortion"

---

[1] In *Wilkie*, the conduct at issue began with one federal official calling the plaintiff and "demanding" the easement, and expanded to multiple officials who (1) intentionally trespassed on the plaintiff's land; (2) singled the plaintiff out for "close" investigation and enforcement of permit violations; (3) cancelled the plaintiff's right-of-way over federal land; (4) first changed the plaintiff's five-year Special Recreation Use Permit to require an annual renewal, which "disrupted his guest ranching business" due to the resulting uncertainty, and then later denied the permit altogether; (5) revoked the plaintiff's grazing permit; (6) levied administrative fines against the plaintiff; and (7) charged and tried the plaintiff for unsubstantiated federal crimes.  *See Wilkie*, 551 U.S. at 542-47.

under the Hobbs Act. *Id.* at 548-49. The Tenth Circuit also rejected the defendants' claim that they were entitled to "demand" the easement, finding that "if an official obtains property that he has lawful authority to obtain, but does so in a wrongful manner, his conduct constitutes extortion under the Hobbs Act." *Id.*

The Supreme Court reversed. It noted that at common law, "extortion by the public official was the rough equivalent of what we would now describe as taking a bribe," and was "focused on the harm of public corruption, by the sale of public favors for private gain, not on the harm caused by overzealous efforts to obtain property on behalf of the Government." *Id.* at 564 (quoting *Evans*, 504 U.S. at 260) (internal punctuation marks omitted). The Court unanimously held that it would not interpret the Hobbs Act to permit extortion charges against public officials who "stretch in trying to enforce Government property claims," because "the fear of criminal charges or civil claims for treble damages . . . could well take the starch out of regulators who are supposed to bargain and press demands vigorously on behalf of the Government and the public." *Id.* at 566-67; *see also id.* at 586 n. 11 (Ginsburg, J., concurring in part and dissenting in part).

Just one day before the First Superseding Indictment was returned in this case, the Supreme Court reiterated these concerns when it reversed the convictions of former Virginia Governor McDonnell and his wife for honest services fraud and Hobbs Act extortion. *See McDonnell*, 136 S. Ct.at 2372-73. There, the government clearly proved payments that personally benefited the defendants and were made in exchange for the governor's assistance; the issue was whether the assistance given constituted an "official act" for purposes of criminal liability. *See McDonnell*, 136 S. Ct. at 2365. The government urged an interpretation of "official act" that encompassed such things as setting up a meeting, making a phone call, or

inviting a guest to an event, but the Supreme Court rejected that interpretation, in part, because

of "the constitutional concerns raised by Governor McDonnell" – including the "substantial"

concern of chilling the ability of conscientious public officials to advocate on behalf of their

political supporters:

> [C]onscientious public officials arrange meetings for constituents, contact other officials
> on their behalf, and include them in events all the time. The basic compact underlying
> representative government <u>assumes</u> that public officials will hear from constituents and
> act appropriately on their concerns – whether it is the union official worried about a plant
> closing or the homeowners who wonder why it took five days to restore power to their
> neighborhood after a storm. The Government's position could cast a pall of potential
> prosecution over these relationships if the union had given a campaign contribution in the
> past or the homeowners invited the official to join them on their annual outing to the
> ballgame. Officials might wonder whether they could respond to even the most
> commonplace requests for assistance, and citizens with legitimate concerns might shrink
> from participating in democratic discourse.

*Id.* at 2367-68, 2372. The Supreme Court also recognized the need to draw clear lines for

prosecutors and the public, and refused to adopt an interpretation of the Hobbs Act that assumed

the government would use its prosecutorial power responsibly. *Id.* at 2373. Instead, it

interpreted the term "official act" in such a way as to provide "sufficient definiteness that

ordinary people can understand what conduct is prohibited" and protect against "arbitrary and

discriminatory enforcement." The Court again voiced the due process and void-for-vagueness

issues implicated if "public officials could be subject to prosecution, without fair notice, for the

most prosaic of interactions." *Id.* at 2373. And the Court noted the "significant federalism

concerns" lurking in the government's expansive view of the Hobbs Act:

> A State defines itself as a sovereign through the structure of its government, and the
> character of those who exercise government authority. That includes the prerogative to
> regulate the permissible scope of interactions between state officials and their
> constituents. Here, where a more limited interpretation of official act is supported by
> both text and precedent, we decline to construe the statute in a manner that leaves the
> outer boundaries ambiguous and involves the Federal Government in setting standards of
> good government for local and state officials.

*Id.*

**B.** **The Government Failed to Allege or Prove that Mr. Brissette Solicited or Received a Personal Payment as a Quid Pro Quo in Exchange for a Promise to Take or Refrain from Taking an Official Act.**

Every one of the concerns identified by the Supreme Court in *McCormick*, *Wilkie*, and *McDonnell* is implicated by this prosecution. The government did not introduce any evidence showing a payment for the personal benefit of Mr. Brissette made as a quid pro quo for his agreement to take or refrain from taking an official act. Even the government concedes that there is no such evidence. Nonetheless, throughout the trial, the government expressly and repeatedly used the fact of Mr. Brissette's title and office as a substitute for proof of the elements of a "wrongful use of fear of economic harm" case.

The government opened its case by describing Mr. Brissette and Mr. Sullivan as "two City of Boston officials" and "defendants in a position of power." *See* Tr., Day 2 (7/23/19) at 5:4-6; 21:25-22:1. While eschewing any notion of a direct threat, the implied "threat" supposedly made by the defendants was inherent in their jobs. *Id.* at 5:19-23 ("these two defendants . . . had all the hallmarks of power. They had official titles, they had official positions. They had offices in City Hall"); *id.* at 9:18-21, 10:10-12. The "fear" experienced by Crash Line was a "fear" of City Hall generally and/or other officials operating within the City, and not Mr. Brissette or Mr. Sullivan. *Id.* at 16:21-17:6 (Crash Line "believed that Ken Brissette and Tim Sullivan had the power to influence" the permits and future dates it wanted because "[t]he festival was on City Hall Plaza and these guys were Crash Line's landlords."). The "wrongful means" consisted of Mr. Brissette meeting with Crash Line in his office and asking the company to hire union labor at a time when Crash Line wanted other things from other people who also worked for the City. *Id.* 15:21-24 ("when Appel took a call from Brissette on September 2nd and Brissette said come to my office, Crash Line was essentially at the mercy of

8

Ken Brissette and the City of Boston"); *see also* Tr., Day 4 (7/25/19) at 144:14-19 (Testimony of

Brian Appel) (explaining he was "concerned" about Crash Line's permits on September 2, 2014

while meeting with Mr. Brissette and Mr. Sullivan even though "I wasn't exactly sure that either

of them had direct oversight of our licenses or permits" because "City Hall was my landlord for

this event, Ken works in City Hall, the permits were issued by City Hall. I felt I needed to make

sure I was doing as much as I could here to get the problem solved so I would ultimately get my

permits."). And the "wrongful purpose" was either to stop a picket on public property, according

to Crash Line, or to help out the Mayor's political supporters, according to the government's

factually unsupported and legally misleading argument. *See* Tr., Day 2 (7/23/19) at 20:5-8.

Indeed, the government relied heavily on this narrative throughout trial to prove its case despite

the fact that neither Mayor Walsh nor the City of Boston was ever identified as an unindicted co-

conspirator,[2] despite the fact that it is perfectly appropriate to help out political supporters, and

despite the fact that it knew it did not have a shred of evidence to support an "under color of

official right" Hobbs Act charge or conviction. The upshot is that two innocent men currently

stand convicted of a non-existent crime.

By intentionally blurring the lines between legitimate conduct and Hobbs Act extortion in

this case, the government has left <u>all</u> interactions between public officials and their constituents

open to second guessing by the federal government on pain of criminal sanction; indeed, this

case exemplifies the "arbitrary and discriminatory enforcement" that the Supreme Court warned

against. *McDonnell*, 136 S. Ct. at 2373. Equally disturbing, the government in this case has

done <u>exactly</u> what the Supreme Court has said cannot constitutionally be done – use the Hobbs

Act to criminalize zealous advocacy on behalf of constituents and chill the day-to-day work of

---

[2] The government identified only one City of Boston employee as an unindicted co-conspirator in this case. During
trial, however, the Court correctly found that the government failed to establish that person was in fact a member of
any conspiracy to harm Crash Line. Indeed, there was no such conspiracy.

public officials that is not only legitimate, but is also in a very real sense unavoidable. *See McDonnell*, 136 S. Ct. at 2372-73; *Wilkie*, 551 U.S. at 566-67; *McCormick*, 500 U.S. at 272-73; *see also United States v. Brissette*, 919 F.3d 670, 685 (1st Cir. 2019).

In order to use Mr. Brissette's status as a public official to prove Hobbs Act extortion, the government had to charge and prove that he sought or accepted a payment that would personally benefit him as a quid pro quo in exchange for his promise to take or refrain from taking an official act. *See McDonnell*, 136 S. Ct. at 2371-72; *Wilkie*, 551 U.S. at 563; *McCormick*, 500 U.S. at 265-66; *accord Wilkie*, 551 U.S. at 562 (declining to recognize a *Bivens* action when government employees are "unduly zealous in pressing a governmental interest affecting property," because "[a] judicial standard to identify illegitimate pressure going beyond legitimately hard bargaining would be endlessly knotty to work out"). Conversely, in order to prove an actual fear of economic harm case, the government cannot rely on the fear of economic harm inherent in the legitimate exercise of official authority. Because the government failed to charge or prove each and every one of those essential elements, the Court should acquit Mr. Brissette of all crimes with which he has been charged.

## II. Kenneth Brissette Is Innocent of Committing or Conspiring to Commit Hobbs Act Extortion Through the Wrongful Use of Fear of Economic Harm

Even if the Court chose to ignore the government's blatant disregard of Supreme Court precedent and basic constitutional principles, the government <u>still</u> wholly failed to prove that Mr. Brissette wrongfully used Crash Line's fear of economic harm to induce it to part with the money it paid as wages and benefits to Local 11 workers.

To carry its burden, the government needed to prove beyond a reasonable doubt that Mr. Brissette acted "wrongfully;" that Mr. Brissette conveyed a threat to Crash Line; that Crash Line perceived such a threat from Mr. Brissette; that Crash Line feared economic harm within the

meaning of the Hobbs Act; that Crash Line reasonably believed Mr. Brissette could and would

cause the company economic harm; that Mr. Brissette was aware of and intentionally used or

exploited Crash Line's fear with the specific purpose of inducing Crash Line to pay money in the

form of wages and benefits to Local 11 workers; and that Mr. Brissette "obtained" the wages and

benefits at issue. For the following reason, no rational jury could have found that the

government carried its burden as to those elements.

### A. No Rational Jury Could Find that the Government Proved Beyond a Reasonable Doubt that Mr. Brissette Acted Wrongfully.

Fear of economic harm "may be a necessary consequence of many legitimate exercises of

official authority." *Brissette*, 919 F.3d at 685. Moreover, "[t]here is nothing inherently wrongful

about the use of economic fear to obtain property." *United States v. Sturm*, 870 F.2d 769, 773

(1st Cir. 1989). Fear of economic harm "is a driving force of our economy that plays an

important role in many legitimate business transactions." *George Lussier Enterprises, Inc. v.

Subaru of New England, Inc.*, 393 F.3d 36, 50 (1st Cir. 2004) (quoting *Brokerage Concepts, Inc.

v. U.S. Healthcare, Inc.*, 140 F.3d 494, 523 (3d Cir. 1998)).

In order to determine whether economic fear has been used "wrongfully," the First

Circuit looks to whether the putative victim "had a pre-existing statutory right to be free from the

defendant's demand." *George Lussier Enterprises*, 393 F.3d at 50 (citations omitted); *accord id.*

at 50-51 (finding that "conditioning of access to cars to which dealers had no pre-existing

entitlement represents lawful hard-bargaining, not unlawful extortion"). Whether the use of

economic fear is wrongful within the meaning of the Hobbs Act extortion provision also turns,

"at least in part, on whether it was employed to achieve a wrongful purpose." *Brissette*, 919 F.3d

at 685.

At trial, none of the three Crash Line witnesses who testified – including the two Crash Line representatives who attended the September 2, 2014 meeting at which the charged extortion allegedly took place – recalled Mr. Brissette "demanding" anything, much less making a demand that Crash Line had a pre-existing statutory right to avoid.  To the contrary, Brian Appel testified that at the September 2nd meeting, "we were being asked to take union labor for the festival that was occurring three days later to avoid a picket and the inflation of the rat in front of our entrance."  *See* Tr., Day 5 (7/26/19) at 168:11-21.  Mr. Appel knew in advance that the subject of the meeting would be hiring union labor for the upcoming concert because "that was the only other topic that we had been going back and forth on over the last couple of months."  *See* Tr., Day 4 (7/25/19) at 135:25-136:6.  During the meeting, Mr. Appel recalled Mr. Brissette saying Local 11 was "not happy that they were not involved in the Boston Calling production and that they were threatening to picket the event and also to blow up the inflatable rat at the entrance to the festival throughout the weekend."  *Id.* at 138:15-21.  Mr. Appel's response was "How many people are we talking about here?  How many jobs?" to which Mr. Brissette replied half of the jobs.  *Id.* at 139:20-24.  When Mr. Appel told Mr. Brissette "that number was too much for us to bear," Mr. Brissette said he "would have conversations and get back to us later."  *Id.* at 140:3-12.  Mr. Appel did not "recall specifically" anything about Mr. Brissette's demeanor during the meeting.  *Id.* at 141:19-20.  Mr. Appel believed that it made sense for the company to hire union labor if it meant they could avoid the picket and it did not cost too much, and the company ultimately settled on hiring nine Local 11 workers.  *See* Tr., Day 5 (7/26/19) at 160:3-14.

Michael Snow also attended the September 2nd meeting.  *See* Tr., Day 10 (8/2/19) at 33:4-6.  Mr. Snow had already had multiple conversations with Mr. Appel around issues with union labor and, like Mr. Appel, he assumed the meeting was going to be about that topic; he even

changed his shirt, which had "The Rat" on it, because he did not think it would be appropriate for the meeting. *Id.* at 33:21-34:12. Mr. Snow recalled a discussion by Mr. Brissette and Mr. Sullivan that "[t]hey believed that the unions were going to picket the show and blow up the rat, and you know, how are we going to work together to solve that." *Id.* at 34:20-22. When Mr. Snow said changing Crash Line's contract "would mean scheduled employees would be removed from their job . . . [t]heir response was that that was not their intent, that was not what they wanted. They were looking for a way for everybody to come together on this project." *Id.* at 35:17-25. "From there, we opened a dialogue of, you know, well, if we were to sort of take employees, we started talking about [the] quantity of employees that we would take." *Id.* at 36:17-19. The "suggestion" from Mr. Brissette was for 30 people, *see id.* at 36:20-23, 37:14-16, and Mr. Appel or Mr. Snow responded "you know, we were thinking, or our company was thinking three or four." *Id.* at 37:17-20. The "upshot of that meeting" was that "Mr. Appel and myself had basically agreed that we would take union labor at that point and there was going to be a future conversation between my partner and somebody else to determine total flow." *Id.* at 38:13-16.

Jesse Du Bey, who represented and controlled investors owning approximately 80% of Crash Line, *see* Tr., Day 5 (7/26/19) at 128:6-15, testified that Mr. Appel told him about the September 2nd meeting and "the risk of potentially a picket of our event." *See* Tr., Day 8 (7/31/19) at 19:5-12, 19:23-20:1. Mr. Du Bey understood from Mr. Appel "if we didn't use union labor, that we could end up with a loud picket in front of our music festival," which Mr. Appel "was very concerned about." *Id.* at 20:3-6. Mr. Du Bey was also concerned about how a picket "would be perceived by our consumers, who paid a lot of money to attend," and that it "could really be problematic for the artists and for the fans. So that bothered me. And then I had

a general concern about – just a PR concern about the fact that we are operating a festival at City Hall Plaza, which is very symbolic of the government of Boston, and [that] we would have a big picket there wouldn't be a very good thing probably for our PR." *Id.* at 20:15-21:2. Mr. Appel and Mr. Du Bey jointly decided to hire union workers during their conversation; "[w]e had a discussion about it, like you do about a business issue. We thought about the cost of doing it, versus the potential risk of not doing it, and decided to do it." *Id.* at 22:20-24.

Even if the September 2nd conversation could be stretched into a "threat" that Local 11 would come to the concert and picket, Crash Line did not have a statutory right to be free from such a threat. Quite the opposite, Local 11 had a statutory right to put up an area standards picket at Crash Line's event. As explained by the National Labor Relations Board, while Section 8(b)(7) of the National Labor Relations Act "prohibits picketing – and threatening to engage in picketing – that has a 'recognitional' or 'organizational object,'" "[a]rea standards picketing – to protest the targeted employer's payment of wages below the level set by union contracts in the area – is <u>not</u> recognitional. . . . That means that area standard picketing remains lawful for Section 8(b)(7) purposes even if it has an effect . . . of 'induc[ing] any individual employed by any other person in the course of his employment, not to pick up, deliver or transport any goods or not to perform any services." *See* https://www.nlrb.gov/rights-we-protect/whats-law/unions/recognitional-picketing-section-8b7 (emphasis added); *accord United States v. Burhoe*, 871 F.3d 1, 16 (1st Cir. 2017).

Nor did Crash Line have a pre-existing statutory right to be free from being asked by Mr. Brissette or anyone else from the City of Boston to hire union labor. When state or local officials are acting as owners or managers of publicly owned property and interacting with private participants in the marketplace, they may go so far as to <u>require</u> the hiring of union

members without violating the law. *See, e.g., Buldng & Constr. Trades Council of Metro. Dist. v. Assoc. Bldr's & Contract'rs of Mass./R.I, Inc.*, 507 U.S. 218, 227-28 (1993). Nothing in the Irrevocable License Agreement between Crash Line and the City of Boston (admitted as Exhibit 7) precluded any City official from asking Crash Line to consider hiring union workers; in fact the City rejected Crash Line's request for just such a provision in an earlier draft of the Agreement. *See* Exhibit 251. Nothing in Exhibit 7 precluded any City official from trying to help resolve a dispute involving a union's request for work either. In fact, the Agreement required <u>Crash Line</u> to "use commercially reasonable efforts . . . to minimize any material disruption to the environment surrounding" City Hall Plaza during the Boston Calling concerts and to "coordinate with local stakeholders" to accomplish that goal. *See* Exhibit 7 at 6, ¶ 8.

There was also a complete absence of evidence that Mr. Brissette acted with a wrongful purpose. The evidence was undisputed that Mr. Brissette said – and Crash Line's representatives believed – that he was trying to figure out a way to avoid an impending picket on City Hall Plaza. *See, e.g.,* Tr., Day 5 (7/26/19) at 158:17-159:12. There is nothing wrongful about trying to avoid a demonstration on public property; such a goal falls squarely within the authority of public officials.

In contrast, there was zero evidence in support of the government's theory that Mr. Brissette was motivated to get Local 11 workers hired in order to pay some hypothetical political "debt" owed by Mayor Walsh. Colleen Glynn, Local 11's business manager, testified that Local 11 supported Mayor Walsh's 2013 mayoral campaign by "doing a lot of door knocking, canvassing. I believe there may have been some phone banks at my office," but neither she nor Local 11 contributed any money whatsoever. *See* Tr., Day 6 (7/29/19) at 178:3-12; Tr., Day 7 (7/30/19) at 88:13-17. Ms. Glynn also testified that Local 11 supported Mayor Walsh because it

believed he was the best candidate for the job and denied that it did so because it was trying to curry political favor with him should he win the election. *See* Tr., Day 7 (7/30/19) at 87:24-88:6. That testimony was not subsequently challenged or impeached by the government either through re-direct examination of Ms. Glynn or through any other witness's testimony.

Whether or not there was evidence to support the government's argument, seeking to obtain real work for qualified people at the prevailing wage is not a wrongful purpose, even if the work was unwanted or unneeded by the employer. *See Burhoe*, 871 F.3d at 13, 16-17, 20. And it is certainly not a wrongful purpose under the Hobbs Act for a public official to assist or favor constituent groups or political supporters, or to act in the hope of securing future political support. *See McDonnell*, 136 S. Ct. at 2372. "To hold otherwise would open to prosecution not only conduct that has long been thought to be well within the law but also conduct that in a very real sense is unavoidable so long as election campaigns are financed by private contributions or expenditures, as they have been since the beginning of the Nation." *McCormick*, 500 U.S. at 272-73.

The government also argued at trial that Mr. Brissette's conduct somehow implicated M.G.L. c. 268A. As a factual matter, there was not a shred of evidence to support that argument, thus rendering it improper. Moreover, as the federal government should know, it is precluded from using the Hobbs Act "to regulate the permissible scope of interactions between state officials and their constituents" as a matter of law. *McDonnell*, 136 S. Ct. at 2373; *accord United States v. Tavares*, 844 F.3d 46, 54 (1st Cir. 2016). Thus, not only was the government's closing argument on this point unsupported by <u>any</u> evidence, it misled the jury on the law; indeed, the argument contradicted the Court's jury instructions on that very point. As argued in Mr. Brissette's separate memorandum in support of his motion under Fed. R. Crim. P. 33, the

prejudice from this improper argument alone warrants a new trial. However, in light of the fact that <u>no</u> rational jury could have found the government proved beyond a reasonable doubt that Mr. Brissette acted wrongfully when he asked Crash Line to consider hiring Local 11 workers on September 2, 2014, the more appropriate course is for the Court to enter a judgment of acquittal on all charges.

### B. <u>No Rational Jury Could Find that the Government Proved Beyond a Reasonable Doubt that Mr. Brissette Induced Crash Line's Consent Through Use of Fear of Economic Harm</u>

Because there was no evidence presented at trial that Mr. Brissette threatened Crash Line, that Crash Line perceived a threat by Mr. Brissette, that Crash Line's feared cognizable "economic harm," or that Crash Line reasonably believed Mr. Brissette could or would harm the company, there is insufficient evidence on which a rational jury could find beyond a reasonable doubt that Mr. Brissette induced Crash Line's consent to pay wages and benefits to Local 11 workers by the use of fear of economic harm.

#### 1. There is No Evidence Mr. Brissette Conveyed an Implicit Threat to Crash Line

No rational jury could find beyond a reasonable doubt on this record that Mr. Brissette used or exploited Crash Line's fear of economic harm through an implied threat. *See Sanchez et al v. Triple-S Management Corp. et al*, 492 F.3d 1, 13 (1st Cir. 2007); *Capo*, 817 F.2d at 951. The government conceded that it had no evidence of an explicit threat, and it further failed to establish that Mr. Brissette did or said <u>anything</u> that could conceivably constitute an implied threat.

The First Circuit has described an implied threat as "a rock thrown through a window." *Sanchez*, 492 F.3d at 13 ("We agree that a threat need not be explicit to be extortionate; under the appropriate circumstances, a rock thrown through a window can be just as effective as a

threatening letter in convincing the victim to relinquish his property. This is the lesson of the cases, on which plaintiffs heavily rely, that upheld extortion convictions based on implied threats."). But as set forth above, there was absolutely no evidence that Mr. Brissette "threw a rock through" Crash Line's desire to get permits with better hours or the ability to reserve City Hall Plaza for its private use in 2018 and beyond. *See* Part II(A), *supra.* There was no evidence presented that Mr. Brissette made <u>any</u> demand of Crash Line, much less that he indicated Crash Line had to comply with any such demand, or that negative consequences might result should Crash Line choose not to do so. Thus, there was no evidence from which a rational jury could find that the government proved this element of the offense.

At closing, the government argued only two pieces of evidence to demonstrate the presence of a threat: (1) the fact that the September 2nd meeting was held three days before the music festival was scheduled to begin; and (2) Mr. Brissette and Mr. Sullivan's positions as public officials. Neither is sufficient. With regard to the timing of the meeting, the Supreme Court has been clear that federal law cannot be used to set "limits to legitimate zeal on the public's behalf in situations where hard bargaining is to be expected in the back-and-forth between public and private interests that the Government's employees engage in every day." *Wilkie*, 551 U.S. at 554.

Mr. Brissette's role as a public official included meeting with constituents, acting on concerns, making recommendations and requests of constituents, and bargaining and pressing demands on behalf of the government and the public. If Mr. Brissette was within his rights to have the conversation at all – and even the government concedes that he was – criminal liability cannot turn on a claim that the timing of the conversation somehow put "too much" pressure on Crash Line. The Supreme Court has already flatly rejected a theory of liability that relies on a

finding that public officials placed "too much" pressure on property owners.  *See id.* at 560-61;

*see also McDonnell*, 136 S. Ct. at 2372 (due process prohibits using Hobbs Act as a "shapeless"

standard for what conduct is potentially criminal); *McCormick*, 500 U.S. at 272; *Brissette*, 919

F.3d at 685.

As for the government's effort to rely on Mr. Brissette's official position to substitute as

proof for a threat, that is unconstitutional for the reasons in Part I, *supra*.  Indeed, the following

testimony from Mr. Appel encapsulates succinctly the government's attempt to prove an

"implied" threat by reference to the "threat" inherent in one's status as a City employee:

> Q:    And what did you think with respect to whether either Ken Brissette or Tim Sullivan could influence your permits or entertainment license?
>
> A:    I wasn't exactly sure that either of them had direct oversight of our licenses or permits.
>
> Q:    So why were you so concerned about them?
>
> A:    I was concerned about my permits overall for the reasons I had mentioned.  <u>City Hall was my landlord for this event.  Ken works in City Hall, the permits were issued by City Hall.</u>  I felt I needed to make sure that I was doing as much as I could here to get the problem solved so I would ultimately get my permits.

*See* Tr., Day 4 (7/25/19) at 144:8-19 (emphasis added); *but see Brissette*, 919 F.3d at 685 ("just

as fear of economic harm is part of many legitimate business transactions, fear of economic harm

may also be a necessary consequence of many legitimate exercises of official authority")

(citations and internal quotation marks omitted).

Because there was no evidence from which a rational jury could find Mr. Brissette did or

said anything that constituted an implied threat to Crash Line, he must be acquitted of all charges

against him.

### 2. There is No Evidence that Crash Line Perceived Mr. Brissette as Having Conveyed a Threat

At trial, there was also no evidence that Crash Line perceived anything Mr. Brissette said or did as a threat intended to cause or exploit Crash Line's fear. To the contrary, both Mr. Appel and Mr. Snow clearly testified that they did not believe Mr. Brissette was trying to harm the company. Mr. Appel testified to that several times, as well as to his "understanding" of what Mr. Brissette's words meant. *See* Tr., Day 5 (7/26/19) at 160:15-18 (Q: "[A]t this meeting you certainly didn't think Ken Brissette was trying to harm you or your company in any way, did you?" A: I didn't think specifically he was trying to harm us, no."); *id.* at 168:11-21 (Q: "In the September 2nd meeting with the defendants, what did you understand the defendants' words about hiring union labor to mean? The words that they were using." A: I believe that we were being asked to take union labor for the festival that was occurring three days later to avoid a picket and the inflation of the rat in front of our entrance."); *id.* at 179:15-21 (Q: "You had indicated on examination, cross-examination, that you did not believe that Ken Brissette was out to harm you or hurt you, correct?" A: "Him personally, no." Q: "And with regard to Tim Sullivan, would the answer be the same?" A: "Yes."). Mr. Snow was even more succinct. *See* Tr., Day 10 (8/2/19) at 80:2-8 (Q: "You didn't think Mr. Brissette, sitting there in the office on September 2, 2014, was out to harm your business, did you?" A: "No." Q: "And certainly, Mr. Brissette never threatened you, correct?" A: "No.").[3]

---

[3] In its closing argument, the government highlighted two comments made by Mr. Du Bey and Mr. Snow as evidence that they were in fact "extorted." Mr. Du Bey testified that the word "asked . . . means all range of things," and gave as an example that "[i]f I ask my seven-year-old to clean up her room, I'm not asking." *See* Tr., Day 8 (7/31/19) at 44:16-23. Mr. Du Bey also testified, however, that Mr. Appel reported "a request or a potential for us to use union labor," that Mr. Appel may have used the word "asked," and that Mr. Du Bey may also have used the word "asked" when he later described that conversation to the government. *Id.* at 15:13-14, 45:17-21, 45:25-46:6. Mr. Snow testified that he did not "know" whether he had been extorted but that he "did something I did not want to do." *See* Tr., Day 10 (8/2/19) at 97:2-6. That testimony does not undo his clear testimony that he did not think Mr. Brissette was out to harm his business and that Mr. Brissette never threatened Crash Line. *Id.* at 80:2-8. Indeed,

Without any evidence that Mr. Appel or Mr. Snow thought Mr. Brissette intended to harm the company or perceived Mr. Brissette as having said or done something threatening to their company, no reasonable jury could have found beyond a reasonable doubt that Crash Line understood Mr. Brissette's statements and/or acts as a threat designed to use or exploit Crash Line's fear. Acquittal is warranted on this ground as well.

### 3. There is No Evidence Crash Line Was Induced to Hire Local 11 Workers By a Fear of "Economic Harm" Contemplated by the Hobbs Act

Fear of economic harm is part of many legitimate business transactions and may be a necessary consequence of many legitimate exercises of official authority. *Brissette*, 919 F.3d at 685. For this reason, the Hobbs Act protects against only a "fear" that the putative victim has a "pre-existing statutory right" to avoid. *See George Lussier Enterprises*, 393 F.3d at 50; *see also* Part II(A), *supra*.

Crash Line did not have a "pre-existing statutory right" to get the permits it wanted. While Mr. Appel testified that he had "general concerns" that Crash Line would not get its permits in time for the September 2014 festival or would receive "inferior permits to what [Crash Line] believed [it] would be issued," *see* Tr., Day 4 (7/25/19) at 140:24-141:5, he also acknowledged that Crash Line's liquor license and entertainment license had in fact been approved by September 2, 2014. *See* Exhibit 15 (package of permits with approvals dated 9/2/14); Tr., Day 5 (7/26/19) at 76:20-55:5; 78:10-19; 81:2-83:19. Mr. Appel's actual concern was that he wanted different licenses with better hours. *See* Tr., Day 4 (7/25/19) at 141:7-11 ("We believed that there was a world in which we would not get the 11pm curfew that we had believed we had been approved for, that there would be significant restrictions around alcohol,

---

doing something one does not want to do is the essence of business negotiation which is precisely why the use of fear of economic harm arising out of the exercise of legitimate authority is not inherently wrongful.

and that there would also be restrictions around capacity."); *Id.* at 141:7-11.  Tr., Day 5 (7/26/19) at 108:20-109:3 (Q: "The licensing board had issued [the liquor license] and you didn't like the hours, and those were the problems you thought existed with the license, correct?"  A: "Correct."); *id.* at 83:14-22 (Q: "And you knew, on September 2nd, that your license had been approved, correct?"  A: "We did not know that at the time, I don't believe, no."  Q: "Well, you knew shortly thereafter that you had an entertainment license approved, correct?"  A: "Yes."  Q: "But you didn't like the hours for the curfew on that either, correct?"  A: "Correct.").

Mr. Appel also understood the licensing board had the authority to affix whatever conditions that board felt were appropriate on the liquor license, and that the head of Consumer Affairs and Licensing had the same authority with respect to the entertainment license.  *Id.* at 109:5-14 (Q: "The licensing board can affix whatever conditions the licensing board feels are appropriate on a liquor license, correct?"  A: "Correct."  Q: And Ms. Malone, as head of Consumer Affairs and Licensing, can affix whatever conditions she thinks were appropriate on the entertainment license; am I right?"  A: "Yes."  Q: "That's their obligation and their authority, right?"  A: "I believe so, yes.").  That understanding was correct as a matter of law.  *See* Exhibit 12 (letter from P. Malone to B. Appel, citing statutory licensing authority).  In other words, Crash Line had no right – and knew it had no right – to be free from conditions placed upon its licenses by the issuing authorities, even if Crash Line found those conditions to be undesirable or "inferior" to what it wanted to receive.  Thus, whatever subjective worry Mr. Appel or any other representative of Crash Line may have felt about getting <u>better</u> permits than the ones that had already been approved, that is precisely the type of generalized business anxiety that companies regularly deal with and is not the type of "economic fear" protected by the Hobbs Act.  *See Sanchez*, 492 F.3d at 12; *George Lussier Enterprises*, 393 F.3d at 50-51.

With regard to Crash Line's desire for an extension of the Irrevocable License Agreement, or some new agreement authorizing it to use City Hall Plaza in 2018 and beyond, that is a hoped-for benefit that is not cognizable under the Hobbs Act. There is certainly no pre-existing statutory right to use City Hall Plaza for a private for-profit concert, and Mr. Appel knew Crash Line was not "entitled" to an extension of its agreement with the City. *See* Tr., Day 5 (7/26/19) at 116:20-117:4; *Sanchez*, 492 F.3d at 12; *George Lussier Enterprises*, 393 F.3d at 50-51. Nor was there any evidence that Crash Line was operating out of "fear of a diminished opportunity" as opposed to an effort to influence and improve its position. *See United States v. Capo*, 817 F.2d 947, 952, 954 (2nd Cir. 1987) (reversing conviction where no evidence "that the 'victims' were coerced or threatened by defendants, and all the evidence points to the conclusion that they paid voluntarily to improve their chances to get jobs they had not been able to obtain on their own"). Mr. Appel testified that he knew Crash Line would have to participate in an RFP process for future dates on City Hall Plaza, that he preferred not to follow that process, and that he hoped to parlay the request to help the City avoid a picket by hiring Local 11 workers into a "bargaining chip" to get future dates outside of the RFP. See Tr., Day 5 (7/26/19) at 116:20-117:4, 126:1-127:2, 167:19-24. Business decisions made in order to achieve a desired objective do not constitute "economic fear" under the Hobbs Act. *See United States v. Albertson*, 971 F. Supp. 837, 842-43 (D. Del. 1997); *see also Viacom Int'l, Inc. v. Icahn*, 747 F. Supp. 205, 213 (S.D.N.Y. 1990).

Finally, of course, there is no evidence that Mr. Brissette said or did anything that "induced" or caused Crash Line to be in fear. Mr. Appel acknowledged that "there was no discussion at all about either permits or liquor licenses or anything else" when he was "in Mr. Brissette's presence," because Mr. Appel "knew he didn't have anything to do with that." *See*

Tr., Day 5 (7/26/19) at 135:21-136:2. No one at Crash Line testified they thought Mr. Brissette would harm the company; they all believed that Mr. Brissette was simply trying to avoid a picket on City Hall Plaza. *See, e.g.,* Tr., Day 5 (7/26/19) at 158:24-159:12.[4]

### 4. There Is No Evidence That Crash Line Reasonably Believed Mr. Brissette Could or Would Harm The Company

Even if there was sufficient evidence that Crash Line had a cognizable "fear of economic harm" (which there was not), there was no evidence from which a rational jury could find that Crash Line "reasonably believed: first, that [Mr. Brissette] had the power to harm the victim, and second, that [Mr. Brissette] would exploit that power to [Crash Line's] detriment." *Capo*, 817 F.2d at 951 (emphasis in original).

Mr. Appel and Mr. Snow testified that they did not believe Mr. Brissette had authority over the permitting and licensing process in advance of the September 2014 concert. *See* Tr., Day 4 (7/25/19) at 135:5-136:25; Tr., Day 5 (7/26/19) at 109:4-23; Tr., Day 10 (8/2/19) at 47:5-23. Moreover, the individuals who did have that authority – then-Commissioner Evans and Patricia Malone – testified unequivocally that Mr. Brissette had no power to affect the issuance of Crash Line's licenses and did not in fact attempt to do so. *See* Evans Dep., (7/31/19) at 37:11-22, 50:18-21; Tr., Day 11 (8/5/19) at 36:21-39:10; *accord Capo*, 817 F.2d at 952 (evidence of "fear of economic loss was insufficient as a matter of law" because "there was no evidence that any defendant did, in fact, negatively influence any hiring decision or even attempt to do so"); *see also* Tr., Day 5 (7/26/19) at 110:10-20 (Q: "Mr. Brissette, to your knowledge, did absolutely nothing to obstruct or delay or in any way impact the liquor license that Crash Line received for that September concert, correct?" A: "I don't believe he was involved in that, no." . . . Q: "And you didn't believe that then, right?" A: "Correct.").

---

[4] This same evidence precludes any rational jury from finding that Mr. Brissette acted with the knowledge and specific intent necessary to wrongfully use Crash Line's fear of economic harm.

Nor did Mr. Brissette have authority over the extension of the license agreement Crash Line wanted. By September 2, 2014, Crash Line had known for months (since March 2014) that Crash Line could not have an extension and would need to respond to the City of Boston's 2015 RFP to secure future plaza dates. *See* Exhibit 8 (Amendment to Irrevocable License Agreement); Tr., Day 5 (7/26/19) at 115:22-116:10, 116:20-117:4. That was not only required by City ordinance, but it was explained to Mr. Appel by both Mr. Brissette and Maribeth Cusick, the attorney for the City of Boston who drafted the language in Exhibit 8. See Tr., Day 4 (7/25/19) at 106:5-22; Tr., Day 5 (7/26/19) at 126:19-127:14; Tr., Day 9 (8/1/19) at 76:13-18, 76:25-77:6, 123:19-25. Nor did Mr. Brissette have authority over the RFP process itself. Ms. Cusick testified that both she and Mr. Brissette explained to Mr. Appel that Mr. Brissette was one of many City employees who could make non-binding recommendations that a bid be awarded, but the ultimate decision maker was the Commissioner of Property and Building Management, not Mr. Brissette. See Tr., Day 9 (8/1/19) at 124:12-125:21; see also Exhibit 26 (March 2015 Request for Proposals) at 11. In any event, here, too, there was no evidence that Mr. Brissette negatively influenced any RFP decision concerning Crash Line or even attempted to do so. *Capo*, 817 F.2d at 952. To the contrary, Mr. Appel testified that Mr. Brissette "had conveyed to me that he was willing to work on getting a license agreement done for me and that is what he was doing." *See* Tr., Day 5 (7/26/19) at 171:18-172:3. [5]

Because there is simply no evidence from which a reasonable jury could find beyond a reasonable doubt that Crash Line reasonably believed Mr. Brissette would harm the company, Mr. Brissette must be acquitted. For all of these reasons, no rational jury could have found that

---

[5] Mr. Brissette incorporates by reference the arguments made by Mr. Sullivan concerning the additional failure of proof on the "obtaining property" element.

the government carried its burden as to this element and Mr. Brissette must be acquitted on the basis of this failure of proof as well.

## CONCLUSION

Because the government pursued a legal theory in this case that violates fundamental principles of constitutional law and representative government, and because there is no evidence on which a reasonable jury could find Mr. Brissette and Mr. Sullivan guilty of conspiring to commit or committing extortion, Mr. Brissette and Mr. Sullivan must be acquitted.

Respectfully submitted,
KENNETH BRISSETTE,
By his attorneys,

*/s/ William H. Kettlewell*
*/s/ Sara E. Silva*
*/s/ Courtney Caruso*
William H. Kettlewell (BBO #270320)
Sara E. Silva (BBO #645293)
Courtney A. Caruso (BBO #687642)
HOGAN LOVELLS US LLP
100 High Street, 20th Floor
Boston, MA 02110
(617) 371-1000
(617) 371-1037 (fax)
bill.kettlewell@hoganlovells.com
sara.silva@hoganlovells.com
courtney.caruso@hoganlovells.com

Dated: August 21, 2019