## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

_____
)
UNITED STATES OF AMERICA ) 
 )
 v. ) Case No. 16-cr-10137-LTS
 )
KENNETH BRISSETTE and )
TIMOTHY SULLIVAN )
_____)

### SUPPLEMENTAL MEMORANDUM IN SUPPORT OF DEFENDANT SULLIVAN'S MOTION FOR A JUDGMENT OF ACQUITTAL

Timothy Sullivan submits the following supplemental memorandum of law in support of his motion for a judgment of acquittal pursuant to Fed. R. Crim. P. 29 on Count One of the Third Superseding Indictment.[1] Sullivan was acquitted of Count Two, which charged him with Hobbs Act extortion. His co-defendant, Kenneth Brissette, was not acquitted of the Count Two charges. Nevertheless, Sullivan incorporates by reference the arguments advanced in his co-defendant's supplemental filing because it addresses the elements of the substantive offense that Sullivan would have had to intend be committed in order to support a conspiracy conviction.[2]

### FACTS

The indictment charged the defendants with conspiring to extort Crash Line Productions ("Crash Line") between May 1, 2014, and September 30, 2014, by wrongfully using its principals' fear of economic harm to induce it to part with its property. At trial, the government's evidence purporting to show that Sullivan entered into an agreement with Brissette to extort Crash Line and that Sullivan knowingly participated in the conspiracy boiled down to this: Sullivan attended a single meeting with Brissette and Crash Line principals Brian Appel and

---

[1] This memorandum supplements, and does not replace, the original memorandum filed by Sullivan on August 3, 2019.
[2] *See United States v. Gonzalez*, 570 F.3d 16, 24 (1st Cir. 2009).

Mike Snow on September 2, 2014.[3]  During the remainder of the charged conspiracy period,

Sullivan had no contact with Crash Line and little contact with Brissette.  (10 Tr. 86:10-23.)

Despite the fact that Brissette and Sullivan both worked for the City of Boston, the only evidence

that they otherwise communicated at all during the period of the charged conspiracy was phone

records showing that calls were made between phones ascribed to them on August 19, August

21, and September 2, as well as the September 2 email from Brissette to Sullivan asking him to

call upon his return.  *See* Ex. 57 & 58.  No evidence was introduced about what Brissette or

Sullivan might have said, whether a conversation between them actually took place, or whether

either of them even picked up the phone.  (Tr. 132:13-134:10.)

As for the meeting on September 2, Appel and Snow testified Crash Line was asked to

hire workers through Local 11 in order to avoid a potential labor demonstration during the

festival.  (5 Tr. 168:11-21; 10 Tr. 72:15-16.)  In response, Crash Line opened "a dialogue of you

know, well, if we were to sort of take employees, we started talking about quantity of employees

that we would take."  (10 Tr. 36:17-37:20.)  Either "half" or the number 30 was suggested, and

Crash Line responded that "our company was thinking three or four." (4 Tr. 139:19-146:22; 10

Tr. 36:17-37:20.)  The discussion ended with Brissette suggesting that he would have a

conversation and get back to them.  (4 Tr. 139:19-146:22.)

Appel did not recall Sullivan saying very much at the meeting. (4 Tr. 141:20-21.)  Snow

did not even know who Sullivan was—he assumed that Sullivan was present at the meeting as a

union representative and was not aware of his position with the City of Boston.  (10 Tr. 38:22-

39).  Snow therefore understood that there was nothing that Sullivan could do to affect Crash

Line's permits.  (10 Tr. 91:6-14.)   Snow could not remember who exactly did the talking at the

---

[3] Evidence of Sullivan's communications with Joyce Linehan and Colleen Glynn, both identified as non-
conspirators, is not evidence that he entered into an agreement with Brissette to extort Crash Line or that
he knowingly participated in any conspiracy.

meeting, but thought that Sullivan did most of the talking around the "negotiation piece."  (10 Tr. 79:8-14.)  There was no other evidence about anything else that Sullivan said to Crash Line, the alleged victim of the conspiracy, or Brissette, his only identified co-conspirator, regarding Boston Calling.

## ARGUMENT

A conspiracy charge has long been a "potent and oft-used weapon in the prosecutorial arsenal." *United States v. Caro*, 569 F.2d 411, 418 (5th Cir.1978).  *See Harrison v. United States*, 7 F.2d 259, 263 (2d Cir. 1925)(conspiracy is the "darling of the modern prosecutor's nursery").  As Justice Easterbrook observed almost three decades ago, "prosecutors seem to have conspiracy on their word processors as Count I; rare is the case omitting such a charge."  *United States v. Reynolds*, 919 F.2d 435, 439 (7th Cir. 1990).  "Even when appropriately invoked, the looseness and pliability of the doctrine presents inherent dangers which should be in the background of judicial thought wherever it is sought to extend the doctrine to meet the exigencies of a particular case."  *Krulewitch v. United States*, 336 U.S. 440, 449 (1949)(opinion of Jackson, J.)

To convict a defendant of conspiracy, the government must prove three elements beyond a reasonable doubt: "(1) a conspiracy existed; (2) the defendant had knowledge of the conspiracy; and (3) the defendant knowingly and voluntarily participated in the conspiracy." *United States v. Rivera-Ruperto*, 846 F.3d 417, 432 (1st Cir. 2017)(internal quotation and citation omitted).  "The requisite intent needed for a conspiracy conviction is that the defendant intended to join in the conspiracy and intended the substantive offense to be committed."[4] *United*

---

[4] It is difficult to fathom how the jury could have acquitted Sullivan of the substantive extortion count, which encompassed a theory of aiding and abetting, if it found that Sullivan intended the substantive offense to be committed.  "There is nothing necessarily inconsistent, in law or logic, with such a result and we do not hold that a conviction for conspiracy and acquittal of the substantive offense may never

*States v. Gonzalez*, 570 F.3d 16, 24 (1st Cir. 2009)(internal quotation and citation omitted).  For the reasons set forth below, in Sullivan's memorandum of law filed on August 3, 2019, and in the filings made on behalf of co-defendant Brissette, the government failed to offer evidence to support a jury verdict based on the existence of a conspiracy between Brissette and Sullivan to commit Hobbs Act extortion and Sullivan's knowingly participation in any such conspiracy.

### I.     The Government Was Required to Prove Beyond a Reasonable Doubt That Brissette and Sullivan Agreed to Commit Hobbs Act Extortion.

The Hobbs Act criminalizes the acts of one who "conspires" with another person to commit extortion.  18 U.S.C.  §1951(a).  Defendants Kenneth Brissette and Timothy Sullivan were the only co-conspirators named in the indictment, although it charged them with conspiring "together with others, known and unknown." Ind. ¶ 20.  Shortly after the defendants were indicted, the government represented that it was not aware of the existence of any other co-conspirators.  *See* Sealed Dkt #99.  The government later alleged the existence of an unindicted co-conspirator, *see* Dkt #99, but the Court found that the evidence at trial did not establish, even "by preponderance of the evidence that [the individual] joined a conspiracy to threaten the permits in order to get them to hire union at the September concert."  (8 Tr. 19:24-20:2.)[5]  To the contrary, the evidence at trial proved that the individual was actually "trying to advocate [for Crash Line], get them better hours, and get the cops to give them more hours and not the beer gardens." (8 Tr. 18:6-8.)

---

properly arise from the same facts and trial. We do suggest however, that such a result should engage our judicial skepticism. A critical analysis of the facts is required when such a contrariety of results does appear. Viewing the slippery facts and the speculations necessary to uphold this conviction in this spirit, we find the syrup of proof simply too thin."  *United States v. Caro*, 569 F.2d 411, 418 (5th Cir.1978).

[5] With the exception of Day 8, the transcript citations refer to the partial transcripts of the trial, which exclude any discussion before the jury was seated on that particular day.

The government never identified any other possible co-conspirators. [6] While a defendant theoretically can be convicted of conspiring with a co-conspirator whose name is unknown, the government must prove that the unknown co-conspirator existed and entered into an agreement with the defendant. *See United States v. Nason*, 9 F.3d 155, 159 (1st Cir. 1993)("A defendant can be indicted and convicted even if the names of his co-conspirators are unknown, as long as the government presents evidence of an agreement between two or more persons.").  The government presented no evidence, however, that proved the existence of an agreement between one of the defendants and an unknown co-conspirator.  Therefore, Brissette and Sullivan's conspiracy convictions cannot withstand Rule 29 scrutiny unless a rational jury could find beyond a reasonable doubt that an agreement existed between the two of them to extort Crash Line. *See United States v. Bailey*, 13 F.3d 407 at *5 (10th Cr. 1993)("Because we have reversed Bailey's conspiracy conviction, we must also reverse Smith's unless the government proved *beyond a reasonable doubt* the existence of one or more 'unknown' coconspirators.")(emphasis added).

## II.     No Rational Jury Could Find Beyond a Reasonable Doubt That Brissette and Sullivan Agreed to Commit Hobbs Act Extortion.

"[T]he fundamental characteristic of a conspiracy is a joint commitment to an 'endeavor which, if completed, would satisfy all of the elements of [the underlying substantive] criminal offense.'" *Ocasio v. United States*, 136 S.Ct. 1423, 1429 (2016), *quoting Salinas v. United States,* 522 U.S. 52, 65 (1997).  *See United States v. Palmer*, 203 F.3d 55, 63-64 (1st Cir. 2000)("The gist of conspiracy is an agreement to disobey or to disregard the law."). "The actions, as well as the words of the defendants, are evidence of the existence and scope of a

---

[6]  At a sidebar discussion with counsel at the close of the government's case, the government represented to the Court that Commissioner Evans and Patricia Malone were not co-conspirators.  The government also did not consider Local 11 or its members to be co-conspirators, and the Court instructed the jury accordingly.  *See* Dkt #348 at 27.

conspiracy." *United States v. Rivera-Santiago*, 872 F.2d 1073, 1079 (1st Cir. 1989).  Critical to

this joint commitment is that "membership of any defendant in a conspiracy must be established

on the basis of evidence as to what he himself did and what he himself said."  *United States v.*

*Rawwad*, 807 F.2d 294, 296 (1st Cir. 1986)(affirming conspiracy instruction to that effect).

"[S]imple knowledge, approval of, or acquiescence in the object or purpose of the conspiracy,

without an intention and agreement to accomplish *a specific illegal objective*, is not sufficient."

*United States v. Melchor-Lopez*, 627 F.2d 886, 891 (9th Cir. 1980)(emphasis added).  It is

improper for prosecutors to use conspiracy "to punish activity not properly within the ambit of

federal criminal sanction."  *United States v. Shoup*, 608 F.2d 950, 955-956 (3d Cir. 1979).

To convict Brissette and Sullivan of conspiracy to commit Hobbs Act extortion, the

government was required to prove that they entered into an agreement to "(1) knowingly and

willfully obtain property from Crash Line with Crash Line's consent; (2) induce Crash Line's

consent by knowingly and willfully using Crash Line's fear of economic harm; (3) wrongfully

use Crash Line's fear of economic harm; (4) affect interstate or foreign commerce."  *See* Dkt

#348.  The government failed to introduce evidence that would satisfy three of the four required

elements.  As a result, the defendants are entitled to a judgment of acquittal under Rule 29 on the

conspiracy to commit extortion count.  *Cf. United States v. Kirsh*, 903 F.3d 213, 231-232 (2d Cir.

2018)(reversing Hobbs Act conspiracy conviction where government failed to prove that union

workers were unqualified for work); *United States v. McFall*, 558 F.3d 951, 958 (9th Cir. 2009)

(reversing Hobbs Act conspiracy conviction where "the evidence did not establish, nor did the

indictment allege, that [defendant] obtained or attempted to obtain any property or intangible

right from [the alleged victim]"); *United States v. Pendergraft*, 297 F.3d 1198, 1208 (11th Cir.

2002) (holding that government failed to offer sufficient evidence of illegal conspiracy where defendants' use of fear of economic loss did not constitute wrongful means).

> A. *There is Insufficient Evidence That Brissette and Sullivan Agreed to Use Crash Line's Fear of Economic Harm to Induce Crash Line to Part with its Property.*

"The second element of extortion requires the government to prove beyond a reasonable doubt that the defendants induced Crash Line's consent to pay the wages and benefits at issue by using Crash Line's fear of economic harm." *See* Dkt #348 at 17.  "In this case, economic harm can include the financial consequences resulting from: 1) the denial of a permit to which Crash Line was otherwise entitled; 2) the refusal to fairly consider requests by Crash Line related to alcohol or event hours for the September 2014 festival; or 3) the refusal to consider fairly a request by Crash Line to use City Hall Plaza for future events." *Id.*  To survive a Rule 29 motion, the government was required to prove not only that the defendants "conveyed an implicit threat of economic harm...but also that the defendants intended to convey such a threat." *Id.* at 18.  The evidence also "must establish beyond a reasonable doubt that Crash Line's fear—and its belief that the defendants could and would cause such harm if Crash Line failed to comply with their demands—were reasonable under the circumstances." *Id.* at 19.

First, the government did not present any evidence that the defendants had knowledge of Crash Line's fear of economic harm.  Brian Appel testified that Crash Line did not communicate their concerns to the defendants nor make any physical gestures that would evidence their fear.[7] In fact, prior to Crash Line's August 19 meeting with Brissette and Linehan, Appel had told Linehan that Crash Line would be amenable to a conversation about hiring union members and

---

[7] **Q.** Did you ever tell them as they were talking to you, hey, wait a second, I think you're threatening me.
  **A.** I didn't specifically say that, no.
  **Q.** Well, did you -- did you quiver?
  **A.** I doubt it.
  **Q.** Did you ask them if they knew how they were making you feel?
  **A.** No.   (5 Tr. 66:16-23.)

thought that it could be something much bigger than just hiring a couple of guys.[8]  (4 Tr. 170:18-171:6.)  The Crash Line principals did not testify that either defendant had any direct authority over the licenses or permits.[9]  As the defendants had no control over the permits, they would have no reason to even consider the possibility that Crash Line might be afraid that they would deny it permits if it did not agree to hire workers through Local 11.  There was no evidence that Sullivan had any knowledge about liquor licenses issued by the gubernatorial-appointed Licensing Board or about the Entertainment Licenses issued by the Commissioner of Consumer Affairs & Licensing.

Second, the government failed to adduce evidence to establish that Crash Line possessed a fear of economic harm that was reasonable under the circumstances.  When Snow was asked on direct examination how he felt at the September 2 meeting, he testified that he was "naturally amped up" and "already sort of hyper" because he was in "show mode" and that the conversation with the defendants made him feel "stuck."  (10 Tr. 42:23-43:15.)  The fact that Snow felt "stuck" during a conversation because it happened while he was in "show mode" is insufficient to prove that he reasonably believed that the defendants "could and would cause Crash Line [economic] harm." *See* Dkt #348 at 17.  Appel testified that he did not tell the defendants that he would not hire workers through Local 11 at the September 2 meeting because he was "concerned that we were not going to get our permits or inferior permits, this seemed like a problem that could be solved so at that point my job with the company is to make sure the event happens overall and this felt like a way I could solve this problem."  (4 Tr. 143:21-144:4.)  But Appel admitted that he already had a liquor license at the time of the September 2 meeting, that the

---

[8] Appel testified that the "bigger and better conversation" was that Crash Line would hire union labor for the following year and that he was told that putting on union labor in 2015 would not satisfy the union.  (5 Tr. 179:23-180:9.)

[9]  Appel testified on direct that "I wasn't exactly sure that either of them had direct oversight of our licenses or permits."  (4 Tr. 144:8-12.)

entertainment license had been dropped off with Patricia Malone on August 29, and that it was not unusual to get an entertainment license the day of the festival.  (5 Tr. 83:23-84:16.)

While Appel testified that the September festival was "a much more challenging permitting process for us," the challenges he referred to involved getting "signoffs from the police department."  (4 Tr. 123:22-125:20.)  Appel testified that he believed that the police department was giving them difficulties because "they did not like the fact that we were not confining attendees to beer gardens any longer, and also we learned that they were not pleased that we were trying to get them to reduce their police deployment"—not because the defendants had directed them to or because Crash Line was not using union labor.  (4 Tr. 123:22-125:20.)  More importantly, Appel testified not only that he "wasn't exactly sure that either of them had direct oversight of our licenses or permits" (4 Tri. 144:8-12.) but also that he knew Brissette and Sullivan had no involvement in the liquor license and had done nothing to obstruct or delay it (5 Tr. 110:11-19); and that there was no discussion of permits or liquor licenses in Brissette's presence because Appel knew that he did not have anything to do with it (5 Tr. 135:21-136 2.).  Thus, Brissette would have had no basis on which to suggest to Sullivan (or anyone else) that Crash Line had a fear of economic harm arising from the status of its permits and approvals.  Appel even testified that he did not believe that the defendants were trying to harm Crash Line.[10]

Third, there is insufficient evidence upon which a rational jury could find beyond a reasonable doubt that the defendants knowingly and willfully entered into an agreement to exploit Crash Line's unexpressed fear of economic harm.  Appel testified that "at [the September 2] meeting we were told that IATSE was not happy that they were not involved in the Boston

---

[10] **Q:** You had indicated on examination, cross-examination that you did not believe that Ken Brissette was out to harm you or hurt you, correct?
  **A.** Him personally, no.
  **Q.** And with regard to Tim Sullivan, would the answer be the same?
  **A.** Yes.  (5 Tr. 179:15-21.)

Calling production and that they were threatening to picket the event and also to blow up the inflatable rat at the entrance to the festival throughout the weekend." (4 Tr. 139:14-21.)  That is "predictive", not threatening.  Likewise, Snow testified that the thrust of the conversation on September 2nd was "let's see if we can avoid this demonstration" by the union.  (10 Tr. 80:9-12.)  Snow confirmed that neither defendant said that "if you don't hire union labor, you're not going to be able to put this festival on." (10 Tr. 91:16-20).  Snow also testified that he did not recall either of the defendants making any hand gestures that were threatening.  (10 Tr. 91:24-92:12.)

While Snow testified that there was "an implication" of "[d]o this or else," the "else" to which he was referring was that "there would be a picket and a rat."[11]  To the extent that a picket and inflatable rat constitutes economic harm, it is not economic harm that would be caused by the defendants.  Snow testified that he "did something [he] didn't want to do," *i.e.*, hired nine workers through Local 11, because he "was put in a position to make a decision" by the defendants. The defendants could not commit extortion by merely informing Crash Line that the union might cause problems it did not hire any workers through Local 11.[12]  Even assuming, arguendo, that taken in the light most favorable to the government, the testimony of the alleged victims equally supported a theory of innocence and a theory of guilt, it would still be insufficient to survive a Rule 29 motion.  *See United States v. Flores-Rivera*, 56 F.3d 319, 323 (1st Cr. 1995)("If the evidence viewed in the light most favorable to the verdict gives equal or

---

[11] **Q.** Okay.  When you were talking to -- and when Tim was at that meeting on the 2d of September, you understood, did you not -- strike that.  Never – nobody ever articulated or said, "Do this or else?"
  **A.** I believe there was an implication.
  **Q.** I didn't ask you if there was an implication.  Did anybody say it?
  **A.** We were told there would be a picket and a rat. (5 Tr. 65:1-6.)

[12] THE COURT: I think, I assume, maybe one thing they're going to argue is that their clients simply said, "Look, if you don't hire union, you're going to get problems, predictive."  In other words, "We're not causing the problems, we're just the messenger.  We're just telling you, this is what we hear.  We know lots of people, we hear this, just FYI."  And if the jury believes that, that is all they were doing was telling hem that, that wouldn't be extortion, right?
MS. KAPLAN: Correct.  *See* Dkt #178 at 49.

nearly equal circumstantial support to a theory of guilt and a theory of innocence of the crime charged, this court must reverse the conviction.")(internal quotation and citation omitted).

Fourth, but closely related, the government did not prove that the defendants knowingly and willfully induced Crash Line to part with its property through their use of Crash Line's fear of economic harm.  Appel testified that he had called Crash Line's lead investor, Jesse Du Bey, prior to the September 2 meeting to get his advice about the request that they hire workers through Local 11, and that Du Bey advised him to "see if, you know, there can be some positive that comes out of it in the long run." (4 Tr. 146:7-17.)  As Appel told the jury, "Jesse Du Bey, who was part of our strategy group, and I had discussed we thought if we're going to have a conversation around unions and we're going to end up taking union labor, perhaps we can get a lease extension."  (4 Tr. 172:2-12.)  In other words, "[l]et's use it as a bargaining chip."[13]  (4 Tr. 173:2-4.)  In addition, Appel testified that after Brissette called him to ask for a meeting, Snow said to Appel that "[t]his probably means we're taking union labor for this show."  (4 Tr. 135:14-16.)  Since Appel and Snow entered the meeting prepared to take union workers, they could not have been induced by a known and reasonable fear of economic harm exploited by the defendants at the meeting.

> **B.  There is No Evidence That Brissette and Sullivan Agreed to Use Wrongful Means to Achieve a Wrongful Purpose.**

"The third element of extortion requires the government to prove beyond a reasonable doubt that the defendants' alleged use of fear of economic harm was 'wrongful.'"  *See* Dkt #348 at 21.  The government must prove that the defendants "used 'wrongful means' to achieve a 'wrongful purpose.'"  *Id.  See United States v. Brissette,* 919 F.3d 670, 685 (1st Cir. 2019)("In

---

[13] The evidence that Crash Line used the request to hire workers through Local 11 as bargaining power in its efforts to secure a long-term lease extension also supports Sullivan's argument that Crash Line's fear of economic harm was not reasonable.

the end, whether '[t]he use of economic fear' is 'wrongful' within the meaning of the Hobbs Act

extortion provision turns, at least in part, on whether it was employed to achieve a wrongful

purpose.").  The Supreme Court has cited as examples of wrongful conduct instances "where

union officials threatened force or violence against an employer in order to obtain personal

payoffs" and "where unions used the proscribed means to exact 'wage' payoffs from employers

in return for 'imposed, unwanted, superfluous and *fictitious* services' of workers."  *United States*

*v. Burhoe*, 871 F.3d 1, 8 (1st Cir. 2017), citing *United States v. Enmons*, 410 U.S. 396, 400

(1973)(emphasis added).  In this case, "[t]he defendants have been charged...with conduct that is,

as a factual matter, quite distinct from other wrongful uses of fear."  *Brissette*, 919 F.3d at 685.

The defendants were indicted on a "novel theory" of Hobbs Act extortion involving "the use of

fear by government officials to secure real work for members of a specific union and for which

the officials would receive no personal gain."  *Id.*

   "A defendant uses 'wrongful means' if he makes threats of economic harm that he

knows are prohibited."  *Id.*[14]  Prior to trial, the government had set forth four theories of

"wrongful means."  *See* Dkt #249.  The government subsequently disavowed those theories that

relied on a breach of the National Labor Relations Act,[15] *see* Dkt #349, and the Court rejected

the theory of "wrongful means" as a violation of the state ethics law.[16]  *See* #259 at 5.

---

[14] *See United States v. Pendergraft*, 297 F.3d at 1206-1208 (holding that threat to add additional claim to existing litigation that was backed by fabricated evidence did not qualify as wrongful means).

[15] Accordingly, the Court removed from its final jury charge all references to the NLRA that had appeared in its draft charge circulated to the parties on August 3, including the following language: "when state or local officials are acting as market participants with no interest in setting policy—for example, if they are owners or managers of publicly owned property, interacting with private participants in the marketplace—they may require the hiring of union members without violating federal law."  That language reflected a truism, drawn from *Building & Constr. Trades Council*, 507 U.S. 218, 225-227 (1993), and the defendants unsuccessfully sought to have it reinserted.  Importantly, removing this instruction from the charge—rightly or wrongly—does not make the statement any less true.

[16] Not to be deterred, the government repeatedly referenced the state ethics law in its closing argument.

Thus, the only remaining theory of "wrongful means" is that the defendants' conduct was wrongful because Crash Line's Irrevocable License Agreement ("ILA") somehow precluded City officials from weighing in on who Crash Line hires.  That position is severely undercut by the City's deletion of the labor-related provisions at the end of Clause 3 of Crash Line's draft of the ILA.  *Compare* Ex. 251 and 254.  The government persisted with that theory, however, closing by pointing to Clause 4(v) of the ILA.  In relevant part, the ILA provides: "4. Licensee's responsibilities: Licensee shall also be solely responsible for and shall have the right to do each of the following:... v) Providing and setting up all electrical, stage, sound and displays for the Events; ... ix) Selecting, in its sole discretion and contracting with the performers, talent and other acts performing at or appearing during each Event."  *See* Ex. 7.  If Clause 4(v) were intended to bestow sole discretion on Crash Line with respect to the composition of its work force, then its language would mimic Clause 4(ix) of the Agreement, which actually does give Crash Line sole discretion in selecting performers for the festival.  *See* Ex. 7.

More importantly, as the Court instructed the jury, the ILA "did not preclude any City official from asking Crash Line to consider hiring union workers, or from trying to help resolve a dispute involving a union's request for work."[17]  *See* Dkt #348 at 21.  The government's proof fails on this ground because the overwhelming evidence at trial was that the defendants *asked* Crash Line to hire workers through Local 11 to avoid a labor demonstration by the union.[18]

---

[17] Even Snow testified to this fact:
**Q**. You understood, did you not, that there was no prohibition for anybody asking Crash Line if they would hire union labor?
**A.** I understood it was okay to ask.
**Q.** You understood it was okay to ask, right?
**A.** Sure. You can ask anybody anything.  (10 Tr. 92:25-93:5.)
[18] The government never alleged that Colleen Glynn and Local 11 were part of a conspiracy to wrongfully use fear of economic harm to induce Crash Line to part with its property and presented no evidence to support such a claim.  *See* Dkt #348 at 27 ("The government does not claim that Local 11 or any of its representatives, or that Crash Line or any of its representatives, were co-conspirators with the defendants

Appel testified that "I believe that we were being asked to take union labor for the festival that was occurring three days later to avoid a picket and the inflation of the rat in front of our entrance." (5 Tr. 168:11-21.)  Snow also testified that they were *asked* to accept some union labor. (10 Tr. 72:15-16.)  Thus, even taken in the light most favorable to the government, the evidence was clearly consistent with innocence, not guilt.[19]

Equally or more significant in determining whether the defendants used "wrongful means" based on the ILA are the provisions of Paragraph 8 of the ILA labelled "Non-Disturbance."  Paragraph 8 required Crash Line to "use commercially reasonable efforts, taking into consideration the intended use of the Event Property for outdoor music festivals, to minimize any material disruption to the environment surrounding the Event Property...[and to] coordinate with local stakeholders, either in person or telephonically, to ensure consideration is given to minimize any disruption from the Event."  *See* Ex. 7, ¶ 8.  Thus, the ILA did not make it wrongful for the defendants to ask Crash Line to hire some workers through Local 11 to avoid a disruptive labor protest by Local 11 on the area surrounding City Hall Plaza.  Instead, the ILA actually required Crash Line to use commercially reasonable efforts, such as coordinating with local stakeholders like Local 11, to avoid such a disruption.  It is also noteworthy that the ILA released the parties from their respective obligations by reason of strike or labor troubles.  *Id.* at ¶16.

---

in this case.").  Although the government's theory of the First Superseding Indictment was that the defendants were acting as agents for the union, it later amended its theory to charge the defendants with acting solely as City agents.  *See* Dkt #204 at 4.  The government maintained in its opening statement at trial that this "is not a case about unions."  (2 Tr. 21:14.)

[19] Even if the evidence viewed favorably to the government presented "equal or nearly equal circumstantial support to a theory of guilt and a theory of innocence," the defendants are entitled to a judgment of acquittal because in such circumstances "a reasonable jury *must necessarily entertain* a reasonable doubt   *Flores-Rivera*, 56 F.3d at 323 (internal quotation and citation omitted).

The government also introduced no evidence to prove that the defendants agreed to achieve a "wrongful purpose."  As a general proposition, "[s]eeking to obtain real work for qualified people is not a wrongful purpose even if the work was unwanted or unneeded by an employer."  *See* Dkt #348 at 22. Snow testified that the stagehands hired to work at Boston Calling through Local 11 did in fact perform the work that they were hired to do.  (10 Tr. 78:13-23.)

More specifically, the government attempted to prove a "wrongful purpose" by arguing to the jury that it is wrongful for a public official to favor political supporters.  The government asserted that the defendants forced Crash Line to hire workers "as payback to a union that was a political supporter" (2 Tr. 5:13-15.); that the defendants "knew it was against state law for City employees to use their position to take jobs away from one group of workers and give them to their political supporters" (2 Tr. 19:3-6.); that "forcing Crash Line to hire political supporters...is not a legitimate exercise of defendants' authority" (2 Tr. 21:3-6.); that the defendants "breached their public trust in order to favor political supporters" (12. Tr. 6:3-4.); and that "we all deserve so much more from our public officials." (12 Tr. 98:8-9.)  The government even went so far as to declare to the jury that if it finds that "this is just politics as usual then the Judge, the lawyers, myself included, have failed to find an impartial jury, who will reach a verdict based solely on the evidence and I know that's not the case." (12 Tr. 98:2-6.)  Hyperbole is no substitute for evidence.  Neither is suggesting that the jury lacks impartiality if it sides with a defendant in a novel case such as this.

Contrary to the government's intimations, the evidence proved that the defendants asked Crash Line to hire workers through Local 11 to avoid a protest and inflatable rat on City Hall Plaza, not to favor or pay back political supporters.  Snow testified that the defendants told them

that "there could be a union protest involving picketers and the rat" if they did not hire some

workers through Local 11 and that he believed the defendants were telling the truth.  (10 Tr.

94:13-95:5.)  Appel also testified that the defendants said that Local 11 was threatening to picket

the event and blow up the inflatable rat and that Brissette was concerned around the optics.  (4

Tr. 138:15-139:8.)  Even the government proffered that "[t]he defendants wanted to avoid any

embarrassment that a Local 11 picket and the use of a giant inflatable rat on City Hall Plaza

might cause to a defendant and the Walsh administration."  *See Brissette*, 919 F.3d at n.4.  In

addition, while a theory of payback to political supporters connotes a politician who feels

indebted to a big donor, Colleen Glynn testified that Local 11 did not donate a cent to the

Mayor's campaign and that they volunteered to do a phone bank and to knock on doors for him

because they believed he was the best candidate for the job. (7 Tr. 86:24-88:17.)

     In any case, as the Supreme Court has recognized, "[f]avoritism and influence are not, as

the Government's theory suggests, avoidable in representative politics." *McConnell v. Federal*

*Election Comm'n*, 540 U.S. 93, 279 (2003)(opinion of Kennedy, J.).  "It is well understood that a

substantial and legitimate reason, if not the only reason, to cast a vote for, or to make a

contribution to, one candidate over another is that the candidate will respond by producing those

political outcomes the supporter favors." *See Citizens United v. Fed. Election Comm'n*, 558 U.S.

310, 359 (2010)("The appearance of influence or access...will not cause the electorate to lose

faith in our democracy.").

     The government's theory that it is extortion for a public official to ask a business to hire

workers through a labor union in order to avoid a disruptive protest on public property would

effect a "breathtaking expansion of public-corruption law [that] would likely chill [public]

officials' interactions with the people they serve and thus damage their ability effectively to

16

perform their duties." *Id.* No public official could ever ask a business to do anything that would affect the business without risking criminal prosecution.[20] *Cf. McDonnell*, 136 S.Ct. at 2372.

An interpretation of a federal criminal statute that would encompass "nearly any activity by a public official" raises due process concerns as "public officials could be subject to prosecution, without fair notice, for the most prosaic interactions." *McDonnell*, 136 S.Ct. 2367-2373. Such an interpretation also raises "significant federalism concerns." *Id*. at 2373. Accordingly, the Supreme Court has repeatedly declined to construe federal law "'in a manner that leaves its outer boundaries ambiguous and involves the Federal Government in setting standards of 'good government for local and state officials.'" *Id.* at 2373, *quoting McNally v. United States*, 483 U.S. 350, 360 (1987). *See also United States v. Tavares*, 844 F.3d 46, 53-54 (1st Cir. 2016)(ordering entry of judgment of acquittal where "state officials' efforts to increase funding for their department through closed-door arrangements with state legislators and other public officials" did not "satisf[y] the appropriate criminal statutes").

C. *There is No Evidence That Brissette and Sullivan Agreed to Direct Wages and Benefits to Individuals They Identified.*

The required element of obtaining property "may be satisfied by showing that the defendants induced the victim's consent to transfer property to third parties *the defendants identified*, even where the defendants do not incur any personal benefit from the transfer and where the transfer takes the form of wages for real rather than fictitious work." *Brissette*, 919 F.3d at 685-686 (emphasis added). In reaching this conclusion, the First Circuit aligned itself with "the only other circuits to have squarely addressed the question," each of which had held that the obtaining element is satisfied by directing the transfer of property "*to another of his*

---

[20] *See e.g.*, Tim Logan, *Developers pressed to fund extra T service*, THE BOSTON GLOBE (July 9, 2019), https://www.bostonglobe.com/business/2019/07/09/developers-pressed-fund-extra-service/CUJs6lAMOao1Tas71LWgXM/story.html.

*choosing*, irrespective of whether he receives a personal benefit as a result." *Id.* at 679 (emphasis added). This Court analyzed four of the five cases from those circuits in footnote 17 of its reconsideration order, *see* Dkt #204 at 19-20: *United States v. Carlson*, 787 F.3d 939, 944 (8th Cir. 2015)(where the payments sought were to be delivered to a particular doctor with whom the defendant was "infatuated"); *United States v. Vigil*, 523 F.3d 1258, 1264 (10th Cir. 2008)(where money was directed to the wife of the person to whom the defendant owed money); *United States v. Gotti*, 459 F.3d 296, 324 n.9 (2d Cir. 2006)(holding that "extortion victim's property right might be exercised, transferred, or sold by an extortionist" where "the victim's right is sold by the extortionist to a third party *of the extortionist's choosing*")(emphasis added); and *United States v. Provenzano*, 339 F.2d 678, 696 (3rd Cir. 1964)( "It is enough that payments were made at the extortioner's direction to *a person named by him*")(emphasis added).[21]

In this case, the property obtained from Crash Line is the wages and benefits that were paid to nine workers hired through Local 11.  Wages and benefits are paid to individuals.  There was no evidence presented at trial that the defendants identified specific individuals to be paid wages and benefits by Crash Line.[22]  To the contrary, the testimony at trial was that Crash Line gave Colleen Glynn a list of people that it wanted on the call because Bill Kenney Productions was familiar with them.[23]  (7 Tr. 14:10-23; 9 Tr. 18:15-19:6.)  Thus, Crash Line, Bill Kenney, and Colleen Glynn—but not the defendants—identified the parties who would receive the property at issue by choosing or naming them.  The government cannot satisfy its burden of

---

[21] The fifth case considered by the First Circuit was *United States v. Panaro*, 266 F.3d 939, 943 (9th Cir. 2001), where the court cited to the above quoted statement in *Provenzano*.

[22] The dictionary definition of the verb "identify" is "to show to be a certain person or thing."  Webster's New Universal Unabridged Dictionary 902 (2 ed. 1983).

[23] Kenney testified that "what I requested, since this was being brought on, because I didn't know how both teams would mesh and jive, okay, that I could put a list together of 20 – I think it was 20 plus names of people that had worked for me...I was able to have I'd say seven of them, out of the nine, were people that worked for me, and the other couple I did know like their dads or uncles, or whatever." (9 Tr. 18:15.)

proving that the defendants directed the transfer of wages and benefits to a third party they identified by pointing to evidence that they asked Crash Line to hire workers through Local 11. If that were the case, an individual would obtain property within the meaning of the Hobbs Act any time he or she encouraged the hiring of a particular group or category of people, such as residents, veterans, women, or any historically disadvantaged group.

### III.   No Rational Jury Could Find That The Government Proved Beyond a Reasonable Doubt That Sullivan Knowingly Participated in Any Conspiracy to Extort Crash Line.

A conspiracy conviction requires the government to prove the defendant's "knowing and voluntary participation in the conspiracy."  *United States v. Dellosantos*, 649 F.3d 109 (1st Cir. 2011)(internal quotation and citation omitted).  That requires facts, not conjecture.  The defendant must "knowingly contribute his efforts to the conspiracy's objectives." *United States v. Duckworth*, 945 F.2d 1052, 1053 (8th Cir. 1991).  *See United States v. Falcone*, 311 U.S. 205, 210-211 (1940) (holding that in order to prove participation in conspiracy, government must prove defendant was aware his actions would further conspiracy).  "'Mere association' with the conspirators or 'mere presence' during activities of the conspiracy will not, standing alone, be sufficient for conviction." *United States v. Nelson-Rodriguez*, 319 F.3d 12, 28(1st Cir. 2003). *See United States v. Pardo*, 636 F.2d 535, 549 (D.C. Cir. 1980)("It may be foolish to stand by when others are acting illegally, or to associate with those who have committed a crime... [s]uch conduct or association, however, without more, does not establish the offenses here charged.").

In *United States v. Santos*, 449 F.3d 93, 104 (2d Cir. 2005), the Second Circuit reversed Defendant Vazquez Baez's conviction of conspiracy to commit Hobbs Act robbery where "[t]he government's principal evidence, even when viewed in the light most favorable to the government, only establishes Vazquez Baez's 'mere presence' at the scene" and "does not

establish that Vazquez Baez knowingly *participated in* the conspiracy to rob."  (emphasis in original).  Similarly, here, the government's "proof" of Sullivan's participation in any conspiracy to extort Crash Line is the mere fact that he attended the September 2, 2014, meeting.[24]  While Snow testified that Sullivan did most of the talking around the negotiation piece of the meeting, discussing the number of Local 11 workers in response to Crash Line "opening a dialogue of you know, well, if we were to sort of take employees, we started talking about quantity of employees that we would take" cannot be fairly characterized as contributing his efforts to an extortion of Crash Line.  (10 Tr. 79:8-14.)

The government has no evidence—nothing—to prove that Sullivan participated in a conspiracy with Brissette to extort Crash Line.  Therefore, as in *Santos*, Sullivan is entitled to a judgment of acquittal.  *See also Pardo*, 636 F.2d at 549-550 (granting acquittal on conspiracy count where defendant stood behind drug dealer while dealer sold cocaine to undercover agent).

## CONCLUSION

For the foregoing reasons, and the reasons set forth in Sullivan's previous memorandum in support of his Rule 29 motion and in Brissette's memoranda in support of his Rule 29 motions, the Court should enter a judgment of acquittal on Count One of the indictment.

---

[24] As Colleen Glynn and Joyce Linehan were not conspirators, Sullivan's communications with them do not prove his knowing participation in any conspiracy.  Evidence that Colleen Glynn sent an email to Sullivan's email address indicating that she was sending a draft agreement for the Boston Calling concert, *see* Ex. 30, cannot prove his knowing participation because the government conceded that there is no evidence that Sullivan actually forwarded the contract on to anyone (or, for that matter, even read the email).  (2 Tr. 14:12-18.)  Similarly, Colleen Glynn's testimony that she spoke with Sullivan on a few occasions prior to September 2 to request help getting work on Boston Calling because her members were angry that Bill Kenney Productions was being used and were "chomping at the bit" does not prove Sullivan's knowing participation in any conspiracy because there is no evidence that Sullivan took any action or asked anyone else to take action regarding her request.   (7 Tr. 6:9-7:4; 54:11-21.)

Respectfully submitted,

TIMOTHY SULLIVAN,
By his attorneys,

*/s/ Thomas R. Kiley*
*/s/ William J. Cintolo*
*/s/ Meredith G. Fierro*

_____
Thomas R. Kiley (BBO # 271460)
William J. Cintolo (BBO # 084120)
Meredith G. Fierro (BBO # 696295)
COSGROVE EISENBERG & KILEY, P.C.
One International Place, Suite 1820
Boston, MA 02110
617-439-7775
tkiley@ceklaw.net
wcintolo@ceklaw.net
mfierro@ceklaw.net

Dated: August 21, 2019

## CERTIFICATE OF SERVICE

I hereby certify that on this date, August 21, 2019, a copy of the foregoing document has

been served via electronic filing upon all registered parties.

/s/ Meredith Fierro
Meredith Fierro