## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | |
| v. ) | Case No. 16-cr-10137-LTS |
| ) | |
| KENNETH BRISSETTE and ) | |
| TIMOTHY SULLIVAN ) | |
| ) | |

## MEMORANDUM IN SUPPORT OF
## KENNETH BRISSETTE'S MOTION FOR NEW TRIAL

Defendant Kenneth Brissette moves this Court to rectify the manifest injustice of the verdict in this case. On this record, the most appropriate way to do so is by entering a judgment of acquittal, as argued by both defendants in their Motions for Judgment of Acquittal under Fed. R. Crim. P. 29 and supporting papers. At the very least, the Court should grant the defendants a new trial under Fed. R. Crim. P. 33 because the verdicts constitute a miscarriage of justice and contradict the record evidence and decades of Supreme Court precedent concerning the proper application of the Hobbs Act to zealous advocacy on the part of public officials.

### ARGUMENT

Numerous independent grounds warrant a new trial in this case, including: (1) the government's improper and repeated references to Mr. Brissette's title and office with the City of Boston and his role as a public official as proof of Hobbs Act extortion; (2) multiple misstatements of law and fact made by the government at closing; and (3) the prejudicial admission of Top Chef-related evidence ostensibly to prove Mr. Brissette's state of mind despite the fact that there was no evidence linking such evidence to any facts or circumstances pertaining to the underlying charge and case.

A trial judge may grant a new trial "if the interest of justice so requires." Fed. R. Crim. P. 33(a). The remedy of a new trial is warranted "where there would be a miscarriage of justice or where the evidence preponderates heavily against the verdict." *United States v. Andrade*, 94 F.3d 9, 14 (1st Cir. 1996) (quotations omitted). There is no question that with respect to Mr. Brissette, both are true. Not only did the government fail to prove beyond a reasonable doubt that Mr. Brissette extorted and conspired to extort Crash Line, but it presented an unsound and unconstitutional theory of criminality to the jury. And if that were not bad enough, in the closing argument, the government intentionally misrepresented the evidence and the law in several key respects. This combination of prejudicial acts by the government and an unconstitutional theory of criminality resulted in a manifestly unfair trial for Mr. Brissette.

With respect to closing and rebuttal arguments by the government, prosecutors may "strike hard blows," but they are never permitted "to strike foul ones." *United States v. Taylor,* 54 F.3d 967, 977 (1st Cir.1995) (quoting *Berger v. United States,* 295 U.S. 78, 88, 55 S.Ct. 629, 79 L.Ed. 1314 (1935)). In determining whether argument is improper, courts can consider any number of factors, including the extent of the improper remarks; the context; the likely effect of any curative instructions given by the judge; the weight of the evidence against the defendant; the frequency with which the government made "persistently pejorative" comments; the nature and tendency of those comments "to lead the jury away from the charges in the indictment;" and the limited purpose, if any, for which the evidence was admitted and whether the comments drew the jury away from that limited purpose. *United States v. Carpenter*, 494 F.3d 13, 23-24 (1st Cir. 2007) (citing *United States v. Casas,* 425 F.3d 23, 38 (1st Cir.2005)). These factors are not exhaustive; they are meant merely to guide the court's

inquiry into whether the prosecutor's improper comments have undermined the fairness of the trial. *Id*.

One key consideration in evaluating a motion for a new trial based on inflammatory argument is the overall strength of the government's case. *See United States v. Manning,* 23 F.3d 570, 574 (1st Cir.1994); *United States v. Mandelbaum,* 803 F.2d 42, 45 (1st Cir.1986). The court may consider both the weight of the evidence and the credibility of the witnesses in deciding a motion for a new trial. *United States v. Rothrock*, 806 F.2d 318, 321 (1st Cir. 1986). Where the government's case is not so strong that it can confidently be said that repeated improper comments had no illegitimate effect on the jury's assessment of the evidence—particularly where that evidence goes to a crucial issue of the case—the verdict cannot be allowed to stand. *United States v. Carpenter*, 405 F. Supp. 2d 85, 102–03 (D. Mass. 2005), *aff'd in part, appeal dismissed in part*, 494 F.3d 13 (1st Cir. 2007).

### I. A New Trial Must be Granted Because the Government Impermissibly Relied on Mr. Brissette's Title and Office as a Substitute for Actual Evidence of Hobbs Act Extortion

As set forth in detail in Mr. Brissette's papers in support of his Motion for Judgment of Acquittal, the government presented a manifestly improper theory of criminality to the jury. Specifically, the government repeatedly urged the jury to convict Mr. Brissette of committing Hobbs Act extortion because of the title and office he held in the City of Boston all the while knowing that Mr. Brissette was not charged with – and the government could not prove – an "under color of official right" case.

Mr. Brissette's Supplemental Memorandum in Support his Motion for Judgment of Acquittal ("Supp. Mem.") details the ways in which the government improperly used his title and office as a proxy for criminality in the opening statement. *See* Supp. Mem. at 8-9. In the closing

argument, the government again repeatedly urged the jury to find Mr. Brissette guilty by drawing a legally non-existent line between "vigorous advocacy" and Hobbs Act extortion. *See, e.g.,* Tr., Day 12 (8/6/19) at 5:9-15 ("[v]igorous advocacy does not include telling a private company, who was under no obligation to hire members of a union, that they must give up their wages and benefits to union members or face financial ruin"); 36:24-37:7 ("As a public official, you can put people together, including your political supporters and you can advocate for them . . . but you can't, as a public official, force a company to breach their labor agreement with a company they have chosen to hire, threaten their permits and hours of operation and entertainment license, all because you want them to hire your political supporters"); 38:20-22 ("public officials have no business interfering in the hiring decisions of a private employer unless there's some legitimate purpose"); 88:21-23 ("vigorous advocacy and doing your job as a public official doesn't mean forcing Crash Line to take on additional labor that they didn't want or need").

Those arguments were contrary to black letter law, which holds unequivocally that vigorous advocacy does **not** constitute extortion unless the advocacy at issue is an "official act" undertaken as part of a quid pro quo agreement in exchange for a payment that personally benefits the official. *McDonnell v. U.S.*, 136 S. Ct. 2355, 2371-72 (2016); *Wilkie v. Robins*, 551 U.S. 537, 562-63 (2007); *McCormick v. U.S.*, 500 U.S. 257, 265-66 (1991). Those cases preclude the federal government from using the Hobbs Act to second guess a public official's interactions with constituents or decide when those interactions go "too far." Yet that is <u>exactly</u> what the government told the jury it must do. *See* Tr., Day 12 (8/6/19) at 98:3-4 (arguing that if the jury feels "this is just politics as usual, then the judge, the lawyers, myself included, have failed to find an impartial jury"). Wherever the boundaries of permissible closing argument lie, purposefully and repeatedly misstating the law to the jury falls well outside those lines.

The government also urged the jury to accept misleading and inaccurate testimony about the scope of Mr. Brissette's "official authority." Tellingly, at trial, the government did <u>not</u> call the individuals who actually had regulatory authority over the permits Crash Line needed to operate the Boston Calling concert: Patricia Malone, the then-Director of the Office of Consumer Affairs and Licensing, and the individual with sole regulatory authority to issue Crash Line's entertainment license; and then-Boston Police Commissioner William Evans, who had sign off authority on both the entertainment license and the liquor license. The only explanation for not calling those witnesses is that the government knew their testimony – although true and accurate – would undermine the misleading picture that the government apparently intended to argue to the jury.[1] Instead, the government elicited inaccurate testimony about Mr. Brissette's permitting authority from Lisa Lamberti-Menino, an employee of a separate City department who had nothing to do with the permits at issue, and then argued <u>that</u> testimony to the jury at closing – despite the fact that the government knew it was factually inaccurate. *See id.* at 19:23-20:1. It misrepresented the testimony of Ms. Malone, Commissioner Evans, Mr. Appel, and other witnesses on precisely this point. *See* Part II(C), Part III, *infra*. It even argued that "the testimony about the alcohol license and the concerns on the part of Ms. Malone and Commissioner Evans was nothing more than a side show." *See* Tr., Day 12 (8/6/19) at 95:6-9.

The government also encouraged rank speculation on the part of jury. For example, the government argued that the jury could find Mr. Brissette wrongfully used Crash Line's fear based on the following hypothetical: <u>if</u> Crash Line had said no to his request that it hire union

---

[1] Instead, the defense called Ms. Malone and Commissioner Evans, each of whom testified that they personally imposed the permit conditions Crash Line did not want; that they did so in the exercise of their regulatory authority and in the interest of public safety; that Mr. Brissette had no authority over the permits and did not speak with them at any point about the permits; and that they neither knew nor cared whether Crash Line employed union labor. *See* Part III, *infra*.

labor (which did not happen) and Mr. Brissette was "not happy with them" (which did not happen) and "he's the Director of the Sports, Tourism and Special Events" and he conveys his unhappiness to the rest of the committee (which did not happen), "don't you think that the rest of the committee is going to listen to him?  He certainly could have affected the outcome of the RFP."  *See* Tr., Day 12 (8/6/19) at 13:4-12.  The government's argument was not just speculative; it was contrary to the undisputed evidence that the Commissioner of Property Management had sole decision-making authority over the award of any RFP; that Mr. Brissette had no authority to affect that decision; and that Mr. Brissette did not in fact affect the RFP process.  *See* Tr., Day 9 (8/1/19) at 124:12-125:21, 126:11-127:2; *see also* Exhibit 26 (March 2015 Request for Proposal) at 11.  The government even went so far as to tell the jury that it should equate Mr. Brissette with the "City of Boston" or "City Hall."  *See, e.g.,* Tr., Day 12 (8/6/19) at 24:1-6 ("The City could not demand that Boston Calling use union labor, even to reward their political supporters and even to please Mayor Walsh"); 29:5-7 ("Appel and Snow were called into this meeting at City Hall, with the defendants who held the power of City Hall in their hands"); 93:2-3 ("The defendants on trial today are public officials representing the City of Boston.").

The government also repeatedly and strenuously argued that Mr. Brissette and Mr. Sullivan were motivated not by a desire to avoid a picket (which the government claimed the defendants "made up" despite ample evidence that Local 11 was in fact planning to picket the concert), but rather by a desire to please Mayor Walsh and his political supporters.  *See, e.g., id.* at 7:2-7, 16:6-8, 29:11-16, 31:8-9, 32:16-23, 33:8-11, 38:24-39:3, 89:1-11, 96:3-8.  That argument was improper in two ways – first, because there was absolutely no evidence to support

it, and second, because it contradicted this Court's legal instructions and prior Supreme Court precedent.

As to the lack of factual support, the undisputed evidence at trial – including from all of the Crash Line and Local 11 witnesses – was that Mr. Brissette and Mr. Sullivan were genuinely trying to avoid a picket on City Hall Plaza, and that Local 11 was in fact planning to picket the event. Not one witness testified in a way that supported the government's argument at closing. The government's argument also falsely and misleadingly suggested that Mayor Walsh and/or the members of Local 11 (or unions generally) had some role in the alleged conspiracy when in fact – as the government well knows – they have never been identified as unindicted co-conspirators in this case nor is there a shred of evidence linking them to any wrongdoing.

The government's argument also sowed confusion with the jury as to what the law does and does not allow public officials to do. Again, it is well settled by long-standing Supreme Court precedent that there is <u>nothing wrong</u> with a public official catering to political supporters – so long as the official does not solicit or receive a personal payment as a quid pro quo for an agreement to take or refrain from taking an official act. *See McDonnell*, 136 S. Ct. at 2372; *McCormick*, 500 U.S. at 272-73. The government, however, repeatedly and forcefully asserted that the opposite is true, using inflammatory rhetoric that was designed to (and clearly did) lead the jury to return verdicts that did not reflect the evidence or the law.

These "persistently pejorative" and legally misleading comments clearly "led the jury away from the charges in the indictment," because the jury returned guilty verdicts despite the complete absence of evidence on several essential elements of the charged offenses as well as the Court's instructions on the law. It certainly cannot confidently be said that these repeated improper comments had <u>no</u> illegitimate effect on the jury's assessment of the evidence given that

the comments were designed to inflame and confuse the jury as to the legal standards at play; the government even went so far as to compare Mr. Brissette's efforts to avoid a picket on public property, without the use of threats or fear and without seeking or receiving any personal gain, to "a hostage situation" in which he held "a gun" to Crash Line's proverbial head. Tr., Day 12 (8/6/19) at 37:13-16, 38:7-8.

These were not closely contested factual issues; to the contrary, there was no evidence in support of multiple elements of the charged crimes, all of which leads to the inexorable conclusion that it was the government's misconduct that caused the jury to return verdicts of guilt. The Court should acquit Mr. Brissette (and Mr. Sullivan) outright because they are legally and factually innocent of these charges. At the very least, the Court should order a new trial where a jury can properly be instructed – and not misinformed, misled or inflamed by the government – as to the relevance, if any, of Mr. Brissette's title and office in light of the fact that he has <u>never</u> been charged with committing extortion under color of official right.

## II. A New Trial Must be Granted Because Other Aspects of the Government's Closing Arguments Were Unfairly Prejudicial and Contained Incorrect Statements of Law

1. <u>Incorrect Statement of the Law that a Violation of M.G.L. c. 268A Amounts to "Wrongful Conduct" Under the Hobbs Act</u>

The government also prejudicially argued during closing arguments that a violation of Massachusetts General Laws, Chapter 268A ("Chapter 268A"), § 23 could serve as evidence of "wrongfulness" under the Hobbs Act. *See, e.g.,* 7:16-18, 24:7-13. The government even presented the jury with a chalk of that statute despite the Supreme Court's repeated admonition that the Hobbs Act cannot be used to enforce "local standards of good government," and this Court's clear instruction to the jury that it was "not authorized by way of federal criminal law to enforce state or local codes of conduct or ethics." *See* dkt # 348 at 14.

"The Massachusetts Legislature originally enacted the conflict-of-interest law in 1962, as part of an effort to 'strike at corruption in public office, inequality of treatment of citizens and the use of public office for private gain.'" *O'Connor v. Spain*, 84 F. Supp. 3d 60, 68 (D. Mass. 2015) (citing *Everett Town Taxi, Inc. v. Bd. of Aldermen of Everett,* 366 Mass. 534, 536, 320 N.E.2d 896 (1974)) (emphasis added). Consistent with those origins, M.G.L. c. 268A, § 23(b)(2) states that no current officer or employee of a state, county, or municipal agency shall knowingly or with reason to know "use or attempt to use such official position to secure for such officer, employee or others unwarranted privileges or exemptions which are of substantial value and which are not properly available to similarly situated individuals." And M.G.L. c. 268A, § 23(b)(3) states that a municipal employee should avoid acting in manner that would cause a reasonable person, having knowledge of the relevant circumstances, to conclude that the employee can be improperly influenced "in the performance of his official duties."

There is no basis from which any factfinder could conclude that the defendants' conduct violated the state ethics law. The law was designed to regulate the solicitation or receipt of gifts or other things of monetary value to public employees and their relatives and friends, not to generally regulate their interactions with constituents. *See, e.g.,* 930 Code Mass. Reg. 5.01, 6.27. And even a violation of the state ethics law is not relevant to whether a defendant has committed Hobbs Act extortion. *See McDonnell*, 136 S. Ct. at 2373; *McCormick*, 500 U.S. at 272-73. That is certainly the case where, as here, the defendants have not been charged with soliciting or receiving anything of personal value to them, a loved one, or anyone even acquainted with them as a quid pro quo in exchange for taking an official act.

Given this, the government never should have been permitted to introduce the fact of M.G.L. c. 268A into evidence. And it certainly should not have used it to suggest to the jury that

the law had some relevance to the question of whether the defendants were guilty of the charged crimes. But that is exactly what the government did. Despite clear black letter law from the Supreme Court – and the Court's legal instructions to the jury – the government told the jury it could first find that Mr. Brissette's conduct violated Chapter 268A, and then use that "finding" to determine that the government carried its burden of proving "wrongfulness" under the Hobbs Act. *See* Tr., Day 12 (8/6/19) at 24:7-13.

In so doing, the government unjustly caused the jury to confuse a wholly unproven hypothetical ethical violation with the requisite criminal intent. Here again, it cannot confidently be said that improper argument had <u>no</u> illegitimate effect on the jury's assessment of the evidence, particularly in light of the fact that the government failed to identify <u>any</u> legitimate basis from which the jury could have found Mr. Brissette acted "wrongfully" beyond a reasonable doubt. Again, acquittal is the proper remedy but, at the very least, a new trial is needed to remedy the manifest injustice of the government's inflammatory and legally inaccurate argument on this essential element of the offense.

    2. <u>Incorrect Statement of the Law that City Could Not Require Union Labor</u>

The government asked at least ten witnesses whether City Hall required the use of union labor. By repeatedly asking this question throughout trial, the government caused unfair prejudice to Mr. Brissette by suggesting to the jury that any requirement that union workers be used on City Hall Plaza was inherently wrongful.

The NLRA, however, does not prohibit a City from requiring union labor as a condition for using its property, as the government recognized in its own proposed jury instructions. "When a State owns and manages property, for example, it must interact with private participants in the marketplace. In doing so, the State is not subject to pre-emption by the NLRA, because

pre-emption doctrines apply only to state regulation." *Bldng & Constr. Trades Council of Metro. Dist. v. Assoc. Bldr's & Contract'rs of Mass./R.I., Inc.*, 507 U.S. 218, 227 (1993).  For example, when the Massachusetts Water Resources Authority ("MWRA") acted in the role of a purchaser of construction services, and conditioned its purchasing agreement on a labor agreement which included, among other provisions, a requirement that all employees be subject to union-security provisions and be compelled to become union members within seven days of employment, the Supreme Court found that such action constituted permissible proprietary conduct. *Id.* at 232-33.

The City of Boston clearly acted as a proprietor with respect to its relationship with Crash Line.  Crash Line's ability to use City Hall Plaza was granted through the Irrevocable License Agreement – a document which Brian Appel repeatedly referred to as a "lease." *See e.g.*, Tr., Day 4 (7/25/19) at 52:7, 55:20-23, 56:14-15, 58:25-59:2, 61:4-18, 102:24-103:1, 106:2-4; Tr., Day 5 (7/26/19) at 23:13-20.  The City entered into that Agreement as the proprietor of City Hall Plaza. *See Sprint Spectrum L.P. v. Mills*, 283 F.3d 404, 420 (2nd Cir. 2002) (a school district's execution of a lease agreement was "plainly proprietary").  Indeed, Crash Line sought the contract with the City precisely <u>because</u> of the City's capacity as a property owner. *Accord id.* at 420-21.  And the terms of the agreement were tailored to the specialized needs associated with use of City Hall Plaza as evidenced by the fact that no city-wide regulations were alleged to be at issue. *See Chamber of Commerce of U.S. v. Brown*, 554 U.S. 60, 65 (2008) (*citing Wisconsin Dept. of Indus. v. Gould Inc.*, 475 U.S. 282, 291 (1986)); *see also Airline Service Providers Assoc. v. Los Angeles World Airports*, 873 F.3d 1074, 1082-84 (9th Cir. 2017) (emphasizing that the disputed contract provision was not enforced throughout the rest of the city and did not hamper any other service provider's operations).

The City of Boston was entitled to place the same restrictions on the use of its property as any other private property owner.  Therefore, <u>even if</u> Mr. Brissette or some other City employee had conditioned the use of City Hall Plaza on a requirement that Crash Line hire union labor, such action was not pre-empted by the NLRA.  *See Bldng & Constr. Trades Council of Metro. Dist. v. Assoc. Bldr's & Contract'rs of Mass./R.I., Inc., et al*, 507 U.S. 218, 233 (1993) (when the state acts in a proprietary capacity, the negotiating party is faced with a choice—it may alter its usual mode of operation to secure the business opportunity at hand, or seek business from others whose needs do not include the required labor agreement).

The government knew all of this – indeed, before trial commenced, the government actually requested a jury instruction informing the jury of this law.  After putting in its case, however, the government abruptly shifted gears and told the Court that it no longer intended to argue that the jury could find "wrongfulness" from any violation of the National Labor Relations Act.  The Court, taking the government at its word, thereafter removed the NLRA-related instructions from the final charge – including the following language:

> [T]he federal laws do not exclude city or state officials from requiring the use of qualified or licensed workers, government workers like firefighters or city inspectors, or workers receiving a higher wage or certain benefits.  They may do this even if in so doing they require the hiring of union members, such as police officers.  In addition, when state or local officials are acting as market participants with no interest in setting policy – for example, if they are acting as owners or managers of publicly owned property, interacting with private participants in the marketplace – they may require the hiring of union members without violating federal law.

*Compare* dkt # 337 at 21-22 *with* dkt # 348.  At closing argument, however, the government <u>expressly</u> argued that the City of Boston "could not require" Crash Line to use union labor.  *See* Tr., Day 12 (8/6/19) at 22:21-23:2, 24:1-6, 25:2-4, 26:22-27:2, 36:18-21, 96:20-97:4, 97:9-12.  Even more outrageous, when defense counsel requested that the Court add the above-quoted language back into the final charge as a result of that argument, both Assistant U.S. Attorneys

<u>denied</u> saying what the transcript now clearly reflects was in fact repeatedly said.  That misconduct, which drove the Court's decision not to further instruct the jury on the law, was clearly improper and warrants a new trial.

### 3. **Incorrect Statement of the Law that Local 11 Could Not Picket**

Through its questioning of Local 11's business manager, Colleen Glynn, the government also repeatedly insinuated that Local 11 could not lawfully have put up an area standards picket at the Boston Calling concert by misusing terms of art that are defined by law with that non-lawyer witness.  Although Ms. Glynn expressed some confusion as to the proper legal terminology  (leafletting demonstration versus area standards picket), she was not confused about the fact that Local 11 workers are permitted to demonstrate and protest an employer that Local 11 believes is not following area standards with regard to the workers they hire.  *See* Tr., Day 7 (7/30/19) at 18:13-19:4, 32:6-16, 33:1-10, 33:20-34:1; *see also* Exhibit 158 (5/19/14 email from C. Glynn stating "[t]he Boston Calling folks do not pay area standard wages & benefits" and "my Members are ready to protest" with "our 15' inflatable Rat"); Exhibit 159 (8/22/14 email from C. Glynn that "[i]f we do not hear something next week we will be preparing for an informational picket line/job action").

Nonetheless, in its questioning of Ms. Glynn, the government used her confusion about those legal terms of art to suggest that Local 11 could not have lawfully put up an area standards picket at the Boston Calling concert.  *See* Tr., Day 7 (7/30/19) at 18:13-19:9, 111:15-113:5.  That was another misstatement of law.  As set forth in Mr. Brissette's Supplemental Memorandum in Support of his Motion for Judgment of Acquittal, "area standards picketing," which is the term used by the National Labor Relations Board, is exactly what Ms. Glynn described Local 11 was planning to do at the September 2014 Boston Calling concert, and it is absolutely permissible

under the NLRA. *See* Sup. Mem. at 14. But having convinced the Court <u>not</u> to instruct the jury as to the NLRA, the government was then able to take advantage of Ms. Glynn's confusion as to the proper legal term. At closing, the government repeatedly and misleadingly told the jury that the "picket" was not permitted by law. *See, e.g.,* Tr., Day 12 (8/6/19) at 30:13-15, 30:22-25, 31:2-4, 31:10-14, 90:2-6.

That conduct – coupled with the other misstatements of law and fact described herein – were improper because it leant a false credence to the government's claim that the defendants "made up" the fact that Local 11 was planning on picketing the concert despite the somewhat ironic fact that there was absolutely no evidence to support that claim and a wealth of evidence – including contemporary writings by Ms. Glynn and the testimony of each of the Crash Line witnesses – that proved otherwise. A new trial is warranted on this ground as well.

### 4. Other Inaccurate Statements of Fact and Law

The government's closing argument consisted of a hodgepodge of other misconduct as well. For example, the government advised the jury that it "did not matter" if the jury found that Crash Line's representatives "might not have thought" Mr. Brissette was "out to harm them." *See, e.g.,* Tr., Day 12 (8/6/19) at 15:2-7. That statement directly contradicts *United States v. Capo*, 817 F.2d 947, 951 (2nd Cir. 1987), which held that wrongful use of fear of economic harm requires, in relevant part, proof "that the victim reasonably believed: first, that the defendant had the power to harm the victim, and second, that the defendant <u>would exploit that power to the victim's detriment</u>" (emphasis added).

The government also told the jury that it could ignore the absence of testimony by anyone associated with Crash Line that Mr. Brissette conveyed an implied threat. Specifically, the government argued that "even if all the defendants said was that there would be a picket and a

rat," it was reasonable for Crash Line to take that as a threat, *see, e.g.,* Tr., Day 12 (8/6/19) at 14:4-25 – despite the fact that Mr. Appel and Mr. Snow both affirmatively testified that they had <u>not</u> been threatened by Mr. Brissette.  Indeed, the government went so far as to suggest that the jury could excuse the absence of any testimony that Crash Line was threatened by Mr. Brissette at any point in time because "Crash Line still has to appear at the Special Events meeting," *see* Tr., Day 12 (8/6/19) at 8-15, thereby insinuating some sort of ongoing, unspoken, and uncharged intimidation despite the fact that there is absolutely no basis in the evidence for such an argument and despite the government's understanding that proof of an implied threat is legally required to convict Mr. Brissette.

At still other points in the closing argument, the government simply manufactured evidence that was not in the record.  For example, the government asked "[I]f . . . Ken Brissette didn't have the authority [over Crash Line's permits] why is Patricia Malone and Joyce Linehan and Commissioner Evans and Appel and Snow all checking in with Ken Brissette?"  *See id.* at 17:10-13.  But Ms. Malone, Ms. Linehan and then-Commissioner Evans all testified they had <u>no</u> conversations with Mr. Brissette about Crash Line's permits at any time – as did Mr. Appel himself.  *See* Tr., Day 11 (8/5/19) (Malone Testimony) at 36:21-24; Tr., Day 8 (7/31/19) (Linehan Testimony) at 162:4-163:16; Evans Dep., (7/31/19) at 37:11-22, 50:18-21; Tr., Day 5 (7/26/19) (Appel Testimony) at 135:5-7, 21-24.

The government also asserted that Colleen Glynn testified that she did not tell either defendant that Local 11 members wanted to picket when in fact Ms. Glynn testified on direct examination that while she did not think she used the word "picket," she did tell Mr. Sullivan that Local 11 members "were very angry and upset about what was going on at Boston Calling" and that they were "chomping at the bit."  *See* Tr., Day 6, 7/29/19 at 17:14-18:4.  Ms. Glynn also

testified on cross-examination, after being refreshed with her grand jury testimony, that in fact she "may have" told Mr. Sullivan that Local 11 was planning to protest the September 2014 Boston Calling concert.  *See* Tr., Day 7 (7/30/19) at 77:2-78:8, 96:21-97:11.

These improper arguments, when combined with the government's unconstitutional theory of criminality and the dearth of evidence as to multiple essential elements, add fuel to the unjust fire that is this prosecution.  Again, acquittal is the true remedy, but a new trial is at a minimum required.

**III.   A New Trial Must be Granted Because of the Improper Admission of Top Chef Evidence**

Finally, a new trial is warranted because the evidence related to the wholly separate issues that arose between the producers of the Top Chef reality show and Teamsters Local 25 unfairly prejudiced Mr. Brissette.  The Court permitted the government to present evidence pertaining to Top Chef in light of the government's argument that the evidence was relevant for the limited purpose of assessing Mr. Brissette's knowledge and intent – and specifically why Mr. Brissette did not explicitly threaten Crash Line's permits.  But a necessary predicate to the government's argument was the assumption that it would introduce some evidence that Mr. Brissette threatened Crash Line's permits in some way.

In fact, at trial, the undisputed evidence was that Mr. Brissette did absolutely nothing with regard to Crash Line's permits.  Mr. Appel testified extensively about permit-related issues that were raised by the Boston Police Department and Patricia Malone (both of whom had actual sign off authority on Crash Line's permits, whereas Mr. Brissette did not) but did not recall specifically mentioning those issues to Mr. Brissette.  *See* Tr., Day 4 (7/25/19) at 131:13-17. Mr. Appel also testified that he "wasn't exactly sure that either of them [Mr. Brissette or Mr. Sullivan] had direct oversight of our licenses or permits," and that he was "generally" concerned

16

about the permits during the September 2, 2014 meeting with Mr. Brissette because "City Hall was my landlord for this event, Ken works in City Hall, the permits were issued by City Hall." *Id.* at 144:11-19. Mr. Appel did not believe Mr. Brissette had anything to do with Crash Line's permits, and there were "no discussions at all about either permits or liquor licenses or anything else" when Mr. Appel was "in Mr. Brissette's presence." *See* Tr., Day 5 (7/26/19) at 109:15-23, 135:21-136:2. And Mr. Appel did not believe, then or now, that Mr. Brissette did anything to "obstruct or delay or in any way impact the liquor license that Crash Line received for that September concert." *Id.* at 110:11-23.

Consistent with Mr. Appel's testimony, Patricia Malone and then-Commissioner Evans testified that they – and not Mr. Brissette – had the authority to set conditions on Crash Line's permits. They further testified that they were not willing to issue the permits Crash Line requested due to public safety concerns and specifically the lengthy alcohol service Crash Line wanted; that they therefore placed conditions on Crash Line's permits they were within their authority to impose; that they never spoke with Mr. Brissette about Crash Line's permits; and that they did not know or care who Crash Line employed to work at the Boston Calling concerts. *See* Evans Dep., (7/31/19) at 37:11-22, 50:18-21; Tr., Day 11 (8/5/19) at 36:21-39:10**.**

Given that testimony, there was no justification for admitting the Top Chef-related evidence into this trial other than to confuse the jury. And sure enough, during closing argument, the government argued not that the Top Chef evidence showed Mr. Brissette "knew" he could not revoke permits, which was the basis for its admission, but rather, that he was not allowed to "use his leverage to try and obtain jobs for the union." *See* Tr., Day 12 (8/6/19) at 25:12-26:6, 26:22-27:2 Not only was that a misleading and inaccurate statement of the law, *see* Part II(2), *supra.*, it had nothing to do with the purported limited purpose for admitting the Top

Chef evidence in the first place.  In fact, the government even went so far as to suggest that the jury <u>ought</u> to use the Top Chef evidence as proof that Mr. Brissette extorted Crash Line.  *See* Tr., Day 12 (8/6/19) at 26:14-16.

Here again, the government's argument was manifestly contrary to both law and fact, as well as this Court's prior rulings, and served only to distract the jury from the government's failure to muster both a constitutionally acceptable theory of criminality and the evidence to prove it.  A new trial is required at a minimum to remedy the manifest injustice of this case.

## CONCLUSION

The verdicts in this case constitute a miscarriage of justice and are wholly unsupported by the evidence presented at trial.  For these reasons, as well as the numerous grounds outlined in the Rule 29 papers, Mr. Brissette should be acquitted of all charges against him.  At the very least, the interests of justice require that he be granted a new trial.

    Respectfully submitted,

    KENNETH BRISSETTE,
    By his attorneys,

    */s/ William H. Kettlewell*
    */s/ Sara E. Silva*
    <u>*/s/ Courtney Caruso*</u>
    William H. Kettlewell (BBO #270320)
    Sara E. Silva (BBO #645293)
    Courtney A. Caruso (BBO #687642)
    HOGAN LOVELLS US LLP
    100 High Street, 20th Floor
    Boston, MA 02110
    (617) 371-1000
    (617) 371-1037 (fax)
    bill.kettlewell@hoganlovells.com
    sara.silva@hoganlovells.com
    courtney.caruso@hoganlovells.com

Dated:  August 21, 2019